UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

THE REPUBLIC OF COLOMBIA,
acting on its own behalf and on behalf of the
DEPARTMENTS it has power to represent, and the
DEPARTMENT OF AMAZONAS, DEPARTMENT OF ANTIOQUIA,
DEPARTMENT OF ARAUCA, DEPARTMENT OF ATLANTICO,
DEPARTMENT OF CALDAS, DEPARTMENT OF CAQUETA,
DEPARTMENT OF CHOCO, DEPARTMENT OF CORDOBA,
DEPARTMENT OF CUNDINAMARCA, DEPARTMENT OF GUAVIARE,
DEPARTMENT OF HUILA, DEPARTMENT OF PUTUMAYO,
DEPARTMENT OF SANTANDER, DEPARTMENT OF SUCRE,
DEPARTMENT OF TOLIMA, DEPARTMENT OF VALLE DEL CAUCA,
DEPARTMENT OF VICHADA and BOGOTA, Capital District,
individually,

       Plaintiffs,

                       AMENDED COMPLAINT
                       Case No: CV 04-4372-Garaufis

- against -

DIAGEO NORTH AMERICA INC., f/k/a
Guinness UDV North America, Inc., f/k/a
UDV North America Inc., f/k/a as IDV North
America Inc., f/k/a Hueblein, Inc.,
UNITED DISTILLERS MANUFACTURING INC.,
DIAGEO PLC, SEAGRAM EXPORT SALES COMPANY INC.,
PERNOD RICARD USA LLC., and PERNOD-RICARD S.A.

       Defendants.
_____

TABLE OF CONTENTS

I. INTRODUCTION............................................... 1

II. PARTIES................................................... 7

III. JURISDICTION............................................ 11

IV. VENUE................................................... 11

V. THE MARKET FOR LIQUOR IN COLOMBIA: AN OVERVIEW............ 12

VI. ALLEGATIONS COMMON TO ALL DEFENDANTS.................... 16

    *1. Defendants' Direction and Control of the Money-*
*Laundering Scheme*........................................ 32

    *2. Money Laundering by the DIAGEO/UDV DEFENDANTS, the*
*SEAGRAM DEFENDANTS, and the PERNOD RICARD DEFENDANTS,*
*through the MANSUR GROUP*................................. 34

    *3. Money Laundering by the DIAGEO/UDV DEFENDANTS, the*
*SEAGRAM DEFENDANTS and the PERNOD RICARD DEFENDANTS through*
*ROY and MILTON HARMS*..................................... 38

    *4. Satuma Brands*....................................... 45

    *5. Operation "Golden Trash"*............................ 46

VII. DEFENDANTS' JOINT EFFORTS TO DECEIVE THE PLAINTIFFS...... 53

    *The Colombian Association of Importers of Liquor and Wines*
*(ACODIL)*................................................. 53

VIII. ALLEGATIONS AS TO INDIVIDUAL DEFENDANT GROUPS.......... 56

i

*1. DIAGEO/UDV's Direct Involvement in Money Laundering and Organized Crime*........................................... 56

*2. Seagram's Direct Involvement in Money Laundering and Organized Crime*........................................... 60

*3. DIAGEO DEFENDANTS' and PERNOD RICARD DEFENDANTS' Purchase of SEAGRAM Assets*.............................. 70

*4. Pernod Ricard's Direct Involvement in Money Laundering and Organized Crime*.................................... 73

IX. ADDITIONAL ALLEGATIONS AS TO ALL DEFENDANTS.............. 77

*1. Travel and Entertainment by Defendants' Employees*..... 77

*2. The DEFENDANTS' Purchase of Colombian Importers*....... 78

*3. External Affairs*...................................... 80

*4. Defendants' Responsibility for their Agents, Employees, and Coconspirators*...................................... 82

*5. Defendants' Use of Wires and Mails*................... 83

X. RELATIONSHIP BETWEEN NARCOTICS TRAFFICKING AND TERRORISM IN COLOMBIA.................................................... 87

XI. IMPACT OF THE MONEY-LAUNDERING SCHEME ON THE UNITED STATES, THE REPUBLIC OF COLOMBIA, AND THE STATE OF NEW YORK.......... 89

XII. MONEY LAUNDERING THROUGH THE EASTERN DISTRICT OF NEW YORK. ............................................................ 93

XIII. CONTINUING DAMAGE TO THE PLAINTIFFS AND COMPELLING NEED

FOR INJUNCTIVE AND EQUITABLE RELIEF.......................... 102

COUNT I (AS TO ALL DEFENDANTS) (RICO, 18 U.S.C. § 1962(a))... 124

COUNT II (AS TO ALL DEFENDANTS) (RICO, 18 U.S.C. § 1962(b)).. 143

COUNT III (AS TO ALL DEFENDANTS)(RICO 18 U.S.C. § 1962(c))... 145

COUNT IV (AS TO ALL DEFENDANTS)(RICO, 18 U.S.C. § 1962(d))... 147

COUNT V (AS TO ALL DEFENDANTS)(RICO, 18 U.S.C. §§ 1964(a),

1964(c), 28 U.S.C. § (a))................................... 150

COUNT VI (AS TO ALL DEFENDANTS)(COMMOND LAW FRAUD)........... 153

COUNT VII (AS TO ALL DEFENDANTS)(PUBLIC NUISANCE)............ 157

COUNT VIII (AS TO ALL DEFENDANTS)(UNJUST ENRICHMENT)......... 162

COUNT IX (AS TO ALL DEFENDANTS)(NEGLIGENCE).................. 165

COUNT X (AS TO ALL DEFENDANTS)(NEGLIGENT MISREPRESENTATION).. 169

COUNT XI (AS TO ALL DEFENDANTWS)(COMMON LAW CONVERSION)...... 172

COUNT XII (AS TO ALL DEFENDANTS)(MONEY HAD AND RECEIVED)..... 174

DEMAND FOR JUDGMENT......................................... 176

............................................................

PLAINTIFFS, REPUBLIC OF COLOMBIA, acting on its own behalf and on behalf of the DEPARTMENTS it has the power to represent, and the DEPARTMENT OF AMAZONAS, DEPARTMENT OF ANTIOQUIA, DEPARTMENT OF ARAUCA, DEPARTMENT OF ATLANTICO, DEPARTMENT OF CALDAS, DEPARTMENT OF CAQUETA, DEPARTMENT OF CHOCO, DEPARTMENT OF CORDOBA, DEPARTMENT OF CUNDINAMARCA, DEPARTMENT OF GUAVIARE, DEPARTMENT OF HUILA, DEPARTMENT OF PUTUMAYO, DEPARTMENT OF SANTANDER, DEPARTMENT OF SUCRE, DEPARTMENT OF TOLIMA, DEPARTMENT OF VALLE DEL CAUCA, DEPARTMENT OF VICHADA and BOGOTA, Capital District, individually,, (collectively referred to as "THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA", and, with the REPUBLIC OF COLOMBIA, the "PLAINTIFFS"), by and through the undersigned attorneys, for their complaint against Defendants, allege as follows:


I. INTRODUCTION


1.   The Departments of the Republic of Colombia hold a constitutional monopoly on the domestic manufacture and sale of liquor products.  Certain Departments operate one or more major liquor manufacturing facilities in Colombia.  Most of the other Departments, sell and distribute liquor products, both

made by the other Departments and those which are legally imported into the Republic of Colombia.  By virtue of the aforesaid activities, the Departments of the Republic of Colombia are by far the largest sellers and producers of liquor products within the Republic of Colombia.  As such, they have the largest financial stake in this business and are the most harmed by illegal competition.  But for the acts of the DEFENDANTS described below, the Departments of the Republic of Colombia would enjoy a majority ownership interest in the liquor sales and distribution business in the Republic of Colombia. However, as a result of the actions of the DEFENDANTS, as set forth more fully below, the Departments, and the Republic of Colombia, have experienced a catastrophic reduction in their business and have lost money and property as a result.

2.  For more than a decade, the SEAGRAM DEFENDANTS (described below), the DIAGEO/UDV DEFENDANTS (described below),and the PERNOD RICARD DEFENDANTS (described below), have directed, managed, and controlled a criminal scheme to compete unfairly with the PLAINTIFFS by knowingly selling their products into illegal channels and receiving payment in the form of laundered proceeds from narcotics sales and other criminal activities to gain a competitive advantage over the PLAINTIFFS,

to cheat them out of their legitimate business, to monopolize markets, including the import market into the United States, and to unlawfully control prices in the markets in which the DEFENDANTS compete with the PLAINTIFFS.  The DEFENDANTS carry out their massive scheme through a variety of activities, including but not limited to money-laundering operations that extend within and/or directly damage the PLAINTIFFS and the business operations of the PLAINTIFFS.  The DEFENDANTS have systematically acted to defraud the PLAINTIFFS via numerous wire fraud schemes, causing significant injury to the business of the PLAINTIFFS.  The DEFENDANTS have engaged in and facilitated organized crime by laundering the proceeds of narcotics trafficking, terrorism, and other crimes.

3.    The members of this vertical group, consisting of the DEFENDANTS, the distributors, the shippers, the criminal customers, currency brokers, and the DEFENDANTS' agents and subsidiaries who receive payment for the liquor products, work together for the common purpose of depriving PLAINTIFFS of money and property and engaging in a course of conduct to gain massive profits from the sale of liquor products as a part of a global money-laundering enterprise while harming PLAINTIFFS' business and other economic interests.  The activities of this core group

constitute a conspiracy in law and in fact.

4.   The DEFENDANTS knowingly sell their products to organized crime, arrange for secret payments from organized crime, and launder such proceeds in the United States or offshore venues known for bank secrecy.  DEFENDANTS have routinely laundered the illegal proceeds of Colombian organized crime through financial institutions in New York City.

5. By engaging in this illegal conduct the DEFENDANTS have achieved multiple benefits for themselves, including but not limited to the following:

a. The DEFENDANTS have obtained a significant business advantage over their competitors, including the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA by illegally distributing liquor with illegal labeling, having full and complete knowledge that such illegal distribution of liquor products bearing illegal labels would appeal to their customers and make their products more competitive and attractive to their customers.

b. The DEFENDANTS have increased their liquor product sales because they have new and additional customers, namely, the money-launderers and the criminal organizations they service.

c. The DEFENDANTS have increased their profit margins because they require the criminals to pay a premium for their liquor products and/or subject the criminals to sales and credit terms that are more favorable to the DEFENDANTS than those granted to legitimate customers.

d. The DEFENDANTS have increased their market share by adding to their customer base to the detriment of their competitors, including the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

e. The DEFENDANTS have enhanced the market value of their liquor operations, while decreasing the market value of their competitors' operations.

f. The DEFENDANTS have obtained a significant business advantage over their competitors, including the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA by price fixing and manipulation.

6.    The DEFENDANTS have, at the highest corporate level, determined that it will be a part of their operating business plan to sell their liquor products to and through criminal organizations and to accept criminal proceeds in payment by secret and surreptitious means, which under United States law constitutes money laundering.  The officers and

directors of the DEFENDANTS facilitated this overarching money-laundering scheme by restructuring the corporate structure of the DEFENDANTS, to direct and implement their money-laundering schemes and to assist in the avoidance of detection by U.S. and Colombian law enforcement.  This overarching scheme to establish a corporate structure and business plan to sell liquor products to criminals and to launder criminal proceeds was implemented through many subsidiary schemes within THE REPUBLIC OF COLOMBIA.

7.   This civil action is based upon violations of the Racketeer Influenced and Corrupt Organizations Act, which was specifically intended by Congress to eradicate organized crime on all fronts (including in foreign and interstate commerce) and to deprive violators of their ill-gotten gains.  It is also based upon violations of standards of common law, including fraud, negligence, unjust enrichment, public nuisance, and conspiracy to commit such torts. PLAINTIFFS seek damages; equitable relief such as disgorgement of profits; and injunctive relief (a) to enjoin DEFENDANTS from engaging in money laundering and facilitating organized crime, and (b) to compel DEFENDANTS to adopt necessary programs and procedures to prevent such conduct in the future.  Absent such relief, there will be an increased risk to national security, continued harm to

PLAINTIFFS, and damage to the vital interests of the United
States and PLAINTIFFS.


## II. PARTIES


8.   The REPUBLIC OF COLOMBIA is a sovereign state.
The DEPARMENTS OF THE REPUBLIC OF COLOMBIA are autonomous
political subdivisions of the REPUBLIC OF COLOMBIA.   As such,
each possesses the legal capacity to acquire, own, or dispose of
property and may be a party to legal proceedings.   Each is a
"person" as defined under the applicable United States law.
Each has the right to hold a legal or beneficial interest in
property.

9.   Each of THE DEPARTMENTS OF THE REPUBLIC OF
COLOMBIA and BOGOTA, CAPITAL DISTRICT, has rights and
responsibilities comparable to that of a state of the United
States.   Among the legal rights of THE DEPARTMENTS OF THE
REPUBLIC OF COLOMBIA is the right to hold a legal or beneficial
interest in property and receive money arising from the
manufacture and distribution of liquor products in the Republic
of Colombia.

10.  By law, the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA are entitled to own and operate companies that manufacturer, distribute, and sell liquor throughout Colombia and for export to other nations, including the United States. The DEPARTMENTS OF THE REPUBLIC OF COLOMBIA derive a substantial amount of money from the manufacturer, distribution, and sale of liquor within and outside the Republic of Colombia and the United States. Income earned from a DEPARTMENT'S liquor sales constitutes a significant share of the total income of the DEPARTMENT.

11.  DEFENDANT DIAGEO NORTH AMERICA is a Connecticut corporation authorized to do business in the State of New York, and was formerly known as Guinness UDV North America, Inc., and prior to that was formerly known as UDV North America Inc., prior to that was formerly known as IDV North America Inc., and prior to that was known as Heublein, Inc. DIAGEO NORTH AMERICA INC., has its principal place of business at 6 Landmark Sq. Stamford, CT 06901-2704.

12.  DEFENDANT UNITED DISTILLERS MANUFACTURING is a Delaware corporation authorized to do business in the State of New York.  Its principle place of business is located at 6 LANDMARK SQUARE STAMFORD, CONNECTICUT 06901.

13.   DEFENDANT DIAGEO PLC. was and is a British corporation which is engaged in substantial and not isolated activity within this State and which in 1997 purchased the above-described UNITED DISTILLERS entities.  Its main offices are located at 8 Henrietta Place London, EN W1G 0.  Hereinafter the above described DIAGEO, UNITED DISTILLERS (UD), UNITED DISTILLERS & VINTNERS (UDV), and all related affiliate and subsidiary entities will be referred to as DIAGEO/UDV DEFENDANTS.

14.   DEFENDANT SEAGRAM EXPORT SALES CO., INC., d/b/a Seagram Overseas Sales Co., Inc., is a New York corporation with offices located at 375 Park Avenue, New York, New York, 10152-0192. DEFENDANT SEAGRAM EXPORT SALES CO., INC., is currently owned by the DIAGEO DEFENDANTS.  Over the years, the export division of SEAGRAM'S exporting entity has done business under a variety of names, including Seagram Overseas Sales Co., Inc., Seagram Global Markets Group, and SEAGRAM EXPORT SALES CO., INC. For the purposes of this complaint, DEFENDANT SEAGRAM EXPORT SALES CO., INC., SEAGRAM OVERSEAS SALES CO., INC., SEAGRAM GLOBAL MARKETS GROUP, and all other related entities will be referred to as the SEAGRAM DEFENDANTS.  Additionally, in December 2001, DEFENDANTS PERNOD RICARD S.A., and DIAGEO Plc.,

purchased SEAGRAM entities, brands and assets.  Some of the original SEAGRAM entities went to DIAGEO, while others went to PERNOD RICARD and other companies.  Hereinafter, the SEAGRAM entities that are now owned by PERNOD-RICARD and DIAGEO will be referred to as the SEAGRAM DEFENDANTS.

15.  DEFENDANT PERNOD RICARD USA, LLC, is an Indiana corporation authorized to do business in the State of New York. Its principal place of business is located at 777 WESTCHESTER AVENUE, WHITE PLAINS, NEW YORK 10604.

16.  DEFENDANT PERNOD-RICARD S.A. is a French multinational corporation that is engaged in substantial and not isolated activity within this State. Its principal place of business is located at 12 place des Etats-Unis, 757 Paris Cedex 16, France. During the 1990's, PERNOD RICARD emerged at the head of the one of the world's largest international distilled spirits manufacturing and distribution concerns.  Consolidation within the industry, along with purchases of significant SEAGRAM whisky assets, further enhanced PERNOD RICARDS position as an industry leader.  Currently, PERNOD RICARD is the world's second largest international alcoholic beverage manufacturer, producing such well-known brands as Chivas Regal and Glenlivit scotch whiskies, and many world-renowned specialty drinks such as

10

Dubonnet and Martell.  Hereinafter the above described Pernod
Ricard USA LLC and Pernod-Ricard S.A. will be referred to as the
PERNOD RICARD DEFENDANTS.

### III. JURISDICTION

17.  As to all the PLAINTIFFS, jurisdiction is proper
in this Court pursuant to 28 U.S.C. §§ 1331, 1337 because this
matter involves allegations of illegal behavior arising under
the laws of the United States, including violations of RICO.
Furthermore, jurisdiction in this Court is proper pursuant to
RICO, 18 U.S.C. §§ 1964(a),(c) and 28 U.S.C. § 1651(a).  The
DEFENDANTS are "persons" within the meaning of 18 U.S.C. §
1961(3).  The PLAINTIFFS are "persons" within the meaning of 18
U.S.C. § 1961(3).  Finally, this Court may exercise jurisdiction
over PLAINTIFFS' non-federal claims pursuant to 28 U.S.C. §
1367.

### IV. VENUE

18.  Venue is proper in this Court pursuant to 18
U.S.C. § 1965(a) because DEFENDANTS reside, are found, have an
agent, or transact affairs in this District.  Venue is also

proper in this Court pursuant to 18 U.S.C. § 1965(b) because, to the extent any DEFENDANT may reside outside of this district, the ends of justice require such DEFENDANT or DEFENDANTS to be brought before the Court.  Venue also properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(2), 28 U.S.C. § 1391(b)(3) and/or 28 U.S.C. § 1391(d).  Further, certain of the conspiratorial acts alleged herein took place within this judicial district.

## V. THE MARKET FOR LIQUOR IN COLOMBIA: AN OVERVIEW

19.  The Colombian market for liquor products (excluding beer and wine) in 2002 was 13.2 million cases, down from 15.5 million cases in 1995.  This total liquor market is divided into eight product categories:

        (a)   whisky,

        (b)   vodka,

        (c)   gin,

        (d)   brandy/cognac,

        (e)   rum,

        (f)   tequila,

        (g)   aguardiente, and

(h)   Various.

20.   On the manufacturer side, the market is divided
into 2 segments, domestic and foreign producers.  On the
domestic side, the Colombian Departments themselves hold a
constitutional monopoly on the domestic manufacture and sale of
certain liquor products, such as aguardiente.  However, the
market has long been open to competition from foreign
manufacturers, which import their liquor products into Colombia.
In broad terms, the liquor products manufactured in Colombia (by
the Colombian Departments) are rum and the traditional
aguardiente.  While production and sales have plummeted 32.1%
(down from 10.6 million cases in 1995 to 7.2 million cases in
2002), aguardiente is still by far the volume leader, holding a
total combined share of 54.7% the total Colombian market for
liquor products. However, this is down significantly from 1995,
when aguardiente's total combined share was 68.3% of the total
Colombian market for liquor products, and is a direct and
intended result of the DEFENDANTS' illegal distribution schemes.

21.   As to rum, the other product category in which
the DEPARTMENTS principally compete, the total market size for
rum in Colombia has grown 20% over the past decade (reaching 3.1
million cases in 2002, up from 2.5 million in 1995) Imported rum

13

has increased 288.9% due to the inroads made by the DEFENDANTS'
illegal distribution schemes.

22.   In fact, the entire Colombian market has seen the
effects of the DEFENDANTS' illegal distribution schemes.   The
market has changed substantially since 1995, with import volume
(manufactured by the DEFENDANTS) rising steadily at the expense
of domestic items such as aguardiente, (manufactured by the
DEPARTMENTS):

|  | 1995 | | 2002 | | |
| --- | --- | --- | --- | --- | --- |
| Category | volume | % of market | volume | % of market | Market Share Variation |
| Whiskey | 1,197,116 | 7.71 | 1,156,750 | 8.74 | +13.4 |
| Vodka | 147,871 | 0.95 | 130,595 | 0.99 | +3.7 |
| Gin | 33,188 | 0.21 | 13,000 | 0.10 | -54.0 |
| Brandy/cognac | 899,366 | 5.79 | 797,750 | 6.03 | +4.1 |
| Rum | 2,501,266 | 16.10 | 3,080,739 | 23.28 | +44.6 |
| Tequila | 18,500 | 0.12 | 41,000 | 0.31 | +160.2 |
| Aguardiente | 10,608,295 | 68.29 | 7,234,833 | 54.68 | -19.9 |
| Various | 129,500 | 0.83 | 777,590 | 5.88 | +705 |

23.  Viewed individually, the amounts of liquor

products distributed illegally in Colombia varies greatly from category to category:

| Category | Domestic Production | Formal Imports | Illegal Imports | Total market | % of total imports distributed illegally |
|---|---|---|---|---|---|
| Whiskey | 82,000 | 126,825 | 947,925 | 1,156,750 | 88.2 |
| Vodka | 40,000 | 30,124 | 60,471 | 130,595 | 66.75 |
| Gin | 4,000 | 3,089 | 5,911 | 13,000 | 65.68 |
| Brandy/Cognac | 772,000 | 13,402 | 12,348 | 797,750 | 47.95 |
| Rum | 2,949,959 | 41,514 | 89,266 | 3,080,739 | 68.26 |
| Tequila | 0 | 5,741 | 35,259 | 41,000 | 86.0 |
| Aguardiente | 7,234,833 | 0 | 0 | 7,234,833 | 0 |
| Various | 623,000 | 154,590 | Not av. | +777,590 | Not av. |

24.  As the chart above shows:

- 88.2% of all imported whiskey is distributed illegally;

- 66.75% of all imported vodka is distributed illegally;

- 65.66% of all imported gin is distributed illegally;

- 47.95% of all imported Brandy/cognac is distributed illegally;

- 68.26% of all imported rum is distributed illegally; and,

- 86% of all imported tequila is distributed

15

illegally.

25.  In the face of such illegal and unfair competition, as is the design and purpose of the DEFENDANTS' scheme, it is impossible for legitimate domestic manufacturers to produce and compete freely.

## VI. ALLEGATIONS COMMON TO ALL DEFENDANTS

26.  Although the DEFENDANTS were and are separate corporate groups and were at times competitors with each other in their illegal distribution and money-laundering schemes, they were well aware of each other's activities, copied each other's strategies when they were  successful, and in most cases utilized the same distributors to conduct their illegal sales. For example, the DIAGEO/UDV DEFENDANTS, the SEAGRAM DEFENDANTS, and the PERNOD RICARD DEFENDANTS, all sold their products illegally through the various Mansur family companies, including but not limited to MANSUR TRADING FREEZONE, MANIMEX, MARLEX and TRANSIMEX.  Also, the DIAGEO/UDV DEFENDANTS, the SEAGRAM DEFENDANTS, and the PERNOD RICARD DEFENDANTS, all sold their products illegally through ROMAR Trading Freezone, owned and operated by Roy Harms and his son, Milton Harms.  Accordingly,

16

for the allegations in this complaint, many of the activities of the DEFENDANT groups were virtually identical.  Common elements of their illegal distribution and money-laundering schemes are set forth below.

27.  All the DEFENDANTS share the common goal of increasing their market share in Colombia by selling their products through illegal means.  Those illegal mechanisms include the following:

(a)  The DEFENDANTS created a circuitous and clandestine distribution chain so as to sell their liquor to criminal organizations and to receive payment for their products with criminal proceeds while at the same time concealing their activities from Colombian and U.S. law enforcement.  The intermediaries in such a circuitous distribution chain are known to law enforcement officials as "cut outs".  The use of multiple intermediaries to conceal money laundering is known as "layering".  The decision to establish and maintain this distribution chain was made at the highest executive levels of the DEFENDANTS.

(b)  The DEFENDANTS and their co-conspirators used multiple companies as cut outs through which to funnel the money laundering proceeds.  These companies included, but were

17

not limited to ROMAR, MANSUR TRADING FREEZONE, MANIMEX, TRANSIMEX, MARLEX, LITANI, MITANI, RUNAM HOLDINGS, DOUBLETREE INVESTMENTS, CARDDGAME, LTD, and LICORES ARUBA.

          (c)  An example of how laundered narcotics proceeds are used to pay the DEFENDANTS for their liquor products is as follows: A Colombian narcotics trafficking organization makes use of "smurfs" to process bulk cash located in the United States into numerous bank accounts located in the United States and frequently in this District.  These bank accounts have been opened by the "smurfs" in multiple locations. The purpose is to allow each "smurf' to continually deposit amounts of cash narcotics proceeds into these accounts to build up the balances in these accounts.  Each deposit is structured so as to be well below the threshold for suspicious or cash transactions.  The key to the "smurf" system is the use of a lot of accounts – and a lot of "smurfs".  Checks are then drawn on these accounts – which represent narcotics proceeds – and these checks are then exchanged by Colombian criminal organizations for liquor products manufactured by the DEFENDANTS.  Examples of such transactions include the following:

          (i)  On Oct. 23, 1991, "Olga L. Martinez", from Jackson Heights, New York, wrote a check for $6,000.00 on

her account # x8060 located at the Korea First Bank of New York, Jackson Heights branch, located at 78-14 Roosevelt Avenue, Jackson Heights, New York 11371.  The payee was left blank.  The check was smuggled into Colombia and on October 30, 1991, was picked up in Maicao Colombia, by José M. Martino, on behalf of TRANSIMEX, which was, at that time, a distributor for the DIAGEO/UDV DEFENDANTS, the SEAGRAM DEFENDANTS, and the PERNOD RICARD DEFENDANTS.  Thereafter, the check was smuggled out of Colombia by Mr. Martino, stamped as payable to TRANSIMEX, and on November 4th, 1991, was smuggled out of Maracaibo, Venezuela to Aruba by plane.  On November 27, 1991, it was deposited by TRANSIMEX into Account xxxxxxxxx1583, located at INTERBANK in Orangestad, Aruba. These proceeds were then co-mingled with other similarly derived funds and paid to one or more of the DEFENDANTS in payment for their liquor products.

(ii) On Oct. 23, 1991, "Angel Alvaro" wrote a check for $6,000.00 on his account # xxxx0513, located at Banco Central of New York, located at 76-03 Broadway, Elmhurst, New York 11373.  The payee was left blank.  The check was smuggled into Colombia and followed the same path as described above.

(iii) On Oct. 23, 1991, "Dolly Perez" wrote

19

a check for $6,000.00 on her account # xxxx2216, located at
First Federal, Elmhurst Branch, located at 76 Broadway,
Elmhurst, New York 11373.  The payee was left blank.  The check
was smuggled into Colombia and followed the same path as
described above.

        (iv) On Oct. 23, 1991, "Enrique Camacho"
wrote a check for $6,000.00 on his account # xxxxxxxxx9465,
located at Manufacturers Hanover Bank, located at 37-29 Junction
Boulevard, Corona, New York 11365.  The payee was left blank.
The check was smuggled into Colombia and followed the same path
as described above.

        (v)  On Oct. 23, 1991, "Enrique Camacho"
wrote a check for $6,000.00 on his account # xxxx0513, located
at Banco Central of New York, located at 76-03 Broadway,
Elmhurst, New York 11373.  The payee was left blank.  The check
was smuggled into Colombia and followed the same path as
described above.

Money gathered in this way from the criminal organizations was
continuously deposited into the TRANSIMEX bank accounts where it
was commingled with other criminal proceeds and other funds and
then transferred to each of the DEFENDANTS or their agents.
All of the Mansur group and Romar group entities operated in

virtually the same manner as described in the example above.
Money from these intermediary accounts was then forwarded to
each of the DEFENDANTS.

(d)   Hundreds of thousands of checks such as
these were processed in this way.  In each and every case, the
person writing the check was completely isolated from the
underlying transaction – and the DEFENDANTS and their co-
conspirators knew that the purpose and design of this system of
seemingly unrelated parties to the financial transaction was to
conceal, hide and/or disguise the true nature of the criminal
proceeds they were accepting.

(e)   This pattern of activity continued at all
times relevant to this complaint, and continues to this day.
Enormous amounts of criminal proceeds were processed in this
manner.  In the example described above, $180,666.00 was picked
up in one day by Mr. Martino for TRANSIMEX.  This particular
transaction included 24 "third party checks", similar to the
ones described above, and $74,265.00 dollars cash.  Mr. Martino
made hundreds of 'collection trips' to Maicao, going two and
three times a week for a variety of front companies owned by the
DEFENDANT'S co-conspirators.  All of the money for TRANSIMEX was
deposited into TRANSIMEX'S INTERBANK account, and it was from

this account that criminal proceeds were wired or mailed directly to the DEFENDANTS.

(f)   Each of the DEFENDANTS' Aruban distributors maintain operations similar to the one described above.  In what is a massive and complex criminal money laundering system, transactions like the above have been made on virtually a daily basis for at least two decades, involve a continuing use of the U.S. wires and mails, and continue to this day.

(g)   Employees of many of the DEFENDANTS were personally involved in the laundering of the proceeds of illicit narcotics sales.  On certain occasions, employees of the DEFENDANTS personally traveled to Colombia and entered the country illegally, paying bribes to ensure that their passports were not marked so as to reflect that they had entered Colombia. On these trips these employees received large volumes of cash that they took into their personal possession or these employees were present when large volumes of cash and third party checks were turned over to the distributors with whom the DEFENDANTS' employees were traveling.  These individuals would then smuggle the cash out of Colombia and into Venezuela, with the cash ultimately being deposited in banks and transferred into the coffers of the DEFENDANTS.  The DEFENDANTS were fully aware of

the nature and illegality of these activities.

        (h)   On other occasions, employees of each of the Defendant groups, including some high ranking officials in the companies, traveled to Aruba for face-to-face meetings with their customers including known criminals such as Samuel Santander Lopesierra, Alfonso Fuminaya, Randolf Habibe, David Cybul, and Jose Lopesierra for purposes of discussing the illegal liquor trade.  At such meetings both the DEFENDANTS' distributors and the criminal customers explained the criminal nature of the business in great detail including that narcotics proceeds were utilized to pay for the liquor, that many participants in the scheme were dangerous criminals, and that the risk of arrest and seizure of money and product was very high.  These discussions were all a part of the negotiating process in that the distributors and criminal customers felt the need to take all these risks into account in establishing the fair sales price which the DEFENDANTS would charge them for the product.  In spite of these detailed explanations of the criminal nature of the liquor sales, all these DEFENDANTS continued not only to conduct this business but to take all possible steps to expand this business.

        (i)  DEFENDANTS' criminal customers were

23

obtained, serviced, and supervised by other DEFENDANT employees in the United States, Panama, and Colombia, in addition to their Aruban and Panamanian distributors.  The distributors and warehousemen in Aruba and Panama had regular communications with these employees regarding many of the DEFENDANTS' criminal customers, such as Samuel Santander Lopesierra, Gaspar Lubo, Victor Ojeda, Nora Diaz, Lucho Jimenez, Alfonso Fuminaya and others.  For example, these criminal companies routinely used certain ships for the shipment of DEFENDANTS' products.  These ships included the M/N Renacer, the M/N Lady Caribe, the M/N Cacique, the M/N Santa Lucia, and others.  Details of the shipments of liquor products aboard these vessels were requested by and delivered to DEFENDANTS' employees in the United States through a continuing use of the U.S. wires and mails, so that DEFENDANTS could keep track of the liquor products all the way to their ultimate destination.  In this way, the DEFENDANTS knew who their ultimate customers were and knew that they were receiving criminal proceeds in payment for their products.

(j)  The DEFENDANTS developed and operate "umbrella operations." An "umbrella operation" is a purportedly legal corporation established within Colombia which allowed the DEFENDANTS to advertise and conduct commercial activities within

24

Colombia under the banner of legitimate business while in fact the true purpose of the operation is to advertise and market the DEFENDANTS' massive illegal sales of product.  These "umbrella operations" serve a primary purpose of acting as a focal point for the DEFENDANTS' efforts to deceive and mislead the PLAINTIFFS.

(k)  The DEFENDANTS conduct extensive and expensive advertising campaigns to promote the sales of their liquor brands within THE REPUBLIC OF COLOMBIA.  This is done in spite of the fact that the volume of their sales of legally imported liquor does not justify the level of expense in advertising and related commercial campaigns.  The purpose of this extensive advertising and promotional campaign is to increase the consumption and sale of DEFENDANT'S product, including DEFENDANT'S liquor products illegally distributed in COLOMBIA and sold to criminal money laundering organizations. The decisions of the DEFENDANTS as to the amounts to be spent on advertising and the extent of advertising and the quality thereof within THE REPUBLIC OF COLOMBIA are made by high-level executives within the DEFENDANTS.

(l)  On a regular basis, for at least the last decade, the DEFENDANTS have made, or caused the making of, false

25

statements to Colombian authorities, including the PLAINTIFFS. The DEFENDANTS engage in this process to systematically misinform the PLAINTIFFS about their true role in the criminal money-laundering scheme, and to prevent the PLAINTIFFS from discovering the role of the DEFENDANTS in the money laundering enterprise.   At no time did the DEFENDANTS disclose their real participation in the illegal "informal market" in Colombia. Instead, they purport to "fight against" the illegal informal trade in liquor products.  The ruse that they were going to "fight against" this illegal informal market was designed to deceive and misinform the PLAINTIFFS as to the real causes and solutions to the illegal informal market.  The DEFENDANTS, directly and through multiple joint mechanisms, used these deceptions to disguise their willing participation in the illegal distribution of liquor products in Colombia and elsewhere.

(m)  On a regular basis, the DEFENDANTS employ a systematic process of illegally manipulating the prices of liquor products the DEFENDANTS import into Colombia.  By illegally manipulating the price of their liquor products, the DEFENDANTS are able to unlawfully manipulate the price of liquor products in THE REPUBLIC OF COLOMBIA.  This practice of

26

systematic illegal price manipulation allows the DEFENDANTS to
control the final retail price of the liquor product sold
through the money laundering exchange, to minimize the loss at
which the DEFENDANTS operate in Colombia, and allows the
DEFENDANTS to increase their market share at the expense of
those entities that comply with the law, including the
DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

(n)  Since at least 1991, all the DEFENDANTS were
selling liquor to individuals whom they knew were reputed
narcotics traffickers.  For example, as of 1994, court records
that were available to the DEFENDANTS demonstrate that one of
those individuals, Samuel Santander Lopesierra, had actually
told U.S. government informants that he was involved in drug
trafficking.  Specifically, he had told U.S. law-enforcement
agents that he was involved in the "pool system" of drug
trafficking whereby he would combine his load of drugs with
those of other drug dealers into a single large shipment
destined for the United States.  He went on to explain that
individual traffickers in the United States received the drugs
and sold them for U.S. currency.  The traffickers would then
deliver the cash to couriers approved by the drug lords who
would convert the cash into cashier's checks made payable to

specific businesses owned by this individual.  The businesses to which these drug funds were delivered are identified by name in the court documents.  Accordingly, the fact that this individual was a drug trafficker and the identity of the companies that he used to launder money were known or should have been known to the DEFENDANTS.  In spite of this fact, each of the DEFENDANTS continued to sell large volumes of liquor to this individual so that he could distribute them illegally into Colombia and use those sales to launder narcotics and other criminal proceeds. Samuel Santander Lopesierra and his group of companies were major customers of each of the Defendants up to and including the time when he was arrested for narcotics trafficking and money laundering in October 2002.  Even after Lopesierra's arrest the Defendants continued to sell liquor to his companies.

(o)  The DEFENDANTS maintained direct ongoing relationships with the money laundering organizations located within Colombia and elsewhere.  The Aruban distributors were at times mere warehousers or "stockists", and the DEFENDANTS themselves maintained direct relationships with the money-laundering organizations.  As such, many times these Colombian criminal organizations were direct clients of DEFENDANTS.  An example of the type of relationship that existed between the

DEFENDANTS and their Aruban distributors is the relationship between United Distillers and TRANSIMEX, a Mansur group company and one of the Aruban distributor entities.  That relationship is described in the contract between the two parties, as follows:

"THIS AGREEMENT is made between UNITED DISTILLERS … ('the Company') and TRANSIMEX FREEZONE N.V., … ("the Stockist") for the purpose of the Stockist stocking products on behalf of the company ("Products"), for the collection of the Products by the Stockist from the Port of discharge in Aruba ('the Port') for storage at the Stockist's secure bonded warehouse ("Warehouse") and for delivery of the Products by the Stockist to the Company's customers ("Customers") within Colombia or any other location as instructed in writing by the Company." All the DEFENDANTS had similar relationships with Mansur or Harms group companies.

(p)  Beginning at least in the 1980s and continuing to the present, the DEFENDANTS and their affiliates entered into agreements with their Aruban, Panamanian, and Colombian distributors by which DEFENDANTS could control the price of their product that illegally entered Colombia while at the same time financing the promotion and marketing of the

illegal product in Colombia.  The process worked as follows:

(i)  First, the Aruban distributor and the DEFENDANTS agree on how much, on a per case of liquor basis, will be contributed by the DEFENDANTS to the efforts made by the Aruban distributor in Maicao and elsewhere to promote the sale of DEFENDANTS' product.

(ii) The amount of the marketing support allowance is then accounted for and calculated by the Aruban distributor by applying the per-case amount to the volume of product sold by the Aruban distributor during the accounting period.  In this accounting, the Aruban distributor determines the volume sold, the amount of the marketing allowance per case, and the Aruban distributor then outlines exactly how the marketing allowance was used, identifying the specific clients that were benefitted by the marketing allowance.

(iii)This accounting is then provided by the Aruban distributor to the DEFENDANTS, and the amounts used by the Aruban distributor, up to the amount-per case agreed upon between the DEFENDANTS and the Aruban distributor is then paid by the DEFENDANTS to the Aruban distributor.

(iv) This activity occurred at all times relevant to this complaint.  An example of this type of activity

is the letter sent on January 31st, 1991, to Mr. Kees Bouwkamp,

of Seagram Overseas Sales Company, an entity now owned by the

DIAGEO/UDV Defendants.  In this letter, the Aruban distributor

noted that 2840 cases of Chivas Regal were sold by the Aruban

distributor and that the agreed upon marketing allowance was

7.60 pounds sterling per case, for a total of 21,584 pounds

sterling.  The letter also indicated the specific use of the

marketing allowance:

"The marketing support allowance was used by MANIMEX FREEZONE
N.V. exclusively for 'free goods' to our major customers as
follows:

| Customer | Free Case Allowance 9/lt. Equiv. |
|---|---|
| Jose Luis Iguaran | 66 |
| Samuel Lopesierra | 65 |
| Uriel Arcila | 65 |
| Lino Iguaran | 65 |
| Gaspar Lubo | 65 |
| Total | 326 |

| | |
|---|---|
| Net Cost of Chivas Regal | PS    66.15 |
| Total Value of free goods | PS 21,584.00" |

The purpose of this "marketing support allowance" was to promote

the use of DEFENDANTS' products in the money laundering exchange

in Panama, Aruba and Colombia.

            (q)  The DEFENDANTS' Aruban distributors were

actively engaged in the exchange of narcotics and other criminal

proceeds for a variety of products, including liquor

manufactured by the DEFENDANTS and/or their affiliates.  As part
of their design to hide their activities from scrutiny, the
Aruban distributors routinely use a variety of front companies
and other cutouts to funnel narcotics and other criminal
proceeds back to the DEFENDANTS.  As such, while the DEFENDANTS
ostensibly maintain a single relationship with a single Aruban
distributor, it was routine throughout the 1990s that payment on
the account of the single Aruban distributor would come from a
variety of companies and a variety of accounts all controlled
ostensibly at arms length by the Aruban distributors.  The
DEFENDANTS, aware of the artifice and design of the Aruban
distributors and the need to disguise the nature, source and
origin of the narcotics and other criminal proceeds they were
receiving, adapted themselves to and received payment
continually from these various cutout companies and the accounts
they held.

         (r)  Transfers of narcotics and other criminal
money laundering proceeds such as the above continued throughout
the 1990's and continue to this day.


  *1. Defendants' Direction and Control of the Money-Laundering
                         Scheme*

28.   The DEFENDANTS controlled every aspect of the financial transactions involving the purchase of their liquor products.   The DEFENDANTS also controlled the exact methods and means by which they were paid for the liquor products.   In this way, the DEFENDANTS structured their payment schemes to maximize their own security from detection by United States and Colombian law enforcement.

29.   In addition to establishing the rules by which the DEFENDANTS would be paid by cash, Brady Bonds, secret payments to foreign accounts, or other means as described more fully below, the DEFENDANTS also dictated that their criminal customers route payments to them through intermediary distributors, shippers, and other cut outs.  This procedure, known in money-laundering jargon as "layering," is conducted for the sole purpose of concealing the payments' true source from Colombian and United States law enforcement.   In the case of money-laundering transactions related to Colombia, such intermediaries included ROMAR, TRANSIMEX, LICORES ARUBA, and various brokers in Colombia, including Victor Ojeda and Samuel Santander Lopesierra.

30.   At key distribution points such as Aruba and Panama, the DEFENDANTS utilized certain distribution, storage

33

and shipping companies to handle their products.  These Aruban
and Panamanian companies were organized along strict product
lines, and maintained these channels according to specific
instructions from the DEFENDANTS, which included special
handling instructions for shipments designated for Colombian
customers that the DEFENDANTS knew were involved in criminal
activities.  These customers included but were not limited to
Samuel Santander Lopesierra, Lino Iguarán, Gaspar Lubo, Victor
Ojeda, and others.  The Aruban and Panamanian distributors would
constantly use the wires and mails to communicate every detail
about their activities.  They would send details of product
movement of their own products, as well as information on the
movement of competitor's products, including prices.  They would
periodically visit the Colombian customers with representatives
of the DEFENDANTS so as to keep a close eye on the market.
These direct and constant contacts and communications clearly
demonstrated that the DEFENDANTS knew that they were selling to
criminal customers and thereby demonstrated that the DEFENDANTS
knew that they were receiving criminal proceeds in payment for
their products.

        *2. Money Laundering by the DIAGEO/UDV DEFENDANTS,*
    *the SEAGRAM DEFENDANTS, and the PERNOD RICARD DEFENDANTS,*

34

*through the MANSUR GROUP*

31.  The DIAGEO/UDV DEFENDANTS, the SEAGRAM
DEFENDANTS, the PERNOD RICARD DEFENDANTS, knowingly sold large
volumes of liquor products to and through the various companies
of the MANSUR Group, including but not limited to MANSUR TRADING
FREEZONE, MANIMEX, TRANSIMEX and MARLEX.  The Mansur Group is a
large and wealthy Aruban concern involved in a variety of
commercial enterprises.  Several executives of the MANSUR Group
have been indicted in the United States for Money Laundering.
The DIAGEO/UDV DEFENDANTS, the SEAGRAM DEFENDANTS, and the
PERNOD RICARD DEFENDANTS, their co-conspirators, and the MANSUR
group created a complex web of companies located in Aruba and
Panama to disguise the true nature and origin of the criminal
proceeds that the Mansur money-laundering organizations were
receiving from Colombian criminal organizations which included
the proceeds of narcotics trafficking, and other illegal
activity.  Monies received from the Mansur group's criminal
activities, as well as from the activities of other criminal
organizations, would be smuggled illegally out of Colombia in
large amounts, both in the form of raw foreign currency
(principally US dollars) and other monetary instruments

(principally third-party checks and money orders), and received
by the money-laundering organizations located in Venezuela,
including but not limited to the José M. Martino money-
laundering organization.  The Mansur group companies
accomplished their purchases of the DEFENDANTS' liquor products
through the use of the U.S. wires and/or mails.

32.  From the accounts held by the Mansur Group,
payments would be sent directly to the DIAGEO/UDV DEFENDANTS,
the SEAGRAM DEFENDANTS, and the PERNOD RICARD DEFENDANTS.
Through this process, large volumes of criminal proceeds would
be exchanged for the DIAGEO/UDV DEFENDANTS, the SEAGRAM
DEFENDANTS, and the PERNOD RICARD DEFENDANTS' liquor products as
part of the money-laundering process, and then laundered into
the various MANSUR group accounts.  The MANSUR group company
accounts used in this process that provided payments directly to
the DEFENDANTS included:

(a)  DOUBLETREE INVESTMENTS LTD, account
#xxxxx1398 located at Interbank in Orangestad, Aruba;

(b)  RUNAM HOLDINGS LTD, account number
xxxxxxxxx0795 at Interbank Aruba, located in Oranjestad, Aruba;

(c)  CARDGAME LTD, account number xxxxxxxx1546
at Interbank, located in Oranjestad, Aruba;

   (d) PIN POINT HOLDINGS, account number xxxxx1134 at Interbank Aruba located in Oranjestad, Aruba;

   (e) SATUMA BRANDS N.V., account number xxxxxxxxx2825 at Interbank, located in Oranjestad, Aruba;

   (f) RED ROBIN LTD., account number xxxxx1538 at Interbank, located in Orangestad, Aruba;

   (g) READON HOLDINGS, account number xxxxxxxxx6928 at Interbank, located in Oranjestad, Aruba;

   (h) BRAMPTON INTERNATIONAL, account number xxxxxxxxx1554 at Interbank, located in Oranjestad, Aruba;

   (i) LITANI LIMITED, account number xxxxxxxxx2012, located at INTERBANK in Orangestad, Aruba;

   (j) TRANSIMEX FREEZONE N.V., account number xxxxxxxxx1583, located at INTERBANK in Orangestad, Aruba;

   (k) MANIMEX FREEZONE N.V., account number xxxxxxxxx9326 at Aruba Bank located in Oranjestad, Aruba; and

   (l) MANSUR TRADING FREEZONE N.V., account number xxxxxxxxx8921 at Interbank, located in Oranjestad, Aruba.

   33.  The DIAGEO/UDV DEFENDANTS, the SEAGRAM DEFENDANTS, and the PERNOD RICARD DEFENDANTS, all received money from accounts held by all or several of these Mansur Group companies.

34.   Criminal customers serviced by the Mansur group
for these DEFENDANTS included Alfonso Fuminaya, Randolf Habibe,
David Cybul, and Jose Lopesierra.

*3. Money Laundering by the DIAGEO/UDV DEFENDANTS, the SEAGRAM
DEFENDANTS and the PERNOD RICARD DEFENDANTS through ROY and
MILTON HARMS*

35.   The DIAGEO/UDV DEFENDANTS, the SEAGRAM
DEFENDANTS, and the PERNOD RICARD DEFENDANTS, all knowingly sold
large volumes of liquor products to and through companies owned
and operated by Roy Milton Harms, Sr., (known as "Roy") and his
son, Roy Milton Harms Jr. (known as "Milton" or "El Gordo"),
including but not limited to ROMAR TRADING FREEZONE N.V.  The
Harms family is a large and wealthy Aruban family involved in a
variety of commercial enterprises (the Harms Group).  Several
members of the HARMS family, specifically Roy Harms and Milton
Harms, have been involved in narcotics and other criminal money
laundering for several decades.  Roy Harms founded ROMAR in the
late 1980's, the latest in a long line of money laundering
enterprises.  The DEFENDANTS, their co-conspirators, Roy Harms
and Milton Harms used ROMAR to create a complex web of companies
located in Aruba, Panama and elsewhere to disguise the true

38

nature and origin of the criminal proceeds that the ROMAR money-laundering organization was receiving from Colombian criminal organizations which included the proceeds of narcotics trafficking, and other illegal activity.  Monies received from ROMAR'S criminal activities, as well as from the activities of other criminal organizations, would be smuggled illegally out of Colombia in large amounts, both in the form of raw foreign currency (principally US dollars) and other monetary instruments (principally third-party checks and money orders), and received by the money-laundering organizations located in Venezuela, including but not limited to the Servio Tulio Raven Guerra organization.  ROMAR accomplished its purchases of the DEFENDANTS' liquor products through the use of the U.S. wires and/or mails.

36.   The principal company of the Roy Harms and Milton Harms money-laundering organization was ROMAR TRADING FREEZONE, N.V., located at Oranjestad, Aruba.

37.   From the accounts held by the Roy Harms and Milton money-laundering organizations, payments would be sent directly to the DEFENDANTS.  Through this process, large volumes of criminal proceeds would be exchanged for DEFENDANTS' liquor products as part of the money-laundering process, and then

laundered into the various Harms Group accounts.  The Harms Group company accounts used in this process that provided payments directly to the DEFENDANTS or were used to secret away the fruits of the criminal money-laundering activities included:

(a)    ROMAR FREEZONE, account #xxxxx.649 located at ABN/AMRO Bank in Orangestad, Aruba; account xxxxx57.5 located at Aruba Bank in Orangestad, Aruba; account xx5328 located at Carribean Mercantile Bank in Orangestad, Aruba; account xxxxxxxxxxxxx.004 located at First National Bank in Orangestad, Aruba; account xxxxx.633 located at ABN/AMRO Bank in Willemstad, Curacao; account number xxxxx.262 located at ABN/AMRO Bank in St. Maarten, West Indies; account xxxxxxxxxx0255 located at ABN/AMRO Bank in Miami, Florida;

(b)    ETANA HOLDING, account xxxxx.094 and account xxxxx.124, located at ABN/AMRO Bank in Willemstad, Curacao;

(c)    MATSUMOTO INVESTMENT LTD., account xxxxx2414 located at First Union Bank in Miami, Florida;

(d)    TRANSPORTES Y FLETES, C.A., account xxxxx.979 and account xxxxx.987, located at ABN/AMRO Bank in Willemstad, Curacao;

(e)    ALTAMIRA INVESTMENT A.V.V., account

xxxx03.0, located at Aruba Bank in Orangestad, Aruba and account
xxxxx.996 located at ABN/AMRO Bank in Orangestad, Aruba;

       (f)   DISTRIBUIDORA CARACAS S.A., account
xxxxx.952 and account xxxxx.960 account xxxxx.094 located at
ABN/AMRO Bank in Willemstad, Curacao;

       (g)   GOLDEN EAGLE INVESTMENTS N.V., account
xxxxx.003 located at ABN/AMRO Bank in Orangestad, Aruba;

       (h)   BERCOW HOLDING, account xxxxx.936 and
account xxxxx.936 located at ABN/AMRO Bank in Willemstad,
Curacao;

       (i)   ROMAR FREEZONE TRADING, account xxxxx.633
and account xxxxx.765 located at ABN/AMRO Bank in Willemstad,
Curacao; and

       (j)   KULOFF LTD., account xxxxx.108 and account
xxxxx.132 located at ABN/AMRO Bank in Willemstad, Curacao.

       38.   On a routine money-laundering collection trip on
February 22, 1994, Servio Tulio Raven Guerra and Milton Harms
were on their way back from a day of collections of narcotics
and other criminal proceeds in Maicao, Colombia.  They had
already crossed the Colombia/Venezuelan border, bribing the
border guards as they went.  They had collected US$ 400,160.00
and 2.6 million Venezuelan Bolivares, in cash.  Having smuggled

the cash out of Colombia, they were detained by chance by a
roving unit of the Venezuelan Army, and the cash was seized.
Both Servio Tulio Raven Guerra and Milton Harms were arrested.
After spending several days in Venezuelan jail, the two money-
launderers were released and fled back to Aruba.  The seized
money remained in Venezuela pending the outcome of an
investigation into the source of the money.  Once back in Aruba,
Milton made efforts to recover his money from the Venezuelan
Authorities.  In order to demonstrate that the money was part of
his normal business operation, he requested that the Managers of
the ABN/AMRO Bank in Aruba, M.M. Loefstok and E.L. Farro write a
letter to the Venezuelan judge handling the case.  The following
is the transcript of a certified translation of the letter:

       "ABN-AMRO Bank

       Honorable
       Dr. O Perez de la Cruz
       Fourteenth First Instance
       Penal Court of Zulía
       Maracaibo – Zulía State
       Republic of Venezuela

       Department:
       Business Development
                                        Date:
                                        March 15, 1994
       Reference:
       Mrs. F. M. Chan

       Very respectfully,

By means of this letter we address your honorable court at
the request of the Board of Directors of ROMAR FREEZONE
TRADING COMPANY N.V., a business corporation legally
incorporated under the business laws of the Territory of
the Island of Aruba and all applicable laws in effect in
the Netherlands.
For such purposes, we would like to state and certify the
following facts:

1. This banking institution has maintained relationships
with Mr. Roy Milton Harms, shareholder and director of
ROMAR, since 1956 when he acted as shareholder and director
of HARMS BROTHERS Ltd., a corporation that dealt, as well
as ROMAR, in the sale, distribution and export of
cigarettes, liquor, chocolates, etc., to the Caribbean
area, and very especially to the Republic of Colombia.

2. Since March 1988, Mr. Roy Milton Harms, with his sons
Roy Milton Harms, Jr. and Edmund Everard Harms, started
ROMAR FREE ZONE TRADING COMPANY N.V. with identical and
similar activities to those that they had developed, when
they rendered their services to HARMS BROTHERS Ltd.

3. It has been normal activity, specifically for this type
of company, such as ROMAR, to legally bring in cash from
clients in the Republic of Colombia, especially from the
city of Maicao; this is money that enters after prior and
formal declaration to the local customs authorities.

4. To our knowledge, money representing the product of the
collections    efforts    of    ROMAR's    executives    and
representatives is transported, after its declaration and
approval by customs authorities, to the vaults of our main
offices   in   this   city   where,   after   being   counted   and
verified, it is credited to ROMAR's bank account.

5. This process of receiving foreign currency (dollars) is
not only performed by ROMAR, but it used to be a normal and
common  practice  performed  on  a  weekly  basis  by  HARMS
BROTHERS Ltd. with this bank.

6. From the profits obtained by ROMAR, that are deposited
into its bank account, we can certify which are the main
companies  to  which  payments  have  been,  and  are  presently

being sent, and what amounts of ROMAR's total outlays said
payments represent during 1993:

|  | Amount | Percentage |
|---|---|---|
| C.A. CIGARRERA BIGOTT, SUCS. Caracas, Venezuela | USD 32,622,624.31 | 46.5 |
| UNITED DISTILLERS PLC. Glasgow, Scotland, United Kingdom | GBP 12,805,621.11 | 21.8 |
| B.A.T. (UK. & EXPORT) London – United Kingdom | USD 7,190,820.15 | 10.3 |
| M&M MARS / MASTERFOOD INTERAMERICA Puerto Rico | USD 296,754.60 | 0.4 |
| BROWN & WILLIAMSON TOBACCO CORPORATION Louisville, Kentucky | USD 3,604,977.90 | 5.1 |
| TABACALERA HONDUREÑA, S.A. San Pedro Sula – Honduras | USD 1,010,534.00 | 1.4 |
| VIÑA CONCHA Y TORO, S.A. Santiago de Chile – Chile | USD 153,913.94 | 0.2 |
| COMPAÑÍA SOUZA CRUZ Rio de Janeiro – Brazil | USD 2,173,392.28 | 3.1 |
| GALLO WINERY, MODESTO, CALIFORNIA United States of America | USD 118,182.12 | 0.2 |

Payments to the above mentioned companies represent a total
of 89% of the income deposits made by ROMAR.

Finally, we would like – expressly – to be at your disposal
in order to provide you any additional or clarifying
information that in this regard the Honorable Judge may

44

request.

This information is provided to you in a confidential
manner and without any liability on our part.

Sincerely,
ABN AMRO Bank N.V. [initials]

[signature][signature]
M.M. LoefstokE. L. Farro
Deputy Manager Senior Account Manager

39. Except for the misrepresentation that the funds
were not criminal proceeds, this letter provides a good example
of the money-laundering cycle.


*4. Satuma Brands*


40. The DIAGEO/UDV, PERNOD RICARD and SEAGRAM
DEFENDANTS and their co-conspirators created, acquired and
sustained multiple business entities in order to carry out
and/or facilitate their illegal distribution and criminal money-
laundering scheme.  An example of these entities created by the
DIAGEO/UDV, PERNOD RICARD and SEAGRAM DEFENDANTS and/or their
co-conspirators is SATUMA BRANDS N.V., incorporated in Aruba on
May 5th, 1992.  One of the directors of this limited liability
company, formed under the laws of Aruba, was JOSE FERNANDO

LOPESIERRA, (AKA "Jochi") who, on September 19th, 2002, was indicted by the United States for narcotics trafficking, along with multiple co-conspirators, including but not limited to his brother, Samuel Santander Lopesierra (aka "Santa", described elsewhere in this complaint).  JOSE FERNANDO LOPESIERRA was arrested by Colombian authorities pursuant to the US arrest warrant and request for extradition, and then extradited to the United States on August 29th, 2003, along with his brother.

41.  As noted above, JOSE FERNANDO LOPESIERRA was a managing director of SATUMA BRANDS from its inception to May 20th, 1996. During that time, and continuing thereafter, SATUMA BRANDS was fully engaged in the illegal distribution activities described in this complaint for the DIAGEO/UDV, PERNOD RICARD and SEAGRAM DEFENDANTS, including but not limited to: receiving narcotics proceeds in exchange for DIAGEO/UDV, PERNOD RICARD and SEAGRAM DEFENDANTS liquor products and the illegal distribution on behalf of the DIAGEO/UDV, PERNOD RICARD and SEAGRAM DEFENDANTS of the DEFENDANTS' liquor products within the Republic of Colombia.

*5. Operation "Golden Trash"*

46

42.   Since the 1980's, throughout the 1990's and
continuing to this day, United States, Colombian and Aruban law
enforcement officials have worked to put an end to money-
laundering, with special emphasis placed on Colombian Narcotics
related money laundering.  As part of these efforts, law
enforcement agencies have run undercover operations to
infiltrate and expose Colombian narcotics money laundering
operations.  One of these operations, known as OPERATION "GOLDEN
TRASH", involved a criminal scheme to deposit narcotics proceeds
into Puerto Rican banks.  Subsequent to these deposits,
"manager's checks" were then drawn.  These checks contained and
were in fact the proceeds of narcotics sales.  It was the design
of the criminal conspiracy to use the Puerto Rican "manager's
checks" as a means to convert the bulk narcotics proceeds into
more easily handled checks.  These "managers checks" were then
handled in a manner similar to the "third-party checks" out of
the Eastern District of New York and Miami, i.e. they were
smuggled out of the United States into Panama, Aruba, and
Colombia.  In Colombia, the criminal narcotics money-laundering
organizations would exchange the "managers checks" for liquor
products.  These checks would then be smuggled out of Colombia

and taken back to Aruba and elsewhere, where they were then
deposited into ROMAR and MANSUR Group accounts, among others.
These narcotics proceeds were then wired directly to the
DEFENDANTS.  Examples of these 'managers checks' constituting
narcotics proceeds that were processed through this mechanism
include, but are not limited to:

(a)   CO-OP Manager's check number 061062, for
US$5,000.00, dated May 14th, 1992, deposited into TRANSIMEX
FREEZONE N.V.'S account #xxxxxx1583 located at Interbank in
Orangestad, Aruba;

(b)   CO-OP Manager's check number 106244, for
US$5,000.00, dated June 1st, 1994, deposited into ROMAR FREEZONE
TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in
Orangestad, Aruba;

(c)   CO-OP Manager's check number 100504, for
US$3,500.00, dated December 28th, 1993, deposited into DOUBLETREE
INVESTMENTS LTD'S account #xxxxx1398 located at Interbank in
Orangestad, Aruba;

(d)   CO-OP Manager's check number 100505, for
US$4,500.00, dated December 21st, 1993, deposited into DOUBLETREE
INVESTMENTS LTD'S account #xxxxx1398 located at Interbank in
Orangestad, Aruba;

(e)    CO-OP Manager's check number 100508, for US$4,500.00, dated January 13th, 1994, deposited into SATUMA BRANDS N.V.'S account #xxxxx2825 located at Interbank in Orangestad, Aruba;

(f)    CO-OP Manager's check number 100511, for US$4,000.00, dated January 13th, 1994, deposited into SATUMA BRANDS N.V.'S account #xxxxx2825 located at Interbank in Orangestad, Aruba;

(g)    CO-OP Manager's check number 100519, for US$3,500.00, dated January 13th, 1994, deposited into SATUMA BRANDS N.V.'S account #xxxxx2825 located at Interbank in Orangestad, Aruba;

(h)    CO-OP Manager's check number 100516, for US$5,000.00, dated January 4th, 1994, deposited into DOUBLETREE INVESTMENTS LTD'S account #xxxxx1398 located at Interbank in Orangestad, Aruba;

(i)    CO-OP Manager's check number 100522, for US$3,500.00, dated January 4th, 1994, deposited into DOUBLETREE INVESTMENTS LTD'S account #xxxxx1398 located at Interbank in Orangestad, Aruba;

(j)    CO-OP Manager's check number 100523, for US$5,000.00, dated December 28th, 1994, deposited into DOUBLETREE

49

INVESTMENTS LTD'S account #xxxxx1398 located at Interbank in Orangestad, Aruba;

(k)   CO-OP Manager's check number 100890, for US$3,000.00, dated April 19th, 1994, deposited into READON HOLDING'S account #xxxxx6928 located at Interbank in Orangestad, Aruba;

(l)   CO-OP Manager's check number 100891, for US$3,500.00, dated April 20th, 1994, deposited into READON HOLDING'S account #xxxxx6928 located at Interbank in Orangestad, Aruba, and,

(m)   CO-OP Manager's check number 100524, for US$4,000.00, dated January 4th, 1994, deposited into DOUBLETREE INVESTMENTS LTD'S account #xxxxx1398 located at Interbank in Orangestad, Aruba.

(n)   CO-OP Manager's check number 100712, for US$4,500.00, dated June 1, 1994, deposited into ROMAR FREEZONE TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in Orangestad, Aruba;

(o)   CO-OP Manager's check number 100730, for US$3,200.00, dated June 1, 1994, deposited into ROMAR FREEZONE TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in Orangestad, Aruba;

(p)   CO-OP Manager's check number 100971, for US$5,000.00, dated June 1, 1994, deposited into ROMAR FREEZONE TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in Orangestad, Aruba;

(q)   CO-OP Manager's check number 100973, for US$5,000.00, dated June 1, 1994, deposited into ROMAR FREEZONE TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in Orangestad, Aruba;

(r)   CO-OP Manager's check number 100974, for US$4,800.00, dated June 1, 1994, deposited into ROMAR FREEZONE TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in Orangestad, Aruba;

(s)   CO-OP Manager's check number 100976, for US$4,800.00, dated June 1, 1994, deposited into ROMAR FREEZONE TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in Orangestad, Aruba;

(t)   CO-OP Manager's check number 100978, for US$4,500.00, dated June 1, 1994, deposited into ROMAR FREEZONE TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in Orangestad, Aruba;

(u)   CO-OP Manager's check number 100980, for US$4,500.00, dated June 1,1994, deposited into ROMAR FREEZONE

TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in
Orangestad, Aruba;

       (v)   CO-OP Manager's check number 100985, for
US$4,000.00, dated June 1, 1994, deposited into ROMAR FREEZONE
TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in
Orangestad, Aruba;

       (w)   CO-OP Manager's check number 100987, for
US$3,500.00, dated June 1, 1994, deposited into ROMAR FREEZONE
TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in
Orangestad, Aruba; and,

       (x)   CO-OP Manager's check number 100989, for
US$3,500.00, dated June 1, 1994, deposited into ROMAR FREEZONE
TRADING COMPANY'S account #xxxxx.649 at ABN/AMRO Bank in
Orangestad, Aruba.

      43. After being deposited into accounts held by the
MANSUR Group and the Harms Group, these funds were commingled
with additional criminal proceeds and were then wired to each of
the DEFENDANTS.  The purpose of the commingling was to further
disguise the true nature and source of the proceeds.  The Mansur
Group then forwarded these proceeds to the DIAGEO/UDV
DEFENDANTS, the SEAGRAM DEFENDANTS, and the PERNOD RICARD
DEFENDANTS.  Similarly, the HARMS Group forwarded these proceeds

to the DIAGEO/UDV DEFENDANTS, the SEAGRAM DEFENDANTS, and the
PERNOD RICARD DEFENDANTS.


     VII. DEFENDANTS' JOINT EFFORTS TO DECEIVE THE PLAINTIFFS

     *The Colombian Association of Importers of Liquor and Wines
                            (ACODIL)*

          44. The DEFENDANTS participated in and/or maintained
an industry association known as the Colombian Association of
Importers of Liquor and Wines (*Asociación Colombiana de
Importadores de Licores y Vinos*), known as "ACODIL".

          45. It was the design, purpose and intent of the
DEFENDANTS to take advantage of ACODIL and to use it as a means
by which they could further deceive and defraud the Colombian
government, including the REPUBLIC OF COLOMBIA and the
DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.  Many of the items on
the DEFENDANTS' individual "External Affairs" agendas were
executed by ACODIL. ACODIL was and is an association of all of
the DEFENDANTS or their representatives and agents, and other
innocent parties, and has been used by the DEFENDANTS to further
the deception of the REPUBLIC OF COLOMBIA and the DEPARTMENTS OF
THE REPUBLIC OF COLOMBIA as to the true source and cause of the

illegal trade in liquor products.  It was also used to lobby the
PLAINTIFFS so as to prevent effective action by the PLAINTIFFS
to discover and put an end to the criminal narcotics money-
laundering scheme engaged in by the DEFENDANTS.  An example of
such deception is contained in a letter sent on July 30th, 1998,
by the Director of ACODIL, who at the time was also the General
Director of UDV/RUEDA, the DIAGEO/UDV subsidiary in Colombia.
In this letter, addressed to the Colombian Ministry of Foreign
Trade, the Director of ACODIL - UDV/RUEDA presented a document
to the Colombian government, entitled "Proposal for the Fight
against the Informal Market in Wine and Liquor."  The letter
notes that the document had already been presented to the
Minister of Finance, and that it was being discussed on an
individual basis with the individual Governors.  The purpose of
the proposal was to make certain changes in the way the
Colombian government controlled the liquor industry in order to
more effectively fight against the informal market.  At no time
did the Director of ACODIL - UDV/RUEDA state that the parties he
represented were in fact the cause of the "informal market" and
that such market had been created and manipulated to take
advantage of the criminal money-laundering mechanism whose
benefits gave them an overwhelming competitive advantage over

their competitors.  The proposal went to great lengths to deceive and misinform the PLAINTIFFS and to mislead them as to the causes and solutions to the huge "informal market", which, according to the letter, reached an astonishing 84% of the total market for imported liquor.  In their desire to steer any suspicion away from them, the DEFENDANTS, through ACODIL, included a section in the proposal entitled "Motivation for ACODIL", or "Motivation of the Members of ACODIL".  In this section, the DEFENDANTS, through ACODIL, noted that their reasons for providing the proposal were to:

> - "Facilitate the building of long-term brands
> - Generate stable and sustainable income over the long-term
> - Create profitable and <u>sustainable</u> businesses in Colombia
> - Protect the consumer and the brands from the scourge of adulteration
> - Promote the participation of the importers for the well-being of the local community (employment, sponsorships, etc.)"

(emphasis in original).

At no time did the DEFENDANTS frankly disclose their role in the creation, support and control of the informal market and through this and other direct communication to the PLAINTIFFS at all times attempted to deceive and mislead the PLAINTIFFS as to the causes of and solutions to the "informal market".

55

Acting through the aforesaid group, the DEFENDANTS obstructed Colombian government oversight and falsely represented to PLAINTIFFS and the public that the DEFENDANTS were not involved in illegal activities.  This deception and fraud continues to this day.

VIII. ALLEGATIONS AS TO INDIVIDUAL DEFENDANT GROUPS

*1. DIAGEO/UDV's Direct Involvement in Money Laundering and Organized Crime*

46.   The DIAGEO/UDV DEFENDANTS sell various brands of liquor into illegal channels in Colombia including Johnny Walker, Smirnoff, Jose Cuervo, Dom Perignon, and others.

47.   The DIAGEO/UDV DEFENDANTS maintained a group of agents and employees dedicated exclusively to promoting the illegal sale of DIAGEO/UDV products Colombia including the receipt of criminal proceeds from Colombian and other international criminal organizations.  Examples of these agents and employees include Philip Lewis, René Scull, Luke Tegner, Gavin Gemmell, Chris Stokes, Martin Browne, and Lorna Dunster, who worked for several DIAGEO/UDV companies and their affiliates, including United Distillers in the United States,

Venezuela and Scotland.  These employees, each a key figure in
the DIAGEO/UDV DEFENDANT'S liquor for criminal proceeds money-
laundering scheme, directly serviced the accounts of the
principal money launderers who were providing criminal proceeds
to DIAGEO/UDV in exchange for DIAGEO/UDV products.  In fact, on
behalf of DIAGEO/UDV, these employees were in charge of handling
the accounts that facilitated the exchange of huge amounts of
criminal proceeds for DIAGEO/UDV products, and were personally
responsible for remitting products to and receiving payments
from the Aruba, Panamanian and Colombian money laundering
organizations who, in turn, received their laundered proceeds
from representatives of Colombian and other organized crime.

48.   These employees and DIAGEO/UDV knew that the
proceeds that they were receiving from their distributors
represented and, in fact, were proceeds of criminal activities
occurring in Colombia and elsewhere, and that the design and
intent of their money laundering co-conspirators was to use
DIAGEO/UDV products to further their money-laundering scheme.
In fact, starting in the 1980s and throughout the 1990s
DIAGEO/UDV employees, including but not limited to Philip Lewis,
René Scull, Luke Tegner, Gavin Gemmell, Chris Stokes, Martin
Browne and Lorna Dunster, maintained close, almost daily

communications with their money laundering co-conspirators located in Colombia, Aruba and Panama.

49.  Examples of individual transactions of criminal money-laundering proceeds being forwarded to the DIAGEO/UDV defendants through the money-laundering scheme include:

(a)  On July 14th, 1995, Mansur Trading Freezone, N.V. transferred US$1,086,878.32 of criminal proceeds to the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its account number xxxxxxxxxxx8921 at Interbank, located in Oranjestad, Aruba, in payment for liquor products;

(b)  On July 26th, 1995, Mansur Trading Freezone, N.V. transferred US$1,184,795.51 of criminal proceeds to the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its account number xxxxxxxxxxx8921 at Interbank, located in Oranjestad, Aruba, in payment for liquor products;

(c)  On August 25th, 1995, Mansur Trading Freezone, N.V. transferred US$500,525.00 of criminal proceeds to the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its account number xxxxxxxxxxx8921 at Interbank, located in Oranjestad, Aruba, in payment for liquor products;

(d)  On August 31st, 1995, Mansur Trading Freezone, N.V. transferred US$140,420.14 of criminal proceeds to

the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its
account number xxxxxxxxxxx8921 at Interbank, located in
Oranjestad, Aruba, in payment for liquor products;

       (e)   On September 8th, 1995, Mansur Trading
Freezone, N.V. transferred US$299,668.42 of criminal proceeds to
the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its
account number xxxxxxxxxxx8921 at Interbank, located in
Oranjestad, Aruba, in payment for liquor products;

       (f)   On October 18th, 1995, Mansur Trading
Freezone, N.V. transferred US$813,525.14 of criminal proceeds to
the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its
account number xxxxxxxxxxx8921 at Interbank, located in
Oranjestad, Aruba, in payment for liquor products;

       (g)   On November 22nd, 1995, Mansur Trading
Freezone, N.V. transferred US$1,170,016.50 of criminal proceeds
to the DIAGEO/UDV DEFENDANTS United Distillers affiliate from
its account number xxxxxxxxxxx8921 at Interbank, located in
Oranjestad, Aruba, in payment for liquor products;

       (h)   On December 8th, 1995, Mansur Trading
Freezone, N.V. transferred US$335,959.53 of criminal proceeds to
the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its
account number xxxxxxxxxxx8921 at Interbank, located in

Oranjestad, Aruba, in payment for liquor products;

        (i)  On January 22nd, 1996, Mansur Trading Freezone, N.V. transferred US$957,152.16 of criminal proceeds to the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its account number xxxxxxxxxxx8921 at Interbank, located in Oranjestad, Aruba, in payment for liquor products;

        (j)  On January 29th, 1996, Mansur Trading Freezone, N.V. transferred US$634,385.26 of criminal proceeds to the DIAGEO/UDV DEFENDANTS United Distillers affiliate from its account number xxxxxxxxxxx8921 at Interbank, located in Oranjestad, Aruba, in payment for liquor products.

       50.  The aforesaid conduct continues unchecked to the present date.  As recently as August 2004, the DEFENDANTS have sold their liquor products to criminal organizations in Maicao, Colombia, with the knowledge that they were receiving criminal proceeds in payment for these products and thereby committing money-laundering.

       51.  Known criminal customers of the DIAGEO/UDV DEFENDANTS include Samuel "Santa" Lopesierra, Alfonso Fuminaya, Randolf Habibe, David Cybul, and Jose Lopesierra.

*2. Seagram's Direct Involvement in Money Laundering and Organized Crime*

52.  The SEAGRAM DEFENDANTS sell various brands of liquor, including Chivas Regal, Passport, Glenlivet, and others, into illegal channels in Colombia including.

53.  The SEAGRAM DEFENDANTS maintained a group of agents and employees dedicated exclusively to promoting the illegal sale of SEAGRAM products in Colombia including the receipt of criminal proceeds from Colombian and other international criminal organizations.  One of these agents and employees was Kees Bouwkamp, who worked for several SEAGRAM companies and affiliates, including Seagram Overseas Sales Company (SOSCO) located at 375 Park Avenue, New York, New York 10152, U.S.A., and later at what was known by several names, including but limited to the "Export Marketing Company" located 2 Alhambra Plaza, Suite 507, Coral Gables, FL 33134.  Mr. Bouwkamp, a key figure in the SEAGRAM DEFENDANT'S liquor for criminal proceeds money-laundering scheme, directly serviced the accounts of the principal money launderers who were providing criminal proceeds to SEAGRAM in exchange for SEAGRAM products. In fact, on behalf of SEAGRAM, Mr. Bouwkamp was in charge of handling the accounts that facilitated the exchange of huge amounts of criminal proceeds for SEAGRAM products, and was

personally responsible for remitting products to and receiving payments from the Aruba, Panamanian and Colombian money-laundering organizations who, in turn, received their laundered proceeds from representatives of Colombian and other organized crime.

(a)   Mr. Bouwkamp and SEAGRAM knew that the proceeds that they were receiving from their distributors represented and, in fact, were proceeds of criminal activities occurring in Colombia and elsewhere, and that the design and intent of their money laundering co-conspirators was to use SEAGRAM products to further their money-laundering scheme.   In fact, starting in the 1980s and throughout the 1990s Mr. Bouwkamp and SEAGRAM maintained close, almost daily communications via use of the US wires and/or mails with their money-laundering co-conspirators located in Colombia, Aruba and Panama.

(b)   For example, on October 31, 1992, the SEAGRAM distributors in Aruba communicated, via letter faxed to Mr. Bouwkamp a communication in which the distributor made a claim under the contractual agreement between SEAGRAM and its affiliates and the Aruban distributor for reimbursement of "marketing support allowances" used by the Aruban distributor to

promote the use of SEAGRAM-brand liquor in the lucrative liquor
for criminal proceeds exchange.  In that communication, and in
dozens of others, the Aruban distributor identified their "major
customers" as being Jose Luis Iguaran, Samuel Lopesierra, Uriel
Arcila, Lino Iguaran and Gaspar Lugo.  These "major customers"
were known to Mr. Bouwkamp and to the SEAGRAM DEFENDANTS as
being several of the principals of money laundering operations.

(c)  Other examples of SEAGRAM employees who were
directly involved in the criminal money laundering enterprise
include Michael Misiorski, Daniel Koslovsky, Santiago Sablón,
Silvio Lean, Jim Howie, and Jerrold K. Milstead.

(d)  Beginning at least in the 1980s and
continuing throughout the 1990s the SEAGRAM DEFENDANTS and their
affiliates entered into agreements with their Aruban,
Panamanian, and Colombian distributors by which SEAGRAM
DEFENDANTS would provide a set sum of money per case sold by
their distributors to be used for marketing support.  The
purpose of this "marketing support allowance" was to promote the
use of SEAGRAM'S products in the money laundering exchange in
Panama, Aruba and Colombia.  The amounts payable to the Aruban
distributors were not deducted from the Aruban distributors'
open account with the SEAGRAM DEFENDANTS and/or their

affiliates, but rather billed by the Aruban distributors to
SEAGRAM and/or their affiliates, who in turn, would issue a
check to the Aruban distributor for the amounts claimed.

(e)   Examples of such invoices generated by the
Aruban distributors to the SEAGRAM DEFENDANTS and/or their
affiliates are invoices numbers 1032 dated October 31, 1992, in
the amount of 30,400 British pounds; 1033 dated October 31,
1992, in the amount of 26,700 British pounds; and 1034 dated
also issued on October 31, 1992, in the amount of 8,000 British
pounds.  Upon receipt of the invoices, the SEAGRAM DEFENDANTS
and/or their affiliates would issue subsequent checks in favor
of the Aruban distributor.

(f)   Examples of such payments and drafts from
SEAGRAM to the Aruban distributors in reimbursement of marketing
expenses incurred by the Aruban distributors as agreed with Mr.
Bouwkamp and the SEAGRAM DEFENDANTS and/or their subsidiaries,
are too numerous to complete outline in this complaint, but
examples include 122,585.31 British Pounds paid to the Aruban
distributor on December 16, 1992, via check number 159581 drawn
on account held by Joseph E. Seagram and Sons Incorporated at
CoreState Philadelphia National Bank, and check number 150369
issued on January 30, 1992, in the amount of 111,461.20 British

64

Pounds.

54.   Examples of the money laundering transactions through the common scheme carried out by the SEAGRAM DEFENDANTS and their co-conspirators include:

(a)   Payments by Brampton International Limited which made multiple payments to the SEAGRAM DEFENDANTS and/or their affiliates, including October 4, 1993, when a check was issued on account number xxxxxxxxx1554 at Interbank, located in Oranjestad, Aruba.  The payment for $280,062.88 dollars, covered several invoices of Chivas Brothers' scotch whisky sold by the SEAGRAM DEFENDANTS and/or their affiliates to the Aruban distributors for sale in the illegal liquor market in Colombia;

(b)   Payments by Manimex Free Zone N.V., which issued a check on September 10, 1993, in favor of Chivas Brothers for Chivas Regal scotch sold to the Aruban distributor for sale in the illegal liquor market in Colombia.  The payment for $614,861.46, came from account xxxxxxxxx9326 held by Manimex at Aruba Bank located in Oranjestad, Aruba;

(c)   Payments by Cardgame Limited, which on November 4, 1993, issued a check to Chivas Brothers in payment for Chivas Regal scotch sold by the SEAGRAM DEFENDANTS and/or their affiliates to the Aruban distributor for sale in the

illegal liquor market in Colombia.  The check, issued for
$24,279.27, was issued on account number xxxxxxxx1546 at
Interbank, located in Oranjestad, Aruba;

        (d)  Payments by Pinpoint Holdings Limited which
on November 2, 1993, issued a check as payment for Chivas Regal
scotch whisky sold by the SEAGRAM DEFENDANTS and/or their
affiliates to the Aruban distributor for sale in the illegal
liquor market in Colombia.  The check, issued for $516,117.57
was issued on account number xxxxx1134 at Interbank Aruba
located in Oranjestad, Aruba;

        (e)  Payments by Runam Holdings Limited, which on
July 22, 1992, issued three checks, $112,627.07, $102,709.01 and
$126,391.59 in favor of Chivas Brothers Limited as payments for
Chivas Regal scotch whisky sold to the Aruban distributor for
sale in the illegal liquor market in Colombia.  These three
checks, were drawn on account number xxxxxxxxx0795 at Interbank
Aruba, located in Oranjestad, Aruba;

        (f)  Payments by Aruba Bank Limited, which on
June 8, 1994, issued a check in favor of Chivas Brothers Limited
as payment for Chivas Regal scotch whisky sold to the Aruban
distributor for sale in the illegal liquor market in Colombia.
The check for $396,323.27 was drawn on account number

xxxxxxxxx1526 held by Manimex Free Zone N.V at Aruba Bank Limited, located in Oranjestad, Aruba.

55.   The SEAGRAM DEFENDANTS maintained constant high-level communication with their Aruban distributors, managing, on a daily basis, the relationship with one of their largest distributors in the world.   The DEFENDANTS used the U.S. wires and mail to carry out this communication and to closely manage and monitor their important and highly-profitable money-laundering enterprise.   Examples of this high degree communication to manage the money-laundering enterprise include, but are not limited to:

(a)   Fax communication dated August 22nd, 1994 from Michael Misiorski, Director of Finance and Administration for the SEAGRAM Export Marketing Company (now DEFENDANT SEAGRAM EXPORT SALES COMPANY, currently property of DEFENDANT DIAGEO/UDV), to MANIMEX FREEZONE, N.V., in which Mr. Misiorski raised issues concerning payments from MANIMEX to SEAGRAM.   This communication was sent via fax from Miami to Aruba via United States wires.

(b)   Fax communication from Ms. Ilienne Ponson Mansur, on behalf of MANIMEX FREEZONE, N.V., in which Ms. Ponson-Mansur pointed out several remissions of substantial

67

payments constituting the proceeds of narcotics and other criminal money laundering that were not credited by SEAGRAM to the MANIMEX account.  Ms. Ponson-Mansur then suggested that "Since it is of the utmost importance to you to have your accounts receivables payments in on time we would like to start sending our payments directly to your office and you can then forward it to the corresponding offices.  This way there will be no delay in crediting our account."  This proposal was, in essence, to use the SEAGRAM Miami office as a clearinghouse and hub for the narcotics and other criminal money-laundering scheme payments to the all of the SEAGRAM DEFENDANTS entities (now belonging to the PERNOD RICARD and DIAGEO/UDV DEFENDANTS). Payments from the money-laundering operation in Aruba/Colombia would go to the Miami office of the SEAGRAM DEFENDANTS and from there would be further disbursed. This communication was sent via fax from Aruba to Miami via United States wires, and was a reasonably foreseeable act of a SEAGRAM co-conspirator in furtherance of the common money-laundering scheme.

(c)   Fax communication from Michael Misiorski, Director of Finance and Administration for SEAGRAM EXPORT MARKETING COMPANY (now DEFENDANT SEAGRAM EXPORT SALES COMPANY, currently property of DEFENDANT DIAGEO/UDV), in which Mr.

Misiorski notified MANIMEX that the missing payments noted by
Ms. Ponson-Mansur had been credited to the MANIMEX account, and
forwarded a copy of the consolidated statement for SATUMA for
review.  Mr. Misiorski, as Director of Finance and
Administration for SEAGRAM EXPORT MARKETING COMPANY further
indicated SEAGRAM accepted MANIMEX'S proposal to use SEAGRAM'S
Miami office as a clearinghouse for all the money-laundering
payments to all of the SEAGRAM DEFENDANTS.  In this regard, he
wrote:

"In reference to your request to send your payments directly to
us, kindly send them to the attention of:
                    Mr. Santiago Sablon
                    Export Manager
                    Seagram EMCO
                    Two Alhambra Plaza
                    Suite 807
                    Coral Gables, FL 33134

Once we receive the funds we will forward them to the correct
ex-point for proper handling."

          56.  The aforesaid conduct continues unchecked to the
present date.  As recently as August 2004, the DEFENDANTS have
sold their liquor products to criminal organizations in Maicao,
Colombia, with the knowledge that they were receiving criminal
proceeds in payment for these products and thereby committing
money laundering.

          57.  Known criminal customers of the SEAGRAM

DEFENDANTS include Samuel "Santa" Lopesierra, Alfonso Fuminaya,
Randolf Habibe, David Cybul, and Jose Lopesierra.

### 3. DIAGEO DEFENDANTS' and PERNOD RICARD DEFENDANTS' Purchase of SEAGRAM Assets

58.   On December 4th, 2000, DEFENDANTS DIAGEO and
PERNOD RICARD entered into a framework and implementation
agreement (which agreement has subsequently been amended) (the
"Framework and Implementation Agreement") relating to the
acquisition from VIVENDI UNIVERSAL S.A. of certain companies and
assets and the assumption of certain liabilities comprising the
Seagram spirits and wine and beverage businesses (the "Seagram
Spirits and Wine Division").  As noted above, this Framework and
Implementation Agreement has been amended and/or superseded
several times.  On April 14th, 2003, the current agreement was
entered into by the DIAGEO AND PERNOD RICARD DEFENDANTS.  This
agreement, called the "Agreement Relating to the Termination of
the Framework and Implementation Agreement" is known as "SOFIA".

59.   On December 19th, 2000, DEFENDANTS DIAGEO PLC. and
PERNOD RICARD S.A. purchased SEAGRAM from Vivendi via the
"Vivendi Sale Agreement".  Pursuant to the Vivendi Sale

Agreement, the DIAGEO DEFENDANTS, the PERNOD RICARD DEFENDANTS, certain jointly-owned entities of both the DIAGEO DEFENDANTS and the PERNOD RICARD DEFENDANTS, certain of the DIAGEO DEFENDANTS' affiliates and certain of the PERNOD RICARD DEFENDANTS' affiliates acquired substantial SEAGRAM companies and assets and assumed certain of the liabilities comprising the Spirits and Wine Division.

60.   The DIAGEO and PERNOD RICARD DEFENDANTS agreed to purchase the SEAGRAM Spirits and Wine Division to further their illegal and anti-competitive activities, and agreed to continue to manage these entities, both jointly and separately.  In this way, the DIAGEO/UDV DEFENDANTS and the PERNOD RICARD DEFENDANTS knowingly acquired a money-laundering enterprise in order to enhance and to further their illegal activities.

61.   Specifically, the DIAGEO and PERNOD RICARD DEFENDANTS agreed to purchase and retain joint ownership of the SEAGRAM "umbrella operation" located in Colombia, a corporation called ATLAS COMERCIAL SEAGRAM DE COLOMBIA, S.A..  Under the April 2003 SOFIA Agreement, the DIAGEO and PERNOD RICARD DEFENDANTS agreed that PERNOD RICARD would manage ATLAS COMERCIAL SEAGRAM DE COLOMBIA, S.A..

62.   Additionally, under the Framework and

Implementation Agreement and the subsequent SOFIA, DIAGEO acquired DEFENDANT SEAGRAM EXPORT SALES CO., in order to further facilitate and carry out their illegal scheme.

63. All acts attributable to SEAGRAM entities are attributable to the SEAGRAM successor entities. As outlined above, the DIAGEO DEFENDANTS and the PERNOD RICARD DEFENDANTS have purchased substantial SEAGRAM assets and are SEAGRAM SUCESSOR ENTITIES. Liability assessed to any SEAGRAM entities that are now owned by the any of the DEFENDANTS, jointly or individually, also now lies with the respective SEAGRAM SUCESSOR ENTITIES.

64. Under the terms of the April 2003 SOFIA AGREEMENT, the SEAGRAM SUCESSOR ENTITIES agreed that any liabilities arising out of the claims made against SEAGRAM entities for involvement in illegal activities in Colombia would be jointly borne by the SEAGRAM SUCESSOR ENTITIES. Furthermore, the SEAGRAM SUCESSOR ENTITIES further agreed the claims would be "jointly managed".

65. The design and purpose of the common "management" of this SEAGRAM liability and of the joint ownership of the SEAGRAM entities was and is to further the money-laundering scheme put into place by the DIAGEO and PERNOD RICARD

DEFENDANTS.  A secondary design and purpose was and is to further facilitate the cover-up of the fraudulent and money-laundering activities of the DIAGEO and PERNOD RICARD DEFENDANTS.

66.  Since December 2001 when DEFENDANT PERNOD-RICARD and DEFENDANT DIAGEO purchased the SEAGRAM entities from VIVENDI UNIVERSAL, DEFENDANT PERNOD-RICARD and DEFENDANT DIAGEO have operated the illegal distribution and money-laundering scheme which had previously been operated by SEAGRAM and later by VIVENDI UNIVERSAL during the time period in which it owned the SEAGRAM entities.  Said illegal activities continue through 2004.

### 4. *Pernod Ricard's Direct Involvement in Money Laundering and Organized Crime*

67.  The PERNOD RICHARD DEFENDANTS sell various brands of liquor into illegal channels in Colombia including Dubonnet, Glenlivet, Havana Club, and others.  Also, as indicated above, the PERNOD RICARD DEFENDANTS purchased substantial SEAGRAM DEFENDANT assets, and multiple money-laundering entities formerly belonging to SEAGRAM.

68.  Certain of the traditional Seagram brands, such

as Chivas Regal, "Something Special" and Passport are some of the most popular brands of liquor in Colombia and are illegally sold in Colombia in huge volumes.  When the PERNOD RICARD DEFENDANTS purchased these brands they were well aware that these products were being used in a money laundering conspiracy. The PERNOD RICARD DEFENDANTS purchased these brands in part because of their high sales and high value in illegal markets in Colombia and elsewhere.

69.  After acquiring the aforesaid Seagram brands, the PERNOD RICARD DEFENDANTS continued to sell these products to known criminals and continued to knowingly receive criminal proceeds, including narcotics proceeds in exchange for these products.

70.  The PERNOD RICARD DEFENDANTS continued to sell Seagram brand products to companies owned by known criminals and narcotics traffickers including Alfonso Fuminaya, Randolf Habibe, David Cybul, and Jose Lopesierra. Sales to such companies have occurred as recently as September 2004.  In addition, the PERNOD RICARD DEFENDANTS, through their distributors maintain direct business relationships with individuals such as are described below.

71.  The PERNOD RICARD DEFENDANTS currently have a

74

very dangerous criminal customer who is engaged in weapons trafficking, narcotics trafficking and trafficking in human cargo.  He conducts this business through the use of fast boats by which he transports all the foregoing throughout the Caribbean and into and out of Colombia and Venezuela.  He uses these same boats to transport liquor products sold to him by the DEFENDANTS through their distributors, with most of said liquor then being sold illegally into Colombia.  The PERNOD RICARD DEFENDANTS and their co-conspirators consider this individual to be a very good customer because he requires no credit terms and always pays in U.S. dollars which he derives from his weapons trafficking and narcotics trafficking activities.  The PERNOD RICARD DEFENDANTS, through their distributors sell liquor products to this individual on a regular basis.  Such sales have occurred in the summer of 2004.

72.  In addition to activities related to Seagram products, the PERNOD RICARD DEFENDANTS themselves receive criminal proceeds from various money-laundering organizations as described generally above. Examples of the large volumes of monies being funneled to PERNOD RICARD through various cutout companies include:

(a)  On July 30th, 1992, Runam Holdings, Ltd.

75

transferred US$60,095.88 of criminal proceeds to the PERNOD

RICARD DEFENDANTS from its account number xxxxxxxxxxx0795 at

Interbank, located in Oranjestad, Aruba, in payment for PERNOD

RICARD DEFENDANT'S (RICARD) liquor products;

    (b)   On December 27th, 1994, Mansur Trading

Freezone, N.V. transferred US$514,230.95 of criminal proceeds to

WILLAIM LONGMORE & SONS, an entity now owned by PERNOD RICARD,

from its account number xxxxxxxxxxx8921 at Interbank, located in

Oranjestad, Aruba, in payment for liquor products;

    73.   The PERNOD RICARD DEFENDANTS have acquired money-

laundering entities to further facilitate their money-laundering

activities and enhance their money-laundering profits.   These

acquisitions were specifically designed to enhance the PERNOD

RICARD DEFENDANT'S position in the illegal liquor market in

Colombia.   Examples of these acquisitions of money-laundering

entities include, but are not limited to:

    (a)   Chivas Brothers. (producers of Chivas Regal

scotch whiskey) (December, 2001)

    (b)   Havana Club (producers of Cuban rum)(April,

1993)

    74.   In each instance, the entity which was acquired

by the PERNOD RICARD DEFENDANTS was purchased, in part, because

it produced a product which was already being actively sold in the illegal markets in Colombia.  As such, the purchase of each entity was either the acquisition of an ongoing money-laundering enterprise or the acquisition of an entity for the purpose of adding it to the PERNOD RICARD DEFENDANTS' ongoing money-laundering enterprise.

75.   The aforesaid conduct continues unchecked to the present date.  As recently as August 2004, the DEFENDANTS have sold their liquor products to criminal organizations in Maicao, Colombia, with the knowledge that they were receiving criminal proceeds in payment for these products and thereby committing money laundering.

76.   Known criminal customers of the PERNOD RICARD DEFENDANTS include Samuel "Santa" Lopesierra, Alfonso Fuminaya, Randolf Habibe, David Cybul, and Jose Lopesierra.

IX. ADDITIONAL ALLEGATIONS AS TO ALL DEFENDANTS

1. *Travel and Entertainment by Defendants' Employees*

77.   To advance the money-laundering schemes set forth above, the employees, executives, and managers of the DEFENDANTS often traveled extensively, both to supervise the schemes and

77

also to entertain their criminal customers.  For example,
DEFENDANT DIAGEO/UDV executives such as Anthony Greener, William
Bullard, José Colombo and Timothy Finch-Lee traveled to South
America to meet with, entertain, and maintain relations with
DEFENDANTS' criminal customers.  DEFENDANTS' executives and
managers who engaged in such travel and entertainment often
received large travel and entertainment budgets from the
DEFENDANTS.  Some DEFENDANTS' executives received substantial
travel and entertainment budgets for the purpose of advancing
the DEFENDANTS' illicit activities in this fashion.  Such
travel, entertainment, and meetings occurred throughout the
1990s and thereafter.

### 2. The DEFENDANTS' Purchase of Colombian Importers

78.  The DEFENDANTS purchased importation and
distribution entities in Colombia in order to further their
fraudulent scheme to launder narcotics proceeds and to carry out
other acts central to their scheme. The DEFENDANTS, having
competed unfairly and illegally for some time with the
legitimate Colombian importers/distributors, first brought these
legitimate importers/distributors to the brink of financial

insolvency by selling liquor products to them for 'legitimate'
importation into Colombia while at the same time dumping large
volumes of product on the illegal market. Examples of such
distributors include, but are not limited to Colombian companies
known as Rueda, Atlas Comercial, Puyana & Cia., and Fonandes.
These legitimate importer/distributors were forced to deal with
all the costs of representing a brand in the local Colombian
market such as import duties, taxes, labor costs, advertising
costs and other fixed costs attendant to a legitimate
importation/distribution entity, while their suppliers, the
DEFENDANTS were at the same time providing the same product to
the illegal criminal narcotics money laundering organization
with the full knowledge that the product would cannibalize the
legitimate importer/distributor's sales.  After driving the
Colombian importer/distributor to bankruptcy, the DEFENDANTS
then purchased the importing/distributing entities.  After this
purchase, the DEFENDANTS renamed the entities (for example,
"Rueda" became "UDV/RUEDA" and "Atlas Comercial" became "Atlas
Comercial Seagram de Colombia"), but did not channel their sales
to Colombia through these now wholly owned "legitimate"
channels, but rather continued to use them as "umbrella
operations" to cover their illegal sales to the criminal

narcotics money laundering organizations, and to continue reaping the benefits of the money-laundering cycle.  Through the umbrella operation, the DEFENDANTS are able to carry out vital activities, such as direct communication with the PLAINTIFFS, in order to continue to deceive and misinform the PLAINTIFFS as to the causes of and persons responsible for the massive illegal distribution of liquor products.

### 3. *External* Affairs

79.   The DEFENDANTS created an extensive "External Affairs" component to their business strategy to make use of the criminal money-laundering organizations for the distribution of their products into Colombia.  This "External Affairs" section was and is, directly and through various business associations, charged with lobbying officials of THE REPUBLIC OF COLOMBIA and of the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, in order to continue to deceive them as to the causes of and persons responsible for the massive illegal distribution of liquor products, to distract and dissuade them from any lines of investigation that might uncover the massive money-laundering scheme, and to curry favor for proposals in favor of the

DEFENDANTS, stating that other factors were the cause of the illegal trade in the DEFENDANTS' liquor products.  The "External Affairs" representatives met with representatives of the PLAINTIFFS on many occasions and continually lied to the PLAINTIFFS concerning the nature, sources and causes of the illegal trade in their products.  At no time did the "External Affairs" representatives of the DEFENDANTS disclose to Colombian government officials the true cause and source of the illegal trade in the DEFENDANTS' liquor products, to wit, the willful participation by the DEFENDANTS in the criminal narcotics money laundering enterprise.

80.  To further facilitate and promote the use of the criminal proceeds exchange for liquor products, the DEFENDANTS would have specialized sales personnel located in THE REPUBLIC OF COLOMBIA whose function was to promote the money laundering exchange.  An example of these persons is JOE DIAZ, who worked the Northeastern Atlantic coast of the REPUBLIC OF COLOMBIA for the DIAGEO/UDV DEFENDANTS.  Mr. Diaz would host lavish parties and other events, including the sponsorship of private and public cultural events and holidays, in an effort to lobby Colombian governmental authorities and to promote the use of the DIAGEO/UDV DEFENDANTS' products in the illegal money-laundering

exchange.  The hiring and maintenance of Mr. Diaz and other promoters like him were decisions made by the DIAGEO/UDV DEFENDANTS.  The salaries and expenses of the in-market promoters like Mr. Diaz were paid for by the DIAGEO/UDV DEFENDANTS through their distributor in Aruba.  Even though Mr. DIAZ was a direct employee of the DIAGEO/UDV DEFENDANTS, the DIAGEO/UDV DEFENDANTS did not want to be associated with him and those like him.  As such, they created mechanisms by which the Aruban distributors (in this example, ROMAR), would make all payments to Mr. Diaz, and the DEFENDANTS would reimburse the Aruban distributor for these payments.  In this way, the DEFENDANTS could maintain direct control over their in-market promoter, while at the same time maintaining some distance from his activities.

*4. Defendants' Responsibility for their Agents, Employees, and*

81.  The acts and omissions of the individuals employed by the DEFENDANTS are imputed to the DEFENDANTS under the doctrines of vicarious liability and respondeat superior. The DEFENDANTS actually benefited from the performance of predicate acts of racketeering through increased sales, profits, name-brand recognition, and market share.

82.   The DEFENDANTS and their employees were central figures and aggressors in the fraudulent scheme.   DEFENDANT personnel, including those named above, performed their fraudulent and illegal acts on behalf of the DEFENDANTS within the scope and course of their employment with the DEFENDANTS.

83.   The DEFENDANTS are liable under principles of agency.   Each of the DEFENDANTS is responsible for the conduct of its supervisory employees who violated the law and caused the DEFENDANTS to enter into and act to further money-laundering conspiracies.

*5. Defendants' Use of Wires and Mails*

84.   During all relevant times, the DEFENDANTS communicated with each other and with their joint and individual co-conspirators on virtually a daily basis, by means of interstate and international wires, as a means of obtaining orders for liquor products, arranging for sale and shipment of liquor products, arranging for and receiving payment for the liquor products in question and accounting for the payments for the products.   Under principles of conspiracy and concert of action, the DEFENDANTS are jointly and severally liable for the

actions of their co-conspirators in the furtherance of the
money-laundering scheme.

85.   The DEFENDANTS and their co-conspirators utilized
the United States and international mail and wires, and other
means of communications, to prepare and transmit documents that
intentionally misstated the purchases of the liquor products in
question so as to mislead the authorities within the United
States and THE REPUBLIC OF COLOMBIA in regard to the nature and
objectives of the money-laundering scheme.   THE REPUBLIC OF
COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA,
reasonably relied on said misrepresentations of fact were
damaged as a result, and continue to be damaged by such
reliance.


86.   Because the money-laundering conspiracy is a
multi-million dollar per year operation and is continuing on a
daily basis, it is impractical and impossible, in advance of
discovery, to delineate each and every fraudulent communication
in what is a pervasive and ongoing use of the mails and wires in
furtherance of the money-laundering activities.   By conducting
some of their activities in countries known for bank secrecy,
the DEFENDANTS have taken affirmative steps to prevent the

victims of their fraud and illicit conduct from discovering the exact details of the vast number of wire and mail communications that furthered the money-laundering schemes, including orders for liquor products, and repatriation of the proceeds of the money-laundering schemes to the United States.

87. In addition to using the mail and wire communications themselves to advance the money-laundering schemes, the DEFENDANTS, caused the use of the U.S. mails and wires in furtherance of the money-laundering schemes by acting with knowledge that the use of the U.S. mails and/or wires would follow in the ordinary course of business and/or could be reasonably foreseen as a result of their activities. The mailing or use of wire communications was for the purpose of executing the scheme, to wit, the money-laundering activities. These mail and wire transmissions furthered the money-laundering schemes and were essential to the success of those schemes, since such communications were necessary for the co-conspirators, who were separated by great distances and national borders to effectuate their common goals within the money-laundering enterprises.

88. At all relevant times the DEFENDANTS devised or intended to devise, a scheme or artifice to defraud PLAINTIFFS

and used, or caused the use of, mail and wire communications in interstate and foreign commerce to further the scheme. The scheme to defraud and cheat was inconsistent with moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of members of society.  In the execution of or attempt to execute this scheme, the DEFENDANTS used the United States interstate and foreign mail in violation of 18 U.S.C., Sections 2 and 1341, and interstate and foreign wires, radio, and television, in violation of 18 U.S.C., Sections 2 and 1343.

89.   The DEFENDANTS were conspirators and direct participants in the affairs of the illegal distribution enterprise, and each participant in the conspiracy is responsible for the actions of the others in pursuit of the illegal distribution scheme.  Acting for the benefit of the DEFENDANTS, and with the knowledge and authorization of corporate executives of the DEFENDANTS, the DEFENDANTS, with and through their conspirators, agents, and employees, carried out the foregoing activities to facilitate the illegal distribution scheme.

90.   The DEFENDANTS entered into an understanding or agreement, express or tacit, with its distributors, customers,

agents, consultants, and other co-conspirators, to participate in a common scheme, plan or design to commit tortious acts and thereby illegally distribute liquor products into THE REPUBLIC OF COLOMBIA.  In pursuance of the agreement, the DEFENDANTS and their distributors, customers, agents, consultants, and other co-conspirators acted tortiously by, among other things, committing the aforesaid acts constituting fraud, negligent misrepresentation, unjust enrichment, public nuisance, and negligence, thereby causing harm to PLAINTIFFS.  The DEFENDANTS, through joint action with their co-conspirators, acted tortiously, recklessly, unlawfully, and negligently, to the detriment of PLAINTIFFS.  By means of the aforesaid concerted action, the DEFENDANTS and their co-conspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

91.    All of the predicate acts set forth herein share the same purpose and the same victims, namely, THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.


X. RELATIONSHIP BETWEEN NARCOTICS TRAFFICKING AND TERRORISM IN COLOMBIA

87

92.   There is a direct relationship between Colombian narcotics trafficking and terrorism.  In fact, several significant Colombian narcotics-trafficking and narcotics-related criminal organizations have been included in the list of Designated Foreign Terrorist Organizations by the United States Department of State.

93.   As of August 12th, 2004, the following narcotics organizations were also listed as Designated Foreign Terrorist Organizations:

(a)   National Liberation Army (*Ejército de Liberación Nacional,* ELN)

(b)   Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarias de Colombia,* FARC)

(c)   United Self-Defense Forces of Colombia (*Autodefensas Unidas de Colombia*, AUC).

94.   The United States Department of State's report on international terrorism lists all of the above entities as involved in narcotics, as producing entities or otherwise.  All of these Designated Foreign Terrorist Organizations use narcotics trafficking as a means to finance their activities. For example, the leader of the AUC, Carlos Castaño, has stated that over 70% of the AUC's financing comes from narcotics

trafficking.

95.   As relates to the DEFENDANTS, these narcotics trafficking entities provide a significant portion of the dollars and funding to the Black Market Peso Exchange mechanism that drives the money-laundering enterprise at the center of the DEFENDANTS' scheme to illegally distribute their products and earn these narcotics proceeds.

96.   The DEFENDANTS and their co-conspirators engage in dealings with these Designated Foreign Terrorist Organizations and/or their representatives in order to arrange for the laundering of the narcotics and terrorist proceeds through the Black Market Peso exchange.

XI. IMPACT OF THE MONEY-LAUNDERING SCHEME ON THE UNITED STATES,
    THE REPUBLIC OF COLOMBIA, AND THE STATE OF NEW YORK.

97.   International money laundering has become a threat to United States security, as well as to the security of THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.  As Asa Hutchinson, Director of the United States Drug Enforcement Administration, has stated: "The illegal drug production that undermines America's culture also funds terror and erodes democracies across the globe.  They all represent a

clear and present danger to our national security." Since the money-laundering scheme that is the subject matter of this complaint is a fundamental part of the drug-production cycle, these money-laundering activities equally represent a threat to U.S. national security as well as the security of THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

98.   Money laundering through the purchase and sale of liquor products has become a primary means by which terrorists finance their illegal activities.  The DEFENDANTS knowingly or negligently support the activities of terrorists when they allow terrorist groups to launder narcotics proceeds in THE REPUBLIC OF COLOMBIA through the purchase of liquor products.

99.   A large percentage of the conduct of the DEFENDANTS that is material to this case is conducted by the DEFENDANTS in the United States.  There is a substantial effect experienced in the United States and in this district as a result of the schemes that are the subject matter of this complaint because:

(a)   The DEFENDANTS receive, and have received, the profits and proceeds of said schemes in the United States. Such funds have been repatriated to this country through money laundering and other acts of concealment, all of which threaten

90

the integrity of the U.S. financial system.

(b)  A significant portion of the money-laundering activities described in relation to this scheme occurred in Queens, New York, and tens of millions of dollars of laundered criminal proceeds that constitute the subject matter of this complaint were laundered in Queens, New York.

(c)  The money-laundering and racketeering scheme is used to aid and abet the conduct of narcotics traffickers throughout the United States, including but not limited to the State of New York.  The U.S. Treasury Department has described the Black Market Peso Exchange as perhaps the most dangerous money-laundering scheme ever encountered, and it is a matter of public record that the proceeds of narcotics transactions on the streets of the State of New York are laundered through the purchase of liquor, which is in turn sold illegally into Colombia.

(d)  The United States and THE REPUBLIC OF COLOMBIA have recognized in international conventions their mutual interest in ending transnational money-laundering schemes.  The DEFENDANTS' conduct contravenes the vital public interest in stemming such illicit conduct.

(e)  The State of New York, and its international

91

business facilities, have been used by the DEFENDANTS as a
springboard for transnational criminal activities.

(f)  Large volumes of false documents have been
filed with the United States Customs Service and the Bureau of
Alcohol, Tobacco and Firearms by the DEFENDANTS and/or their co-
conspirators.  The purpose of these filings was to deceive the
United States Customs Service and the Bureau of Alcohol, Tobacco
and Firearms and allow the criminal activity to continue.

(g)  The money-laundering scheme is advanced by
numerous acts of wire fraud and mail fraud, many of which
occurred in the United States and the State of New York.  The
United States has an interest in preventing such schemes from
being carried out through the U.S. telecommunications system and
postal system.

100. All the aforesaid activities occurred with both
the knowledge and at the direction of persons at both middle
management and high-level management positions within the
DEFENDANTS' corporations.  Many of the liquor products utilized
in the money-laundering schemes are shipped from the United
States.  Many of the activities of the DEFENDANTS that are the
subject matter of this complaint, including management decisions
and direction of the schemes, are conducted by the DEFENDANTS in

the United States and, more particularly, from the DEFENDANTS'
offices in the State and City of New York.

XII. MONEY LAUNDERING THROUGH THE EASTERN DISTRICT OF NEW YORK.

101. The "smurf" money-laundering system employed to a
great extent by the DEFENDANTS and their narcotics money-
laundering co-conspirators, including, but not limited to the
ROMAR and MANSUR organizations, greatly affects financial
activities in this State and particularly Long Island.  Due to
demographic reasons, the vast majority of "smurf" accounts and
third-party checks come from 2 principal sources: New York
(specifically Long Island), and Miami.  This creates additional
criminal money-laundering activity within this state (and
specifically Long Island) as bulk cash is transported into the
area by criminal organizations for "processing" by the smurf
organizations.  This misuse of the financial institutions in
Long Island, Miami and elsewhere is pervasive and greatly
affects the areas in which the activity occurs.  Examples of
accounts used in the DEFENDANTS' money-laundering scheme for the
creation of third-party checks on New York financial
institutions include, but are not limited to:

93

(a)     Account # xxxxxx1537 in the name of "Adriana Uribe" at CHEMICAL BANK, located at 196-03 Northern Blvd., in Flushing, New York 11354;

(b)     Account # xxxxxxxxx4265 in the name of "Alfred Lopez" at MANUFACTURERS HANOVER TRUST COMPANY, located at 118-34 Queens Boulevard in Forest Hills, New York 11375;

(c)     Account # xxxxxxxxx3865 in the name of "Olga L. Goez" at MANUFACTURERS HANOVER TRUST COMPANY, located at 37-29 Junction Boulevard in Corona, New York 11368;

(d)     Account # xxxxxxxxx5365 in the name of "Blanca R. Velasquez" at MANUFACTURERS HANOVER TRUST COMPANY, located at 37-29 Junction Boulevard in Corona, New York 11368;

(e)     Account # xxxxxxxxx1465 in the name of "Hector Pinedo" at MANUFACTURERS HANOVER TRUST COMPANY, located at 47-11 Queens Boulevard in Long Island City, New York 11104;

(f)     Account # xxxxxxxxx5465 in the name of "Juan Guillermo Posada" at MANUFACTURERS HANOVER TRUST COMPANY, located at 37-29 Junction Boulevard in Corona, New York 11368;

(g)     Account # xxxxxxxxx9965 in the name of 'Luz M. Picon' at MANUFACTURERS HANOVER TRUST COMPANY, located at 77-22 21st Avenue in East Elmhurst, New York 11370;

(h)     Account # xxxxxxxxx2865 in the name of

94

"Jose M. Ramos" at MANUFACTURERS HANOVER TRUST COMPANY, located at 43-33 91st Place in Elmhurst, New York 11373;

(i)     Account # xxxxxxxxx0365 in the name of "Orlando Rojas" at MANUFACTURERS HANOVER TRUST COMPANY, located at 47-11 Queens Boulevard in Long Island City, New York 11104;

(j)     Account # xxxxxxxxx2065 in the name of "Jorge Giraldo" at MANUFACTURERS HANOVER TRUST COMPANY, located at 37-29 Junction Boulevard in Corona, New York 11364;

(k)     Account # xxxx9306 in the name of "Hector G. Pinedo" at CITIBANK, located at 169-21 37th Avenue in Jamaica, New York 11434;

(l)     Account # xxxx3827 in the name of "Bladen A. Rizo" at CITIBANK, located at 87-11 Queens Blvd., in Elmhurst, New York 11373;

(m)     Account # xxxx1093 in the name of "Luis C. Gomez' at CITIBANK, located at 69-80 188th Street in Fresh Meadows, New York 11365;

(n)     Account # xxxx1793 in the name of "Fausto Castellanos" at CITIBANK, located at Roosevelt Avenue at 81st Street, in Jackson Heights, New York 11372;

(o)     Account # xxxx9716 in the name of "Ivan Arbelaez" at CITIBANK, located at 95-46 Roosevelt Avenue in

95

Jackson Heights, New York 11372;

(p)   Account # xxxx9376 in the name of
"Pinelli's Import and Export Sortswear" at CITIBANK, located at
102-29 Queens Blvd., in Forest Hills, New York 11375;

(q)   Account # xxxx2897 in the name of "Alfred
Lopez" at CITIBANK, located at 156-19 Crossbay Blvd., in Howard
Beach, New York 11414;

(r)   Account # xxxxxxxxx3252 in the name of
"Martha Zuluaga" at LONG ISLAND SAVINGS BANK, located at 201 Old
Country Road in Melville, New York 11747;

(s)   Account # xxxxxx3993 in the name of "Hernan
Perez" at LONG ISLAND SAVINGS BANK, located at 70-09 Parsons
Blvd., in Flushing, New York 11365;

(t)   Account # xxxxxxxxx3336 in the name of
"Jorge Ivan Giraldo" at LONG ISLAND SAVINGS BANK, located at 201
Old Country Road in Melville, New York 11747;

(u)   Account # xxxxxx1884 in the name of "Noema
Perez" at LONG ISLAND SAVINGS BANK, located at 17-27 Queens
Blvd., in Rego Park, New York 11374;

(v)   Account # xxxxxxxxx9278 in the name of
"Gustavo de Jesus Arbelaez" at LONG ISLAND SAVINGS BANK, located
at 136-21 Roosevelt Avenue, in Flushing, New York 11354;

(w)   Account # xxxxxxxxxx8148 in the name of "Gilberto Lopez" at LONG ISLAND SAVINGS BANK, located at 201 Old Country Road in Melville, New York 11747;

(x)   Account # xxxxxx1933 in the name of "Fernando Rizo" at LONG ISLAND SAVINGS BANK, located at 201 Old Country Road in Melville, New York 11747;

(y)   Account # xxxxx5198 in the name of "Carlos A. Calle" at LONG ISLAND SAVINGS BANK, located at 17-27 Queens Blvd., in Rego Park, New York 11374;

(z)   Account # xxxxxxxxxx0265 in the name of "Juan R. Suarez" at LONG ISLAND SAVINGS BANK, located at 201 Old Country Road in Melville, New York 11747;

(aa)   Account # xxxxxxxxxxx0429 in the name of "Jorge M. Bedoya" at LONG ISLAND SAVINGS BANK, located at 136-21 Roosevelt Ave., in Flushing, New York 11364;

(bb)   Account # xxxxxxxxxx0265 in the name of "Juan R. Suarez" at LONG ISLAND SAVINGS BANK, located at 201 Old Country Road in Melville, New York 11747;

(cc)   Account # xxxxxxxxxx2223 in the name of "Blanca A. Restrepo" at LONG ISLAND SAVINGS BANK, located at 201 Old Country Road in Melville, New York 11747;

(dd)   Account # xxxxxx1644 in the name of "Carlos

97

Rubiano" at LONG ISLAND SAVINGS BANK, located at 201 Old Country
Road in Melville, New York 11747;

(ee)  Account # xxxxxx1620 in the name of "Atala
Ochoa Torrenegra" at LONG ISLAND SAVINGS BANK, located at 201
Old Country Road in Melville, New York 11747;

(ff)  Account # xxxxxxxx7749 in the name of
"Jorge F. Camacho" at CHASE MANHATTAN BANK, located at 81-35
Lefferts Blvd., in Kew Gardens, New York 11415;

(gg)  Account # xxxxxxxx4006 in the name of "Luz
M. Picon" at CHASE MANHATTAN BANK, located at 22-45 31st Street
in Astoria, New York 11105;

(hh)  Account # xxxxxxxx6873 in the name of
"Hernan Pinedo W" at CHASE MANHATTAN BANK, located at 104-17
Queens Blvd., in Forest Hills, New York 11375;

(ii)  Account # xxxxxxxx5447 in the name of
"Fausto Castellano" at CHASE MANHATTAN BANK, located at 37-94
103rd Street in Corona, New York 11368;

(jj)  Account # xxxxxxxx1981 in the name of
"Pinellis Import & Export Sportswear" at CHASE MANHATTAN BANK,
located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(kk)  Account # xxxxxxxx3045 in the name of
"Gabriel Lozano" at CHASE MANHATTAN BANK, located at 104-17

Queens Blvd., in Forest Hills, New York 11375;

(ll)   Account # xxxxxxxx8226 in the name of "Alcira Perez Perez" at CHASE MANHATTAN BANK, located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(mm)   Account # xxxxxxxxx8757 in the name of "Hector Pinedo" at CHASE MANHATTAN BANK, located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(nn)   Account # xxxxxxxx2351 in the name of "Victoria E. Velasquez" at CHASE MANHATTAN BANK, located at 163-20 Northern Blvd., in Flushing, New York 11358;

(oo)   Account # xxxxxxxx0851 in the name of "Fernando Rizo" at CHASE MANHATTAN BANK, located at 37-67 75th Street, in Jackson Heights, New York 11372;

(pp)   Account # xxxxxxxx9310 in the name of "Marco Sanchez" at CHASE MANHATTAN BANK, located at 260 Broadway, in Brooklyn, New York 11211;

(qq)   Account # xxxxxxxx7475 in the name of "Alcides Pinto Wilches" at CHASE MANHATTAN BANK, located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(rr)   Account # xxxxxxxx8234 in the name of "Nelsy Perez Perez" at CHASE MANHATTAN BANK, located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(ss)  Account # xxxxxxxx9935 in the name of "Maria Bolivar" at CHASE MANHATTAN BANK, located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(tt)  Account # xxxxxxxx9547 in the name of "Moises S. Gomez Navarro" at CHASE MANHATTAN BANK, located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(uu)  Account # xxxxxxxx9372 in the name of "Marta Ligia Fernandez" at CHASE MANHATTAN BANK, located at 104-17 Queens Blvd., in Forest Hills, New York 11375;

(vv)  Account # xxxxxx9235 in the name of "Hector G. Pinedo" at CHEMICAL BANK, located at 165-40 Baisley Blvd., in Jamaica, New York 11434;

(ww)  Account # xxxxxx9491 in the name of "Gustavo Arbelaez" at CHEMICAL BANK, located at 93-01 Northern Blvd., in Jackson Heights, New York 11372;

(xx)  Account # xxxxxx3640 in the name of "Emilce Berrios" at CHEMICAL BANK, located at 136-37 Roosevelt Avenue, in Flushing, New York 11354;

(yy)  Account # xxxxxx7896 in the name of "Jorge B. Bedoya" at CHEMICAL BANK, located at 136-37 Roosevelt Avenue, in Flushing, New York 11354;

(zz)  Account # xxxxxx5436 in the name of "Martha

Estrada" at CHEMICAL BANK, located at 136-37 Roosevelt Avenue,
in Flushing, New York 11354;

(aaa) Account # xxxxxx8610 in the name of
"Gabriel Lozano" at CHEMICAL BANK, located at 93-01 Sutphin
Blvd., in Jamaica, New York 11435;

(bbb) Account # xxxxxx8811 in the name of "Blanca
Montoya" at CHEMICAL BANK, located at 1624 Brentwood Road, in
Brentwood, New York 11717;

(ccc) Account # xxxxxx4734 in the name of "Luis
Gaviria" at CHEMICAL BANK, located at 31-05 30th Ave., in Long
Island City, New York 11102;

(ddd) Account # xxxxxx3175 in the name of
"Pinell's Import & Export" at CHEMICAL BANK, located at 165-40
Baisley Blvd., in Jamaica, New York 11434;

(eee) Account # xxxxxx7346 in the name of "Carlos
Arbelaez" at CHEMICAL BANK, located at 81-19 Roosevelt Ave., in
Jackson Heights, New York 11354;

(fff) Account # xxxxxx6870 in the name of "Hernan
J. Perez" at CHEMICAL BANK, located at 71-41 Main Street, in
Flushing, New York 11367;

(ggg) Account # xxxxxx3145 in the name of "Luz
Amparo Rodriguez" at CHEMICAL BANK, located at 93-01 Northern

Blvd., in Jackson Heights, New York 11372;

(hhh) Account # xxxxxx9221 in the name of "Alfred Lopez" at CHEMICAL BANK, located at 93-01 Sutphin Blvd., in Jamaica, New York 11435;

(iii) Account # xxxxxx0472 in the name of "Jose Max Ramos" at CHEMICAL BANK, located at 81-19 Roosevelt Ave., in Jackson Heights, New York 11354; and

(jjj)Account # xxxxxxxx3058 in the name of "Bladen A. Rizo" at NATIONAL WESTMINSTER BANK USA, located at 2900 Queens Plaza East, in Long Island City, New York 11101.


XIII. CONTINUING DAMAGE TO THE PLAINTIFFS AND COMPELLING NEED FOR INJUNCTIVE AND EQUITABLE RELIEF

102. THE REPUBLIC OF COLOMBIA and THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have the right and duty to make claims for, and to seek injunctive relief against, the money-laundering conspiracy that is the subject matter of this complaint.

103. As a result of the DEFENDANTS' wrongful activities, THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have been injured in their businesses and deprived of money and property, and the DEFENDANTS have secured vast profits and proceeds from their illegal schemes.  The

injuries to the PLAINTIFFS include, but are not limited to, the following:

(a) *Lost Sales Due to Money Laundering Scheme.* Under the laws of the REPUBLIC OF COLOMBIA, the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA manufacture and distribute liquor products. As such, they are direct competitors in the market for liquor products in Colombia, and in other markets in which they compete, including but not limited to, the United States. The DEFENDANTS' money-laundering scheme described in this Complaint gives the DEFENDANTS an unfair and illegal competitive advantage over the PLAINTIFFS and causes a loss of business and property to the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA because sales that would have been made by the PLAINTIFFS' legitimate business operations are lost to the DEFENDANTS' money-laundering enterprise.

(b) *Lost Sales Due to Illegal Distribution Scheme.* In that the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA are direct competitors to the DEFENDANTS, every bottle of illegally distributed liquor product unfairly and illegally supplants sales of PLAINTIFFS' liquor products. Furthermore, the products distributed illegally by the DEFENDANTS via their criminal scheme gain an unfair and illegal competitive advantage over the

PLAINTIFFS, whose products do comply fully with Colombian labeling requirements.  In Colombia, alcohol products must bear a warning stating that "consumption of alcohol may be damaging to the consumer's health."  This label must be in Spanish, and be of certain dimensions and placement on the product. Additionally, imported liquor must bear a statement of the name and local address of the importer.  Both the health warning and importer address requirements are mandated by Colombian law, and follow a public policy tendency towards these matters espoused by many nations, including the United States.  The liquor products illegally distributed by the DEFENDANTS do not comply with these requirements.  This is of benefit to the DEFENDANTS because this non-compliance gives them a competitive advantage over their competitors in the Colombian market, including the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.  In addition to the unfair and illegal cost savings related to the labeling requirements, the fact that the bottles of illegally distributed liquor bear no health warning, no indication of a local importer, and are labeled exclusively in the English language, is a significant selling point for the illegally distributed product.  This translates into an unfair competitive advantage over their direct competitors, THE DEPARTMENTS OF THE REPUBLIC

104

OF COLOMBIA.  This is a specifically intended and additional
benefit to the DEFENDANTS of their illegal and criminal
distribution scheme, and this causes additional losses to the
PLAINTIFFS in that they lose sales to such improperly labeled
and illegally distributed liquor product.

(c)  *Reduced Value of Sales.*  In addition to lost
sales, the DEFENDANTS' money-laundering scheme described in this
Complaint gives the DEFENDANTS an unfair and illegal competitive
advantage over the PLAINTIFFS and causes a loss of business and
property to the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA because
the DEFENDANTS' use of laundered narcotics and other criminal
proceeds and illegal distribution scheme allows the DEFENDANTS
to manipulate the prices of their illegally distributed product
which is intended to and in fact does have the effect of
limiting the price at which the PLAINTIFFS can sell their liquor
products.  Specifically, this loss is the differential between
the greater price at which the PLAINTIFFS could sell their
liquor products (with no loss in sales volume) and the reduced
price at which they are forced to sell their products by the
DEFENDANTS' narcotics and other criminal money-laundering
scheme.  Simply put, but for the DEFENDANTS' narcotics and other
criminal money laundering and illegal distribution scheme, the

105

PLAINTIFFS would be able to command a higher price for their products without losing any sales because of the higher price. This is an important and specifically intended effect of the DEFENDANTS' scheme.

(d)  *Lost Profits from Liquor Sales by PLAINTIFFS.*   In that the DEFENDANTS' illegal distribution scheme gives the DEFENDANTS an unfair and illegal competitive advantage over their direct competitors, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, and illegally supplants the PLAINTIFFS' liquor sales and reduces the prices at which the PLAINTIFFS can sell their products, the PLAINTIFFFS make less profits from their competitive commercial activity.  This in turn has a negative effect on the economic viability of the PLAINTIFFS' liquor operations, and, in fact, several DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have had to close down their operations, and/or cut back product lines and production facilities. Through their scheme, the DEFENDANTS have acted to unfairly and illegally stifle their competitors, THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

(e)  *Reduction of PLAINTIFFS' Ability to Compete in the United States and Other Markets.*  Due to the injury suffered by the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, as

106

described in this complaint, these PLAINTIFFS suffer an
additional loss in that their ability to compete within the
international markets, including, but not limited to, the United
States of America is reduced.  The DEPARTMENTS OF THE REPUBLIC
OF COLOMBIA not only produce and distribute liquor products for
domestic consumption, but also for export.  These export sales
are significant in both volume and value.  In that the
DEFENDANTS' money-laundering and illegal distribution scheme
injures the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA'S liquor
manufacturing and distribution entities, as described in this
complaint, the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA suffer
from a reduced ability to compete in international markets,
including, but not limited to, the United States.  Through their
scheme, the DEFENDANTS have acted to unfairly and illegally
stifle THE DEPARTMENTS OF THE REPUBLIC OF COLOMBIA in their bid
for a share of the international liquor market, including that
of the United States.

       *(f)  Right, Title, and Interest in the Proceeds
of Crime.*  Under the laws of the REPUBLIC OF COLOMBIA, the
REPUBLIC OF COLOMBIA possesses title in, and has a right to the
proceeds of, any criminal activity conducted within its borders.
This right is a civil right of reparation.  The DEFENDANTS'

107

money-laundering scheme described in this Complaint causes a
loss of property to THE REPUBLIC OF COLOMBIA because the
laundering of the criminal proceeds, including the surreptitious
removal of these proceeds from the territory of the REPUBLIC OF
COLOMBIA, effectively prevents the REPUBLIC OF COLOMBIA from
collecting the money and property constituting the proceeds of
criminal activity, to which right or title has vested in the
REPUBLIC OF COLOMBIA.

(g)  Right, Title, and Interest in the
Instrumentalities of Crime.  Under the laws of the REPUBLIC OF
COLOMBIA, the REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE
REPUBLIC OF COLOMBIA possess title in, or have a right to, any
property used in the commission of a crime conducted within
their borders, including money and goods, including illegal
liquor products.  This right is a civil right of reparation.
The DEFENDANTS' money laundering described in this Complaint
causes a loss of business and property to the PLAINTIFFS because
the laundering of the criminal proceeds and the illegal
distribution scheme prevents the REPUBLIC OF COLOMBIA and the
DEPARTMENTS OF THE REPUBLIC OF COLOMBIA from acquiring title in
or rights to the instrumentalities used in the commission of
criminal activity, which title or right has vested in the

REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

(h)  *Money Laundering Facilitates Organized Crime.*  The money-laundering scheme by the DEFENDANTS facilitates organized crime including narcotics trafficking, arms trafficking, and other offences.  The REPUBLIC OF COLOMBIA, the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, and their citizens are the victims of these crimes.  But for the active assistance of the DEFENDANTS, money launderers and criminals could not have laundered the proceeds of their criminal activities to the detriment of the REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.

(i)  *Costs of Fighting Money Laundering.*  The DEFENDANTS' money-laundering scheme and related criminal activities cause direct economic losses to REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA in the form of increased expenditures to prevent money laundering, including financial audits, anti-money-laundering protocols, and other expenditures that are necessitated by such conduct.

(j)  *Law-Enforcement Costs of Fighting Underlying Criminal Activity.*  THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA are required to expend large amounts

of money on law-enforcement activities to combat the criminal
activity that is facilitated by the money laundering and related
activities of the DEFENDANTS and their co-conspirators.  Such
criminal activity includes, but is not limited to, narcotics
trafficking, weapons trafficking, terrorism, money laundering,
and an array of other organized criminal activities.  But for
the money-laundering activities of the DEFENDANTS, the efficacy
of these crimes would be diminished, the incentive to commit
these crimes would be reduced, and the law enforcement and other
costs incurred by the REPUBLIC OF COLOMBIA and the DEPARTMENTS
OF THE REPUBLIC OF COLOMBIA would be accordingly diminished.

(k)  *Damage to Property of the REPUBLIC OF
COLOMBIA and DEPARTMENTS OF THE REPUBLIC OF COLOMBIA*.  The means
employed by the DEFENDANTS and their co-conspirators routinely
result in damage to or the destruction of property of the
REPUBLIC OF COLOMBIA and DEPARTMENTS OF THE REPUBLIC OF COLOMBIA
such as automobiles and vessels.  This damage to the PLAINTIFFS'
property is foreseeable and anticipated by the DEFENDANTS and
their co-conspirators, and results in additional expenditures by
the REPUBLIC OF COLOMBIA and DEPARTMENTS OF THE REPUBLIC OF
COLOMBIA to repair and replace the damaged property.

(l)  *Damage to the Legitimate Economy*.  The

DEFENDANTS' money-laundering scheme and related criminal activities cause a direct and adverse economic impact on the REPUBLIC OF COLOMBIA and DEPARTMENTS OF THE REPUBLIC OF COLOMBIA because this underground economy competes illegally against the legitimate economy of the REPUBLIC OF COLOMBIA and DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, and thereby causes direct financial loss to the PLAINTIFFS.

(m) *Damage to Banks Owned by the REPUBLIC OF COLOMBIA.* Money laundering associated with the liquor product sales described in this Complaint has a direct and adverse impact on commercial banks owned wholly or partially by the REPUBLIC OF COLOMBIA. The underground currency exchange deprives commercial banks of transaction fees and other sources of income associated with the international and/or foreign exchange transactions that are displaced by these money-laundering activities. When commercial banks fail as a result of money laundering, the REPUBLIC OF COLOMBIA sustains direct economic losses as a result of those failures.

(n) *Protection of the Colombian Peso.* When the REPUBLIC OF COLOMBIA issues its currency, the Colombian peso, the REPUBLIC OF COLOMBIA acts as a guarantor of its stability. The REPUBLIC OF COLOMBIA provides value to the currency by its

willingness to maintain the strength and integrity of that currency. When the DEFENDANTS and their co-conspirators launder Colombian pesos, they convert and make illicit use of the currency and thereby erode the stability and credibility of that currency thereby depriving the PLAINTIFFS of money and property. In fact, the money-laundering scheme developed by the DEFENDANTS has created and maintains a huge and illegal black market for foreign currency (principally United States Dollars).

(o) *Distortion of the Money Supply.* The process of laundering criminal proceeds through the purchase and sale of liquor products involves the unrecorded and irregular physical removal of huge amounts of local currency from the territory of the REPUBLIC OF COLOMBIA. The money-laundering activities of the DEFENDANTS, when they involve an unrecorded and irregular removal of huge amounts of Colombian pesos from the country, act to affect and distort the supply of money in the REPUBLIC OF COLOMBIA. This distortion directly and adversely affects the official calculations of the money supply performed and maintained by the REPUBLIC OF COLOMBIA, thereby causing additional expenditures of funds by the REPUBLIC OF COLOMBIA to detect and compensate for the huge unrecorded and irregular physical removals of Colombian pesos from the country, depriving

112

the REPUBLIC OF COLOMBIA of money and property.

(p) *Balance of Payments.*  The process of laundering criminal proceeds through the purchase and sale of U.S.-made liquor products involves the illegal conversion of Colombian pesos into U.S. dollars outside of the facilities provided by the REPUBLIC OF COLOMBIA for this exchange.  The money-laundering activities of the DEFENDANTS, when they involve an unrecorded and irregular conversion of Colombian pesos into United States dollars, distort the official balance of payments calculated and maintained by the REPUBLIC OF COLOMBIA, thereby causing additional expenditures of funds by the REPUBLIC OF COLOMBIA to detect and compensate for the huge unrecorded and irregular foreign exchange operations, depriving the REPUBLIC OF COLOMBIA of money and property.

*(q)  Damage to THE REPUBLIC OF COLOMBIA'S Regulation of its Customs Territory.*  The violation and permeation of the Colombian border and the Territory of the REPUBLIC OF COLOMBIA by money-laundering activities and the illegal transport of money into and out of the REPUBLIC OF COLOMBIA violates the legal rights of THE REPUBLIC OF COLOMBIA, threatens the safety, security, and well-being of governmental personnel and property within THE REPUBLIC OF COLOMBIA, and

interferes with and damages the regulatory system and authority of THE REPUBLIC OF COLOMBIA.

(r)   *Injury to THE REPUBLIC OF COLOMBIA and DEPARTMENTS OF THE REPUBLIC OF COLOMBIA due to DEFENDANT'S Support of Narcotics Trafficking and Terrorist Organizations.* Illegal liquor sales by the DEFENDANTS and their co-conspirators into Colombia and other areas have resulted in a direct financial benefit to narcotics trafficking and terrorist organizations that have caused harm to THE REPUBLIC OF COLOMBIA and to the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, including but not limited to destruction of public property, death and/or injury of government personnel, diminished economic productivity, increased law-enforcement expenses, and other costs associated with combating terrorism.

(s)   *Damage Caused by Bribery of Public Officials.* Money-laundering activities, bribery of government officials, and other related criminal acts conducted in various countries and in particular Colombia and Venezuela, have caused severe harm to THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, including but not limited to increased law-enforcement and military expenditures, disruption of public services, expenses to stabilize unstable political situations in

114

entire regions of Colombia, and damage to the trade and the
economy of THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE
REPUBLIC OF COLOMBIA.

(t) *Expenses and Costs Incurred to Address,
Remedy, and Repair the Effects of the Money Laundering by the
DEFENDANTS*.  The REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE
REPUBLIC OF COLOMBIA have been required to incur expenses and
costs to address and remedy the money-laundering activities of
the DEFENDANTS and the effects thereof.  The PLAINTIFFS have
suffered economic losses and other damages as a result of the
need to address and remedy the money laundering conducted by the
DEFENDANTS and the effects thereof and for which the PLAINTIFFS
are entitled to restitution and reimbursement.

104. THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF
THE REPUBLIC OF COLOMBIA and their economies have suffered
losses at least equal to, and properly measured by, the total
amount of criminal proceeds laundered by the DEFENDANTS.  These
losses were directly and proximately caused by the money-
laundering activities of the DEFENDANTS and their co-
conspirators.  THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF
THE REPUBLIC OF COLOMBIA have the duty and responsibility to
protect against, and to seek redress for, such losses.

115

105. As a direct and proximate result of the money-laundering activities that are conducted, aided, and encouraged by the DEFENDANTS, losses of hundreds of millions of dollars per year are being suffered by THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA, which have been deprived of money and property in this manner throughout the 1990s and continuing through the present time.  If the money-laundering activities of the DEFENDANTS are not stopped, THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA will continue to lose money, property and business in the future.  In addition, THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA have been required to expend large amounts of money in their efforts to stop money laundering and to recoup funds that they have lost as a result of the activities of the DEFENDANTS.  All of these losses will continue into the future, absent judgment in PLAINTIFFS' favor and injunctive and equitable relief, including:

(a) *RICO Injunctive and Equitable Relief.*  Under the RICO statute, 18 U.S.C. § 1964(a), and pursuant to inherent equitable powers of the Court, the U.S. District Court is empowered to prevent and restrain violations of 18 U.S.C. § 1962 by issuing appropriate orders, including without limitation: (i)

116

ordering any person to divest himself or herself of any
interest, direct or indirect, in any enterprise; (ii) imposing
reasonable restrictions on the future activities or investments
of any person that affect interstate or foreign commerce,
including, but not limited to, prohibiting any person from
engaging in the same type of endeavor as the enterprise engaged
in; and (iii) ordering dissolution or reorganization of any
enterprise, making due provision for the rights of innocent
persons. In addition, under 28 U.S.C. § 1651(a), the U.S.
District Courts are empowered to "issue all writs necessary or
appropriate in aid of their respective jurisdictions and
agreeable to the usages and principles of law." Consistent with
these powers, the REPUBLIC OF COLOMBIA and the DEPARTMENTS OF
THE REPUBLIC OF COLOMBIA seek an order that: (i) enjoins the
DEFENDANTS and their respective agents, servants, officers,
directors, employees, and all persons acting in concert with
them from laundering the proceeds of criminal activities through
the sale of liquor products; (ii) compels each of the DEFENDANTS
who are found to have violated 18 U.S.C. § 1962 to disgorge all
proceeds derived from any such violation and to make restitution
to the PLAINTIFFS; (iii) enjoins the DEFENDANTS and their
respective agents, servants, officers, directors, employees, and

all persons acting in concert with them from selling liquor
products and/or receiving payment for liquor products without
proper documentation, shipping records, markings, and similar
indicia of compliance with law that will facilitate the proper
tracking of the liquor products and the funds with which they
were purchased; (iv) enjoins the DEFENDANTS and their respective
agents, servants, officers, directors, employees, and all
persons acting in concert with them from selling liquor products
to any distributor or any other person who cannot fully and
accurately account for the source of the funds with which the
liquor products were purchased; (v) enjoins the DEFENDANTS and
their respective agents, servants, officers, directors,
employees, and all persons acting in concert with them from
engaging in any practices by which distributors, shippers, or
wholesalers can pay for the liquor products in question into
offshore corporations, offshore bank accounts, or other
locations that limit the ability of government officials to
track the sale of liquor products or the payment for said liquor
products; (vi) orders the DEFENDANTS to create and utilize
adequate protocols by which all liquor products manufactured by
the DEFENDANTS and all payments made for the sale of such liquor
products into THE REPUBLIC OF COLOMBIA can be adequately tracked

118

and monitored by government officials of THE REPUBLIC OF
COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA; (vii)
orders the DEFENDANTS to take all reasonable and necessary steps
to stop the money-laundering scheme, including the addition of
any necessary labeling, tracking devices, or other means that
would allow the DEFENDANTS and/or THE REPUBLIC OF COLOMBIA and
the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA to track and monitor
the movement of liquor products into and within THE REPUBLIC OF
COLOMBIA; (viii) orders the DEFENDANTS to disclose all
information within their possession concerning the names,
locations, activities, and procedures of their non-legitimate
customers; (ix) orders the DEFENDANTS to implement "know your
customer" protocols and rules for the acceptance of payments for
their products that will make it difficult or impossible for
criminals to launder criminal proceeds through the purchase of
their products; (x) orders the imposition of a constructive
trust and equitable lien upon the DEFENDANTS' ill-gotten gains,
including without limitation those profits and proceeds derived
from the money-laundering scheme, and compels the DEFENDANTS to
disgorge to PLAINTIFFS all ill-gotten gains derived from the
money-laundering scheme; (xi) orders the imposition of a
constructive trust and equitable lien upon all monies laundered

by the DEFENDANTS as a part of the money-laundering scheme and
compels the DEFENDANTS to disgorge to PLAINTIFFS an amount equal
to the total amount of monies laundered through the aforesaid
scheme; (xii) orders divestiture of all interests held by the
DEFENDANTS, directly or indirectly, in the enterprises involved
in the money-laundering activities; and (xiii) orders the
DEFENDANTS to adopt, monitor and enforce appropriate compliance
programs to deter and remedy money-laundering activities
involving their products.  For purposes of this complaint, all
of the foregoing injunctive and equitable remedies and those
injunctive and equitable remedies that may hereafter be sought
by THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC
OF COLOMBIA or ordered by the Court with respect to THE REPUBLIC
OF COLOMBIA'S and the DEPARTMENTS OF COLOMBIA'S claims under
RICO shall be referred to herein as "RICO Injunctive and
Equitable Relief."

          (b)    *Common Law Injunctive and Equitable Relief.*
Under the common law, and pursuant to the inherent equitable
powers of the Court, the U.S. District Court is empowered to
prevent and restrain the DEFENDANTS' and their co-conspirators'
money-laundering activities, enter prohibitory and mandatory
injunctions, and impose other equitable relief, to provide full

relief to PLAINTIFFS and to prevent continuing harm to the
PLAINTIFFS' interests.  In addition, the federal courts are
empowered under 28 U.S.C. § 1651(a) to "issue all writs
necessary or appropriate in aid of their respective
jurisdictions and agreeable to the usages and principles of
law."

106. Consistent with these powers, THE REPUBLIC OF
COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA seek an
order that: (i) enjoins the DEFENDANTS and their respective
agents, servants, officers, directors, employees, and all
persons acting in concert with them from laundering the proceeds
of criminal activities through the sale of liquor products or
otherwise engaging in conduct that violates any common law,
statutory or equitable standard; (ii) compels each of the
DEFENDANTS that is found to have violated any common law,
statutory, or equitable standard to disgorge all proceeds
derived from any such violation and to make restitution to
PLAINTIFFS; (iii) enjoins the DEFENDANTS and their respective
agents, servants, officers, directors, employees, and all
persons acting in concert with them from selling liquor products
without proper documentation, shipping records, markings, and
similar indicia of compliance with law that would allow the

121

proper tracking of the liquor products and the funds with which
they were purchased so that they cannot be sold illegally; (iv)
enjoins the DEFENDANTS and their respective agents, servants,
officers, directors, employees, and all persons acting in
concert with them from selling liquor products to any
distributor or any other person who cannot fully and accurately
account for where the liquor products will ultimately be sold;
(v) enjoins the DEFENDANTS and their respective agents,
servants, officers, directors, employees, and all persons acting
in concert with them from engaging in any practices by which
distributors, shippers, or wholesalers can pay for the liquor
products in question into offshore corporations, offshore bank
accounts, or other locations that limit the ability of
government officials to track the sale of liquor products or the
payment for said liquor products; (vi) orders the DEFENDANTS to
create and utilize adequate protocols by which all liquor
products manufactured by the DEFENDANTS and all payments made
for such liquor products into THE REPUBLIC OF COLOMBIA can be
adequately tracked and monitored by governmental officials of
THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF
COLOMBIA; (vii) orders the DEFENDANTS to take all reasonable and
necessary steps to terminate ongoing money laundering and

prevent future money laundering, including the addition of any necessary labeling, tracking devices, or other means that would allow the DEFENDANTS and/or THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA to track and monitor the movement of liquor products into and within THE REPUBLIC OF COLOMBIA; (viii) orders the DEFENDANTS to disclose all information within their possession concerning the names, locations, activities, and procedures of their non-legitimate customers; (ix) orders the DEFENDANTS to implement "know your customer" protocols and rules for the acceptance of payments for their products that make it difficult or impossible for criminals to launder criminal proceeds through the purchase of their products; (x) orders the imposition of a constructive trust and equitable lien upon the DEFENDANTS' ill-gotten gains, including without limitation those profits and proceeds derived from the money-laundering scheme, and compels the DEFENDANTS to disgorge to PLAINTIFFS all ill-gotten gains derived from the money-laundering scheme; (xi) orders the imposition of a constructive trust and equitable lien upon all monies laundered by the DEFENDANTS as a part of the money-laundering scheme and compels the DEFENDANTS to disgorge to PLAINTIFFS an amount equal to the total amount of monies laundered through the aforesaid

scheme; (xii) orders divestiture of all interests held by the
DEFENDANTS, directly or indirectly, in the enterprises involved
in the money-laundering activities; (xiii) orders the DEFENDANTS
to adopt, monitor and enforce appropriate compliance programs to
deter and remedy money-laundering activities involving their
products.  For purposes of this complaint, all of the foregoing
injunctive and equitable remedies, and those injunctive and
equitable remedies that may hereafter be sought by PLAINTIFFS or
ordered by the Court on PLAINTIFFS' common law claims, shall be
referred to herein as "Common Law Injunctive and Equitable
Relief."


                         COUNT I
                   (AS TO ALL DEFENDANTS)
                (RICO, 18 U.S.C. § 1962(a))


     107. The PLAINTIFFS restate and reallege paragraphs
one (1) through one hundred and six (106) and further allege:

     108. The DEFENDANTS, along with their co-conspirators
in the money-laundering schemes, including associated
distributors, shippers, currency dealers, wholesalers, money
brokers, and other participants in the schemes identified above,
were, at relevant times, an association-in-fact of individuals

and corporations engaged in, and the activities of which
affected, interstate and foreign commerce, and thus constituted
an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the
"DEFENDANTS' Money-Laundering Enterprise").  These persons and
entities were and are associated in fact for the purpose, among
others, of illegally laundering criminal proceeds of criminal
activity to the economic detriment of PLAINTIFFS.  The
DEFENDANTS' Money-Laundering Enterprise is an ongoing
organization whose constituent elements function as a continuing
unit for the common purpose of maximizing the sale of liquor
products through illegal means and carrying out other elements
of the DEFENDANTS' scheme.  The DEFENDANTS' Money-Laundering
Enterprise has an ascertainable structure and purpose beyond the
scope of the DEFENDANTS' predicate acts and the conspiracy to
commit such acts.  The Enterprise has engaged in and its
activities have affected interstate and foreign commerce.  The
Enterprise continues through the concerted activities of the
DEFENDANTS to disguise the nature of the wrongdoing, to conceal
the proceeds thereof, and to conceal the DEFENDANTS'
participation in the Enterprise in order to avoid and/or
minimize their exposure to criminal and civil penalties and
damages.  The role of each DEFENDANT in the DEFENDANTS' Money-

Laundering Enterprise has been set forth above.

109.  In connection with the fraudulent schemes set forth above, and to further their illegal aims, the DEFENDANTS have engaged in numerous acts of "racketeering activity," and each of the DEFENDANTS has aided and abetted each other of the DEFENDANTS and other co-conspirators in committing those acts of "racketeering activity" within the meaning of RICO.  18 U.S.C. §§ 1961, et seq.; 18 U.S.C. § 2.  The DEFENDANTS have committed multiple predicate acts of racketeering including, but not limited to:

110.  Money Laundering.  (18 U.S.C. §§ 1956(a)(1), 1961(1)(B)).  Knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, the DEFENDANTS conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or did so knowing that the transactions were designed in whole or in part to avoid a

transaction reporting requirement under state or federal law.
The DEFENDANTS knew that the funds they received in exchange for
liquor products represented the proceeds of specified unlawful
activity, including without limitation narcotics trafficking,
wire fraud, mail fraud, and violations of the Travel Act.  The
DEFENDANTS also knew that such transactions constituted offences
against a foreign nation involving the manufacture, importation,
sale, or distribution of a controlled substance.  The DEFENDANTS
knowingly conducted and attempted to conduct such financial
transactions with the intent to promote the carrying on of such
unlawful activity.  In addition, the DEFENDANTS knowingly
conducted and attempted to conduct such financial transactions
with the intent to conceal or disguise the nature (proceeds of
racketeering activity), the location, the source (drug
traffickers, money launderers), the ownership, or the control of
the proceeds of specified unlawful activity.  Finally, the
DEFENDANTS knowingly conducted and attempted to conduct such
financial transactions to avoid transaction-reporting
requirements under state or federal law, including without
limitation currency and monetary instrument reports.

        111. International Money Laundering.  (18 U.S.C. §§
1956(a)(2), 1961(1)(B)).  The DEFENDANTS transported,

transmitted, and/or transferred monetary instruments or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, or did so knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity, or to avoid a transaction reporting requirement under state or federal law.  By such conduct, the DEFENDANTS engaged in financial transactions within the meaning of 18 U.S.C. § 1956(c)(4).  Among other things, the DEFENDANTS knew that money orders and funds sent from South America and the Caribbean to pay for liquor products purchased in bulk represented the proceeds of specified unlawful activity, including without limitation wire fraud, mail fraud, and violations of the Travel Act.  The DEFENDANTS also knew that such specified unlawful activity was an offence against a foreign nation involving the manufacture, importation, sale or distribution of a controlled substance.  The DEFENDANTS also

128

aided and abetted violations of 18 U.S.C. § 1956(a)(1) and §
1956(a)(2).

112. Conspiracy to Engage in Money Laundering.  18
U.S.C. §§ 1956(h), 1961(1)).  The DEFENDANTS conspired to commit
offences defined in 18 U.S.C. § 1956 – including § 1956(a)(1)
and § 1956(a)(2).  The DEFENDANTS, by their words and actions,
agreed to accept currency, monetary instruments, and funds with
the knowledge that the currency, monetary instruments, and funds
represented the proceeds of specified unlawful activity
conducted by themselves and their co-conspirators.  The
DEFENDANTS adopted the common purpose of the conspiracy and
participated in its consummation.  The goal of the money-
laundering conspiracy was to deprive PLAINTIFFS of money and
property, while assuring that the profits derived from liquor
product sales were repatriated to the benefit of the DEFENDANTS
in a clandestine manner to avoid detection and prosecution.

113. Money Laundering (18 U.S.C. §§ 1957, 1961(1)).
DEFENDANTS knowingly engaged or attempted to engage in monetary
transactions in the United States, in criminally derived
property having a value greater than $10,000 and derived from
specified unlawful activity.  18 U.S.C. § 1957(f)(3) and §
1956(c)(7).  The DEFENDANTS engaged in monetary transactions,

including deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, involving funds or monetary instruments by, through, or to financial institutions. The DEFENDANTS knew that the funds or instruments received in exchange for their liquor products represented the proceeds of specified unlawful activity, including but not limited to, wire fraud, mail fraud, and violations of the Travel Act.  The DEFENDANTS knew that such specified unlawful activity included offences against foreign nations involving the manufacture, importation, sale, or distribution of controlled substances.

114. Money Laundering of Proceeds of Offences against Foreign Nations.  (18 U.S.C. § 1956(c)(7)(B)(vi); 18 U.S.C. § 1961(1)(B)).  The DEFENDANTS, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or did so knowing that

the transactions were designed in whole or in part to avoid
transaction reporting requirements under state or federal law.
The DEFENDANTS knew that the proceeds of transactions with
narcotics traffickers, participants in organized crime, money
launderers, and others engaged in criminal conduct represented
the proceeds of specified unlawful activity, including without
limitation offences with respect to which the United States
would be obligated by a multilateral treaty either to extradite
the alleged offender or to submit the case for prosecution, if
the offender were found within the territory of the United
States.  Specifically, the DEFENDANTS laundered the proceeds of
offences that are subject to multilateral treaties, including
without limitation the United Nations Convention against Illicit
Traffic in Narcotic Drugs and Psychotropic Substances (1988),
and the International Convention for the Suppression of the
Financing of Terrorism (2001), and the OECD Convention on
Combating Bribery of Foreign Public Officials in International
Business Transactions (Adopted November 21, 1997, entered into
force in the United States: February 15, 1999).

116. The DEFENDANTS have laundered the proceeds of
various offences covered by the United Nations Convention
against Illicit Traffic in Narcotic Drugs and Psychotropic

substances, including, for example: (i) the conversion or transfer of property, knowing that such property is derived from narcotics trafficking, or from an act of participation in such offence or offences, for the purpose of concealing or disguising the illicit origin of the property or of assisting persons involved in the commission of such an offence or offences to evade the legal consequences of their actions; (ii) the financing of narcotics trafficking; (iii) the concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to, or ownership of property, knowing that such property is derived from narcotics trafficking or from an act of participation in such an offence or offences; (iv) the acquisition, possession or use of property, knowing, at the time of receipt, that such property was derived from narcotics trafficking or from an act of participation in such offence or offences; and (v) participation in, association or conspiracy to commit, attempts to commit, and aiding, abetting, facilitating and counselling the commission of acts of, narcotics trafficking.

116. The DEFENDANTS have laundered the proceeds of various offences covered by the International Convention for the Suppression of the Financing of Terrorism (2001), including, for

example, providing material support and resources to persons and
entities engaged in terrorist activities, and providing assets,
including products and services, to those persons and entities,
acting with knowledge that such persons and entities, including
without limitation the Revolutionary Armed Forces of Colombia
(Fuerzas Armadas Revolucionarias de Colombia, FARC) and the
United Self-Defense Units of Colombia (Autodefensas Unidas de
Colombia, AUC), were engaged in terrorism or the sponsorship of
terrorist activities.  Such persons and entities that engage in
terrorist activity are so tainted by their criminal conduct that
providing any assets, material support or resources to any of
them facilitates such terrorist activities.

117. The DEFENDANTS have laundered, and conspired to
launder, the proceeds of various offences covered by the OECD
Convention on Combating Bribery of Foreign Public Officials in
International Business Transactions (Adopted November 21, 1997,
entered into force in the United States: February 15, 1999),
including for example the proceeds of transactions obtained or
continued as a consequence of payments, direct and indirect, to
foreign public officials.  As alleged above, the DEFENDANTS made
payments or provided things of value to foreign public
officials, retained or obtained business as a result of such

133

payments, and laundered the proceeds of those transactions, often through venues known for bank secrecy.

118. Money Laundering of Proceeds of Terrorism.  (18 U.S.C. § 1956(c)(7)(D); 18 U.S.C. § 1961(1)(B); 18 U.S.C. § 1961(1)(G)).  The DEFENDANTS, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to avoid a transaction reporting requirement under state or federal law. The DEFENDANTS knew that the proceeds of transactions with persons and entities engaged in terrorism represented the proceeds of specified unlawful activity, including but not limited to acts of terrorism.

119. Money Laundering of Proceeds of Offences against a Foreign Nation Involving Narcotics Trafficking.  (18 U.S.C. §

1956(c)(7)(B); 18 U.S.C. § 1961(1)(B)).  Knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, the DEFENDANTS conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to avoid transaction reporting requirements under state or federal law.  The DEFENDANTS knew that the proceeds of transactions with narcotics traffickers, money launderers and others engaged in criminal activity represented the proceeds of specified unlawful activity, including an offence against a foreign nation involving the manufacture, importation, sale or distribution of a controlled substance.

120. Money Laundering of Proceeds of Violations of Foreign Corrupt Practices Act.  (18 U.S.C. § 1956(c)(7)(D); 18 U.S.C. § 1961(1)(B)).  In general, the Foreign Corrupt Practices Act (FCPA) makes it unlawful for the DEFENDANTS, or any officer,

135

director, employee, or agent thereof, to pay or promise to pay
money or any thing of value to any foreign official for purposes
of influencing any act or decision of the foreign official in
his or her official capacity, inducing such official to do or
omit to do any act in violation of the lawful duty of such
official, or securing any improper advantage, or inducing such
foreign official to use his or her influence with a foreign
government or instrumentality thereof to affect or influence any
act or decision of such government or instrumentality, in order
to assist the DEFENDANTS in obtaining or retaining business for
or with, or directing business to, any person.  "Foreign
official" means any officer or employee of a foreign government
or any department, agency, or instrumentality thereof, or of a
public international organization, or any person acting in an
official capacity for or on behalf of such entities.

        121. The DEFENDANTS, acting through intermediaries,
provided money or things of value to foreign officials to
obstruct oversight of the DEFENDANTS' conduct, preclude
discovery of their involvement in money laundering and other
criminality, and thereby permit their business to continue.  The
DEFENDANTS, knowing that the property involved in a financial
transaction represented the proceeds of some form of unlawful

activity, conducted or attempted to conduct financial
transactions in interstate and foreign commerce involving the
proceeds of specified unlawful activity with the intent to
promote the carrying on of specified unlawful activity; or,
knowing that the transaction was designed in whole or in part to
conceal or disguise the nature, the location, the source of
ownership, or the control of the proceeds of specified unlawful
activity, or, knowing that the transaction was designed in whole
or in part to avoid a transaction reporting requirement under
state or federal law.

122. Wire Fraud and Mail Fraud. (18 U.S.C. §§ 1341,
1343, 1961(1)(B)). The DEFENDANTS devised a scheme or artifice
to defraud and/or to obtain money by means of false pretenses,
representations, or promises, and used the mails and wires for
the purpose of executing the scheme, and acted with a specific
intent to defraud by devising, participating in, and/or abetting
the scheme. The wire and mail communications were made during
the course of the conspiracy that covered at least 1991 to 2004.
Hundreds of telephone conversations and faxes were made to
further the fraudulent scheme on virtually a daily basis during
the course of the conspiracy, including without limitation those
identified in paragraphs 49, 53, 55, 83, and others. These

137

telephone conversations, mailings, and wire transfer of funds
furthered the scheme by expediting the secret payments to the
DEFENDANTS of funds that constituted the proceeds of criminal
activity and were part of a clandestine system for the
remittance of such proceeds to the DEFENDANTS.  The DEFENDANTS,
acting through their employees, agents, and co-conspirators,
made or caused to be made such telephone calls, mailings, and
wire transfers of funds to further the scheme.  The DEFENDANTS
knew that their co-conspirators, in the course of carrying out
the DEFENDANTS' directions and orders, would use or cause to be
used the interstate and international wires and mails.  The
motive for committing fraud is plain: the acquisition of
criminals as additional customers by laundering their criminal
proceeds meant increased profits and market share for the
DEFENDANTS.

123. Violation of the Travel Act.  (18 U.S.C. §§ 1952,
1961(1)(B)).  The DEFENDANTS travelled in interstate or foreign
commerce, and used facilities in interstate and foreign
commerce, including the mail, with intent to distribute the
proceeds of unlawful activity, and to promote, manage,
establish, carry on, or facilitate the promotion, management,
establishment, or carrying on of unlawful activity, and

138

thereafter performed or attempted to perform unlawful activity. The DEFENDANTS knew that the funds provided to them represented the proceeds of unlawful activity, including trafficking in narcotics and controlled substances, and knew that, by accepting such payments, they aided the efforts of the drug traffickers to launder their ill-gotten gains.  The DEFENDANTS and their representatives and co-conspirators travelled across national borders and otherwise used the facilities of foreign commerce to distribute the proceeds of unlawful activity to the benefit of the DEFENDANTS.  By this conduct, the DEFENDANTS promoted, managed, established, and facilitated such unlawful activity.

124. The acts described above form a "pattern" of racketeering activity within 18 U.S.C. § 1961(5).  The DEFENDANTS and others with whom they have been associated have been related in their common objectives of maximizing global liquor sales and utilizing money laundering to achieve this end. The DEFENDANTS' predicate acts have had the same or similar purposes, results, participants, victims, and methods of commission, and occurred over at least a ten-year period.  The predicate acts have been consistently repeated and are capable of further repetition.

125. The DEFENDANTS' pattern of racketeering

activities dates from at least January 1, 1990, through the present and threatens to continue in the future.

126. The DEFENDANTS used or invested, directly or indirectly, racketeering income, or a part thereof, or the proceeds of such income, to acquire an interest in, establish, and operate, the Money-Laundering Enterprise, which is and was engaged in, or the activities of which affect and have affected, interstate or foreign commerce, in violation of 18 U.S.C. § 1962(a).  The DEFENDANTS were principals in the racketeering scheme.  The PLAINTIFFS have suffered multiple injuries to their economic and business interests as a result of this use and investment of racketeering income.

127. Specifically, the DEFENDANTS received the income and proceeds of a pattern of racketeering activity in which they participated as principals, including an international money-laundering scheme, acts of wire fraud and mail fraud, and violations of the Travel Act.  Upon their receipt of such ill-gotten gains by wire transfers from money launderers and/or their associates, the DEFENDANTS used and invested such income and proceeds, or a portion thereof, to acquire an interest in, establish, and operate the DEFENDANTS' Money-Laundering Enterprise, which was and is engaged in interstate and foreign

commerce.   In particular, the DEFENDANTS used the proceeds of
the scheme: (a) to operate the DEFENDANTS' Money-Laundering
Enterprise; (b) to replenish the supply of liquor products for
ultimate sale to known money launderers; (c) to acquire,
purchase, and subsidize facilities necessary to the DEFENDANTS'
Money-Laundering Enterprise, including manufacturing, sales, and
distribution operations (e.g., United Distillers Colombia, S.A.,
and UDV/Rueda, S.A.), secret offices and offshore companies and
bank accounts (e.g., Aruban companies and bank accounts); (d) to
compensate employees and agents, the DEFENDANTS engaged in the
money-laundering activities; (e) to pay expenses incurred in
connection with money-laundering activities such as telephone
bills incurred in the wire-fraud scheme and travel costs
incurred by such employees; and (f) to establish a money-
laundering scheme, infrastructure, and network.   In sum, the
DEFENDANTS did not reinvest the proceeds of racketeering
activity in their general business operations, but instead used
and invested such proceeds to establish the infrastructure of,
acquire an interest in, and operate the DEFENDANTS' Money-
Laundering Enterprise, and it was this use and investment that
harmed the property and business interests of the PLAINTIFFS.
The use and investment of the proceeds of racketeering activity

occurred in several ways, including but not limited to the following:

128. The proceeds from the money-laundering enterprise finance the sales and marketing operations that promote the increase of sales in succeeding years.

129. The increased market volume and premium prices charged to money-laundering customers are utilized to offset the additional expenses incurred by the DEFENDANTS when they pay for and subsidize the additional shipping and handling charges associated with the clandestine movement of the liquor products through the circuitous routes established by the DEFENDANTS.

130. The PLAINTIFFS were injured in their business and property by reason of the DEFENDANTS' use and investment of racketeering income to acquire, establish, and operate the DEFENDANTS' Money-Laundering Enterprise.  Absent this use and investment of racketeering income, the criminals who launder their criminal proceeds through the purchase of liquor products would find their crimes less profitable and more difficult if not impossible to commit, and the economic injury to the PLAINTIFFS would have been avoided in whole or in part.

131. As a direct and proximate result of the violations set forth above, the PLAINTIFFS, have been injured in

their business and property as set forth more fully above in paragraphs one hundred and eleven(111) through one hundred and thirteen (113).  The DEFENDANTS' violations of 18 U.S.C. § 1962(a) caused these losses.  Under the provisions of 18 U.S.C. § 1964(c), the PLAINTIFFS are entitled to bring this action and recover herein treble damages, the cost of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.


COUNT II
(AS TO ALL DEFENDANTS)
(RICO, 18 U.S.C. § 1962(b))

132. The PLAINTIFFS restate and reallege paragraphs one (1) through one hundred thirty-one (131) and further allege:

133. The DEFENDANTS acquired or maintained, directly or indirectly, through a pattern of racketeering activity, an interest in and control of the DEFENDANTS' Money-Laundering Enterprise, which was and is engaged in, or the activities of which affect and have affected, interstate or foreign commerce in violation of 18 U.S.C. § 1962(b).  The PLAINTIFFS have been injured by the DEFENDANTS' acquisition and maintenance of an interest in and control of the enterprise through a pattern of racketeering activity.

134. The DEFENDANTS, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in and control of the DEFENDANTS' Money-Laundering Enterprise that engaged in and the activities of which affect interstate and foreign commerce.  Specifically, the DEFENDANTS maintained control of the DEFENDANTS' Money-Laundering Enterprise by means of racketeering activities, including, for example: (a) interstate and international wire communications in violation of 18 U.S.C., § 1343 (orders and instructions for payment were placed telephonically and DEFENDANTS had total control over the enterprise and the payment for their product); (b) money laundering in violation of 18 U.S.C., §§ 1956 and 1957 (DEFENDANTS controlled and concealed the flow of the proceeds of the liquor product sales – a key aim of the scheme – through money laundering); and (c) violations of the Travel Act, 18 U.S.C., § 1952 (cross-border travel and transactions to facilitate money laundering and other illicit activities), and the purchase and control of Colombian "umbrella operations" (acquisition of Rueda importer).  Through this pattern of racketeering activities, which also included transmitting false statements to government authorities, the DEFENDANTS were able to acquire and maintain an interest in and control of the

DEFENDANTS' Money-Laundering Enterprise.  This interest and control furthered, concealed, and protected the operations of the money-laundering enterprise, and thereby permitted the DEFENDANTS' Money-Laundering Enterprise to flourish without detection.

135. As a direct and proximate result of the DEFENDANTS' acquisition and maintenance of an interest in and control of the DEFENDANTS' Money-Laundering Enterprise, the PLAINTIFFS have suffered the loss of money and property as set forth more fully above in paragraphs one hundred and eleven(111) through one hundred and thirteen (113).  The DEFENDANTS' violations of 18 U.S.C. § 1962(b) caused these losses.  Under the provisions of 18 U.S.C. § 1964(c), the PLAINTIFFS are entitled to bring this action and recover herein treble damages, the cost of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.


                    COUNT III
                (AS TO ALL DEFENDANTS)
             (RICO, 18 U.S.C. § 1962(c))


136. The PLAINTIFFS restate and reallege paragraphs one (1) through one hundred thirty-five (135) and further

allege.

137. The DEFENDANTS, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in the operation or management of the DEFENDANTS' Money-Laundering Enterprise, the activities of which affect interstate or foreign commerce.

138. At all relevant times, the DEFENDANTS participated in the operation or management of an "enterprise," within the meaning of 18 U.S.C. § 1961(4). The DEFENDANTS, operating together and individually, directed and controlled the DEFENDANTS' Money-Laundering Enterprise. The DEFENDANTS operated, managed, and exercised control over the money-laundering enterprise by, among other things: (a) establishing a money-laundering scheme in which the co-conspirators facilitated the money-laundering scheme and concealed and remitted to the DEFENDANTS the proceeds of the money-laundering scheme; (b) compelling their customers to sell liquor products at a price set by the DEFENDANTS; and (c) investing and using the proceeds of the money-laundering scheme in the enterprise.

139. As a direct and proximate result of the violations set forth above, the PLAINTIFFS, have been injured in their business and property as set forth more fully above in

paragraphs one hundred and eleven(111) through one hundred and
thirteen (113).  The DEFENDANTS' violations of 18 U.S.C. §
1962(c) caused these losses.  Under the provisions of 18 U.S.C.
§ 1964(c), the PLAINTIFFS are entitled to bring this action and
recover herein treble damages, the cost of bringing the suit,
pre-judgment interest, and reasonable attorneys' fees.


                          COUNT IV
                   (AS TO ALL DEFENDANTS)
                 (RICO, 18 U.S.C. § 1962(d))


         140. The PLAINTIFFS restate and reallege paragraphs
one (1) through one hundred thirty-nine (139) and further
allege:

         141. The DEFENDANTS entered into an agreement with
each other and with distributors, shippers, currency dealers,
and wholesalers to join in the conspiracy to violate 18 U.S.C.
§§ 1962(a), 1962(b), and 1962(c). Each DEFENDANT entered into an
agreement to join the conspiracy, and took acts in the
furtherance of the conspiracy and knowingly participated in the
conspiracy.  The purpose of the conspiracy was to acquire and
service new customers by laundering the proceeds of their
criminal activity to the economic detriment of PLAINTIFFS and to

                              147

the economic benefit of the DEFENDANTS.  The conspirators
carried out the scheme and each conspirator was put on notice of
the general nature of the conspiracy, that the conspiracy
extended beyond the individual role of any single member, and
that the conspiratorial venture functioned as a continuing unit
for a common purpose.  The DEFENDANTS adopted the goal of
furthering and facilitating the criminal endeavor.  Their stake
in the money-laundering venture was in making profits and
increasing market share through their informed and interested
cooperation with their criminal customers, and their active
assistance, stimulation, and instigation of the money-laundering
activities.

142. The DEFENDANTS, together with each member of the
conspiracy, agreed and conspired to violate: (1) 18 U.S.C. §
1962(a) by using, or causing the use of, income they derived
from the above-described pattern of racketeering activities in
the acquisition, establishment, and/or operation of the
enterprise, the activities of which affect interstate or foreign
commerce; (2) 18 U.S.C. § 1962(b) by acquiring or maintaining,
or causing the acquisition or maintenance of, through a pattern
of racketeering activity, an interest or control in the
enterprise, the activities of which affect interstate or foreign

148

commerce; (3) 18 U.S.C. § 1962(c) by participating, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern; and (4) violating the USA Patriot Act.

143. The DEFENDANTS participated in and cooperated with each other and with their co-conspirators in the aforementioned conspiracy that enabled each liquor manufacturer and distributor to enhance its market share, suppress its competition, and promote sale of its products.

144. As a result of the conspiracy, the DEFENDANTS and their co-conspirators were able to facilitate the laundering of large volumes of money that constituted the proceeds of criminal activity.

145. The membership of the conspiracy in question included the DEFENDANTS and liquor distributors, the shippers, the wholesalers, currency brokers, and the DEFENDANTS' subsidiary and affiliate corporations; who act in concert to produce the liquor products, mislabel or fail to properly label the liquor products, sell the liquor products, and arrange for

payment in a way that is undetectable by governmental authorities, with said payment ultimately being returned to the DEFENDANTS.  As co-conspirators, the DEFENDANTS are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the PLAINTIFFS that were caused by any members of the conspiracy, regardless of whether the DEFENDANTS were themselves directly involved in a particular aspect of the enterprise.

146. As a direct and proximate result of the violations set forth above, the PLAINTIFFS, have been injured in their business and property as set forth more fully above in paragraphs one hundred and eleven(111) through one hundred and thirteen (113).  The DEFENDANTS' violations of 18 U.S.C. § 1962(d) caused these losses.  Under the provisions of 18 U.S.C. § 1964(c), the PLAINTIFFS are entitled to bring this action and recover herein treble damages, the cost of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

COUNT V
(AS TO ALL DEFENDANTS)
(RICO, 18 U.S.C. §§ 1964(a), 1964(c), 28 U.S.C. § 1651(a))

147. The PLAINTIFFS restate and reallege paragraphs one (1) through one hundred forty-six (146) and further allege:

148. The United States District Court is empowered to prevent and restrain violations of 18 U.S.C. § 1962 by issuing appropriate orders, including, but not limited to: ordering any person to divest himself or herself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor in which the enterprise engaged, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.  18 U.S.C. § 1964(a).

149. The DEFENDANTS currently are actively engaged in the activities set forth within this complaint that promote and support the money laundering that is the subject matter of this complaint.

150. The DEFENDANTS intend to continue said activities and to interfere with investigations by governmental officials into the DEFENDANTS and their co-conspirators' money-laundering

activities.

151. The DEFENDANTS, by their conduct of selling liquor products to money launderers, creating false and misleading documents, improperly labeling shipments of liquor products, and setting forth mechanisms of payment by which criminals may pay for the liquor products without being detected by government investigations, all continue to damage the PLAINTIFFS.

152. As a result of the DEFENDANTS' conduct in violation of 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and 1962(d), the PLAINTIFFS have been and continue to be irreparably injured as is alleged more fully above.

153. As a result of the nature of the money-laundering activities, it would be functionally impossible for the PLAINTIFFS to put a complete halt to said money-laundering activities as long as the DEFENDANTS continue to conduct these activities.  In addition, the PLAINTIFFS continue to suffer injury to business and property to an extraordinary degree.

154. Money damages will not provide a full and complete remedy for DEFENDANTS' unlawful conduct.  There is no adequate remedy at law that will protect the PLAINTIFFS in the future from these money-laundering activities if the DEFENDANTS

do not cease their involvement in and support of money-

laundering activities.  Pursuant to 18 U.S.C. §§ 1964(a),

1964(c), as well as 28 U.S.C. § 1651(a), the PLAINTIFFS demand

full RICO Injunctive and Equitable Relief.


                          COUNT VI
                  (AS TO ALL DEFENDANTS)
                   (COMMON LAW FRAUD)


       155. PLAINTIFFS restate and reallege paragraphs one

(1) through one hundred and fifty-four (154) and further allege:

       156. The DEFENDANTS and their co-conspirators

intentionally falsified documents, falsified shipping records,

and generated false and misleading billing records concerning

the payment for liquor products so as to mislead the PLAINTIFFS,

as to the purchasers of and source of funds for payment for

their liquor products.  The DEFENDANTS, individually, through

their "External Affairs" representatives, and through industry

groups knowingly made false representations to the PLAINTIFFS

regarding their knowledge and role in illegal liquor sales. The

DEFENDANTS and their co-conspirators made these false and

material statements and representations and failed to disclose

material information in such documents and records with intent to defraud the PLAINTIFFS. The DEFENDANTS made these material misrepresentations and omissions with the knowledge and intention that the PLAINTIFFS would reasonably rely on said statements and documents.  The DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other co-conspirators, to participate in a common scheme, plan, or design to commit the aforesaid tortious acts, and thereby launder criminal proceeds to the detriment of PLAINTIFFS. In pursuance of the agreement, DEFENDANTS and its distributors, customers, agents, consultants, and other co-conspirators acted tortiously by, among other things, committing the aforesaid acts constituting fraud, thereby causing harm to PLAINTIFFS. The DEFENDANTS, through agreement and joint action with their co-conspirators, acted tortiously, recklessly, and unlawfully to the detriment of PLAINTIFFS. By means of the aforesaid concerted action, the DEFENDANTS and their co-conspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

　　　157. PLAINTIFFS reasonably relied upon the DEFENDANTS' misrepresentations, and incurred damage as a result of such

reliance. Specific examples of the process by which these activities occurred are set forth above.

158. The PLAINTIFFS reasonably relied upon false statements and falsified or misleading documents produced or procured by the DEFENDANTS, and were thereby misled in the course of performing their duty to fight against money laundering and related criminal activity.

159. Furthermore, the DEFENDANTS knowingly and intentionally generated false, misleading, and material information, and intentionally concealed other material information, concerning their role in money laundering in connection with the sale of their products.

160. The PLAINTIFFS reasonably relied upon data and information provided to them by the DEFENDANTS and/or their co-conspirators and agents in acting or refraining from acting with respect to money-laundering activities.

161.  The DEFENDANTS, in falsifying documents to expedite money laundering, in providing misleading information, and in concealing material and true information concerning their money-laundering activities, acted in willful, wanton, gross, and callous disregard for the rights of the PLAINTIFFS. The aforesaid actions were taken knowingly for the purpose of

supporting the activities of the DEFENDANTS' co-conspirators and with the intent of increasing the profits and sales of the DEFENDANTS and harming PLAINTIFFS.

162. The DEFENDANTS were duty-bound to disclose the material information concerning the destination of shipments of liquor products and the concealed sources of funds used to purchase liquor products.  By law, no person may make false statements to the government.  Having undertaken to make representations to PLAINTIFFS, the DEFENDANTS were obligated to provide full, complete, and truthful information concerning the destination of shipments of liquor products and the sources of funds to purchase their products.  The DEFENDANTS had superior, if not exclusive, knowledge of such information, and it was not readily available to the PLAINTIFFS.  The DEFENDANTS intended and knew, or should have known, that PLAINTIFFS would reasonably rely, act, and refrain from acting, on the basis of false and/or incomplete information provided to PLAINTIFFS by the DEFENDANTS, and PLAINTIFFS did so to their detriment.  Under these circumstances, the DEFENDANTS' conduct amounts to fraudulent misrepresentation and fraudulent concealment, and an effective conversion of PLAINTIFFS' money and property.

163. As a direct and proximate result of the

DEFENDANTS' fraud and the PLAINTIFFS' reliance upon said fraud, the PLAINTIFFS have suffered economic damages as are set forth more fully above in paragraphs one hundred and eleven(111) through one hundred and thirteen (113).  The PLAINTIFFS demand judgment for damages, compensatory and punitive, as well as full Common Law Injunctive and Equitable Relief.


                          COUNT VII
                   (AS TO ALL DEFENDANTS)
                     (PUBLIC NUISANCE)


        164. PLAINTIFFS restate and reallege paragraphs one (1) through one hundred sixty-three (163) and further allege:

        165. PLAINTIFFS are governmental authorities.

        166. Money laundering and related criminal activities are a violation of law and a public nuisance.

        167. The money-laundering activities in the United States and THE REPUBLIC OF COLOMBIA of the DEFENDANTS: (a) have substantially and unreasonably interfered with, offended, injured and endangered, and continue to interfere with, offend, injure and endanger, the public health, morals, safety, convenience, and well-being of the general public, the financial infrastructure of THE REPUBLIC OF COLOMBIA, and the operation of

the market for liquor products in THE REBUBLIC OF COLOMBIA and
the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA; (b) constitute
conduct that is proscribed by applicable laws, administrative
regulations, and directives; (c) constitute conduct of a
continuing nature and/or have produced a permanent or long-
lasting effect, and the DEFENDANTS know or should know that said
conduct has a significant harmful effect upon the public right.

      168.  The money-laundering activities of the
DEFENDANTS in the United States, the PLAINTIFFS have been, and
continue to be, effectuated through widespread criminal
activity, including mail fraud, wire fraud, and other illegal
acts.

      169. The DEFENDANTS facilitated the laundering of
criminal proceeds by means of a variety of acts and omissions
conducted in or directed from the United States, including the
following:

      170. The DEFENDANTS laundered criminal proceeds by
covertly receiving funds that they knew or should have known
were the proceeds of criminal acts and took steps to conceal the
source and nature of the criminal proceeds.

      171. The DEFENDANTS arranged a process by which liquor
products purchased by criminals could be paid for by secret

payments through "cut outs" so as to conceal revenues derived
from criminal activities.

172. The DEFENDANTS filed or caused the filing with
the PLAINTIFFS of false and fraudulent documents that misstated
the value of, the intended destination of, and the source of
funds for the purchase of liquor products that were placed
within customs bonded warehouses and/or free trade zones within
THE REPUBLIC OF COLOMBIA.

173. The DEFENDANTS failed to supervise the
distribution of their liquor products to assure that such
products were not sold into criminal channels or paid for with
illicit funds.

174. The DEFENDANTS failed to act reasonably when they
were put on notice of their involvement with money launderers.

175. The DEFENDANTS entered into an understanding or
agreement, express or tacit, with their distributors, customers,
agents, consultants, and other co-conspirators, to participate
in a common scheme, plan or design to commit the aforesaid
tortious acts and thereby launder money to the detriment of the
PLAINTIFFS.  In pursuance of the agreement, DEFENDANTS and its
distributors, customers, agents, consultants, and other co-
conspirators acted tortiously by, among other things, committing

the aforesaid acts constituting public nuisance, thereby causing harm to PLAINTIFFS.  The DEFENDANTS, through joint action with their co-conspirators, acted tortiously, recklessly, unlawfully, and negligently to the detriment of PLAINTIFFS.  By means of the aforesaid concerted action, the DEFENDANTS and their co-conspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

176. Through these and other intentional and negligent acts and omissions, the DEFENDANTS have substantially and unreasonably offended, interfered with, and caused damage to the public in the exercise of rights common to all, in a manner such as to (a) offend public morals, (b) interfere with use by the public of a public place, (c) endanger and injure the property, life, health, safety, and comfort of a considerable number of persons; and (d) injure and interfere with the market for liquor products in THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA; and (e) injure the economic well being of the citizens of THE REPUBLIC OF COLOMBIA and the DEPARTMENTS OF THE REPUBLIC OF COLOMBIA.  The acts and omissions of the DEFENDANTS constitute a public nuisance. This public nuisance, or some part of it, continues unabated to the detriment of PLAINTIFFS' interests.

177. The DEFENDANTS knew, or reasonably should have known, that their acts and omissions relating to money laundering created great dangers to the community, including PLAINTIFFS' economic and non-economic interests. The DEFENDANTS directly, or through their co-conspirators, undermined the PLAINTIFFS' duties and authority to regulate ports; to regulate foreign commerce; to regulate free trade zones, and customs bonded warehouses; to regulate transportation into THE REPUBLIC OF COLOMBIA or within its borders; to ensure and regulate the free movement of goods within THE REPUBLIC OF COLOMBIA; to regulate and take action to protect against money laundering.

178. The DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.  Their conduct amounts to a fraud on the public.

179. As a direct and proximate result of the acts and/or omissions of the DEFENDANTS, which constitute a public nuisance, PLAINTIFFS have sustained and continue to sustain injury as set forth more fully in paragraphs one hundred and eleven(111) through one hundred and thirteen (113).  The PLAINTIFFS have the right to recover said damages in that each

161

has suffered damages that are unique to it and which are of a kind different from those suffered by the general public.

180. By reason of the injury to their economic and non-economic interests due to the public nuisance described in the preceding paragraphs to this complaint, PLAINTIFFS are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason PLAINTIFFS are therefore entitled to full Common Law Injunctive and Equitable Relief, including a judgment permanently enjoining the DEFENDANTS from the continuation of activities constituting a public nuisance, and compelling the DEFENDANTS to take steps to abate and prevent the money laundering that is the subject matter of this complaint.

COUNT VIII
(AS TO ALL DEFENDANTS)
(UNJUST ENRICHMENT)

181. PLAINTIFFS restate and reallege paragraphs one (1) through one hundred and eighty (180) and further allege:

182. The DEFENDANTS were unjustly enriched at PLAINTIFFS' expense.  The acts and omissions of these DEFENDANTS

and others have placed in the possession of these DEFENDANTS money under such circumstances that in equity and good conscience they ought not to retain it.

183.   The DEFENDANTS were unjustly enriched through their money-laundering scheme. The DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other co-conspirators, to participate in a common scheme, plan or design to commit the aforesaid tortious acts and thereby launder the proceeds of criminal activity to the detriment of the PLAINTIFFS.  In pursuance of the agreement, DEFENDANTS and its distributors, customers, agents, consultants, and other co-conspirators acted tortiously by, among other things, committing the aforesaid acts constituting unjust enrichment, thereby causing harm to PLAINTIFFS.  The DEFENDANTS, through joint action with their co-conspirators, acted tortiously, recklessly, unlawfully, and negligently, to the detriment of PLAINTIFFS.  By means of the aforesaid concerted action, the DEFENDANTS and their co-conspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

184. The DEFENDANTS were unjustly enriched through their money-laundering scheme.  By reason of their money-

laundering scheme, the DEFENDANTS were enabled to illegally enhance profits, market share, and the sales price of their international liquor operations.

185. The unjust enrichment of the DEFENDANTS was accomplished at the expense of PLAINTIFFS.  By reason of the money-laundering scheme, PLAINTIFFS were, and continue to be, deprived of money and property, and have suffered other economic and non-economic injuries, and the DEFENDANTS reaped vast profits and proceeds from their illegal scheme.

186. Under these circumstances, the receipt and retention of the money derived from money-laundering operations are such that, as between PLAINTIFFS and the DEFENDANTS, it is unjust for the DEFENDANTS to retain it.

187. Equity and good conscience require the DEFENDANTS to pay damages and restitution to PLAINTIFFS, disgorge their ill-gotten gains and, to effectuate these remedies, a constructive trust and equitable lien should be imposed by this Court upon the proceeds obtained by the DEFENDANTS by reason of money-laundering activities, which proceeds are rightly owned by and belong to PLAINTIFFS.  PLAINTIFFS have suffered damages as set forth more fully in paragraphs one hundred and eleven(111) through one hundred and thirteen (113), and are entitled to

164

recover actual, compensatory, and punitive damages.  Judgment in
PLAINTIFFS' favor should include full Common Law Injunctive and
Equitable Relief.


                           COUNT IX
                    (AS TO ALL DEFENDANTS)
                        (NEGLIGENCE)


       188. PLAINTIFFS restate and reallege paragraphs one
(1) through one hundred eighty-seven (187) and further allege:

       189. The DEFENDANTS owed, and continue to owe, a duty
of reasonable care to refrain from causing foreseeable loss to
the PLAINTIFFS.  The DEFENDANTS were and are obligated to avoid
negligently causing harm to PLAINTIFFS and were and are duty-
bound to:

              (a)  design, implement, and utilize effective
monitoring and oversight procedures, including appropriate
compliance programs, to deter and detect money laundering-
related activities by their employees and agents;

              (b)  investigate and terminate the money
laundering-related conduct of their employees and agents,
particularly inasmuch as their managerial personnel with
decision-making authority were put on reasonable notice of such

                             165

illicit conduct;

(c)  deal with the PLAINTIFFS, and their representatives, in an honest, good faith, and forthright manner;

(d)  terminate sales of their liquor products to or through persons or entities known to be engaged, directly or indirectly, in money laundering;

(e)  comply with federal and state statutes and the standards of care reflected therein;

(f)  produce, market, and distribute their liquor product products lawfully and with due care; and

(g)  use proper practices and procedures in the hiring, selection, approval, instruction, training, supervision, and discipline of employees and agents engaged in the production, marketing, and distribution of their products, some of whom the DEFENDANTS knew, or reasonably should have known, were assisting and otherwise engaged in money laundering.

190. As manufacturers, distributors, and dominant participants in the marketplace, the DEFENDANTS had, and continue to have, the authority and ability to act reasonably to prevent money laundering in connection with the sale of their products for the protection of PLAINTIFFS.  Reasonable steps

166

could and should have been taken by the DEFENDANTS to prevent or reduce the risk of their products being sold to persons who were using the purchase of liquor products to launder the proceeds of criminal activity.

191. The DEFENDANTS, as manufacturers, distributors, and dominant participants in the marketplace, have a special ability and duty to exercise reasonable care to detect and guard against the risks associated with the distribution of their products, for the benefit and protection of those foreseeably and unreasonably placed at risk of harm from the distribution of their products, including PLAINTIFFS.

192. The DEFENDANTS' unreasonable acts and omissions created and enhanced the risk that their products would be distributed to persons who would use the purchase of liquor products to launder criminal proceeds.

193. The DEFENDANTS' unreasonable acts and omissions affirmatively and foreseeably caused substantial economic and non-economic damages to the PLAINTIFFS, and otherwise obstructed their ability to protect themselves from harms associated with money laundering.  The DEFENDANTS, acting with and through their employees, agents, and co-conspirators, breached their duty of care, as aforesaid, by acts and/or omissions that posed an

unreasonable and foreseeable risk of harm to PLAINTIFFS.  The
DEFENDANTS entered into an understanding or agreement, express
or tacit, with their distributors, customers, agents,
consultants, and other co-conspirators, to participate in a
common scheme, plan, or design to commit the aforesaid tortious
acts, and thereby launder criminal proceeds to the detriment of
the PLAINTIFFS.  In pursuance of the agreement, DEFENDANTS and
its distributors, customers, agents, consultants, and other co-
conspirators acted tortiously by, among other things, committing
the aforesaid acts constituting negligence, thereby causing harm
to Plaintiff.  The DEFENDANTS, through joint action with their
co-conspirators, acted tortiously, recklessly, unlawfully, and
negligently, to the detriment of PLAINTIFFS.  By means of the
aforesaid concerted action, the DEFENDANTS and their co-
conspirators are jointly and severally liable for the torts and
other wrongful conduct alleged herein.  The DEFENDANTS' breach
proximately caused, and continues to cause, damage to the
economic and non-economic interests of the PLAINTIFFS, as set
forth more fully in paragraphs one hundred and eleven(111)
through one hundred and thirteen (113).

194. The DEFENDANTS have acted maliciously, wantonly,
and with a recklessness that bespeaks an improper motive and

vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.  Their conduct amounts to a fraud on the public.

195. By reason of the injury to their economic and non-economic interests due to the negligence of the DEFENDANTS, as aforesaid, PLAINTIFFS are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, PLAINTIFFS are entitled to full Common Law Injunctive and Equitable Relief, including a judgment permanently enjoining the DEFENDANTS from the continuation of activities constituting negligence, and compelling the DEFENDANTS to take steps to abate and prevent the laundering of criminal proceeds through the purchase and sale of their product.


COUNT X
(AS TO ALL DEFENDANTS)
(NEGLIGENT MISREPRESENTATION)

196. PLAINTIFFS restate and reallege paragraphs one (1) through one hundred ninety-five (195) and further allege:

197. The DEFENDANTS owed, and continue to owe, a duty

of reasonable care to refrain from causing foreseeable loss to
PLAINTIFFS.  The DEFENDANTS have assumed the special duty to
speak truthfully to government officials, and particularly due
to their superior knowledge of their own conduct, were bound to
speak with due care.  The DEFENDANTS were and are obligated to
avoid negligently causing foreseeable harm to PLAINTIFFS, and
were and are duty-bound to exercise reasonable care to: (a)
refrain from negligently misrepresenting -- through documents
and other forms of communication that the DEFENDANTS knew or
should have known would be reasonably relied on by PLAINTIFFS --
the payment for and/or value of liquor products; the destination
of liquor products; and the sources of funds with which liquor
products are purchased; (b) be truthful in their representations
to PLAINTIFFS and their representatives concerning money
laundering and other improper activities as aforesaid; and (c)
avoid misleading PLAINTIFFS when providing PLAINTIFFS with such
information as the DEFENDANTS possess concerning the money
laundering associated with the DEFENDANTS' products into THE
REPUBLIC OF COLOMBIA.

198. The DEFENDANTS breached their duty to PLAINTIFFS
by negligently making various material misrepresentations and/or
failing to disclose material information to PLAINTIFFS and their

170

representatives as aforesaid.

199. The DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness and have engaged in outrageous and oppressive conduct and with a recklessness or wanton disregard of the PLAINTIFFS' interests and rights. Their conduct amounts to a fraud on the public.

200. The DEFENDANTS, acting with and through their employees, agents, and co-conspirators, breached their duty of care, as aforesaid, by acts and/or omissions that posed an unreasonable risk of foreseeable harm to PLAINTIFFS.

201. PLAINTIFFS reasonably relied on the DEFENDANTS' misrepresentations and, as a result, the DEFENDANTS' breach proximately caused, and continues to cause, damage to the economic interest of PLAINTIFFS. The DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other co-conspirators, to participate in a common scheme, plan or design to commit the aforesaid tortious acts and thereby launder the proceeds of criminal activity to the detriment of the PLAINTIFFS. In pursuance of the agreement, the DEFENDANTS and their distributors, customers, agents, consultants, and other

co-conspirators acted tortiously by, among other things, committing the aforesaid acts constituting negligent misrepresentation, thereby causing harm to PLAINTIFFS.  The DEFENDANTS, through joint action with their co-conspirators, acted tortiously, recklessly, unlawfully, and negligently, to the detriment of PLAINTIFFS.  By means of the aforesaid concerted action, the DEFENDANTS and their co-conspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

202. By reason of the injury to its interests due to the negligence, malice and recklessness of the DEFENDANTS, as set forth more fully in paragraphs one hundred and eleven(111) through one hundred and thirteen (113), and PLAINTIFFS are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, PLAINTIFFS are entitled to full Common Law Injunctive and Equitable Relief, including a judgment permanently enjoining the DEFENDANTS from the continuation of activities constituting negligence.

COUNT XI
(AS TO ALL DEFENDANTS)
(COMMON LAW CONVERSION)

172

203. The PLAINTIFFS restate and reallege paragraphs one (1) through two hundred and two (202) and further allege:

204. The DEFENDANTS received funds, including the proceeds of narcotics trafficking, and received the instrumentalities of illicit conduct.  Such funds and instrumentalities, and the proceeds thereof, were and are the property of the PLAINTIFFS as of the time of the commission of the illicit conduct.

205. The DEFENDANTS were obligated to either remit such funds and instrumentalities to PLAINTIFFS, or refuse to accept such funds and instrumentalities.  The DEFENDANTS did neither.  Instead, the DEFENDANTS appropriated the funds and instrumentalities for their own use.

206. The DEFENDANTS misappropriated PLAINTIFFS' money and property, and have rejected demands for compensation.

207. The DEFENDANTS have assumed and exercised ownership over funds and instrumentalities belonging to the PLAINTIFFS.  PLAINTIFFS have sustained and will continue to sustain damages as a result of the DEFENDANTS' conversion, for which the DEFENDANTS are liable to PLAINTIFFS.

208. The DEFENDANTS have acted maliciously, wantonly,

and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.  Their conduct amounts to a fraud on the public.

209. By reason of the injury to their economic and non-economic interests due to the negligence of the DEFENDANTS, as set forth more fully above in paragraphs one hundred and eleven(111) through one hundred and thirteen (113), PLAINTIFFS are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, PLAINTIFFS are entitled to full common law Injunctive and Equitable Relief, including a judgment permanently enjoining the DEFENDANTS from the continuation of activities constituting negligence, and compelling the DEFENDANTS to take steps to abate and prevent the laundering of criminal proceeds through the purchase and sale of their products.

COUNT XII
(AS TO ALL DEFENDANTS)
(MONEY HAD AND RECEIVED)

210. The PLAINTIFFS restate and reallege paragraphs

174

one (1) through two hundred and nine (209) and further allege:

211.  The DEFENDANTS knowingly received money belonging to PLAINTIFFS, including funds representing the proceeds of illicit conduct.

212.  The DEFENDANTS benefited from the receipt of money, the benefit of which remains with the DEFENDANTS.  A trust or equitable lien is impressed upon such money and the proceeds thereof.

213.  Under principles of equity and good conscience, the DEFENDANTS should not be permitted to keep the money and the proceeds thereof.  The DEFENDANTS knew that the funds in question were the proceeds of illicit conduct and, as such, were the property of PLAINTIFFS.  Through deceit and acts of concealment, the DEFENDANTS received, handled, deposited, and transferred such funds to their own accounts.  PLAINTIFFS have changed their positions as a result of the DEFENDANTS' conduct and have been precluded from taking action against those persons involved in the illicit conduct, including the DEFENDANTS, at the time of such conduct.  The DEFENDANTS' conduct was tortious, a trespass upon the rights and interests of PLAINTIFFS, and fraudulent.

214.  Equity and good conscience require the DEFENDANTS

to pay damages and restitution to PLAINTIFFS, disgorge their ill-gotten gains and, to effectuate these remedies, a constructive trust and equitable lien should be imposed by this Court upon the proceeds obtained by the DEFENDANTS by reason of money-laundering activities, which proceeds are rightly owned by and belong to PLAINTIFFS. PLAINTIFFS are entitled to damages, including actual, compensatory, and punitive damages, and their injuries are set forth more fully above in paragraphs one hundred and eleven(111) through one hundred and thirteen (113). Judgment in PLAINTIFFS' favor should include full Common Law Injunctive and Equitable Relief.

DEMAND FOR JUDGMENT

WHEREFORE, the PLAINTIFFS demand judgment in their favor and against DEFENDANTS as follows:

215. Pursuant to COUNT I, damages, including interest, against the DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

176

216. Pursuant to COUNT II, damages, including interest, against the DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

217. Pursuant to COUNT III, damages, including interest, against the DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

218. Pursuant to COUNT IV, damages, including interest, against the DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

219. Pursuant to COUNT V, RICO Injunctive and Equitable Relief against the DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial on the merits; treble the actual damages pursuant to 18 U.S.C. §§

177

1964(c), 28 U.S.C. § 1651(a), along with an award of the costs of the suit and a reasonable attorney's fee.

220. Pursuant to COUNT VI, against the DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common Law Injunctive and Equitable Relief and the costs of the suit and a reasonable attorney's fee.

221. Pursuant to COUNT VII, against the DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

222. Pursuant to COUNT VIII, against the DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

223. Pursuant to COUNT IX, against the DEFENDANTS, jointly and severally, an award of compensatory and punitive

damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

224. Pursuant to COUNT X, against the DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

225. Pursuant to COUNT XI, against the DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

226. Pursuant to COUNT XII, against the DEFENDANTS, jointly and severally, an award of compensatory and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

227. Such other and similar relief as the Court deems just, proper, and equitable; and trial by jury as to all issues triable as of right by jury.

Dated: December 29, 2004
New York, New York

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK, LIBERMAN &
McKEE, P.A.


By:_____/s/_____
Carlos A. Acevedo  (CA-6427)
Kevin A. Malone, Esquire
100 Courthouse Law Plaza
700 Southeast Third Avenue
Fort Lauderdale, Florida  33316
954-763-8181 telephone
954-763-8292 facsimile

and

SACKS & WESTON
Andrew B. Sacks, Esquire
John K. Weston, Esquire
510 Walnut Street, Suite 400
Philadelphia, PA  19106
800-578-5300 telephone
215-925-8200 telephone

ATTORNEYS FOR PLAINTIFFS