UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————X

The REPUBLIC OF COLOMBIA, et al.,

      Plaintiffs,

    v.                            **MEMORANDUM & ORDER**
                                      04-CV-4372 (NGG)

DIAGEO NORTH AMERICA INC., et al.,

      Defendants.
———————————————————————X

GARAUFIS, United States District Judge:

     The Republic of Colombia, Colombia's Capital District of Bogota, and a number of

Departments of the Republic of Colombia (collectively, "Plaintiffs") bring a civil Racketeering

Influenced and Corrupt Organizations Act ("RICO") claim and common law claims against

Diageo North America Inc., United Distillers Manufacturing Inc., Diageo PLC, Seagram Export

Sales Company Inc., Pernod Ricard USA LLC, and Pernod-Ricard S.A. (collectively,

"Defendants"). Essentially, Plaintiffs allege that Defendants are members of a RICO enterprise

composed of illegal narcotics traffickers and Defendants' distributors for the purpose of

laundering the proceeds of illegal narcotics sales and illegally smuggling liquor into Colombia.

     At this time, Defendants Diageo North America Inc., United Distillers Manufacturing

Inc., Seagram Export Sales Company Inc., and Pernod Ricard USA LLC move for dismissal on a

number of grounds.[1] First, Defendants assert that the action is barred by the revenue and penal

---

[1] Defendants Diageo PLC and Pernod-Ricard S.A. do not move for dismissal at this time.
However, all of the parties have stipulated that Diageo PLC and Pernod-Ricard S.A. (1) will be
bound by the court's decision with respect to the instant motions and (2) may move for dismissal
on grounds not raised in the instant motions once they are decided.

rules. Second, Defendants move for dismissal under the doctrine of *forum non conveniens*.

Third, Defendants request that this court abstain from hearing the action under the doctrine of

international comity. Fourth, Defendants assert that this case is barred because it presents non-

justiciable political questions. Fifth, Defendants argue that Plaintiffs' RICO claim should be

dismissed because RICO should not be applied extraterritorially to the alleged conduct, which

largely occurred outside of the United States. Sixth, Defendants argue that the RICO claim

should be dismissed because the Second Amended Complaint fails to plead adequately a RICO

claim. Finally, the Defendants assert that Plaintiffs' RICO claim is barred by the statute of

limitations. For the reasons described below, Defendants' motion to dismiss on the ground that

the revenue rule bars the instant action is granted in part and denied in part. Defendants' other

motions are denied.

## I.      FACTUAL BACKGROUND

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6). With respect to Defendants' Rule 12(b)(6) motion, the court must accept all factual

allegations in Plaintiffs' pleadings and must draw inferences from those allegations in the light

most favorable to Plaintiffs. United States v. The Baylor Univ. Med. Ctr., 469 F.3d 263, 267 (2d

Cir. 2006). With respect to Defendants' Rule 12(b)(1) motion, the court must accept all

*undisputed* factual allegations as true and draw all reasonable inferences in the light most

favorable to Plaintiffs. Robinson v. Malaysia, 269 F.3d 133, 140 (2d Cir. 2001). To the extent

the parties dispute facts relevant to Defendants' Rule 12(b)(1) motion using evidentiary

submissions, the court will consider the submitted evidence and, if necessary, decide the

disputed factual questions. See id. at 140 n.6 (in context of motion to dismiss for lack of subject

matter jurisdiction under the Foreign Sovereign Immunities Act, district court "must" consult factual submissions "if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction"). With very few exceptions, the material facts are undisputed. Where the court makes a factual finding, it will do so explicitly. That being said, this statement of facts is not intended to be a comprehensive description of all of the factual issues relevant to this motion. Rather, this section is limited to a description of Plaintiffs' claims. Other factual issues are discussed in detail in subsequent sections.

**Plaintiffs**

Plaintiffs are various Columbian national and regional governmental agencies. The Plaintiff Departments of the Republic of Colombia possess a "constitutional monopoly on the domestic manufacture and sale of liquor products." (Second Amended Complaint ("SAC") ¶ 1.) Some Plaintiffs manufacture and/or distill liquor and some of the Plaintiffs sell and distribute liquor in Colombia. (Id.) Plaintiffs "are by far the largest sellers and producers of liquor products within the Republic of Colombia." (Id.)

**Defendants**

Defendant Diageo North America is a Connecticut corporation authorized to do business in the State of New York. (Id. ¶ 11.) Defendant United Distillers Manufacturing is a Delaware Corporation authorized to do business in the State of New York with a principal place of business in Stamford, Connecticut. (Id. ¶ 12.) Diageo PLC is a British corporation that purchased United Distillers in 1997. (Id. ¶ 13.) Defendant Seagram Export Sales Co., Inc. is a New York corporation. (Id. ¶ 14.) Defendant Pernod Ricard USA, LLC is an Indiana corporation with a principal place of business in White Plains, New York. (Id. ¶ 15.) Defendant

3

Pernod-Ricard S.A. is a French corporation with a principal place of business in France. (Id. ¶ 16.) Defendants manufacture, distill and/or distribute liquor and other alcoholic beverages on an international scale, including such well-known brands as Tanqueray gin, Smirnoff vodka, Seagram's 7, Guinness stout, and Baileys Original Irish Cream. (Id. ¶ 16; Declaration of Carlos Acevedo ("Acevedo Decl.") Exh. 2 at 9.)

**The Enterprise**

Plaintiffs allege that all of the Defendants were part of a single RICO enterprise. (SAC ¶ 108.) Although Defendants competed with each other, "they were well aware of each other's activities, copied each other's strategies when they were successful, and in most cases utilized the same distributors to conduct their illegal sales." (Id. ¶ 26.) Defendants' "co-conspirators, in the money laundering schemes, including associated distributors, shippers, currency dealers, wholesalers, money brokers, and other participants" were also members of the enterprise. (Id. ¶ 108.)

The Second Amended Complaint alleges that Defendants knowingly entered into a money-laundering enterprise with narcotics traffickers and, at all times, controlled the enterprise. Defendants "controlled every aspect of the financial transactions involving the purchase of their liquor products." (SAC ¶ 28.) "Defendants also controlled the exact methods and means by which they were paid for the liquor products." (Id.) Defendants controlled the distribution channels through which their liquor traveled. (Id. ¶ 30.) Defendants worked with their co-conspirators to create a "complex web of companies located in Aruba and Panama to disguise the true nature and origin of the criminal proceeds" that were being laundered. (Id. ¶¶ 31, 35.) "Defendants and their co-conspirators knew that the purpose and design of this system of

4

seemingly unrelated parties to the financial transaction was to conceal, hide and/or disguise the true nature of the criminal proceeds they were accepting." (Id. ¶ 27(d).)

Although the Second Amended Complaint consists of 180 pages and 227 paragraphs, the Plaintiffs essentially allege that Defendants are part of illegal RICO enterprise engaged in money laundering, smuggling, tax evasion, as well as wire and mail fraud.

**The Scheme**

The alleged scheme begins with the United States Dollars or other currency that a Colombian narcotics trafficking organization obtains from illegal drug sales. (Id. ¶ 27(c); Acevedo Decl. Exh. 6 at 13.) At least some of these moneys are deposited into bank accounts in the United States in small amounts. (SAC ¶ 27(c).) "A large percentage of the narcotics laundering process that occurs in regard to these narcotics sales occur in the Eastern District of New York. By virtue of demographics, population, and other factors, a large percentage of individuals involved in laundering these narcotics proceeds reside in and conduct their money-laundering activities in the Eastern District of New York." (Acevedo Decl. Exh. 6, Affidavit of Alvin C. James ("James Aff.") ¶ 12.) These cash deposits are in sufficiently small amounts so as to avoid detection by law enforcement authorities. (SAC ¶ 27(c).) A large number of individuals called "smurfs" are used to make these small bank deposits. "The key to the 'smurf' system is the use of a lot of accounts—and a lot of smurfs." (Id.)

At this point, the Colombian narcotics organization must find a way to convert its United States Dollars into Colombian pesos without disclosing its illegal operation to law enforcement authorities. (James Aff. ¶¶ 5-6.) Because currency and banking laws preclude drug dealers from laundering their money through banks or other financial institutions, the drug traffickers and

money launderers launder their unlawfully obtained funds primarily through the purchase and sale of commercial goods. (Id. ¶ 6.)

Ultimately, the proceeds from the illegal narcotics sales are transferred to Defendants. (SAC ¶ 27.) Precisely how this occurs is far less clear. Often, multiple intermediaries are used. (Id. ¶¶ 27(a), 29.) Defendants' Aruban distributors often serve as intermediaries. (Id. ¶¶ 27(f), 30.) Checks drawn from U.S. accounts in which cash proceeds from narcotics sales were deposited in small amounts appear to be paid directly to Defendants. (See id. ¶ 27(c) ("Checks are then drawn on these accounts—which represent narcotics proceeds—and these checks are then exchanged by Colombian criminal organizations for liquor products manufactured by the Defendants.").)

This transfer of the narcotics proceeds is one aspect of an informal currency exchange known as the Black Market Peso Exchange ("BMPE"). (James. Aff. ¶¶ 2-7.) Plaintiffs have retained Alvin C. James, the former Senior Policy Advisor for Money Laundering of the United States Treasury Department's Financial Crimes Enforcement Network ("FinCEN") and founding chairman of the Treasury Department's BMPE working group. (James Aff. ¶ 2.) James states that, prior to his retirement in 2000, he "was the Treasury Department's leading authority on money laundering via international trade financing." (Id.) In his testimony before the Senate Caucus on International Narcotics Control, James explained the BMPE:

> The Colombian narcotics trafficker has a constant need to repatriate a large part of his drug sale proceeds to Colombia in the form of Colombian pesos. He needs these pesos to operate his illicit business, attempt to avoid government intervention in his activities, and maintain his wealthy lifestyle. It is important to note that the narcotics trafficker's situation is the opposite of the Colombian dollar/peso broker, since the trafficker has dollars in

6

the U.S. and needs pesos in Colombia; the peso broker has pesos in Colombia and needs dollars in the U.S.

The trafficker sells the dollars to the broker. The broker pays for the dollars with pesos in Colombia. . . .

. . . .

The dollar/peso broker uses two parallel bank accounts to facilitate the sale of dollars to the Colombian importer. The first was a peso account in Colombia. The second was [a] U.S. dollar account in the United States. The dollar/peso broker takes an order for U.S. dollars and receives payment in pesos in Colombia. The dollars are not delivered to the Colombian purchaser, but instead at the time of order, the purchaser instructs the dollar/peso broker to deliver the U.S. dollars to the trade goods supplier to whom he owes payment. These suppliers are often in the U.S., although they may also be in Panama or other ports of trade in Asia or Europe. The trade goods are shipped to Colombia and smuggled into the country to avoid tariffs and taxes[.]

(Acevedo Decl. Exh. 2 at 20-21.)

In their brief, Plaintiffs assert that tax evasion is not a purpose of the alleged RICO enterprise. (See Pl. FNC Opp. at 18 ("Defendants' buyers cannot use the legitimate importation system, not because they don't want to pay taxes, but because they cannot risk having their use of narcotics-derived funds discovered by the Colombian authorities. . . . In other words, Defendants' coconspirators are not selling illegally in order to avoid taxes, they are selling illegally in order to avoid detection of their use of laundered funds derived from narcotics trafficking.")) Plaintiffs cite only Alvin James's Affidavit in support of this proposition. The court has carefully reviewed the James Affidavit, however, and finds that at no point does James dispute that tax evasion is a purpose or effect of the alleged enterprise.

Further, James's testimony before United States House of Representatives Subcommittee on General Oversight and Investigations of the Committee on Banking and Financial Services

7

and the United States Senate Caucus on International Narcotics Control, which is attached to James's affidavit,[2] confirms that both tax evasion and money laundering are purposes and functions of the smuggling scheme alleged by Plaintiffs. James testified that Colombian importers need U.S. dollars to purchase foreign goods, and Colombian laws prevent importers from obtaining U.S. dollars legally without paying the "high Colombian tariffs and taxes." (Acevedo Decl. Exh. 6 at 20.) James also testified that the Colombian importer "needs to obtain these [U.S.] dollars discreetly so that he can evade the duties and taxes applicable to his imports." (Id. at 12.) Similarly, James testified that the BMPE provides a means through which Colombian narcotics traffickers can launder the proceeds of illegal drug sales: "[O]nce the trafficker has sold the dollars located in the United States and has received his pesos in accounts in Colombia, he has effectively laundered those dollars." (Id. at 21; see also James Aff. ¶ 6.)

One significant aspect of the BMPE is that the narcotics trafficker is willing to sell each dollar for less than a dollar because he values the service of having his dollars laundered: "[T]he narcotics trafficker sells the currency to the dollar/peso broker at a substantial discount, often amounting to as much as 30 percent. . . . As a result, the dollar/peso broker is now able to offer his clients, notably Colombian importers, not only a [discreet] source of U.S. dollars, but at a rate significantly less than the rate offered by the Colombian central bank." (Acevedo Decl. Exh. 6 at 21.)

---

[2] The exhibits to the James Affidavit are not set off from the James Affidavit with tabs. However, both the James Affidavit and exhibits thereto are Exhibit 6 of the Acevedo Declaration. As a result, the court will cite to exhibits to the James Affidavit as "Acevedo Decl. Exh. 6."

Plaintiffs allege that Defendants benefit from their RICO enterprise in three distinct ways. First, Defendants are able to charge the Colombian importers higher prices than they would be able to charge in a legal market because the importers obtain the U.S. dollars that they use to purchase the goods at a discount, i.e., the importers purchase each U.S. dollar for less than one dollar. (James Aff. ¶ 7.) Second, because the enterprise allows importers to obtain a very large amount of U.S. dollars at a price that is lower than the importers would pay in the absence of the enterprise, the enterprise permits importers to sell large quantities of liquor to consumers at below-market prices. (Id.) In doing so, Defendants increase their market share and their profits by selling a far larger quantity of liquor to Colombian consumers at reduced prices. (Id.) Third, Defendants assert that "because liquor demand is relatively elastic, the manufacturers are able to change demographic buying patterns, so that, for example, consumers will purchase more Johnny Walker or Lucky Strike and less rum or a domestic cigarette brand, because the Johnny Walker and the Lucky Strike are relatively cheaper than they would be if legitimately imported and sold." (Id.) Although it is not entirely clear how this the third alleged benefit is materially different from the second alleged benefit, for purposes of this motion, the court accepts all three allegations as true.

**Damages**

Plaintiffs seek numerous categories of damages. Only a few key categories will be discussed here. First, Plaintiffs seek "the total amount of criminal proceeds laundered by the Defendants." (SAC ¶ 104.) Second, Plaintiffs seek to recover "large amounts of money [expended] in their efforts to stop money laundering and to recoup funds that they have lost as a result of the activities of the Defendants[.]" (Id. ¶ 105.) Third, Plaintiffs, as liquor

9

manufacturers and distributors, seek compensation for the revenues and profits lost as a result of the Defendants' enterprise. (Id. ¶ 103(a).)

## Alleged Relationship between Plaintiffs' Lost Sales and Profits and Defendants' Money Laundering and Tax Evasion

Defendants dedicate a lot of time, energy, and words to their argument that the Second Amended Complaint asserts claims for damages resulting from tax evasion and smuggling as opposed to money laundering. (E.g., Def. FNC Rep. at 18-19.) I find that the Second Amended Complaint states a claim for damages resulting from both money laundering and tax evasion.

The alleged enterprise permits the Colombian importers to purchase liquor from Defendants and/or their agents with U.S. dollars that are acquired at a discounted price, i.e., because each dollar is acquired for less than one dollar. (James Aff. ¶ 6.) Some portion of this discount clearly results from the amount of the Colombian taxes that the importers are unlawfully evading through the enterprise. (Acevedo Decl. Exh. 6 at 12.) Another portion of the discount (if not the remainder of the discount) results from the fact that narcotics traffickers are willing to "sell" their U.S. dollars for less than their face value, i.e., drug dealers sell each dollar for less than one dollar. (Acevedo Decl. Exh. 6 at 20-21.) In effect, the narcotics dealers are paying, as a money laundering fee to the enterprise, the difference between the face value of the money and the price which they are paid for the money. This means that some portion of the discounted price at which the Colombian importers are purchasing the Defendants' liquor results from tax evasion (the "tax evasion discount") and some portion of the discounted price at which the Colombian importers are purchasing the Defendants' liquor results exclusively from laundering the proceeds from narcotics sales (the "money-laundering discount" or the "narco-laundering discount").

The Second Amended Complaint alleges that the price discount that Colombian importers pay for their goods is passed along to consumers. (SAC ¶ 103(c).) The discounted retail prices cause Colombian consumers to purchase more of Defendants' liquor than they would otherwise purchase. This increase in consumption of Defendants' products leads (1) to a decrease in consumption of Plaintiffs' competing liquor and/or (2) Plaintiffs to decrease their prices so as to be able to compete with Defendants. Either way, the enterprise causes Plaintiffs to lose revenues and profits. (Id. ¶¶ 103(a), (c), (d).)

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(1) Motions

On a number of different grounds, Defendants move to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). "It is well ingrained in the law that subject-matter jurisdiction can be called into question *either* by challenging the sufficiency of the allegation *or* by challenging the accuracy of the jurisdictional facts alleged." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 68, 108 S. Ct. 376 (1987) (Scalia, J., concurring in part and concurring in the judgment) (citations omitted; emphasis in original). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Robinson, 269 F.3d at 140 (internal citations and quotation marks omitted). If the parties present factual evidence that is "relevant to the jurisdictional question," the court *may* consider such evidence. Id.; accord Goonewardena v. New York, 475 F. Supp. 2d 310 (S.D.N.Y. 2007). The district court *must* consider facts outside the pleadings "if resolution of a proffered factual issue may result in the dismissal of the

complaint for want of jurisdiction." Robinson, 269 F.3d at 141 n.6. The party asserting subject-matter jurisdiction bears the burden of proving by a preponderance of the evidence that jurisdiction exists. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); accord Goonewardena, 475 F. Supp. 2d at 310.

The parties dispute whether Defendants' motion to dismiss the Second Amended Complaint on the basis of the revenue rule and Defendants' motion to dismiss Plaintiffs' RICO claims on the ground of extraterritoriality are properly brought under Rule 12(b)(1), as opposed to Rule 12(b)(6). Plaintiffs cite Arbaugh v. Y&H Corporation, 546 U.S. 500, 126 S. Ct. 1235 (2006), in support of the proposition that both of these motions may be brought only under Rule 12(b)(6). In Arbaugh, the Supreme Court held that whether the employer had a sufficient number of employees to satisfy the definition of "employer" under Title VII of the Civil Rights Act of 1964 was merely an element of a Title VII claim as opposed to a jurisdictional prerequisite. The Arbaugh court held that "[t]he basic statutory grants of federal-court subject-matter jurisdiction are contained in 28 U.S.C. §§ 1331 and 1332," and other statutory requirements for recovery should not be treated as jurisdictional unless "the Legislature clearly states that a threshold limitation on a statute's scope shall be jurisdictional[.]" Id. at 514-15, 126 S. Ct. at 1244-45.

With respect to Defendants' revenue rule motion, irrespective of whether the revenue and penal rules are characterized as limitations on subject-matter jurisdiction or abstention doctrines, Rule 12(b)(1) is an appropriate basis on which to make such a motion. See United States v. Portrait of Wally, 99 Civ. 9940 (MBM), 2002 WL 553532, at *6 (S.D.N.Y. Apr. 12, 2002) (motion to dismiss on the basis of the act of state, international comity, and political question

doctrines heard on a Rule 12(b)(1) motion even though "[t]hose doctrines go to justiciability rather than to jurisdiction"); 5B Wright & Miller § 1350 ("Courts have recognized a variety of other defenses that one normally would not think of as raising subject matter jurisdiction questions when considering a Rule 12(b)(1) motion, including claims that . . . the subject matter is one over which the federal court should abstain from exercising jurisdiction").

With respect to Defendants' motion to dismiss the RICO claim on the ground of extraterritoriality, I find that the standard of review will be the same whether it is brought under Rule 12(b)(1) or Rule 12(b)(6). Although the Second Circuit treated civil RICO's territoriality requirement as jurisdictional prior to Arbaugh, see North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1050-51 (2d Cir. 1996), at least one court has questioned whether Arbaugh requires courts to treat civil RICO's territorial requirement as merely an element of the claim. See Ayyash v. Bank Al-Madina, No. 04 Civ. 9201 (GEL), 2006 WL 587342, at *4 n.2 (S.D.N.Y. Mar. 9, 2006) ("The Supreme Court's decision in Arbaugh may require that the Court of Appeals review its treatment of the question of RICO's extraterritorial effect."). This court agrees that there is, in the least, a serious question as to whether, in the civil RICO context, the territoriality requirement can be considered jurisdictional under Arbaugh.

In this case, there is no reason to resolve the question of whether RICO's territoriality requirement goes to the court's subject-matter jurisdiction. Defendants have made clear that they "do not rely upon material outside of the Complaint for" their motion to dismiss on the basis of extraterritoriality. (Def. RICO Rep. at 2.) Nor do Plaintiffs seek to introduce facts outside of the Second Amended Complaint for purposes of this motion. As a result, whether the motion on this ground is brought under Rule 12(b)(1) or Rule 12(b)(6), the court is required to

treat the allegations in the Second Amended Complaint as true and to draw reasonable inferences on the basis of such allegations. See Robinson, 269 F.3d at 140 ("If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.") (citations and quotation marks omitted).

## B.    Rule 12(b)(6) Motions

With the exception of the mail and wire fraud predicate RICO acts, which are subject to a heightened pleading requirement under Federal Rule of Civil Procedure 9(b), the Second Amended Complaint is subject to the liberal pleading requirement set forth in Federal Rule of Civil Procedure 8. After briefing and oral argument on this motion were complete, the Supreme Court clarified the pleading standards under Federal Rule of Civil Procedure 8 and the standard under which Rule 12(b)(6) motions are reviewed. In Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007), the Court explained that plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." If they "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id.; see also Goldstein v. Pataki, __ F. Supp. 2d __, No. 06-CV-5827 (NGG), 2007 WL 1654009, at *33 (E.D.N.Y. June 6, 2007) (Garaufis, J.) (discussing Twombly).

Since Twombly, the Second Circuit has explained that Twombly imposes a plausibility requirement on pleadings under Rule 8, but does not, as a general matter, change the Rule 8 pleading standard:

> After careful consideration of the Court's [Twombly] opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible "plausibility standard,"

14

> which obliges a pleader to amplify a claim with some factual
> allegations in those contexts where such amplification is needed to
> render the claim plausible.

Iqbal v. Hasty, __ F.3d__, 2007 U.S. App. LEXIS 13911, at *35 (2d Cir. June 14, 2007). In

another post-Twombly decision, the Second Circuit confirmed that "the district court must

accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from

those allegations in the light most favorable to plaintiff, and construe the complaint liberally."

Roth v. Jennings, __ F.3d __, 2007 WL 1629889, at *11 (2d Cir. June 6, 2007).

Of course, courts in this Circuit have noted that RICO claims "'must be reviewed with

appreciation of the extreme sanctions it provides so that actions traditionally brought in state

courts do not gain access to treble damages and attorneys fees in federal court simply because

they are cast in terms of RICO violations.'" Leung v. Law, 387 F. Supp. 2d 105, 112-13

(E.D.N.Y. 2005) (Garaufis, J.) (quoting Mathon v. Marine Midland Bank, N.A., 875 F. Supp.

986, 1001 (E.D.N.Y. 1995)). In this vein, it has also been said that "courts should strive to flush

out frivolous RICO allegations at any early stage of the litigation." Burnett v. Al Baraka Inv. &

Dev. Corp. (In re Terrorist Attacks on September 11, 2001), 349 F. Supp. 2d 765, 827 (S.D.N.Y.

2005) (quotation marks omitted).

## III.    REVENUE RULE

### A.    Background

The Second Circuit recently explained that "[t]he revenue rule is a longstanding common

law doctrine providing that courts of one sovereign will not enforce final tax judgments or

unadjudicated tax claims of other sovereigns." Attorney General of Canada v. R.J. Reynolds

Tobacco Holdings, Inc. (hereinafter, "Canada"), 268 F.3d 103, 109 (2d Cir. 2001). The revenue

rule was originally created by eighteenth-century English courts as what amounted to a subsidy

for British trade:  English courts refused to enforce foreign customs laws that would have had

the effect of interfering with or diminishing British trade.  Id. at 110.  More recently, federal

courts have found that the revenue rule should continue to be applied to serve separation of

powers and sovereignty concerns.  Id. at 109-115.  Courts continue to refer to Judge Learned

Hand's explanation of the rationale for the revenue rule:

> [A] court will not recognize those [liabilities] arising in a foreign
> state, if they run counter to the 'settled public policy' of its own.
> Thus a scrutiny of the liability is necessarily always in reserve, and
> the possibility that it will be found not to accord with the policy of
> the domestic state. . . . To pass upon the provisions for the public
> order of another state is, or at any rate should be, beyond the
> powers of a court; it involves the relations between the states
> themselves, with which courts are incompetent to deal, and which
> are intrusted to other authorities.  It may commit the domestic state
> to a position which would seriously embarrass its neighbor.
> Revenue laws fall within the same reasoning; they affect a state in
> matters as vital to its existence as its criminal laws.  No court
> ought to undertake an inquiry which it cannot prosecute without
> determining whether those laws are consonant with its own notions
> of what is proper.

Moore v. Mitchell, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring).

Both this court and the Second Circuit recently addressed the revenue rule in the

European Community cases.  See European Community v. Japan Tobacco, Inc. (hereinafter,

"Amazonas"), 186 F. Supp. 2d 231, 243 (E.D.N.Y. 2002) (Garaufis, J.), aff'd in part and rev'd in

part sub nom., European Community v. RJR Nabisco, Inc. (hereinafter, "European Community

I"), 355 F.3d 123 (2d Cir. 2004), cert. granted, judgment vacated and remanded, 544 U.S. 1012,

125 S. Ct. 1968 (2005), on reconsideration following remand, 424 F.3d 175 (2d Cir. 2005)

(hereinafter, "European Community II"), cert. denied, 126 S. Ct. 1045 (2006).

"The revenue rule is implicated whenever the substance of the claim is, either *directly or indirectly*, one for tax revenues, such that the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff." European Community I, 355 F.3d at 131 (emphasis added; internal citations and quotation marks omitted). "What matters is not the form of the action, but the substance of the claim." Canada, 268 F.3d at 130.

## 1.  Direct Enforcement

"A suit directly seeks to enforce foreign tax laws when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenues." European Community I, 355 F.3d at 131. Defendants argue that "the Revenue Rule bars Plaintiffs' claims regardless of whether these Colombian sovereign government entities sue for sovereign or commercial losses resulting from sovereign revenue law issues." (Def. FNC Rep. at 28.) In other words, Defendants are arguing that the instant claims for lost sales and profits are barred by the revenue rule because Plaintiffs are directly seeking compensation for lost revenues. Plaintiffs argue that the revenue rule bars only claims that a sovereign brings in its sovereign capacity and does not preclude claims by a sovereign in its commercial capacity. (Pl. FNC Opp. at 28-33.)

Plaintiffs cite Banco Frances e Brasileiro S.A. v. Doe, 36 N.Y.2d 592, 331 N.E.2d 502 (1975) in support of this proposition. In Banco Frances, a private Brazilian bank brought a fraud claim against individuals, alleging that the individuals submitted false currency-exchange applications to the bank in violation of Brazilian currency regulations, thereby causing the bank to improperly exchange Brazilian cruzeiros into travelers checks in United States dollars. The

Court of Appeals distinguished <u>Banco Do Brasil v. A.C. Israel Commodity Co.</u>, 12 N.Y.2d 371,

190 N.E.2d 235 (1963), and found that the revenue rule did not bar the plaintiff's claims for a

variety of reasons, including as follows:

> The [<u>Banco Do Brasil</u>] case relied upon by the Appellate Division
> is quite distinguishable. There the Government of Brazil, through
> Banco do Brasil, a government bank, sought redress for violations
> of its currency exchange regulations incident to a fraudulent coffee
> export transaction. Here, the plaintiff is a private bank seeking
> rescission of the fraudulent currency exchange transactions and
> damages. [] [N]o case has come to our attention where a private
> tort remedy arising from foreign currency regulations has been
> denied by the forum as an application of the revenue law rule and
> we decline so to extend the Banco do Brasil rationale. Thus, in the
> instant case we find no basis for reliance upon the revenue law rule
> to deny a forum for suit.

<u>Banco Frances</u>, 36 N.Y.2d at 598-99, 331 N.E.2d at 506-07. Without question, at least portions

of the <u>Banco Frances</u> decision are no longer good law in federal courts. Above all else, the

<u>Banco Frances</u> court's conclusion that the revenue rule is not "analytically justifiable" is clearly

inconsistent with the Supreme Court's decision in <u>Pasquantino v. United States</u>, 544 U.S. 349,

125 S. Ct. 1766 (2005), and the Second Circuit's decisions in <u>Canada</u> and the <u>European</u>

<u>Community</u> cases. That being said, <u>Banco Frances</u> does support the proposition that a

commercial actor may bring a private tort claim even though the claim involves a foreign

revenue law.

Defendants rely on <u>Banco Do Brasil</u>, 12 N.Y.2d at 377, 190 N.E.2d at 237, and <u>Ludlow</u>

<u>v. Van Rensselaer</u>, 1 Johns. 94 (N.Y. 1806). These cases are inapposite. <u>Banco Do Brasil</u> is

inapposite because, as the <u>Banco Frances</u> court observed, the plaintiff-sovereign was clearly

suing in its sovereign capacity as opposed to its capacity as a commercial actor. <u>Banco Do</u>

<u>Brasil</u>, 12 N.Y.2d at 377, 190 N.E.2d at 237 (holding that the action by Brazil for damages

caused by defendant's evasion of foreign currency exchange laws was barred by revenue rule).

Ludlow is a very old and curious decision. In Ludlow, a breach of contract action between two private parties, the court held that the revenue rule barred the court from considering a defense based on a French stamp tax law. Ludlow seems to stand for the proposition that, where a claim constitutes a justiciable cause of action to which there exists a potentially meritorious defense based on a foreign tax law that the revenue rule precludes the courts from considering, the court should hear the action and ignore the defense. In this way, Ludlow appears to be inconsistent with those Second Circuit cases that state that the revenue rule precludes a court from hearing a claim that would require the court to consider the validity of a foreign tax law. In European Community I, the Second Circuit explained that foreign tax laws "embody the political and social judgments of the sovereign and its people" and that:

> judicial examination and enforcement of foreign tax laws at the behest of foreign nations may conflict with the other branches' policy choices with respect to cooperation in tax enforcement, and create the risk that the judiciary will be drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government.

European Community I, 355 F.3d at 131 (internal quotation marks omitted).

The Second Circuit's Canada decision strongly supports the conclusion that a claim constitutes proscribed direct enforcement of a revenue law only when the sovereign is seeking damages it sustained in its capacity as sovereign. In considering which types of damages are barred by the revenue rule, Canada recognized a distinction between damages that a government suffers in its sovereign capacity and damages that a government suffers as a commercial actor. See Canada, 268 F.3d at 132. Thus, Canada could not recover law enforcement costs that the

defendants' unlawful acts caused Canada to incur in part because they were a cost that Canada had incurred in its capacity as a sovereign:

> Law enforcement costs incurred to secure taxes for the sovereign are qualitatively different from the damages suffered by a private individual; they fall within the class of acts that are *"jure imperii,"* that is, that are expressions of a foreign sovereign's will or are carried out by virtue of that sovereign authority. United States courts have traditionally been reluctant to enforce foreign laws that are *"jure imperii."*

Id. at 132 (internal citation omitted). The Second Circuit continued to explain that costs that are *jure imperii* are distinct from those that are *jure gestionis*: "An example of a private, '*jure gestionis*' act is operating a business." Id. at 132 n.41.

This distinction between a sovereign suing in its sovereign capacity as opposed to in its capacity as a private actor is consistent with Canada's reading of the purpose of the revenue rule. In Canada, the Second Circuit explained that suits involving a foreign sovereign's revenue laws are problematic because they raise public policy concerns that go to the heart of sovereignty:

> Tax laws embody a sovereign's political will. They create property rights and affect each individual's relationship to his or her sovereign. They mirror the moral and social sensibilities of a society. Sales taxes, for example, may enforce political and moral judgments about certain products. Import and export taxes may reflect a country's ideological leanings and the political goals of its commercial relationships with other nations.

Id. at 111. Under this reasoning, tax laws are problematic not because they raise revenue for the government and the government may use such revenues for a controversial purpose, but because the laws, in and of themselves, embody policy choices that are infused with moral and political judgments. As a result, Canada's reading of the revenue rule strongly supports the proposition that the rule is not triggered by every foreign law that causes a foreign sovereign to generate

revenue; rather, the rule is targeted to those revenue-generating statutes that involve moral and political judgments.[3]

A sovereign's commercial activities do not involve the kind of moral and political judgments that the tax or revenue laws typically involve. A sovereign engages in commercial activity for the same reason a private individual or corporation participates in such activity—to turn a profit. A sovereign's decision to drill for oil, manufacture airplanes, or provide postal services is not infused with the kinds of moral and political judgments necessarily involved in taxing cigarettes or providing a tax credit for higher education spending.

To read the revenue rule to prohibit sovereigns from bringing damages claims irrespective of the nature of the damages claim would have extremely troubling consequences. As Plaintiffs urged at oral argument, if the revenue rule prohibits sovereigns from bringing all claims for damages, then the Venezuelan government could not bring a claim arising out of a contract dispute with an American corporation concerning Venezuela's oil business. (Feb. 2, 2007 Oral Argument Transcript at 40.) If the United Kingdom had such a revenue rule, the United States Postal Service could not bring a contract claim in the United Kingdom against a British corporation that it had retained to deliver American mail in the U.K. Such an interpretation of the revenue rule would (1) make it very difficult for sovereigns to participate in commercial activities and (2) provide strong disincentives for foreign sovereigns to do business with United States corporations. Such a reading of the revenue rule would cause these problems

---

[3] As discussed in detail below in the Section addressing the penal law rule, the distinction between injuries that a sovereign suffers in its sovereign capacity and injuries a sovereign suffers in a commercial capacity is also supported by federal case law addressing the penal law rule. As the penal law rule and revenue rule are analogous, the penal law jurisprudence supports such a distinction in the context of the revenue rule.

while achieving absolutely no public policy purpose: prohibiting sovereigns from bringing claims arising out of purely commercial activities would in no way serve the separation of powers or extraterritoriality concerns that currently motivate federal courts to recognize the revenue rule.

Further, if the revenue rule barred suits by foreign sovereigns suing in their commercial capacity, foreign sovereigns would find themselves at a unique disadvantage in federal courts. Under the Foreign Sovereign Immunities Act ("FSIA"), a foreign sovereign is subject to jurisdiction in federal courts with respect to actions arising out of a commercial activity carried on by the foreign state, provided that there is some connection between the commercial activity and the United States. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611, 112 S. Ct. 2160, 2164 (1992). Thus, under Defendants' reading of the revenue rule, a private plaintiff could sue a foreign sovereign in United States courts for claims arising out of commercial activity but the foreign sovereign could not bring a counterclaim arising out of that same course of conduct. Such an outcome would be manifestly unjust.

Because (1) claims by a foreign sovereign for damages sustained in its capacity as a commercial actor do not raise the same policy concerns as claims brought by a foreign sovereign in its sovereign capacity and (2) foreign sovereigns are subject to suit in the federal courts for claims arising out of commercial actions, I conclude that claims brought by a foreign sovereign in a commercial capacity do not constitute the kind of direct enforcement of a foreign revenue law that is barred by the revenue rule. Of course, such a claim may require a court to rule upon the validity of a foreign revenue law. In those circumstances, such a claim could still constitute indirect enforcement of a foreign revenue law that is barred by the revenue rule.

## 2.    Indirect Enforcement

The reality is that "[i]ndirect enforcement is . . . easier to describe than to define[.]"

Pasquantino, 544 U.S. at 368, 125 S. Ct. at 1778-79 (internal quotation marks omitted).  The

parties vigorously contest precisely what constitutes indirect enforcement of a revenue law.

Defendants argue that any claim that would require the court to have to consider, apply or

otherwise pass on a foreign tax law is barred by the revenue rule.  (E.g., Def. FNC Rep. at 7-8.)

Plaintiffs argue that the revenue rule bars only claims that seek to collect unpaid foreign taxes.

(Pl. FNC Opp. at 25.)  According to Plaintiffs, whether a claim requires a court to rule on the

validity of a foreign tax law is irrelevant.  (Id.)

What is clear is that the revenue rule bars claims for costs resulting from enforcement of

foreign tax laws because such claims seek indirectly to enforce the laws.  See European

Community II, 424 F.3d at 179; Canada, 268 F.3d at 132.  However, much as other aspects of

the revenue rule presented in this case, no binding authority has clarified the extent to which the

revenue rule prohibits courts from considering the validity of or recognizing foreign tax laws.

The Canada and the European Community courts did not have occasion to determine whether a

federal cause of action that is substantively unrelated to foreign tax laws but requires the federal

court to recognize and apply foreign tax laws is the kind of indirect enforcement that runs afoul

of the revenue rule.  There is language in Canada that could be read to mean that a federal court

may not hear any claim that requires the court to recognize and apply a foreign tax law:

> Additional considerations reinforce our determination that
> Canada's claim for law enforcement costs must be dismissed.  To
> proceed with the law enforcement costs claim, we would have to
> examine the tax laws at issue in order to assess the causation
> aspect of this claim.  For example, we would have to assess
> whether the law enforcement costs were in fact spent on achieving

the cessation of cigarette smuggling. So doing, we would have to examine whether, when and to what extent the smuggling existed, which would require a determination that tax laws were applicable to defendants. These inquiries could draw the courts into troubled waters.

Id. at 133; see also Amazonas, 186 F. Supp. 2d at 237 (quoting some of this same language).

The Attorney General of Canada specifically argued that "the revenue rule may prohibit the enforcement of Canadian tax laws, but not their recognition in order to calculate damages." Id. at 133. In support of this proposition, the Attorney General of Canada cited In re State of Norway's Application (Nos. 1 and 2), [1990] A.C. 723, 724 (H.L.) and Regazzoni v. K.C. Sethia (1944) Ltd., [1956] 2 Q.B. 490, 515-16 (C.A.), aff'd [1957] 3 All. E.R. 287 (H.L.). The Second Circuit explained that:

> In both of these cases, the court permitted recognition but not enforcement of foreign revenue laws. However, in neither Norway nor K.C. Sethia was the British court called upon to allow damages that would serve as a substitute for previously unpaid taxes to be paid in the United Kingdom to a foreign sovereign.

Canada, 268 F.3d at 133-34. In concluding that Norway and K.C. Sethia were distinguishable, the Second Circuit did not reject the distinction between recognition and enforcement of a foreign tax law. Further, in Pasquantino, the Supreme Court suggested that a distinction was to be made between recognition of a foreign tax law and enforcement, stating "[i]ndirect enforcement is . . . easier to describe than to define, and it is sometimes difficult to draw the line between an issue involving mere[] *recognition* of a foreign law and indirect *enforcement* of it." Pasquantino, 544 U.S. at 368, 125 S. Ct. at 1778-79 (emphasis added and internal quotation marks omitted).

In the European Community cases, this court stated that "any action in which the court 'will have to pass on[ ] the validity of [foreign] revenue laws and their applicability [to the claims at bar]' constitutes 'enforcing [foreign] revenue laws,' and thereby triggers the revenue rule." Amazonas, 186 F. Supp. 2d at 235. That passage quoted a portion of the Second Circuit's decision in Canada, 268 F.3d at 108, that, in turn, quoted the district court's decision in Canada, Attorney General of Canada v. RJ Reynolds Tobacco Holdings, Inc., 103 F. Supp. 2d 134, 143 (N.D.N.Y. 2000). As the claims in the European Community cases were essentially identical to the claims in Canada, in Amazonas, I did not confront the issue I confront here: whether a claim that requires a court to recognize, apply, or consider the validity of a foreign tax law is barred by the revenue rule. Further, I did not dismiss the Amazonas plaintiffs' money laundering claims on the basis of the revenue rule. In Amazonas, I found only that the smuggling claims were barred by the revenue rule. Amazonas, 186 F. Supp. 2d at 236 ("In this [revenue rule] section of the opinion, the court will consider the RICO claims pursuant to smuggling grounds. The court will consider the claims in light of the money laundering grounds at Part IV of this opinion."). Other than the *dicta* relied upon by Defendants, nothing in Amazonas supports the proposition that any time an action forces a court to consider a foreign revenue law, the action constitutes an attempt to indirectly enforce a foreign revenue law that is proscribed by the revenue rule.

As I am now explicitly confronted with this issue, this is my first opportunity to clarify the extent to which consideration of a foreign revenue law violates the revenue rule. There is a continuum along which a claim will require a court to consider or "pass on" a foreign tax law. At the least problematic end of the continuum is the mere recognition of a foreign tax law. At the next point along the continuum, a court must apply such a foreign law. Next, a claim might

25

require a court to rule on the validity of a foreign tax law. Finally, a claim might require a court to explicitly enforce a foreign revenue law. The Second Circuit cases make clear that the revenue rule clearly bars explicit enforcement. However, I find that whether lesser forms of consideration of a foreign revenue law—recognition, application, and determination of validity—are permissible depends on the extent to which the consideration of the foreign revenue law raises separation of powers and sovereignty concerns.

I recognize that the Second Circuit cases and the language in this court's Amazonas decision make clear that ruling upon the validity of a foreign law will raise significant policy concerns in many, if not all, cases. As Judge Learned Hand explained, "[n]o court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper." Moore, 30 F.2d at 604 (L. Hand, J., concurring). In the typical case where a court will have to rule on the validity of a foreign tax law, the court will have to determine whether the law is consistent with its own public policy. The revenue rule bars such a determination in most, if not all, circumstances. See Canada, 268 F.3d at 113 ("Addressing the public policy concerns raised by the imposition of such foreign taxes could embroil United States courts in delicate issues in which they have little expertise or capacity"); see also Cinar Corp. Securities Litig., 186 F. Supp. 2d 279, 293 n.9 (E.D.N.Y. 2002) (revenue rule "mandates that courts refrain from adjudicating cases where they will have to pass upon the validity of the revenue laws of foreign nations"; holding that the revenue rule did not apply where "[t]he Court would not be commenting on the validity of the Canadian incentive scheme, but rather deciding whether the defendants' admitted abuse of that scheme defrauded American investors.")

This approach to the revenue rule—allowing a federal court to assess the policy

implications of considering, applying, and determining the validity of a foreign revenue law

before determining whether a claim that triggers such consideration is barred by the revenue

rule—is most consistent with the Second Circuit's recent revenue law jurisprudence. The

Canada court explicitly held that determining whether the revenue rule barred a claim required

both an analysis of the facts of the case and the policy concerns behind the revenue rule:

> We do not suggest that the revenue rule always bars United States
> courts from furthering the tax policies of foreign sovereigns. . . .
> These concerns about sovereignty and [extraterritoriality] are
> therefore not absolute, and are not implicated in every case
> involving foreign tax laws.  However, as explained below [ ], the
> particular facts of this case—most notably, the fact that a foreign
> sovereign plaintiff is directly seeking to enforce its tax laws, and
> that our government has negotiated and signed a treaty with this
> sovereign providing for limited extraterritorial tax enforcement
> assistance but stopping well short of the assistance requested
> here—lead us to be wary in this instance of becoming the enforcer
> of foreign tax policy.

Canada, 268 F.3d at 113.

Similarly, in the European Community cases, the Second Circuit reaffirmed that

determining whether a claim involves proscribed indirect enforcement of a revenue law requires

an analysis of the facts of the case and policy concerns behind the revenue rule.  In European

Community I, the court's very definition of indirect enforcement incorporated the policy

concerns motivating the revenue rule: "[I]ndirect enforcement occurs when a foreign state seeks

a remedy that would give extraterritorial effect to its tax laws; for instance, a suit seeking

damages based on law enforcement costs is an attempt to shift the cost of enforcing the tax laws

onto the defendants, and would therefore require the court indirectly to enforce the tax laws."

European Community I, 355 F.3d at 131.  The Second Circuit continued to explain that "[t]he

revenue rule is therefore not absolute. Even if the substance of the claim invokes foreign tax laws, the revenue rule will not be triggered where the sovereignty and extraterritoriality concerns that inform the rule's application are not present." Id. at 131-32. Similarly, the European Community court explained that the argument that the revenue rule is discretionary "is also foreclosed by Canada, which clearly establishes that, once the sovereignty and separation of powers concerns that inform the rule are implicated by the substance of a plaintiff's claims, the court may not hear those claims absent evidence that the rule has been abrogated." European Community I, 355 F.3d at 138. In re-evaluating the Circuit's revenue rule jurisprudence in the wake of Pasquantino, the Second Circuit continued to hold that the scope of the revenue rule would be informed by the dual policy concerns motivating the rule:

> We stressed in our [Canada] opinion that the revenue rule is designed to address two concerns: first, that policy complications and embarrassment may follow when one nation's courts analyze the validity of another nation's tax laws; and second, that the executive branch, not the judicial branch, should decide when our nation will aid others in enforcing their tax laws. These twin concerns for sovereignty and separation of powers are important to the revenue rule analysis, because they imply certain exceptions to the rule.

European Community II, 424 F.3d at 180 (citation omitted).

This is consistent with the Eleventh Circuit's approach to the revenue rule, in that the Eleventh Circuit also considers the policy implications of a claim in determining whether it is barred by the revenue rule. See Republic of Honduras v. Philip Morris Cos., 341 F.3d 1253, 1257 (11th Cir. 2003) ("The Republics' complaints make clear that their tax laws embody anti-smoking policies directed at protecting their citizens from the health hazards of smoking, both by attempting to discourage smoking by raising the price of cigarettes and by providing revenue for

anti-smoking programs. . . . *Because the tax laws underlying the Republics' RICO claims embody specific policy choices*, we hold that the revenue rule applies to these claims and prevents us from considering them.") (emphasis added).

As a result, determining whether a claim for damages that requires a court to recognize, apply, or rule on the validity of a foreign sovereign's tax laws constitutes the kind of indirect enforcement that is proscribed by the revenue rule requires both an analysis of the facts of the case and the policy concerns motivating the revenue rule.

**B.      Analysis**

Although Defendants do not characterize them as such, Defendants have two central arguments as to why the revenue rule bars the instant claims.  First, Defendants argue that the instant claims are an effort to directly enforce the Colombian revenue law providing that the Colombian government shall have a monopoly on certain liquor manufacturing and distribution businesses by awarding Plaintiffs revenues to which they are allegedly entitled under the monopoly law.  Second, Defendants argue that the instant claims constitute impermissible indirect enforcement of Colombian revenue laws because they require the court to "pass on" Colombian revenue laws.  Each of these arguments will be considered in turn.

**1.      Direct Enforcement**

Colombian law provides that the Colombian government shall have a monopoly on certain liquor manufacturing and distribution businesses.  Defendants argue that the instant claims are an effort to directly enforce this law by awarding Plaintiffs revenues to which they are allegedly entitled under the monopoly law.  As discussed above, determining whether the instant claims constitute proscribed direct enforcement of a revenue law depends on whether Plaintiffs

are suing in their sovereign capacity or in a purely commercial capacity. Defendants argue that Plaintiffs are suing in their sovereign capacity because they engage in the following sovereign acts: "(1) monopolizing the entire liquor industry; (2) collecting revenues to be placed in the government coffers for the general health and welfare of the Colombian people; (3) collecting a 'consumption' tax on liquor that is given to the Departments [of the Colombian Government]; and (4) enacting and charging discriminatory taxes." (Def. FNC Rep. at 29.) Defendants point to the fact that Colombia's Constitution requires that revenues generated by government monopolies must be used for the public welfare and that "[r]evenues obtained through the exercise of liquor monopolies shall be used preferably for health care services and education." (Declaration of Mauricio A. Plazas Vega ("Plazas Decl.") ¶¶ 11-12 (quoting the Colombia Constitution).) Defendants are partially correct.

Two categories of claims are clearly barred. First, to the extent Plaintiffs are stating claims for damages resulting from lost liquor taxes, such claims are barred by the revenue rule and are dismissed. See European Community I, 355 F.3d at 132 (RICO claims seeking lost taxes are barred by revenue rule); Canada, 268 F.3d at 131 (same). In this case, lost liquor taxes include both the consumption taxes charged on imported liquor and the so-called "monopoly participations."[4]

---

[4] Although the exact nature of the so-called "monopoly participations" is not clear, they appear to be another consumption tax. Under Colombian law, each Department has the choice of (1) exploiting its liquor monopoly or (2) imposing a consumption tax on liquor. (Plazas Decl. ¶ 15.) If a Department opts to exploit its liquor monopoly, it "may collect a 'participation' from liquors instead of the consumption tax[.]" (Id. ¶ 23.) Although Plazas's description of the "monopoly participation" is less than clear (perhaps because of an imperfect translation of Plazas's declaration), Defendants explain that a monopoly participation is essentially a consumption tax by another name: "Where a Department chooses to exploit the monopoly, the Department will charge a monopoly 'participation' on every bottle of liquor introduced into its territory 'instead of the consumption tax.'" (Def. FNC Mem. at 19 (quoting, Plazas Decl. ¶ 23).) Colombian law

Second, to the extent Plaintiffs are seeking damages that they suffered in their sovereign capacity, such claims are also barred by the revenue rule. A sovereign suffers harms in its sovereign capacity when its injury concerns activity undertaken by the government "by virtue of [its] sovereign authority." <u>Canada</u>, 268 F.3d at 132 (holding that revenue rule barred plaintiffs' claim for law enforcement costs because such costs were suffered by plaintiffs in their sovereign capacities).

The Second Amended Complaint is extremely lengthy and identifies countless forms of injury. On pages 31 and 32 of their Reply Brief, Defendants have identified eighteen allegations of injury that they believe are objectionable.[5] At this time, the court will address only those eighteen alleged injuries. The court agrees that at least sixteen of the eighteen forms of injury are injuries that Plaintiffs could suffer only in their sovereign capacity and, as a result, are barred by the revenue rule. However, two of the eighteen identified forms of injury are not necessarily

---

requires the monopoly participation to be no lower than the consumption. (Plazas Decl. ¶ 23 n.10.) In fact the only distinction between the consumption tax and the monopoly participation that the court can discern is that a centralized Colombian government agency collects the consumption tax, whereas the individual Departments collect the monopoly participations.

[5] These eighteen categories of injury are: failure of Defendants' smuggled products to bear labels with the information required by Colombian law; "adverse economic impact" of the Colombian "underground economy;" "eros[ion] of the stability and credibility" of the Colombian peso; "[d]istortion of the [m]oney supply;" distort[ion] [of] the official balance of payments;" "permeation of the Colombian border and the Territory of the Republic;" threat to the "safety, security, and well-being of governmental personnel and property;" interference with "the regulatory system and authority of the Republic;" "disruption of public services;" "expenses to stabilize unstable political situations in entire regions of Colombia;" damage to the Colombian "trade and the economy;" "interfere[nce] with use by the public of a public space;" "endanger[ment] and injur[y] [to] the property, life, health, safety, and comfort of a considerable number of persons;" "injur[y] [to] the economic well being of the citizens of the Republic of Colombia and the Departments;" "creat[ing] great dangers to the community, including Plaintiffs' economic and non-economic interests;" and "fraud on the public." (Def. FNC Rep. at 31-32.)

barred by the revenue rule: (1) "adverse economic impact" of the Colombian "underground economy;" and (2) harm resulting from Defendants' failure to properly label goods. Each of these two types of injury will be considered in turn.

First, the "adverse economic impact" of the Colombian "underground economy" is simply too general and vague a term to encompass only injury that is barred by the revenue rule. For instance, Plaintiffs' lost sales and profits resulting from Defendants' money laundering are presumably included within the "adverse economic impact" of the Colombian "underground economy." Although the claim for such "adverse economic impact" does not run afoul of the revenue rule, this allegation, read independently, is too vague to withstand Federal Rule of Civil Procedure 8's liberal pleading requirements and, thus, is dismissed. Specific allegations of injury that fall within the category of "adverse economic impact" survive, however. For instance, Plaintiffs have pled a claim for lost sales and profits, which is an injury Plaintiffs suffer in a commercial as opposed to a sovereign capacity.

Second, harm resulting from Defendants' failure to properly label their goods is arguably a harm that Plaintiffs suffer in a commercial capacity. Although Plaintiffs may bring the improper labeling claim in a purely commercial capacity, such a claim may still be barred by the revenue and/or penal rules if it requires the court to enforce Colombian labeling laws. In any event, at this time, the court will dismiss on revenue rule grounds only the sixteen harms that are clearly suffered by Plaintiffs in their sovereign capacities.

However, Plaintiffs' claims for lost revenues and profits seek redress for a harm that Plaintiffs allegedly suffered in a commercial—as opposed to sovereign—capacity and, as a result, do not constitute the kind of direct enforcement of foreign revenue laws that runs afoul of

32

the revenue rule. Manufacturing and/or selling liquor is not "within the class of acts that are *'jure imperii*,' that is, that are expressions of a foreign's sovereign's will or are carried out by virtue of that sovereign authority." <u>Canada</u>, 268 F.3d at 132. Sales of liquor in a national or international market can be made by a government agency authorized to sell liquor by the government's constitution, a private entity that is authorized by a law permitting (or the absence of a law prohibiting) any private individual to sell liquor, a private entity that was granted corporate status by the sovereign, or a private entity that was specially licensed by the sovereign to sell liquor. Although the regulation of liquor distributing and sale is clearly a sovereign act, a sovereign's participation in a liquor manufacturing and distribution market is a purely commercial act. The fact that the sovereign may have decided to enter the liquor business itself as opposed to allowing or licensing others to enter the business in no way transforms the sale of liquor into a sovereign act.

The fact that Colombian law appears to provide that Plaintiffs' profits from the liquor business are to be used for the health and welfare of Colombian citizens in no way changes this conclusion. (Plazas Decl. ¶¶ 11-12.) How the profits of a business are used is irrelevant in determining whether the act is an inherently sovereign act or an inherently commercial act. For purposes of the revenue rule, the sale of liquor to the general public is not one of the *jure imperii* of which the Second Circuit spoke in <u>Canada</u>. As a result, an action seeking to recover lost revenues and profits Plaintiffs suffered in their commercial capacity as participants in the liquor manufacturing and distributing businesses does not seek the kind of direct enforcement of a foreign revenue law that is prohibited by the revenue rule.[6]

---

[6] Although no party has made this argument, an economist might argue that, at least in some contexts, a sovereign's decision to create a state-owned monopoly for a particular good is

33

## 2. Indirect Enforcement

Whether Plaintiffs' claim for lost revenues and profits constitutes the kind of indirect enforcement proscribed by the revenue rule is a close question. Neither Canada nor the European Community cases confronted the precise question presented by the instant claims: whether the revenue rule bars a civil RICO claim brought by a party other than the United States for damages resulting from an enterprise's money laundering when the enterprise is simultaneously engaged in money laundering and tax evasion, both of which caused the plaintiff's alleged damages.

As a preliminary matter, nothing about the instant claims requires the court to pass on the validity of the Colombian laws authorizing the government to manufacture and sell liquor. Defendants repeatedly argue that, in order to rule on Plaintiffs' claims for lost revenues and profits, "this Court would have to *examine* Colombia's revenue laws, including its constitutional authorization of a revenue-raising liquor monopoly to further Colombia's public policy[.]" (Def. FNC Mem. at 52-54 (emphasis added).) Defendants do *not* argue that adjudicating the instant

---

functionally equivalent to enacting a sales tax on that good: in a state-owned monopoly, the government can set prices so as to obtain a monopoly profit, whereas a sales tax may be simply another means of receiving revenue that is often similar or equal in value to the monopoly profit. As a result, under this court's reading of the revenue rule, foreign sovereigns may be able to do an end run around the revenue rule by creating a state-owned monopoly that sells a good or service as opposed to taxing a good or service. In certain markets, creating a state-owned monopoly and charging a monopoly price may be able to provide the sovereign with the same or similar net revenue and have similar effects on supply, demand, and other market characteristics as would charging a sales tax. This problem is more theoretical than real. The political and public policy issues surrounding a sovereign's decision as to whether to tax a good or service or simply create a state-owned monopoly are typically of far greater importance than whether a foreign sovereign can bring claims related to that good or service in United States federal courts. It is very hard to imagine a scenario in which a sovereign would create a state-owned monopoly for the exclusive purpose of bringing an action concerning that business in federal court.

case will require the court *to rule on the validity of* the rules authorizing the Colombian liquor monopolies. Defendants have not articulated any claim, argument or defense raised by or in response to the Second Amended Complaint that would require the court to consider the validity of laws authorizing Plaintiffs' involvement in the liquor business. This conclusion is further supported by the fact that, although Defendants have brought numerous actions in Colombia challenging various aspects of Colombia's liquor laws, none or virtually none of these Colombian actions challenge the legality of Plaintiffs' monopolies. As discussed in greater detail in Section VI(B), the court has carefully reviewed (1) the Declaration of Juan Rafael Bravo Arteaga, which describes these Colombian actions, and (2) the description of these cases contained in Defendants' briefs (Def. FNC Mem. at 19-22). Based on the substantial materials submitted by Defendants concerning the Columbian cases, it is clear that nothing about the instant claims will require this court to consider the validity of Colombian laws authorizing Plaintiffs to manufacture and sell liquor.[7]

---

[7] It is important to note one apparent inconsistency between this court's analysis of the direct and indirect enforcement components of the revenue rule. With respect to direct enforcement, the court concludes that revenues the Colombian government earns from its liquor monopoly are earned by the government in a commercial as opposed to a sovereign capacity. In effect, the court concludes that revenue generated by the monopoly law is not "revenue" within the meaning of the revenue rule. With respect to indirect enforcement, however, this court treats the law that authorizes the liquor monopoly as a "revenue" law for purposes of the revenue rule: the court's analysis strongly suggests that, if Plaintiffs' claims required the court to pass on the validity of the monopoly law, the revenue rule would be violated. Despite appearances, there is no inconsistency here. As discussed above, application of the revenue rule must be based on the policy purposes underlying the rule. There are no policy concerns with allowing the foreign sovereign to bring a claim for damages suffered in its commercial capacity. There are, however, policy concerns with a federal court's passing on the validity of a foreign law that authorizes a state-owned monopoly.

Further, it is of no moment that Colombian law appears to provide that Plaintiffs' profits from the liquor business are to be used for the health and welfare of Colombian citizens. (Plazas Decl. ¶¶ 11-12.) How Plaintiffs decide to spend the proceeds from a judgment or settlement in this case is no more relevant to the adjudication of this case than how a private plaintiff intends to spend the proceeds from a judgment or settlement would be to a civil case. Whether a plaintiff will use an award to open a factory that illegally employs child labor or will donate the award to a university to found a children's hospital has no bearing on whether the plaintiff's claims have merit.

As discussed above, Plaintiffs' claims for lost revenues result from two different aspects of the alleged enterprise: Defendants can charge lower prices, and in doing so increase sales and profits, because they benefit from a (1) tax evasion discount and (2) narco-laundering discount. Permitting Plaintiffs to bring a claim for lost revenues and/or profits for that portion of their losses which results from the alleged enterprise's tax evasion would permit Plaintiffs to bring an indirect claim for lost tax revenues; however, Plaintiffs' claim for that portion of their lost revenues and/or profits resulting from the alleged enterprise's money laundering does not constitute an indirect claim for lost tax revenues.

### (a)     *Damages Resulting from Tax Evasion*

Plaintiffs' claims for lost revenues and profits resulting from the alleged enterprise's tax evasion clearly constitute indirect enforcement of Colombian tax laws and, as a result, are barred by the revenue rule. These claims are nothing more than an attempt to use a United States tort claim to seek compensation for harms suffered as a result of the evasion of a foreign sovereign's tax laws. There is no question that hearing these claims would give extraterritorial effect to

36

Colombian liquor tax laws. As the Second Circuit explained in European Community I, "indirect enforcement occurs when a foreign state seeks a remedy that would give extraterritorial effect to its tax laws; for instance, a suit seeking damages based on law enforcement costs is an attempt to shift the cost of enforcing the tax laws onto the defendants, and would therefore require the court indirectly to enforce the tax laws." European Community I, 355 F.3d at 123.

Permitting Plaintiffs to recover the portion of their lost revenues and/or profits resulting from Defendants' tax evasion is particularly problematic in this case because it would draw this court into a dispute that is currently the subject of heated litigation in Colombia, namely, whether the Colombian taxes on liquor are legal. Defendants argue that if Plaintiffs' claims are allowed to proceed, Defendants will assert that the Colombian taxes on liquor are illegal and, as a result, Defendants' scheme to evade them does not give rise to a RICO claim. (Def. FNC Mem. at 19-22, 47.) Plaintiffs have not challenged Defendants' assertion that a determination that the Colombian taxes on liquor are illegal would not serve as at least a partial defense to Plaintiffs' claims for lost revenues and/or profits. Although Plaintiffs have not explicitly briefed the issue, this court is aware of no reason why the illegality of the liquor taxes would not be a meritorious defense to the tax evasion portion of Plaintiffs' claims: Plaintiffs would not be entitled to recover damages for lost revenues and profits resulting from Defendants' evasion of liquor taxes that were illegal in the first place. Cf. United States v. Pierce, 224 F.3d 158, 166-69 (2d Cir. 2000) (reversing wire fraud conviction for scheme to defraud the Canadian government of taxes to which it was entitled where prosecution failed to introduce any evidence that Canadian government was actually entitled to the taxes at issue).

### (b) Damages Resulting from the Laundering of Proceeds of Narcotics Sales

In contrast to Plaintiffs' claims for lost revenues and profits resulting from the enterprise's smuggling and tax evasion, the revenue rule does not bar Plaintiffs' claims for lost revenues and profits resulting from the enterprise's money laundering. First, the European Community cases and Canada do not bar such claims. Those cases addressed only tort claims by foreign governments that would have had the effect of compensating the foreign governments for taxes that should have been paid and the related costs of collecting such taxes. European Community I, 355 F.3d at 132 ("Because plaintiffs' claims arise exclusively from tax-related losses and costs, adjudicating these claims would implicate the concerns discussed in Canada, requiring the court to evaluate the policies behind the relevant foreign tax laws, interpret their provisions, and enforce them by awarding damages."); Canada, 268 F.3d at 131-32. In both cases, the Second Circuit held that such claims were barred by the revenue rule. European Community I, 355 F.3d at 132; Canada, 268 F.3d at 131-32.

Because (1) Plaintiffs are seeking damages to their liquor manufacturing and distribution businesses resulting from Defendants' enterprise, (2) Defendants' enterprise causes Plaintiffs' damages by (a) evading taxes and (b) laundering proceeds from illegal narcotics sales, and (3) Plaintiffs are entitled to recover damages resulting only from the money laundering aspect of Defendants' enterprise, the Plaintiffs' claims will require the factfinder to distinguish which of Plaintiffs' lost revenues and profits result from narcotics laundering and which result from tax evasion. As a result, the factfinder will be forced to recognize the existence of Colombian tax laws and, to some extent, evaluate the effects that evasion of such taxes had and are having on both Plaintiffs' and Defendants' liquor revenues and profits.

38

The pure narcotics-laundering claim will not, however, require the court to pass on the validity of the Colombian tax laws. At this time, there are actions pending in Colombia in which the Diageo companies have alleged that some or all of the Colombian taxes on liquor are invalid. (Def. FNC Mem. at 19-22.) The illegality or invalidity of the tax laws will not serve as a defense to the pure narcotics-laundering claim because it would be irrelevant to determining Plaintiffs' lost revenues and profits resulting from Defendants' narcotics-laundering enterprise. This court's consideration of Colombian tax laws will be limited to recognizing their applicability and determining their economic effect. The fact that the parties dispute the legality of the tax laws is irrelevant; the only question this court will have to answer is which taxes were actually levied (legally or illegally) during the relevant period.

Admittedly, in the event the instant claims were to reach trial, Defendants may very well introduce factual evidence that Plaintiffs' failure to enforce their own tax laws (e.g., through *de facto* validation of the *Sanandresitos*—local Colombian markets in which smuggled goods are sold) led to the development of the BMPE and the alleged smuggling enterprise. (Def. FNC Mem. at 25.) In effect, Defendants are suggesting that they should not be liable for engaging in money laundering; instead, Plaintiffs should be liable for Defendants' money laundering because Plaintiffs should have stopped Defendants from engaging in such misconduct. The fact that Plaintiffs' acts and omissions led to the alleged enterprise, even if true, is in no way a defense to claims relating to Defendants' decision to join that enterprise by laundering narcotics revenues. That Plaintiffs could have done a better job of enforcing their tax and other laws in no way means that Defendants are somehow less liable for money laundering. Thus, although Plaintiffs' claim for lost revenues and profits resulting from Defendants' narcotics laundering requires the

court to recognize the existence of Colombian tax laws and analyze their effects, it does not require the court to consider the validity of such laws.[8]

In this case, the mere recognition of Colombian tax laws and their economic effects does not trigger the revenue rule. As discussed above, Canada and the European Community cases leave open the possibility that a court could consider a tort claim that requires it to recognize a foreign tax law without running afoul of the revenue rule. The recognition and consideration of Colombian revenue laws required by Plaintiffs' claims for lost revenues and profits resulting from the narco-laundering discount simply do not raise sufficient policy concerns to warrant application of the revenue rule.

As a preliminary matter, the policy and political problems resulting from the mere recognition of a foreign tax law and its effects are far smaller in magnitude than those in the core revenue rule case in which the court must rule on the validity of the foreign law. Long ago, Judge Learned Hand explained that "a court will not recognize those [liabilities] arising in a foreign state, if they run counter to the 'settled public policy' of its own. . . . No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper." Moore, 30 F.2d at 604 (L. Hand, J., concurring). More recently, in the European Community cases, the Second Circuit explained that "policy complications and embarrassment may follow when one nation's courts analyze the

---

[8] Defendants argue that, under Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S. Ct. 1311 (1992), and Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991 (2006), when Plaintiffs' claims are stripped of the tax evasion aspect of the alleged enterprise, as a matter of law, Plaintiffs cannot prove that the enterprise's money laundering was the proximate cause of Plaintiffs' injuries. This argument will be considered below in the context of Defendants' numerous arguments that Plaintiffs have failed to state a claim upon which relief can be granted.

*validity* of another nation's tax laws." European Community II, 424 F.3d at 180 (emphasis added). In hearing the pure narcotics-laundering claim, this court will not be required to make any value-laden judgment as to whether Colombia's tax laws are consistent with American public policies.

Instead, those claims will require the factfinder to measure certain effects of Colombia's tax laws. In distinguishing which of Plaintiffs' lost sales result from Defendants' evasion of Colombian taxes and which of Plaintiffs' lost sales result from Defendants' narco-laundering scheme, the factfinder will most likely make certain judgments as to the effect that Colombian liquor taxes have on overall liquor consumption in Colombia, Plaintiffs' liquor sales and, possibly, Defendants' liquor sales. These are determinations that can in many contexts, including perhaps this context, be very sensitive to both Colombia and the United States. See Canada, 268 F.3d at 113 (discussing this sensitivity and noting that taxes on tobacco could be entirely consistent with New York public policy but entirely inconsistent with the public policy of a tobacco-growing state). The court is not aware of the extent to which liquor taxes are or will become a political issue in Colombia. Nor does this court know whether the Executive or Legislative branches of the United States government have an interest in Colombia's liquor taxation laws.[9] It is entirely possible that one of these branches has taken a position with respect to the economic effects of the Colombian liquor scheme and the factfinder in this case may very well reach a determination that is inconsistent with that position.

_____

[9] Colombia and the United States do appear to be negotiating a trade agreement. (See Trade Promotion Agreement, U.S.-Colomb., draft of May 8, 2006 ("Trade Draft"), available at http://www.ustr.gov/Trade_Agreements/Bilateral/Colombia_FTA/Draft_Text/Section_Index.htm l; see also Def. FNC Rep. at 101-02.) It is not possible, however, to divine the Executive or Legislative branch's position, if any, on Colombian liquor taxation from this draft treaty.

However, the policy concerns presented by this recognition and consideration of the Colombian tax laws and their effects are not sufficient to warrant applying the revenue rule in this case. There are federal causes of action that, even if brought by a private party, would require a federal court or jury to make the same analyses of the effects of Colombian liquor taxes that may very well need to be made in this case. For instance, if a liquor manufacturer brought an antitrust claim against another manufacturer alleging that the defendant had monopolized an international liquor market that included Colombia, the federal court would have to reach conclusions about the nature of Colombian liquor sales, including elasticity of demand, effects of Colombian taxes, and the extent of evasion of Colombian taxes. The fact that the factfinder in this case may have to make certain determinations as to the economic effects of Colombia's taxes simply does not create policy concerns of sufficient magnitude to justify applying the revenue rule in this case.

Further, applying the revenue rule in this case would raise extremely troubling policy implications for RICO and other federal efforts to stop illegal narcotics trafficking. If Defendants' enterprise was involved exclusively in laundering the proceeds of narcotics sales, the instant claims would not trigger the policy concerns associated with recognizing and considering Colombian liquor tax laws, which will probably be necessary in order to distinguish which of Plaintiffs' lost sales resulted from tax evasion and which resulted from narco-laundering. However, the alleged enterprise is engaged in both tax evasion and money laundering. Defendants are, in effect, asserting as follows: if our enterprise paid the taxes that it owed and was exclusively engaged in the laundering of proceeds of narcotics sales, Plaintiffs' claims would not indirectly enforce a foreign revenue law; however, because the enterprise was

42

engaged in tax evasion and money laundering, claims concerning the enterprise are barred by the revenue rule. Defendants go so far as to argue that "[m]oney laundering—like transportation, storage, corruption of border guards and false customs documents—is merely a logistical component of smuggling contraband into Colombia." (Def. FNC Rep. at 19.) To deny Plaintiffs an opportunity to bring claims for damages resulting from the enterprise's money laundering merely because the enterprise is also engaged in tax evasion creates an obvious perverse incentive and moral hazard: individuals engaged in a money-laundering enterprise could shield their conduct from civil RICO claims by expanding their enterprise to include evading a foreign sovereign's taxes.[10]

---

[10] Defendants also argue that tax agreements between Columbia and the United States, which do not provide for United States courts to hear adjudicated or unadjudicated Colombian tax claims, further suggest that the revenue rule bars this claim. (Def. FNC Mem. at 47.) Defendants are correct about the existence and substance of tax agreements between Colombia and the United States. (Plazas Decl. ¶ 24, n.11.) Defendants may be correct that, when a court is considering a revenue rule issue, the existence of such tax agreements is noteworthy:

> It seems to us that the usual absence in our negotiated tax conventions of any provision for the extraterritorial enforcement of a sovereign's tax judgments or claims cannot be not accidental, but instead must reflect the considered policy of the political branches of our government. Thus, the political branches of our government have clearly expressed their intention to define and strictly limit the parameters of any assistance given with regard to the extraterritorial enforcement of a foreign sovereign's tax laws. In this area of foreign relations policy where the political branches have primacy, courts must be wary of intruding in a way that undermines carefully conceived and negotiated policy choices.

Canada, 268 F.3d at 119. This reasoning, however, was called into question in the Supreme Court's decision in Pasquantino. See European Community II, 424 F.3d at 182 n.9. In any event, as this court concludes that Plaintiffs' claims for damages resulting only from the alleged enterprise's laundering of proceeds of narcotics sales neither constitutes enforcement of a Colombian tax law nor requires the court to consider the validity of Colombian tax or revenue laws, this point is inapposite.

In the final analysis, nothing about Plaintiffs' claims for lost revenues and profits will in any way lead this court to "indirectly enforce" Colombia's tax or revenue laws. As discussed in detail above, the Second Amended Complaint alleges that Plaintiffs have lost sales as a result of Defendants' money laundering and tax evasion scheme. In this action, Plaintiffs will only be able to recover for lost sales resulting from Defendants' money laundering. Presumably, one of the primary factual issues in this case will be the extent to which Plaintiffs can prove that their lost sales were caused by Defendants' money laundering as opposed to some other cause. As a result, Plaintiffs will have every incentive to show that Defendants (1) are engaged in little or no tax evasion, and/or (2) tax evasion has little or no effect on Plaintiffs' sales. In contrast, Defendants will have every incentive to show that tax evasion in Colombia is rampant and that the tax evasion is the primary if not exclusive cause of Plaintiffs' lost sales. As the nature of this action requires Plaintiffs to attempt to disprove the existence and effects of Defendants' tax evasion, the argument that Plaintiffs are using this action to "indirectly enforce" Colombian tax law fails.

In short, Plaintiffs' claims for taxes and other damages suffered in Plaintiffs' sovereign capacity is dismissed as barred by the revenue rule. Plaintiffs' claims for damages suffered in Plaintiffs' commercial capacity resulting from Defendants' tax evasion are also barred by the revenue rule. Plaintiffs claims for damages suffered in a commercial capacity resulting from Defendants' money laundering are not barred by the revenue rule.[11]

---

[11] Defendants argue that the Republic of Colombia, the Bogotá Capital District, and those Departments that do not exercise their right to a liquor monopoly suffer no competitive harm. (Def. RICO Mem. at 29-31.) To the extent these Plaintiffs suffer no injury in their commercial capacity—as defined in the revenue rule section of this opinion—these Plaintiffs' claims are barred by the revenue rule and, as a result, are dismissed.

## IV.   PENAL LAW RULE

### A.   Background

The penal law rule is very similar to the revenue rule.  It provides that federal courts do not possess jurisdiction over an action to enforce the penal laws of a sovereign state: "By the law of England and of the United States the penal laws of a country do not reach beyond its own territory except when extended by express treaty or statute to offenses committed abroad by its own citizens; and they must be administered in its own courts only, and cannot be enforced by the courts of another country."  Wisconsin v. Pelican Ins. Co. of New Orleans, 127 U.S. 265, 289-90, 8 S. Ct. 1370, 1374 (1888).

Defendants argue that the revenue and penal law rules are parallel and that the penal law rule prevents this court from hearing actions that directly or indirectly enforce a foreign sovereign's penal laws to the same extent that the revenue rule prevents this court from hearing actions to enforce a foreign sovereign's revenue laws.  (Def. FNC Rep. at 35-45.)  Defendants are correct.

The policy concerns underlying the penal law rule are the same as those that drive the revenue rule.  As Judge Learned Hand explained in Moore v. Mitchell, "[t]o pass upon the provisions for the public order of another state . . . involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities."  Moore, 30 F.2d at 604 (L. Hand, J., concurring).  Judge Hand went on to write that "[r]evenue laws fall within the same reasoning[.]"  Id.  More recently, the Supreme Court stated that, "[s]ince the late 19th and early 20th century, courts have treated the common-law revenue rule as a corollary of the rule that, as Chief Justice Marshall put it, '[t]he Courts of no country

45

execute the penal laws of another.'" Pasquantino, 544 U.S. at 360-61, 125 S. Ct. at 1774 (quoting The Antelope, 10 Wheat. 66, 123, 6 L. Ed. 268 (1825)). In fact, "[t]he basis for inferring the revenue rule from the rule against foreign penal enforcement was an analogy between foreign revenue laws and penal laws." Pasquantino, 544 U.S. at 361, 125 S. Ct. at 1775.

Because there are even fewer recent cases discussing the penal law rule than there are discussing the revenue rule, the exact scope of the penal law rule is far from clear. The Supreme Court has held that the rule can apply to laws that are civil:

> The rule that the courts of no country execute the penal laws of another applies, not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the state for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue, or other municipal laws, and to all judgments for such penalties.

Wisconsin, 127 U.S. at 290, 8 S. Ct. at 1374. Nothing about the penal law rule, however, prohibits foreign sovereigns from bringing a civil cause of action that is not penal in nature: "A foreign sovereign, as well as any other foreign person, who has a demand of a civil nature against any person here, may prosecute it in our courts." Id. (internal quotation marks omitted). Long ago, the Supreme Court announced the standard for determining whether an action is one for violation of a "civil" wrong as opposed to one to enforce a "penal" law:

> The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual, according to the familiar classification of Blackstone: ["]Wrongs are divisible into two sorts or species: private wrongs and public wrongs. The former are an infringement or privation of the private or civil rights belonging to individuals, considered as individuals and are thereupon frequently termed 'civil injuries;' the latter are a breach and violation of public rights and duties, which affect the whole community, considered as a community, and are distinguished by

46

> the harsher appellation of 'crimes and misdemeanors.["] 3 Bl.
> Comm. 2.

Huntington v. Attrill, 146 U.S. 657, 668-69, 13 S. Ct. 224, 228 (1892). See also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 413 n.15, 84 S. Ct. 923, 933 (1964) ("As appears from the cases cited, a penal law for the purposes of this doctrine is one which seeks to redress a public rather than a private wrong."). In light of the shared origins and purposes of the revenue and penal law rules, I read this distinction between "private" and "public" wrongs to be entirely coterminous with the distinction between harms that are *jure gestionis* and *jure imperii*.

**B.      Analysis**

The parties vigorously contest the extent to which the instant claims are barred by the penal law rule. Just as in the context of the revenue rule, the penal law rule bars claims for damages that Plaintiffs suffer in their sovereign capacity, but permits claims for damages that Plaintiffs suffer in a commercial capacity.

Plaintiffs' alleged lost revenue and profit is a harm that Plaintiffs suffer in their private capacity as commercial actors and, as a result, claims based on that harm are not barred by the penal law rule. Such claims are for damages suffered by Plaintiffs' liquor businesses. Defendants cite Oklahoma ex rel. West v. Gulf, Colorado, & Santa Fe Railway Co., 220 U.S. 290, 31 S. Ct. 437 (1911), for the proposition that a sovereign's civil claim for violation of a variety of liquor laws—including violation of a state-owned liquor monopoly—is barred by the penal law rule. Oklahoma is inapposite. In Oklahoma, the State of Oklahoma brought suit to enjoin corporations from violating a variety of Oklahoma state liquor laws by importing liquor into the state. Id., at 291-95, 31 S. Ct. at 438-440. One of the laws that the defendants were accused of violating was a law that granted the State of Oklahoma a monopoly over liquor sales.

Id., at 297, 31 S. Ct. at 439-40. The court concluded that the action was barred by the penal law rule: "The present suit, although in form one of a civil nature is, in its essential character, one to enforce by injunction regulations prescribed by a state for violations of one of its penal statutes, and is therefore one of which this court cannot take original cognizance at the instance of the state." Id. at 300, 31 S. Ct. at 441. The instant claim for lost revenues and profits is distinguishable because such claims are for damages suffered by Plaintiffs in their commercial capacities by Defendants' money-laundering enterprise, whereas the plaintiff in Oklahoma was suing in its sovereign capacity to enforce Oklahoma's liquor laws.

With respect to their penal law rule motion, Defendants make a number of arguments that, understandably, are similar or identical to arguments they made in the context of the revenue rule motion. These arguments fail for the same reasons described in the discussion of the revenue rule motion. First, nothing about Plaintiffs' RICO or other claims requires this court to pass on the validity of Colombian penal laws. Second, Defendants' argument that Plaintiffs "are seeking to enforce a public right granted to the Departments under the Colombian Constitution, which permits the Departments to sell liquor as no private entity can, for the public benefit" (Def. FNC Rep. at 44) also fails. Plaintiffs, in their commercial capacity, bring federal and state civil tort claims. This suit does not involve the laws authorizing the Colombian liquor monopoly any more than does a suit by a specially licensed liquor retailer involve the laws that authorized the retailer to sell liquor. Third, nothing about Plaintiffs' claims for lost revenues and profits constitutes an impermissible effort to indirectly enforce Colombia's penal laws. The fact that Defendants' conduct that allegedly violates federal and state law may also violate Colombian law is of no consequence: the mere fact that a defendant's conduct happens to

48

violate the laws of some foreign sovereign (in addition to U.S. law) is no defense to a federal civil claim. Any other rule would create the perverse incentives to violate foreign laws.

Defendants are correct, however, that the Second Amended Complaint appears to identify certain types of damages claims that constitute an attempt to directly enforce Colombian penal laws. Above all else, Plaintiffs appear to state that they are seeking to enforce the Colombian law providing that the Colombian government may seize instrumentalities of crime: "Under the laws of the Republic of Colombia, the Republic of Colombia and the Departments of the Republic of Colombia possess title in, or have a right to, any property used in the commission of a crime conducted within their borders, including money and goods, including illegal liquor products." (SAC ¶ 103(g).) This claim is an attempt to directly enforce a Colombian law that constitutes a penal law within the meaning of the penal law rule and, as a result, is dismissed. As this court has already determined that the revenue rule bars most of the other categories of damages that Defendants assert violate the penal law rule, there is no reason to address them again in the context of the penal law rule. (See, e.g., Def. FNC Rep. at 43 (Colombian government's expenditures to prevent money laundering, law enforcement costs, damages other than lost revenues are profits that result from violation of Colombia's borders).) Defendants' motion to dismiss the Second Amended Complaint on the ground that it is barred by the penal law rule is granted in part and denied in part, to the same extent as their motion based on the revenue rule.

## V.    *FORUM NON CONVENIENS*

### A.    **Background**

"The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S. Ct. 839, 842 (1947). The decision as to whether to dismiss a case on *forum non conveniens* grounds is trusted to the sound discretion of the trial court. Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001). The Second Circuit has explained that district courts should follow a three-step process when exercising this discretion:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (internal citations omitted).

Step one requires the court to determine what degree of deference should be afforded to the plaintiff's choice of forum. Iragorri, 274 F.3d at 71. When a plaintiff selects her home as a forum, the plaintiff should be given "great deference," but when a foreign resident selects a United States forum, the plaintiff is entitled to "less deference." Id. In order to determine how much deference a plaintiff should be accorded, the court must determine the extent to which the plaintiff's choice of forum was based on legitimate convenience concerns and to what extent the choice constitutes mere forum shopping:

The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*. Thus, factors that argue against *forum non conveniens* dismissal include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense. On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons—such as attempts to win a tactical advantage resulting form local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum—the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts.

Iragorri, 274 F.3d at 71-72 (footnote omitted).

At step two, the plaintiff bears the burden of establishing that an adequate alternative forum exists. Norex, 416 F.3d at 157. "'An alternative forum is adequate if the defendants are amendable to service of process there, and if it permits litigation of the subject matter of the dispute.'" Id. (quoting Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003)).

In the event the court determines that an adequate alternative forum exists, the court proceeds to step three, which requires the court to balance two sets of factors to determine which forum is best suited to adjudicate the case. Iragorri, 274 F.3d at 73. The first set of factors are

51

the "private interest" factors, which are designed to assess which forum is most convenient for the parties: "'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive.'" Id. at 73-74 (quoting Gilbert, 330 U.S. at 508). In making this private interest analysis,

> [T]he court should focus on the precise issues that are likely to be actually tried. . . . In a suit alleging negligence, for example, the court might reach different results depending on whether the alleged negligence lay in the conduct of actors at the scene of the accident, or in the design or manufacture of equipment at a plant distant from the scene of the accident.

Id. at 74. During this third step, the court must also consider the following public interest factors:

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

Id. (quoting Gilbert, 330 U.S. at 508-09).

**B.    Analysis**

Both parties' submissions on the *forum non conveniens* issue appear far more like treatises exhaustively prepared for the purpose of cataloguing every conceivable *forum non*

*conveniens* argument than like focused "briefs" designed to cut to the heart of the *forum non conveniens* issue. As a result, I will not take the time to identify each of the arguments made by the parties. Instead, I note that the court has reviewed the briefs very carefully and will address the most relevant arguments presented. Although it is a close question, I conclude that the instant case should not be dismissed under the doctrine of *forum non conveniens*. My analysis follows the three-step approach the Second Circuit announced in Iragorri.

## 1.    Deference to Plaintiffs' Choice of Forum

Plaintiffs argue that their choice of the instant forum is entitled to a "strong presumption of correctness" (Pl. FNC Opp. at 52 (internal quotation marks omitted)), while the Defendants argue that Plaintiffs' choice of forum should be "accorded little deference" (Def. FNC Mem. at 58). The answer lies somewhere in between. After considering all of the factors described in the Second Circuit's decision in Iragorri, the court finds three factors are most influential in this case and, thus, warrant further discussion here.

First, the parties agree that Plaintiffs are foreign entities. Plaintiffs do not argue that their liquor businesses have any connection to the United States. This factor weighs in favor of attaching little deference to their choice of forum. See Base Metal Trading SA v. Russian Aluminum, 253 F. Supp. 2d 681, 693-98 (S.D.N.Y. 2003), aff'd 98 F. Appx. 47 (2d Cir. 2004) (plaintiffs' choice of U.S. forum is entitled to "little deference" where seven of ten plaintiffs were foreign, three plaintiffs that were U.S. citizens were shell corporations, the conduct at issue did not occur in the United States, and, with one exception, forum selection clauses in relevant contracts choose foreign fora, confirming that the United States was not a convenient forum for the parties).

53

Second, the four Defendants that are seeking dismissal on the ground of *forum non conveniens* are United States corporations with offices near this courthouse. As described in greater detail above, Plaintiffs allege that Defendants masterminded a money-laundering enterprise from offices a few miles from the Brooklyn Bridge. While it is possible that Plaintiffs could have brought claims against a number of other entities that are alleged to be a part of the enterprise (*e.g.*, Defendants' distributors or drug dealers whose revenues are being laundered), Plaintiffs have decided—as is their right to do—to seek compensation exclusively from Defendants. In order to most efficiently gather evidence against Defendants, it would make sense to bring a claim in a United States forum that is geographically proximate to Defendants' witnesses and documents. While it certainly would be possible to obtain at least some evidence from Defendants by bringing suit in Colombia, Plaintiffs may have reasonably concluded that the easiest way to obtain evidence from American Defendants is to retain American lawyers to seek discovery from them in an American court.

A significant amount of evidence essential to Plaintiffs' case that may be located in Colombia. This includes evidence describing (1) the effects of Defendants' money laundering on the Colombian liquor market and (2) Plaintiffs' injuries. However, Plaintiffs may have reasonably concluded that they are already in possession of many if not all of the documents in the latter category and therefore do not require discovery to obtain them. With respect to documents concerning the effects of Defendants' money laundering, Plaintiffs may intend to rely upon documents already in their possession and/or documents to be obtained from Defendants in discovery. As a result, this factor suggests that Plaintiffs selected the instant forum because it

was convenient, as opposed to purely for the sake of forum shopping.[12] See Pollux, 329 F.3d at 74 ("[A] plaintiff's choice to initiate suit in the defendant's home forum—as opposed to any other where the defendant is also amenable to suit—only merits heightened deference to the extent that the plaintiff and the case possess bona fide connections to, and convenience factors favor, that forum.").

Third, the fact that RICO permits successful Plaintiffs to recover treble damages suggests that Plaintiffs may have selected this forum purely for tactical reasons. See Norex, 416 F.3d at 155 ("[W]e recognize that the possibility of a RICO treble damages award might have made the choice of a United States forum attractive to [plaintiff] regardless of convenience.")

After considering all of the Iragorri factors, I find that this case falls somewhere in between those cases where courts accord "little deference" to the plaintiff's choice of forum and those in which courts accord "substantial deference." Compare Pollux, 329 F.3d at 71-72 (foreign plaintiff with only minimal connections to U.S. forum entitled to "lesser degree of deference") with Norex, 416 F.3d at 155 (where "it appear[ed] doubtful from the record that [plaintiff] could have perfected jurisdiction over all defendants in either of its presumptively

---

[12] It appears that Colombian courts may not possess personal jurisdiction over the two non-U.S. Defendants, Pernod-Ricard S.A. and Diageo PLC. No party has asserted that Colombian courts possess personal jurisdiction over them. Of course, these two Defendants, which are not parties to the instant motions, assert that this court does not possess personal jurisdiction over them. In the event this court determines it possesses personal jurisdiction over these two Defendants, Plaintiffs' decision to bring suit in this forum would be supported by yet another legitimate consideration. See Norex, 416 F.3d at 155 ("Notably, it appears doubtful from the record that [plaintiff] could have perfected jurisdiction over all defendants in either of its presumptively convenient home forums, Canada or Cyprus, or even in defendants' preferred forum, Russia. Thus, [plaintiff's] decision to litigate in New York, where all defendants were amenable to suit (and where some reside or are incorporated) is properly viewed as a strong indicator that convenience, and not tactical harassment of an adversary, informed its decision to sue outside its home forum.").

convenient home forums" and much evidence was located in New York forum, plaintiff's choice of forum was entitled to significant deference). As a result, this court will accord reasonable, but not substantial, deference to Plaintiffs' choice of forum. See Giaguaro S.p.A. v. Amiglio, 257 F. Supp. 2d 529, 535-37 (E.D.N.Y. 2003) (foreign plaintiffs' choice of New York forum "entitled to some weight" where defendant was New York resident and defendant alleged to have committed fraud and breach of contract in New York).

### 2. Adequate Alternative Forum

Plaintiffs' only argument that Colombia is not an adequate alternative forum is that Defendants have failed to adduce evidence that Colombia courts could and would entertain claims against the French and United Kingdom Defendants, Pernod-Ricard S.A. and Diageo PLC. (Pl. FNC Opp. at 48.) Plaintiffs' argument appears to go to both the subject-matter and personal jurisdiction of the Colombian courts.

As a preliminary matter, the court notes that, where Colombian courts have subject-matter jurisdiction over a matter and personal jurisdiction over the parties to a dispute, the Colombian courts have the procedures required to constitute an adequate alternative forum. See, e.g., In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 190 F. Supp. 2d 1125, 1134 (S.D. Ind. 2002); Iragorri v. United Techs. Corp., 46 F. Supp. 2d 159, 162-63 (D. Conn. 1999), vacated on other grounds, 274 F.3d 65 (2d Cir. 2001).

The parties have submitted conflicting evidence as to whether Colombian courts possess subject matter jurisdiction over this matter. Plaintiffs' expert, Rafael Nieto Navia, who has been a judge on various international courts (including those of Rwanda and the former Yugoslavia) and a professor of international public law, states, "I believe that Colombian judges do not have

56

jurisdiction to hear this case." (Acevedo Decl. Exh. 7 ("Nieto Decl.") ¶ 9.) This appears to be because "Colombian law does not apply extraterritorially. The general rule is that Colombian judges do not have jurisdiction over events that occur abroad[.]" (Id.)

Plaintiffs' other expert, Alfonso Miranda Londoño, who teaches, studies, and practices competition law in Colombia, testified that Colombian courts do have subject matter jurisdiction over the instant matter: Colombian courts "would surely take cognizance of the case, since some of the effects of the conduct[] described took place in Colombian territory." (Acevedo Decl. Exh. 8 ("Miranda Decl.") ¶ 11.) This conclusion is consistent with both Miranda's and Defendants' expert's description of the scope of Colombian courts' subject matter jurisdiction. Miranda testified that "[i]f the act of unfair competition has been carried out abroad, the judge of the place in which the act produced its effect shall also have jurisdiction." (Id. ¶ 10(b)(iv).)

Defendants' expert is Jorge Santos Ballesteros, a professor of law who has practiced law in Colombia and served as a Justice and the President of the Colombian Supreme Court Civil Division. (Declaration of Jorge Santos Ballesteros ("Santos Decl.") ¶ 1.) According to Santos, Colombian courts possess "jurisdiction over a defendant in situations, such as those described in the [instant] Complaint, in which the defendant is alleged to have engaged or assisted in wrongdoing that caused injury in Colombia. This is true even if the defendant's actions took place outside of Colombia and had effects in Colombia." (Id. ¶ 21.)

The bulk of the evidence clearly supports the conclusion that Colombian courts possess subject matter jurisdiction over the instant dispute. Only Nieto's testimony contradicts this conclusion. I do not credit Nieto's testimony on this point because (1) Nieto specializes in public international law as opposed to the private tort law at issue in this case and (2) Nieto's

testimony on this point fails to address the doctrine that Colombian courts will hear tort claims that cause injuries in Colombia. As a result, I conclude that Colombian courts possess subject-matter jurisdiction over the instant dispute.

Plaintiffs also argue that Colombian courts do not possess personal jurisdiction over Pernod-Ricard S.A. and Diageo PLC. These two Defendants have indicated that they will consent to the jurisdiction of the Colombian courts if this case is dismissed under the doctrine of *forum non conveniens*. (Def. FNC Rep. at 55 n.42 ("Should this Court determine that the *forum non conveniens* dismissal depends on the Foreign Defendants consenting to jurisdiction in Colombia, they also are prepared to so consent.").) This willingness to consent disposes of the personal jurisdiction issue. See Norex, 416 F.3d at 157 ("In urging Russia as an adequate alternative forum for [plaintiff's] claims, defendants satisfied the [amenable-to-service-of-process-in-Russia] prong of [the *forum non conveniens*] test by representing that they would all submit to the jurisdiction of Russian courts in any comparable action field against them by plaintiff."); Jota v. Texaco Inc., 157 F.3d 153, 159 (2d Cir. 1998) (reversing dismissal for *forum non conveniens* where defendant was not amenable to suit in alternative forum and remanding for, *inter alia*, determination as to whether defendant would consent to suit in alternative forum); Skelton Fibres Ltd. v. Canas, No. 96 Civ. 6031 (DLC), 1997 WL 97835, at *4 (S.D.N.Y. Mar. 6, 1997) ("The first prong of the *forum non conveniens* test is satisfied as defendants represented to this Court . . . that the American defendants consent to the jurisdiction of the Spanish courts.").

As the Colombian courts possess subject matter over the matter and the British and French Defendants have consented to the Colombian courts exercising personal jurisdiction over them, the Colombian courts constitute an adequate alternative forum.

### 3. Interest-Balancing

It would be a gross understatement to say that the parties have "over-briefed" the interest balancing issue. Although the court has carefully considered each and every of the seemingly countless arguments included in both parties' briefs, the court will address only those factors that are the most significant. First, the private interest factors will be considered. A discussion of the public interest factors will follow.

#### (a)    *Private-Interest Factors*

##### (I)    *Location and Convenience of Evidence and Witnesses*

This factor favors neither the instant forum nor the Colombian forum. There are two significant categories of evidence that are present in the United States. First, Plaintiffs allege that Defendants masterminded a money-laundering enterprise from offices within a few miles of this courthouse. Plaintiffs allege that Defendants "controlled" the money-laundering enterprise at issue in this case. (SAC ¶¶ 2, 28-30.) Further, Plaintiffs continue to allege that "[m]any of the activities of the Defendants that are the subject matter of this complaint, including management decisions and direction of the schemes, are conducted by the Defendants in the United States and, more particularly, from the Defendants' offices in the State and City of New York." (Id. ¶ 100.) The Second Amended Complaint contains numerous specific allegations of money laundering. (E.g., ¶¶ 27(c), 32, 37.) This suggests that Plaintiffs already possess significant evidence that money laundering occurred. As a result, the most important aspect of discovery in this case will be an examination of whether and, if so, in what ways and to what extent, Defendants were involved in the money laundering. As Defendants are alleged to have managed

the money-laundering enterprise from the United States, this category of evidence will most likely be found in the United States.

Defendants argue that the evidence that is in Defendants' possession in the United States would be just as accessible to Plaintiffs if this case is heard in Colombia as if it is heard in the United States because the Colombian court will have the power to order the Defendants to turn over any evidence in their possession to which Plaintiffs are entitled, irrespective of where it is located. (Def. FNC Rep. at 66-67.) Defendants argue that "[w]hat is most relevant for the *forum non conveniens* analysis is the location of evidence in the hands of *non-parties* who may *not* be subject to the jurisdiction of the court that ultimately hears this case." (Id. at 67 (emphasis in original).) To some extent, this may be true. However, the fact that evidence in Defendants' possession is already located here suggests that it may be cheaper and more expeditious to litigate the dispute here.

Second, Plaintiffs allege that the initial stages of the money laundering occurred in the United States. (James Aff. ¶ 12.) Also, Plaintiffs have stated that at least some of the narcotics traffickers who are alleged to be involved in the enterprise currently reside in the United States. (Pl. FNC Opp. at 65 ("[T]o the extent that the Defendants actually believe that they may call some of the narcotics traffickers and money launderers as witnesses in this case, it happens that now most of them reside in the United States as guests of the United States government.").) As a result, at least some evidence of money laundering is also likely to be located here.

Similarly, there are two categories of evidence that are likely to be located in Colombia. First, the overwhelming majority of evidence of how Defendants' enterprise affected Colombian liquor market(s) and injured Plaintiffs is likely to be in Colombia. This is an extremely

significant body of evidence. Adjudicating Plaintiffs' claims in this court will require

distinguishing the extent to which Plaintiffs' sales were reduced by (1) money laundering, (2) tax

evasion, and/or (3) other economic factors, such as consumer preferences and elasticity of

demand. Although it is possible that Defendants possess such evidence in their United States

facilities (e.g., Acevedo Decl. Exhs. 2-5), the bulk of this evidence is most likely found in

Colombia.

Second, it appears that a significant amount of the money laundering process occurred in

Colombia and, as a result, documents concerning and witnesses to those stages of the money

laundering process will be located in Colombia. (Acevedo Decl. Exh. 6 at 13.)

In addition to evidence in Colombia and the United States, the Second Amended

Complaint states that Defendants' enterprise conducted much of their activities in Aruba. (E.g.,

SAC ¶¶ 27(f), 30.) As a result, it appears that there will be a substantial amount of evidence and

number of witnesses located in the Caribbean. Similarly, two of the Defendants are located in

Europe, and, irrespective of whether the court finds that it possesses personal jurisdiction over

these European Defendants, some evidence and witnesses will presumably be located there.

There is no reason to believe the instant forum or a Colombian forum is more accessible to these

Caribbean and European witnesses and evidence.

Finally, I note that Defendants assert that numerous additional categories of evidence are

located in Colombia. (Def. FNC Rep. at 62-65.) Although I will not address each category

individually, it is sufficient to state that those categories that I have not mentioned are either

irrelevant or of far less relevance to the instant claims than the categories that have been discussed herein.[13]

Overall, the evidence in this case is scattered across the United States, Colombia, the Caribbean, and Europe. As a result, Colombia and the instant forum are equally accessible and convenient to the evidence in this case. See Maritima Aragua, S.A. v. M/T Trade Resolve, 823 F. Supp. 143, 147 (S.D.N.Y. 1993) ("[T]he evidence and witnesses to be produced by the U.S. corporations, combined with the possibility of evidence to be produced from Germany, England, or Greece prevent the convenience of witnesses and the location of the evidence from being [particularly] determinative of the appropriate forum").

### (ii) Compulsion of Attendance of Unwilling Witnesses

Defendants argue that key non-party witnesses are located in Colombia and that Colombia does not have any procedural device for compelling the testimony of a witness to a case pending in this court. (Def. FNC Mem. at 78-81.) Defendants note that, pursuant to 28 U.S.C. § 1782, United States courts can compel third-party witnesses to a proceeding before a Colombian court. (Def. FNC Mem. at 78 n.41.) For the most part, Defendants appear to already be in possession of evidence concerning the Colombian liquor market and the related tax evasion. Further, Plaintiffs undoubtedly possess a significant amount of evidence on the same

---

[13] Defendants identify several categories of damages included in the Second Amended Complaint that are based virtually exclusively on evidence that is to be found in Colombia. (Def. FNC Mem. at 73.) As discussed above in the Section addressing the revenue rule, virtually all (if not all) of these categories of damages are barred by the revenue rule. As a result, evidence concerning these categories of damages will not be relevant to the adjudication of this case. Similarly, as discussed in the revenue rule Section, this case does not require the court to pass upon the validity of Colombian tax laws and, as a result, evidence concerning the validity of such laws is not pertinent. (See Def. FNC Mem. at 74.)

subject. This court is, of course, capable of requiring Plaintiffs to produce employees located in Colombia for depositions and/or trials. This eliminates any concern that adjudicating the dispute in the instant forum will prevent Defendants from obtaining evidence that Plaintiffs' revenue and profits losses are the result of their own inefficiency and mismanagement as opposed to Defendants' money laundering.

The one significant category of third-party witnesses to whom Defendants may not have access in this forum is money launderers located in Colombia. Such individuals could conceivably provide evidence that Defendants were not involved in those individuals' money laundering. Two factors diminish the significance of this shortcoming of the American tribunal. First, even if this action were tried in Colombia and the money launderers could be compelled to testify, the money launderers are unlikely to provide truthful testimony concerning their money laundering. Second, the Second Amended Complaint clearly alleges a transnational money-laundering enterprise. Thus, money launderers located in the United States, the Caribbean, or Colombia could provide evidence that Defendants were involved in the laundering. The fact that money launderers in Colombia were not familiar with Defendants or believed Defendants were not involved in the laundering is far from dispositive. In the final analysis, this factor slightly favors dismissal.

### (iii)    *Joinder of Additional Parties*

Defendants argue that there are several categories of third-party plaintiffs that Defendants will be able to implead in Colombia but not in this court, including Defendants' distributors and importers, Defendants' "criminal customers," and Colombian and Venezuelan individuals and entities involved in money laundering. (Def. FNC Rep. at 74.) Plaintiffs argue that Defendants'

63

vague argument on this ground is largely theoretical because "[t]here is no chance that either in

Colombia or the United States, the liquor companies are going to implead into this case their

criminal coconspirators, the distributors, narcotics traffickers, and money launderers. To do so

would only prove the Plaintiffs' case of the close collaboration between these Defendants and

those criminal groups." (Pl. FNC Opp. at 66-67.) Plaintiffs are largely correct.

There can be no question that this is a highly significant factor. Had Defendants

identified specific third-parties that they wish to implead, this would weigh heavily in favor of

dismissal under the doctrine of *forum non conveniens*. However, Defendants do not appear to be

sincere in their assertion that there are essential third-parties in Colombia. Defendants have not

identified a single such third party despite the fact that they are almost certainly familiar with the

identities of the individuals and/or entities that compose their distribution chain. Further,

Defendants have not requested an opportunity to conduct discovery to identify potential third

parties against whom they wish to bring suit. In light of the vagueness of Plaintiffs' argument

concerning impleading third parties, I will accord this factor significantly less weight than I

ordinarily would.[14] See Massaquoi v. Virgin Atl. Airways, 945 F. Supp. 58, 63 (S.D.N.Y. 1996)

("While the inability to implead a third party is a factor that weighs in defendant's favor, it is not

conclusive and courts have refused to dismiss actions on such grounds."); see also Murray v.

---

[14] In Piper Aircraft Company v. Reyno, 454 U.S. 235, 258, 102 S. Ct. 252, 267 (1981), the
Supreme Court explained that a defendant need not "submit affidavits identifying the witnesses
they would call and the testimony these witnesses would provide if the trial were held in the
alternative forum" but the defendant "must provide enough information to enable the District
Court to balance the parties' interests." Of course, identifying third-party witnesses is different
from identifying third parties that a defendant wishes to implead. This is particularly true in this
case where Defendants appear to be aware of the identities of narcotics traffickers and other
individuals and entities within their distribution chains.

British Broad. Corp., 81 F.3d 287, 293 n. 2 (2d Cir. 1996) (dismissal on *forum non conveniens* grounds appropriate even though joinder of third-party may be "impede[d]" where third-party "is not essential to the adjudication of the core issues.").

### (iv)    View of Premises

There is no question that the Colombian forum would have a better perspective on the alleged enterprise's effects on Plaintiffs and the Colombian liquor market. The instant forum has a better perspective on Defendants' United States conduct and the early stages of the money laundering process, which allegedly largely occurred here. This factor is not particularly significant in this case, however, because in a money laundering case, there is little if any benefit to conducting a physical inspection of any of the stages of the money laundering. Cf. In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India, 634 F. Supp. 842, 860 (S.D.N.Y. 1986) (finding that a physical inspection of an industrial plant in which a serious accident had occurred "would probably not be of utmost importance"). Overall, this factor is neutral.

### (b)    Public Interest Factors

Again, the parties dedicate many pages to this issue and the court has carefully considered each of their arguments carefully. The relevant factors are addressed below.

### (1)    Colombia's and the United States' Interest in the Dispute

"There is a local interest in having localized controversies decided at home." Gilbert, 330 U.S. at 509, 67 S. Ct. at 843. Of course, claims arising out of the alleged international money-laundering enterprise are not "localized controversies." Both Colombia and the United States have an interest in the controversy because the parties are Colombian and American. See Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 611 (2d Cir. 1998)

(United States had an interest in a case to which a New York corporation was a party, and the United Kingdom had an interest in the case because it involved two English banks).

Defendants are correct that Colombia has a far greater interest than the United States in the Colombian liquor market. Further, the fact that this action requires the court to consider the effects (albeit not the validity) of the Colombian liquor taxation system potentially raises politically sensitive issues in which Colombian courts are more interested than United States courts. Although Defendants are correct that Plaintiffs have alleged significant harm to Colombian society as a whole (Def. FNC Rep. at 82-83), as discussed above, this court will entertain only claims concerning Plaintiffs' injuries as liquor manufacturers and distributors.

The instant forum has a far greater interest than Colombia in determining whether United States corporations are engaged in the laundering of proceeds from illegal narcotics sales that are occurring in the United States.[15] See Alfadda v. Fenn, 159 F.3d 41, 47 (2d Cir. 1998) (United States has an interest in applying RICO and securities laws to international financial transactions; this is one factor that should be considered in Gilbert analysis). Congress's enactment of a private RICO cause of action predicated on international money laundering evinces a determination that federal courts should hear such claims, which will almost universally involve evidence located abroad. There are obvious difficulties in weighing whether

---

[15] Defendants cite Usha (India), Ltd. v. Honeywell Int'l Inc., No. 03 Civ. 0494 (DC), 2004 WL 540441 (S.D.N.Y. Mar. 17, 2004), for the proposition that the fact that a United States corporation controlled foreign business activities does not mean that the United States has an interest in the dispute. (Def. FNC Rep. at 87.) Usha is distinguishable because "Usha's claims are based on issues of Indian corporate governance, the duties between shareholders of Indian corporations, and the duties between joint venture partners under Indian partnership law." Usha, 2004 WL 540441, at *7. In contrast, this case is about whether Defendants violated U.S. money laundering and related laws.

Colombia has a greater interest in regulating its liquor market than the United States has in prohibiting American corporations from laundering the proceeds of illegal U.S. narcotics sales. And it is of no small moment that our federal courts are overrun with criminal cases involving conspiracies to import illegal drugs. Allegations that domestic corporations are complicit in such wrongdoing weigh in favor of accepting jurisdiction. Overall, however, the instant forum has a slightly greater interest in adjudicating the instant dispute than does Colombia.

### (ii)    *Law Governing the Instant Dispute*

Although the court will not at this preliminary stage reach any definitive conclusions as to any choice of law issues in this case, it appears that United States law predominates in this dispute. The primary claim is a RICO claim, which clearly raises questions of federal law. Similarly, as Defendants are alleged to have masterminded the tortious conduct that caused Plaintiffs' damages from the United States, it is likely that Plaintiffs' common law claims (fraud, public nuisance, unjust enrichment, negligence, negligent misrepresentation, conversion, and money had and received) are governed by the laws of one or more of the United States. Because Defendants' conduct is alleged to have largely occurred in the United States, the law of the state in which the conduct occurred often applies. See Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (New York choice of law rules apply and, under New York's "interest analysis," where the claim is brought under a conduct-regulating law, the law where the conduct occurred generally applies).

As discussed above, although Defendants argue that the instant claims require this court to pass upon the validity of Colombia's tax laws (Def. FNC Mem. at 90), nothing about the instant claims will require such consideration. However, the instant claims will most likely

require this court to calculate the amount of Colombian taxes owed on various liquor products. Such a determination requires the application of Colombian law. This entails only a relatively modest and purely mechanical application of Colombian law. Overall, this factor weighs in favor of the dispute being heard in the instant forum. See Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 756 (S.D.N.Y. 2004) ("Public interest ordinarily favors the enforcement of the federal law, such as the RICO statutes, in the United States courts[.]").

### (iii)    Judicial Burden

Defendants argue that hearing the instant case in this forum would create an unfair and disproportionate burden on the court and a jury selected from the residents of this District. There is no question that this case has already required and will continue to require significant judicial resources. If the case ultimately proceeds to a jury trial, the cost will be borne by residents of this District in addition to the court. Whether this burden is unfair in some way really depends on (1) the two fora's relative interests in the dispute and (2) how congested the two courts are. As this court has already determined that the Colombian and American fora have relatively similar interests in the dispute, there is nothing unfair about this court bearing the burden resulting from this litigation. Further, although this District and, specifically, this court are clearly highly congested, it is not clear from the record whether Colombian courts are any more or less congested. This factor is neutral.

*    *    *

Whether this case should be dismissed under the doctrine of *forum non conveniens* is a very close and difficult question. With respect to the private interest analysis, two factors weigh slightly in favor of dismissal and two factors are neutral. With respect to the public interest

analysis, two factors support retaining the case and one factor is neutral. Overall, the <u>Gilbert</u>

analysis suggests the factors favoring retaining the case and the factors favoring retention of the

case are in equipoise. Plaintiffs' choice of the instant forum is entitled to reasonable deference.

The balance of interests are neutral and, as a result, do not overcome Plaintiffs' choice of forum.

See <u>Peregrine Myanmar Ltd v. Segal</u>, 89 F.3d 41, 46-47 (2d Cir. 1996) (foreign plaintiffs'

selection of New York forum entitled to deference where some witnesses located in New York

and other witnesses were located in the Far East, defendant resides in New York, and critical

events occurred in New York). Defendants' motion for dismissal on this ground is therefore

denied.

## VI.    INTERNATIONAL COMITY

### A.    Background

International comity is "the recognition which one nation allows within its territory to the

legislative, executive or judicial acts of another nation, having due regard both to international

duty and convenience." <u>Hilton v. Guyot</u>, 159 U.S. 113, 164, 12 S. Ct. 139, 143 (1895).

"Whatever its precise contours, international comity is clearly concerned with maintaining

amicable working relationships between nations, a 'shorthand for good neighbourliness,

common courtesy and mutual respect between those who labour in adjoining judicial

vineyards.'" <u>JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.</u>, 412 F.3d 418,

423 (2d Cir. 2005) (<u>quoting</u> <u>British Airways Bd. v. Laker Airways Ltd.</u>, [1984] E.C.C. 36, 41

(Eng. C.A.)). The doctrine of international comity provides that, in certain circumstances, a

federal court will (1) recognize or provide *res judicata* effect to foreign judgments and/or (2)

dismiss a case before it in deference to a parallel action pending in a foreign jurisdiction. <u>See</u>

Royal and Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006). In this case, Defendants seek dismissal based only on the latter branch of international comity.

Ordinarily, parallel proceedings in a foreign jurisdiction do not warrant dismissal: "The mere existence of parallel foreign proceedings does not negate the district courts' 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" Id. at 92 (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236 (1976)). In fact, "exceptional circumstances" must exist in order to warrant dismissal in deference to a foreign action. Royal and Sun Alliance, 466 F.3d at 93.

The Second Circuit has "described [international comity's] boundaries as 'amorphous' and 'fuzzy'" and has declined to articulate a precise set of factors that district courts should consider in determining whether to dismiss an action in deference to an action pending in a foreign court. Id. at 92-93. However, the Second Circuit has explained:

> In the context of parallel proceedings in a foreign court, a district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency. See Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1518 (11th Cir. 1994); see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 212 (S.D.N.Y. 2002). Proper consideration of these principles will no doubt require an evaluation of various factors, such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternative forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction. See, e.g., [Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc., 180 F.3d 896, 898-99 (7th Cir. 1999); see also Bigio v. Coca-Cola Co., 239 F.3d 400, 454 (2d Cir. 2000).] This list is not exhaustive, and a district court should examine the "totality of the

70

circumstances," <u>Finova Capital Corp.</u>, 180 F.3d at 900, to determine whether the specific facts before it are sufficiently exceptional to justify abstention.

<u>Id.</u> at 94.

## B. Analysis

The overwhelming majority of the factors identified by the <u>Royal and Sun Alliance</u> court have already been addressed above in the context of the *forum non conveniens* motion. There is no reason to repeat a discussion of those factors here. Instead, the court will address those factors that are specific to the international comity question.

### 1. Similarity of the Issues and Parties

"For two actions to be considered parallel, the parties in the actions need not be the same, but they must be substantially the same, litigating substantially the same issues in both actions." <u>Id.</u> at 94. Defendants argue that twenty-seven actions filed in Colombian courts beginning in 2000 involve parties and issues similar to those in this case. (Def. FNC Mem. at 102-04.) Plaintiffs vigorously dispute this. (Pl. FNC Opp. at 77-79.)

*Similarity of Issues.* The instant case and the Colombian Actions do not raise similar issues. Defendants argue that the validity of Colombian tax laws is at issue in both. (Def. FNC Mem. at 100.) Defendants' primary argument appears to be that Plaintiffs are not entitled to recover damages for lost taxes if the taxes themselves were void because of their illegality. As discussed in Section III above, to the extent that Plaintiffs are seeking lost taxes, all claims for lost taxes are dismissed. Thus, this argument fails.

Defendants also appear to be arguing that Plaintiffs are not entitled to recover lost profits because they lack a valid right under Colombian law to sell liquor: "If a Department's

ordinances and decrees implementing the monopoly are null and void, because they do not comply with national law, for example, the Department cannot complain of lost profits to its illegal business." (Def. FNC Mem. at 100.) As a preliminary matter, Defendants' brief provides a detailed description of the Colombian Actions. (Def. FNC Mem. at 19-22.) That detailed description identifies the arguments that the Diageo companies are making in the Colombian Action; nowhere does it suggest that the Diageo companies are asserting that the Plaintiffs' liquor monopolies are not legal.

This conclusion is confirmed by the Declaration of Juan Rafael Bravo Arteaga ("Bravo Decl."), which describes twenty-seven Colombian Actions that Diageo companies have filed against Plaintiffs. (Bravo Decl. ¶¶ 6-13.) Bravo is an attorney licensed to practice law in Colombia, is the *Universidad del Roario's* Chair of Tax Law, and has served, *inter alia*, as the Director of National Taxes at the National Directorate of Taxes, President of the Colombian Institute of Tax Law, and President of the Board of Directors of *Banco de Colombia*. (Id. ¶¶ 3-4.) Bravo's testimony indicates that the Colombian Actions have two primary purposes: (1) to "challenge[] the discriminatory tax treatment of foreign liquors as compared with Colombian national liquors" and (2) to "challenge[] the Departments' ordinances in effect at the time the suits were instituted that permitted the Departments to collect simultaneously the monopoly participation and the consumption tax." (Id. ¶¶ 7, 8.) Bravo describes all of the suits motivated by these two purposes, and it is clear that they are aimed at challenging the validity of liquor taxes charged by Colombian government agencies. None of these suits challenges the legality of

Plaintiffs' monopoly. As a result, these Colombian Actions neither affect the outcome of this case nor bear any relevant similarity to the instant case.[16]

Bravo also testifies that, in three of the Colombian Actions, "the Diageo Companies challenged the Departments whose ordinances or decrees were in effect prior to the passage of Law 223 of 1995 which were not changed to comply with the law once it entered into force." (Id. ¶ 9.) Only one of the instant Plaintiffs, the Department of Vichada, is involved in those three actions. (Id. at page 5 n.3.) Bravo's Declaration does not appear to describe Law 223 of 1995 or identify which of the Department of Vichada's "ordinances or decrees" are alleged to be invalid. To the extent that one or more of these three Colombian Actions challenges Vichada's power to manufacture or distribute liquor, it is similar to the instant case because it addresses an argument that could potentially serve as a defense to the instant action. Given the Defendants' extraordinary investment of resources in preparing the instant moving papers, it is highly unlikely that one or more of the Colombian Actions address such an argument without Defendants describing the Colombian Action(s) and the argument in great detail. In any event, at most, the Colombian Actions address whether one of the twenty-four instant Plaintiffs is authorized to manufacture and/or distribute liquor. As far as the court can tell, there is no reason

---

[16] Defendants also point to an action pending in the Andean Court of Justice that "has considered the Colombian taxation scheme and found it to be anti-competitive." (Bravo Decl. ¶ 13.) However, Defendants acknowledge that nothing about that case suggests that Defendants' liquor monopoly is somehow inconsistent with Colombian or international law: "The Andean Court of Justice ruled that, given their nature as a mechanism for raising public revenue, the mere constitutional authorization of liquor monopolies did not itself violate Andean Community law, but that the Colombian taxation regime and the manner in which the sale of imported goods is made 'more difficult or more costly than goods produce nationally,' did violate Colombian law proscriptions on anticompetitive discrimination against imported goods." (Def. FNC Mem. at 21-22.)

to conclude that the Department of Vichada's alleged damages are greater than those of any of the other twenty-three Plaintiffs. As a result, even if one to three of the Colombian Actions addresses the Department of Vichada's authority to manufacture and/or distribute liquor, such an action would be similar to the instant action only in that it addresses a potential defense to the claims of one of the twenty-four instant Plaintiffs' claims. This very narrow similarity between the instant case and the Columbian Actions—even if true—in no way suggests the actions are parallel.

Otherwise, the Colombian Actions appear to bear no relationship to the instant claims. Defendants have not introduced any evidence that Plaintiffs have raised RICO, fraud, competition, or other tort claims in the Colombian Actions. In fact, with the exception of the three actions against the Department of Vichada, there is no evidence that the Colombian Actions raise any issue relevant to the instant RICO and common law claims.

It is telling that there are twenty-seven pending and decided Colombian Actions and not one of them addresses Plaintiffs' claims. Defendants assert that Plaintiffs could bring tort claims akin to those raised in this case in Colombia. Yet, Plaintiffs have not. This confirms that Plaintiffs strongly prefer the instant forum.

***Similarity of the Parties.*** The instant case and the Colombian Actions involve relatively similar parties. Eighteen of the twenty-four instant Plaintiffs are also parties to the Colombian actions. (Bravo Decl. at footnotes 1 and 2.) Further, the Colombian actions were filed by Guinness UDV Colombia S.A., United Distillers & Vinters (Florida), Inc., and United Distillers and Vintners (ER) Limited (the "Colombian Actions Plaintiffs"), which are all affiliates of two of the instant Defendants—Diageo North America, Inc. and Diageo PLC. (See Def. FNC Rep. at

95.) Courts have found that two parties are "similar" for purposes of international comity when one party is a subsidiary of the other or one party has a substantial ownership interest in the other. See Goldhammer v. Dunkin Donuts, Inc., 59 F. Supp. 2d 248, 253 (D. Mass. 1999) (for purposes of international comity, one party that owns a two-thirds interest in another party is similar to the other party); Caspian Investments, Ltd. v. Vicom Holdings, Ltd., 770 F. Supp. 880, 884 (S.D.N.Y. 1991) (Irish action has similar parties to U.S. action where holding company was party to Irish action and holding company and its subsidiary were parties to the U.S. action). Although the exact relationship between Diageo North America, Inc. and Diageo PLC and the Colombian Actions Plaintiffs is not made clear in the papers submitted in support of and opposition to the instant motions, they are affiliated in some way. As a result, the parties are relatively similar.

## 2. Temporal Sequence of Filings

The Colombian Actions were filed over a period of time beginning in late 2000, whereas the instant case was filed in 2004. (Bravo Decl. ¶ 6.) The fact that the first-filed foreign action was filed four years before the U.S. action weighs in favor of dismissing the action in favor of the foreign forum. See Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc., 949 F. Supp 1123, 1128 (S.D.N.Y. 1997) (deferring to foreign action where it was filed eighteen months before American suit); Advantage Int'l Mgmt., Inc. v. Martinez, No. 93 Civ. 6227 (MBM), 1994 WL 482114, at *3 (S.D.N.Y. Sept. 7, 1994) (defendant's choice of forum entitled to "judicial deference" where foreign suit commenced more than three years before American suit).

Plaintiffs argue that the Colombian Actions were filed as a result of a race to the courthouse: they assert that the filing of the Actions was a purely procedural maneuver designed to gain a tactical advantage. (Pl. FNC Opp. at 81.) They assert that the actions were filed and then permitted to "sit dormant for six years." In their lengthy briefs, they point to no factual citation to support the proposition that the Actions have sat dormant for six years, making it impossible for this court to conclude as a factual matter that the Actions did, in fact, sit dormant. Further, even if there were evidence in the record suggesting that the Colombian Actions sat dormant for several years, it would be difficult to find that actions challenging the legality of Colombian taxes were filed in Colombia merely for the purpose of procedural fencing.

*     *     *

After considering the "totality of the circumstances," including all of the factors mentioned in <u>Royal and Sun Alliance</u>, the court finds that dismissal under the doctrine of international comity in deference to the Colombian Actions is not appropriate. Above all else, the instant action and the Colombian Actions simply involve different claims and issues. As a preliminary matter, because the issues in the instant and Colombian actions are not substantially similar, the instant and Colombian actions are not parallel. The doctrine of international comity may require that a foreign pending action be parallel to the United States action in order to dismiss the case pending in federal court in deference to the pending foreign action. <u>Cf.</u> <u>Royal and Sun Alliance</u>, 466 F.3d at 95 ("The existence of a parallel action in an adequate foreign jurisdiction *must be the beginning*, not the end, of a district court's determination of whether abstention is appropriate. . . . [T]he mere existence of an adequate parallel action, by itself, does not justify the dismissal of a case on grounds of international comity abstention.") (emphasis

76

added); Turner Entmt. Co. v. Degeto Fil, GmbH, 25 F.3d 1512, 1518 ("The issue is whether a federal court, which properly has jurisdiction over an action, should exercise its jurisdiction where parallel proceedings are ongoing in a foreign nation and a judgment has been reached on the merits in the litigation abroad"); European Community v. RJR Nabisco, Inc. (hereinafter, "RJR Nabisco"), 150 F. Supp. 2d 456, 476 (E.D.N.Y. 2001) (Garaufis, J.) ("international comity is not at issue because there is no need for this court to defer to the legislative or judicial acts of a foreign sovereign"). The court, however, need not reach this question.

Assuming *arguendo* that a pending parallel foreign action is not necessary for dismissal under the doctrine of international comity, Defendants must still show that exceptional circumstances justify dismissal:

> [C]ircumstances that routinely exist in connection with parallel litigation cannot reasonably be considered exceptional circumstances. . . . Additional circumstances must present—such as a foreign nation's interest in uniform bankruptcy proceedings—that outweigh the district court's general obligation to exercise its jurisdiction.

Royal and Sun Alliance, 466 F.3d at 95. Defendants have failed to identify any "exceptional circumstances" that warrant dismissal on the ground of international comity. Id. Defendants make two arguments in favor of dismissal: (1) the Colombian courts should be given an opportunity to adjudicate the Colombian Actions "without duplication or interference;" and (2) judicial efficiency will be served by ensuring the issues are only adjudicated once and preventing inconsistent decisions on the same legal and factual questions. (Def. FNC Mem. at 100-107.) However, each of these arguments fails because the Colombian Actions and the instant action do not raise the same issues. Dismissal on the ground of international comity simply is not warranted in this case. See Royal and Sun Alliance, 466 F.3d at 94-95 (dismissal not warranted

even where district court found existence of parallel Canadian action and that Canadian judicial procedures were adequate); Bigio v. Coca-Cola Co., 448 F.3d 176, 178-79 (2d Cir. 2006) (dismissal of damages dispute between Canadian citizens and United States company not warranted even though claims may "require some modest application of Egyptian law").

## VII. POLITICAL QUESTION DOCTRINE

### A. Background

The Supreme Court has identified those situations in which an issue is non-justiciable under the political question doctrine:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker v. Carr, 369 U.S. 186, 217, 82 S. Ct. 691 (1962). Although the Supreme Court has identified these six separate contexts in which the political question doctrine applies, "[b]ecause the nonjusticiability of political questions is primarily a function of the constitutional separation of powers . . . the dominant consideration in any political question inquiry is whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department." 767 Third Avenue Assocs. v. Consulate Gen. of Socialist Fed. Rep. of Yugoslavia, 218 F.3d 152, 160 (2d Cir. 2000) (internal quotation marks omitted). Dismissal under the political question doctrine is inappropriate "in the absence of an issue whose

78

adjudication would likely result in improper judicial encroachment upon the foreign relations power committed to the coordinate political branches." <u>RJR Nabisco</u>, 150 F. Supp. 2d at 475-76.

**B.     Analysis**

Defendants argue that this action is barred by the political question doctrine because: (1) it requires the court "to enforce anti-competitive foreign laws and support an anti-competitive monopoly regime;" (2) it requires the court to review Colombia's role in "facilitating" liquor smuggling and money laundering; (3) it requires the court to review "corruption and mismanagement in the Departments' monopolies that are the principal cause of their financial difficulties;" (4) the United States Constitution assigns the Executive and Legislative branches power over foreign relations, and Colombia and the United States are negotiating a treaty that will impact the Colombian government's liquor monopoly and Colombian liquor taxes; (5) Colombian courts "are providing decisions essential to this matter;" (6) to the extent this case requires the court to rule on Colombian constitutional issues and "esoteric applications" of other Colombian laws, the case presents "a lack of judicially discoverable and manageable standards for resol[ution];" and (7) the case presents "the potentiality for multifarious pronouncements by various departments of the [U.S. government] on one question." (Def. FNC Mem. at 110; Def. FNC Rep. at 101-03.)

As discussed extensively above, the instant case is a commercial dispute. One liquor business is alleging that other liquor businesses have injured it by engaging in money laundering. The fact that the Plaintiffs' liquor businesses are owned by the Colombian government is irrelevant to the merits of the dispute. The fact that the Colombian government's liquor business are authorized by Colombian law, including the Colombian Constitution, is of no moment.

Foreign entities whose very existence depends on foreign law, such as corporations, routinely bring claims in federal courts without the federal court having to analyze the foreign law that creates or authorizes the creation of the foreign corporation. As a result, Defendants' first argument fails. Similarly, Defendants' sixth argument fails because (1) this case does not raise questions that arise under Colombian law (except to the extent that Plaintiffs' common law claims arise under Colombian law) and (2) even if it does to some extent arise under Colombian law, federal courts routinely consider questions under foreign law.

As discussed above, Defendants' second argument fails because the fact that the Colombian government could have done more to enforce smuggling and money laundering laws is irrelevant to the instant dispute.

Defendants' third argument fails even though the instant action may require substantial adjudication of the profitability of Plaintiffs' liquor businesses. This will include consideration of any "corruption and mismanagement." Although, as a practical matter, this could entail some embarrassment to the Colombian government and resulting complications for the Executive and Legislative branches' administration of Colombian foreign policy, (1) there is no "textually demonstrable constitutional commitment" of foreign governments' commercial injuries to the Executive or Legislative branches, and (2) the resulting complications simply are not sufficient to make the dispute non-justiciable.

The fact that the Executive and Legislative branches are negotiating a treaty that addresses issues related to Plaintiffs' liquor monopoly and liquor taxation scheme in no way disposes of the question of whether Defendants' past conduct has caused Plaintiffs' cognizable injuries. Admittedly, this action may result in findings by the court or a jury as to the economic

effects of Plaintiffs' liquor businesses and/or Defendants' money laundering. In theory, such findings could be inconsistent with positions that are being taken by the Executive and Legislative branches in the treaty negotiation. However, Defendants have not identified a single case in which a federal court found that the political question doctrine barred a commercial claim against private corporations. As a result, Defendants' fourth and seventh arguments fail.

Finally, Defendants' fifth argument fails because, as discussed above, the pending and decided Colombian Actions have little or no relationship to the instant case. For these reasons, the instant claims are not barred by the political question doctrine. See RJR Nabisco, 150 F. Supp. 2d at 474-76 (political question doctrine does not bar foreign governments' claims against tobacco companies).

## VIII.   EXTRATERRITORIALITY

### A.   Background

Defendants argue that Plaintiffs' RICO claims constitute an impermissible attempt to apply the RICO law extraterritorially. The RICO statute does not speak to whether or under what circumstances it should be applied extraterritorially and, as a result, the court "must ascertain whether Congress would have intended that federal courts should be concerned with specific international controversies." North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir. 1996). "[T]he ultimate inquiry is . . . whether 'Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries.'" Id. at 1052 (quoting Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir. 1975) (Friendly, J.)). The Second Circuit has, thus far, declined to determine the precise standard for determining whether a

81

particular RICO claim has a sufficient connection to the United States. Id. at 1052. The Second Circuit has, however, applied the standards used in antitrust and securities cases to the civil RICO context. Id. at 1051-52; see also Ayyash, 2006 WL 587342, at *6.

In securities cases, "analysis in the past has focused on whether one of two alternative tests has been satisfied: the 'conduct test' and the 'effects test.'" Al-Turki, at 1051; accord Ayyash, 2006 WL 587342, at *4; Roquette Am., Inc. v. Alymum N.V., No. 03 Civ. 0434 (DC), 2004 WL 1488384, at *7 (S.D.N.Y. July 1, 2004). In securities fraud cases, the conduct test has been described as follows:

> [W]e entertain suits by aliens only where conduct material to the completion of the fraud occurred in the United States. Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction. Only where conduct within the Untied States directly caused the loss will a district court have jurisdiction over suits by foreigners who have lost money through sales abroad.

Al-Turki, 100 F.3d at 1051 (internal quotation marks omitted). This test is premised "on the theory that Congress did not want to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." Al-Turki, 100 F.3d at 1051 (internal quotation marks omitted).

In federal securities law, under the effects test, "the United States prohibition of securities fraud may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States. Transactions with only remote and indirect effects in the United States do not qualify as substantial." Al-Turki, 100 F.3d at 1051 (internal quotation marks and citation omitted).

In antitrust law, "the analysis proceeds along similar lines, but there is more emphasis on the effects of the relevant conduct in the United States and less emphasis on where that conduct took place." Al-Turki, 100 F.3d at 1051. Defendants argue that, in the context of RICO, the effects test as understood in antitrust law is the more appropriate test. (Def. RICO Rep. at 6.) Defendants rely upon language in the Second Circuit's Al-Turki decision:

> It may be that the effects-oriented approach borrowed from antitrust cases is an equally or even more appropriate test, especially since the civil action provision of RICO was patterned after the Clayton Act.' Agency Holding Corp. v. Malley-Duff & Assoc., 483 U.S. 143, 150, 107 S. Ct. 2759, 2764, 97 L. Ed. 2d 121 (1987). Moreover, RICO (like the antitrust laws) provides for treble damages, which heightens concerns about international comity and foreign enforcement. Compare 18 U.S.C. § 1964(c) with 15 U.S.C. § 15(a).

Al-Turki, 100 F.3d at 1052.

Despite this language in Al-Turki, post-Al-Turki decisions in this Circuit have held that the territoriality requirement is met where either the effects or conduct tests is satisfied. See OSRecovery, Inc. v. One Group Int'l, Inc., 354 F. Supp. 2d 357, 366 (S.D.N.Y. 2005) (applying conduct and effects tests); Roquette, 2004 WL 1488384, at *7 ("Although the Second Circuit has not specified a precise standard, courts in this circuit have generally applied two alternative tests derived from transnational and antitrust cases in RICO extraterritoriality cases: the 'conduct test' and the 'effects test.' Because it is not clear which test should be used in the context of RICO, jurisdiction will exist where either test is satisfied.") (internal citations and quotation marks omitted); Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp., 98 F. Supp. 2d 480, 486 (S.D.N.Y. 2004). This court agrees with other district courts that have continued to apply

the effects and conduct tests in the alternative, despite the language in Al-Turki suggesting that there should be an emphasis on the effects test as it is applied in antitrust law.

**B.    Analysis**

The Second Amended Complaint alleges that three types of conduct at the heart of the money-laundering enterprise occurred in the United States. First, Plaintiffs allege that Defendants controlled their money-laundering enterprise at least in part from the United States. The Second Amended Complaint alleges that Defendants "controlled every aspect of the financial transactions involving the purchase of their liquor products." (SAC ¶ 28.) "Defendants also controlled the exact methods and means by which they were paid for the liquor products." (Id.) Defendants controlled the distribution channels through which their liquor traveled. (Id. ¶ 30.) Defendants worked with their co-conspirators to create a "complex web of companies located in Aruba and Panama to disguise the true nature and origin of the criminal proceeds" that were being laundered. (Id. ¶¶ 31, 35.) "Defendants and their co-conspirators knew that the purpose and design of this system of seemingly unrelated parties to the financial transaction was to conceal, hide and/or disguise the true nature of the criminal proceeds they were accepting." (SAC ¶ 27(d).)

Plaintiffs have explicitly alleged that this management and control occurred in the United States: "Many of the activities of the Defendants that are the subject matter of this complaint, including management decisions and direction of the schemes, are conducted by the Defendants in the United States and, more particularly, from the Defendants' offices in the State and City of New York." (Id. ¶ 100.)

Second, Plaintiffs clearly allege that Defendants made communications and took other overt acts in furtherance of the enterprise while in the United States. Defendants maintained "direct ongoing relationships" with the money-laundering organizations. (Id. ¶ 23(o).) An agent of the Seagram Defendants located in New York and Florida "directly serviced the accounts of the principal money launderers who were providing criminal proceeds to Seagram in exchange for Seagram products." (Id. ¶ 53.) Defendants' employees made trips to Aruba to meet with known drug dealers. (Id. ¶ 27(h).) "At such meetings both the Defendants' distributors and the criminal customers explained the criminal nature of the business in great detail including that narcotics proceeds were utilized to pay for the liquor[.]" (Id.) "Defendants' criminal customers were obtained, serviced, and supervised by [ ] Defendant employees in the United States, Panama, and Colombia[.]" (Id. ¶ 27(I).) While in the United States, Defendants' employees, through U.S. wires and mail, requested and received information concerning shipments of the liquor. (Id.) Defendants' employees "were personally involved" in the alleged money laundering. (Id. ¶ 27(g).) On trips to Colombia, Defendants' "employees received large volumes of cash that they took into their personal possession or these employees were present when large volumes of cash and third party checks were turned over to" Defendants' distributors. (Id. ¶27(g).)

Again, even where these allegations do not specifically state that they occurred in the United States, this court is required to infer that at least some of these communications and other acts occurred in the United States. To the extent these allegations state that Defendants' employees committed the acts outside the United States, the court is required to infer that these

employees were often directed and controlled by Defendants' supervisory employees located in the United States.

Third, the Second Amended Complaint clearly alleges that the first steps of the complex money laundering process occurred in the United States. The money laundering chain begins with sales of illegal narcotics in the United States. (Id. ¶ 27(c).) The cash revenues generated by these illegal sales are then deposited in small amounts in numerous bank accounts in the United States. (Id.) "Checks are then drawn on these accounts—which represent narcotics proceeds—and these checks are then exchanged by Colombian criminal organizations for liquor products manufactured by the Defendants." (Id.) The Second Amended Complaint identifies three such checks, all of which were drawn from accounts at banks in the State of New York and then "smuggled into Colombia." (Id.)

All three categories of the conduct that is alleged to have occurred in the United States—controlling the money-laundering enterprise, communications and other overt acts in furtherance of the enterprise, and the initial stage of depositing proceeds from illegal narcotics sales into U.S. bank accounts and then withdrawing the funds using checks—are material to the alleged money-laundering enterprise. See Johnson, 98 F. Supp. 2d at 486 (sales in United States and use of U.S. mail to commit mail fraud satisfied the conduct test). None of these categories of conduct constitutes "[m]ere preparatory activities" or "conduct far removed from the consummation of the fraud." Al-Turki, 100 F.3d at 1051 (internal quotation marks omitted). Even if each of these categories of U.S. conduct was not, in and of itself, material, the three are certainly material when considered as a whole.

As discussed in further detail below in the Section addressing proximate cause, whether these three categories of conduct "directly caused" Plaintiffs' injuries is a far closer question. Plaintiffs' allegation that Defendants "controlled" the money-laundering enterprise from the United States would appear to satisfy the "direct causation" requirement because, as discussed below, the money-laundering enterprise as a whole constitutes the factual and proximate cause of Plaintiffs' injuries.

Defendants argue that Plaintiffs have failed to satisfy their pleading burden:

> [A]ll of the United States conduct alleged by Plaintiffs falls into one of the following categories: (a) it is based on conclusory allegations with no supporting facts; (b) it dates from beyond the applicable limitations period and is therefore not actionable; (c) it is insubstantial and/or far removed from the alleged illegal activities; (d) it does not involve Defendants; or (e) it is not an essential part of the conduct that caused Plaintiffs' alleged losses.

(Def. RICO Rep. at 10.) Arguments (c), (d), and (e) have already been considered and rejected.

Defendants' assertion that the allegations in the Second Amended Complaint concerning United States conduct are conclusory fails. Although some of the allegations are relatively general, they are supported by numerous highly specific allegations. This court is constrained by the Federal Rule of Civil Procedure 8 pleading standards and Plaintiffs have satisfied them on this point.

Defendants' assertion that the allegations concern conduct that is no longer actionable because it gave rise to claims that are barred by the statute of limitations also fails. Assuming *arguendo* that the statute of limitations bars any claim for injury suffered prior to October 8, 2000 (Def. RICO Rep. at 10 n. 14), the Second Amended Complaint clearly states that the conduct at issue occurred continuously beginning in the early 1990s and continued to occur as of

the filing of the Complaint. (SAC ¶¶ 27(e), 27(n) ("Since at least 1991, all the Defendants were selling liquor to individuals whom they knew were reputed narcotics traffickers."), 27®.) As a result, even though the Second Amended Complaint makes reference to conduct that occurred long before October 2000 (e.g., id. ¶ 27(c)), the Second Amended Complaint is merely citing these as specific examples of conduct that is still occurring as of the filing of the Second Amended Complaint.

In short, in light of Rule 8's liberal pleading standard, this court is constrained to find that Plaintiffs have adequately alleged sufficient United States conduct by Defendants to satisfy the "conduct test."[17] As a result, Plaintiffs have adequately alleged territoriality at this stage. Nothing contained in this opinion precludes Defendants from re-raising the territoriality issue once discovery is complete in an appropriate motion.

## IX.    RICO ALLEGATION

### A.    Enterprise

#### 1.    Background

Under RICO, an "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has defined a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct[,]" the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette,

---

[17] As Plaintiffs have successfully satisfied the "conduct test," there is no reason for this court to reach the "effects test" or the "precious resources test." (See Pl. RICO Opp. at 15.)

452 U.S. 576, 583, 101 S. Ct. 2524, 2528 (1981). "The enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise."[18] First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004) (internal citations omitted). A RICO enterprise can be a legal entity or a "discrete economic association existing separately from the racketeering activity." Id. (internal quotation marks omitted).

"[T]he existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir. 1991) (internal quotation marks omitted; emphasis in original). As a result, "[p]roof of racketeering activity may therefore be relied upon to establish the existence of an enterprise." Black Radio Network, Inc. v. NYNEX Corp., 44 F. Supp. 2d 565, 580 (S.D.N.Y. 1999) (citing Coonan, 938 F.2d at 1559-60).

### 2.   Analysis

Defendants argue that Plaintiffs have failed to plead a RICO enterprise because (1) Plaintiffs have failed to allege sufficiently an organizational structure for the enterprise, (2) Plaintiffs do not allege an enterprise that is separate and distinct from the pattern of racketeering activity, and (3) the alleged enterprise is implausible. (Def. RICO Mem. at 33-40.)

---

[18] Plaintiffs cite World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc., 425 F. Supp. 2d 484, 493-500 (S.D.N.Y. 2006), which read Turkette and a number of Second Circuit cases to state that a RICO plaintiff need not prove a RICO enterprise that is separate from a pattern of racketeering activity. (Pl. RICO Opp. at 39.) As it is not material to the outcome of this decision, the court will assume, without deciding, that Plaintiffs must establish both a pattern of racketeering activity and a RICO enterprise that is separate from that activity.

Defendants rely upon Amsterdam Tobacco Inc. v. Philip Morris Inc., 107 F. Supp. 2d 210 (S.D.N.Y. 2000), to support their argument that Plaintiffs have failed adequately to plead an organizational structure for the enterprise. In Amsterdam, the plaintiffs, wholesale cigarette distributors, alleged that the defendant, Philip Morris, was involved in a RICO enterprise that smuggled cigarettes from Virginia to New York to evade New York taxes on cigarettes. Id. at 211-13. The plaintiffs alleged that "Philip Morris sold cigarettes to entities who then sold cigarettes to cigarette smugglers[.]" Id. at 214. The court found that the plaintiffs had failed to allege adequately an organizational structure because "there [were] insufficient allegations of 'an ongoing organization' involving Philip Morris which functioned as a 'continuing unit.'" Id.

Amsterdam is distinguishable because the Second Amended Complaint contains many more allegations concerning organizational structure than did the complaint in Amsterdam. Plaintiffs describe the enterprise as follows:

> The Defendants, along with their co-conspirators in the money-laundering schemes, including associated distributors, shippers, currency dealers, wholesalers, money brokers, and other participants in the schemes identified above, were, at relevant times, an association-in-fact of individuals and corporations . . . [and] constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Defendants' Money-Laundering Enterprise"). These persons and entities were and are associated in fact for the purpose, among others, of illegally laundering criminal proceeds of criminal activity to the economic detriment of Plaintiffs. The Defendants' Money-Laundering Enterprise is an ongoing organization whose constituent elements function as a continuing unit for the common purpose of maximizing the sale of liquor products through illegal means and carrying out other elements of the Defendants' scheme. The Defendants' Money-Laundering Enterprise has an ascertainable structure and purpose beyond the scope of the Defendants' predicate acts and the conspiracy to commit such acts.

(SAC ¶ 108.)

The Second Amended Complaint includes "concrete allegations to the effect that [the members of the enterprise] continued in 'the enterprise's hierarchy, organization, and activities[]'" throughout the duration of the enterprise. Black Radio Network, Inc., 44 F. Supp. 2d at 581 (quoting Coonan, 938 F.2d at 1560-61). First, the Second Amended Complaint alleges that Defendants were at the top of the enterprise's hierarchy. Defendants "have directed, managed, and controlled" the enterprise. (SAC ¶ 2.) Defendants "controlled every aspect of the financial transactions involving the purchase of their liquor products. The Defendants also controlled the exact methods and means by which they were paid for the liquor products." (Id. ¶ 28.) Defendants "also dictated that their criminal customers route payments to them through intermediary distributors, shippers, and other cut outs." (Id. ¶ 29.) Perhaps above all else, Defendants controlled the prices of the liquor at many, if not all, levels of the distribution chain. (Id. ¶ 27(m).) Defendants' decision to create the distribution chain "was made at the highest executive levels." (Id. ¶ 27(a).)

In addition to alleging that Defendants controlled the illegal enterprise, the Second Amended Complaint provides significant detail as to how Defendants exercised control over it. Defendants' employees were "personally involved" in the money laundering. (Id. ¶ 27(g).) Defendants' employees would travel to Colombia in order to effect the money laundering by collecting large amounts of cash. (Id.) While in Colombia, Defendants' employees also witnessed other aspects of the money laundering, including transmitting large volumes of cash and third-party checks to Defendants' distributors. (Id.) Defendants' employees would travel to Aruba for meetings with Defendants' customers, who were involved in narcotics trafficking. (Id. ¶ 27(h).) Members of the enterprise had "regular communications" with Defendants'

employees. (Id. ¶ 27(I).) Defendants used the wires and mails to track distribution of their liquor products to consumers. (Id.) Defendants "maintained direct ongoing relationships with the money laundering organizations[,]" which were Defendants' customers. (Id. ¶ 27(o).) Defendants utilized these relationships and communications "so as to keep a close eye on the market." (Id. ¶ 30.)

Second, in addition to alleging how Defendants controlled the enterprise, the Second Amended Complaint describes the balance of the enterprise's membership and structure. Members of the enterprise include "the Defendants, the distributors, the shippers, the criminal customers, currency brokers, and the Defendants' agents and subsidiaries who receive payment for the liquor products[.]" (Id. ¶ 3.) "The activities of this core group constitute a conspiracy in law and in fact." (Id.) The enterprise is administered, in part, "by restructuring the corporate structure of the Defendants, to direct and implement their money-laundering schemes and to assist in the avoidance of detection by U.S. and Colombian law enforcement." (Id. ¶ 6.) Although Defendants compete with each other in liquor markets, "they were well aware of each other's activities, copied each other's strategies when they were successful, and in most cases utilized the same distributors to conduct their illegal sales." (Id. ¶ 26.) The enterprise uses "cut outs" and multiple layers of intermediaries to conceal the money laundering, including Romar, Mansur Trading Freezone, Manimex, Tansimex, Marlex, Litani, Mitani, Runam Holdings, Doubletree Investments, Cardgame, Ltd., and Licores Aruba. (Id. ¶¶ 27(a), (b), (p).) All of the Mansur group and Romar group entities used the same tactics for effecting the money laundering. (Id. ¶ 27(c).)

Third, the Second Amended Complaint provides significant information about the enterprise's activities. In the most general sense, the enterprise constituted a vertically integrated liquor manufacturing and distribution business. Defendants created and managed "umbrella operations," Colombian corporations ostensibly involved in legitimate businesses. (Id. ¶ 27(j).) Defendants, through the umbrella operations, advertised and conducted other commercial activities in Colombia. (Id.) Defendants also illegally manipulated and controlled the prices, including retail prices, of their products that are sold in Colombia. (Id. ¶ 27(m).) Defendants closely monitored the ways in which enterprise members used marketing allowances provided by Defendants. (Id. ¶ 27(p).) Defendants conducted extensive advertising campaigns to promote their brands in Colombia. (Id. ¶ 27(k).)

Finally, Plaintiffs have alleged that the enterprise has existed continuously for more than twelve years. (Id. ¶¶ 27(n), 122.) The continuity of the enterprise is also established by the fact that the enterprise is largely synonymous with the liquor distribution chain, which has been consistently distributing liquor to Colombia for the same period. (Id. ¶ 27(n).)

Defendants are correct that the Second Amended Complaint fails to detail certain aspects of the enterprise's organizational structure. Most notably, the Second Amended Complaint does not identify by name all of the participants in the enterprise and, other than explaining that Defendants control the enterprise, fails to explain how enterprise participants other than Defendants fit into the enterprise's hierarchy. (Def. RICO Mem. at 35-36.) However, Plaintiffs have essentially alleged that the entire vertical distribution chain is involved in the conspiracy, and, given the numerous other specific allegations about the enterprise's organization, this is sufficient to permit meaningful discovery. See Coonan, 938 F.2d at 1559. Overall, the Second

Amended Complaint provides sufficient allegations concerning the enterprise's organization to withstand a Rule 12(b)(6) motion.

### (a) Enterprise that Is Separate and Distinct from the Pattern of Racketeering Activity

An enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Turkette, 452 U.S. at 583, 101 S. Ct. at 2528. In Stein v. New York Stair Cushion Company, No. 04-cv-4741 (DRH), 2006 WL 319300 (E.D.N.Y. Feb. 10, 2006), relied upon by Defendants, the court found that the plaintiff failed to plead an enterprise separate from the course of conduct because the plaintiff did not allege that the "association-in-fact enterprise ha[d] any purpose other than the execution of [the illegal] scheme[.]" Id. at *4. As the Amsterdam court explained, "[i]n assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is appropriate to consider whether the enterprise would still exist were the predicate acts removed from the equation." Amsterdam, 107 F. Supp. 2d at 215.

In contrast to Stein, in this case, many—if not all—of the members of the alleged enterprise formed a liquor-distribution chain. In addition to the illegal pattern of money laundering and fraud, the enterprise was engaged in the manufacturing and distribution of liquor. This manufacturing and distribution of liquor is a purpose that is separate from money laundering and fraud. Defendants controlled many aspects of this distribution chain, most notably the prices of the liquor being distributed. To the extent that narcotics traffickers are alleged to be members of the enterprise, the narcotics traffickers are also a part of the distribution chain by converting Colombian Pesos into United States Dollars, a conversion that is required to make the distribution chain function. Even if Defendants did not engage in the

alleged money laundering and fraud, they would still distribute their liquor through the distribution chain entities that comprise the alleged enterprise. See Amsterdam, 107 F. Supp. 2d at 215 (suggesting that courts pose this counterfactual question to determine whether a separate enterprise has been alleged). As a result, Plaintiffs have adequately alleged an enterprise separate and distinct from the racketeering activity.[19]

### (b)    Defendants' Membership in a Single Enterprise

Defendants argue that the allegation of a single enterprise composed of companies that compete with each other is implausible and not adequately alleged. (Def. RICO Mem. at 38-40.) "[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular . . . course of conduct and work together to achieve such purpose[]." First Capital Asset Mgmt., 385 F.3d at 174 (quotation marks omitted). Defendants are correct that courts dismiss civil RICO cases when the complaint fails to allege adequately that defendants are part of a single enterprise. See, e.g., Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 271-72 (S.D.N.Y. 2006) (complaint alleging two separate schemes with different purposes failed to allege a single enterprise even though some defendants participated in both schemes); Doe I v. State of Israel, 400 F. Supp. 2d 86, 120 (D.D.C. 2005) ("Plaintiff's complaint never explains how the several groups of defendants associated or operated together, or were otherwise organized into an enterprise with a shared decision-making infrastructure.").

---

[19] Dale v. Banque, No. 02 Civ. 3592 (RCC) (KNF), 2005 WL 2347853, at *7 (S.D.N.Y. Sept. 22, 2005), relied upon by Defendants, is also inapposite. In Dale, the court found that an association-in-fact enterprise was not separate from the pattern of racketeering activity where plaintiffs failed to allege as such.

Plaintiffs argue that they have adequately alleged that all Defendants are involved in a money-laundering scheme with the Mansur group and Roy and Milton Harms. (SAC ¶¶ 31-39.) Plaintiffs also allege that "[a]ll the Defendants share the common goal of increasing their market share in Colombia by selling their products through illegal means." (Id. ¶ 27.) Of course, there are a variety of situations in which competitors do enter into horizontal agreements for the purpose of exploiting a market and, in doing so, increasing profits (e.g., horizontal price-fixing agreements). In this case, it is plausible that Defendants are engaged in a joint money-laundering enterprise because it is, for some reason, easier to launder the money collectively. For instance, it may be that there are a limited number of narcotics traffickers who work through an even more limited number of distributors.

The Second Amended Complaint also provides some specific allegations as to how the Defendants, which generally compete with each other, cooperate with each other in the Colombian market. First, the Diageo Defendants and the Pernod Ricard Defendants have cooperated in the purchase and management of Seagram, which was formerly owned by Vivendi. (SAC ¶¶ 59-60.) The Diageo and Pernod Ricard Defendants, and entities affiliated with one or both of these groups, purchased Seagram from Vivendi. (Id. ¶ 59.) Through the sale, the Diageo and Pernod Ricard Defendants each came to individually own certain Seagram assets. (Id.) However, the Diageo and Pernod Ricard Defendants retained joint ownership of certain assets, including the Seagram "umbrella operation" located in Colombia. (Id. ¶¶ 60-61.) Similarly, the Diageo and Pernod Ricard Defendants agreed to be jointly liable for "any liabilities arising out of claims made against Seagram entities for involvement in illegal activities

in Colombia[.]" (Id. ¶ 64.) The purpose of this joint liability and joint management "was and is to further the money-laundering scheme[.]" (Id. ¶ 65.)

Second, all of the Defendants joined to form an industry association, the alleged purpose of which is to lobby the Colombian government and conceal Defendants' money-laundering scheme. (Id. ¶¶ 44-45.) The Second Amended Complaint does provide some detail about who is involved in the industry association and how the association is used, and details specific deceptive communications that the association allegedly made to the Colombian government. (Id.) Overall, by alleging that (1) Defendants utilize the same distributors, (2) Defendants have formed an industry association, and (3) some of the Defendants have cooperated in the management of their Colombian business activities, Plaintiffs have adequately alleged a single enterprise composed of all Defendants.

**B.     Participation in the Enterprise**

     **1.     Background**

In order to plead a RICO claim successfully, a plaintiff must allege that the defendant violated 18 U.S.C. §§ 1962(a), (b), (c), or (d). Section 1962(a) provides that "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a). "Under the plain language of this section, a violation of § 1962(a) consists of investing income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise; the violation is not established by mere

participation in predicate acts of racketeering." Ouaknine v. MacFarlane, 897 F.2d 75, 82 (2d Cir. 1990). See also United States Fire Ins. Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 448-49 (S.D.N.Y. 2004) ("Claims under Section 1962(a) alleging injury resulting from racketeering activity alone, rather than from the investment of income so derived, are subject to dismissal.") "As a matter of law, reinvestment of racketeering income is insufficient to make out a cause of action under RICO." United States Fire Ins., 303 F. Supp. 2d at 449 (internal quotation marks omitted).

Section 1962(b) provides that an individual violates RICO when he "acquire[s] or maintain[s], directly or indirectly, any interest in or control of any [RICO] enterprise[.]" In order to prevail under this section, the plaintiff must show "an acquisition or maintenance injury separate and apart from the injury suffered as a result of the predicate acts of racketeering." United States Fire Ins., 303 F. Supp. 2d at 450 (internal quotation marks omitted). The purpose of Section 1962(b) is to prevent proceeds from racketeering activities to be used to takeover a legitimate business. Id.

In order "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs" under 18 U.S.C. § 1962(c):

> [O]ne must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S. Ct. 1163, 1170 (1993) (internal footnote omitted; emphasis in original). Under the "operation or management" test, one is liable under

RICO if he "participated in the operation or management of the enterprise itself." Id. at 184, 113 S. Ct. at 1173. Individuals participate in the operation or management of an enterprise when they serve as "lower rung participants in the enterprise who are under the direction of upper management" or are "others 'associated with' the enterprise who exert control over it as, for example, by bribery." Id. at 184, 113 S. Ct. at 1173.

Section 1962(d) makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). "A 'RICO conspiracy requires evidence that [a defendant] participated in the enterprise through a pattern of racketeering activity, or agreed to do so.'" FD Prop. Holding, Inc. v. U.S. Traffic Corp., 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (quoting United States v. Tellier, 83 F.3d 578, 581 (2d Cir. 1996)); accord United States Fire Ins., 303 F. Supp. 2d at 453 ("In order to allege a conspiracy under § 1962(d), the plaintiff must assert that each defendant by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of a RICO enterprise") (internal quotation marks omitted). In order to state a claim under Section 1962(d), the complaint "should state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." FD Prop. Holding, 206 F. Supp. 2d at 373. Conclusory allegations concerning the conspiracy are insufficient. United States Fire Ins., 303 F. Supp. 2d at 453-54. Recently, in the analogous antitrust context, the Supreme Court held that stating a conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 127 S. Ct. at 1999.

### 2. Analysis

With respect to § 1962(a), the Second Amended Complaint alleges that Defendants purchased legitimate Colombian importation and distribution entities. (SAC ¶ 78.) Specifically, the Second Amended Complaint alleges that Defendants "first brought these legitimate importers/distributors to the brink of financial insolvency by selling liquor products to them for 'legitimate' importation into Colombia while at the same time dumping large volumes of product on the illegal market." (Id.) Defendants would simultaneously sell the same product to illegitimate distributors who were part of Defendants' money-laundering and tax-evasion scheme. (Id.) They made these illegal sales "with the full knowledge that the product would cannibalize the legitimate importer/distributor's sales. After driving the Colombian importer/distributor to bankruptcy, the Defendants then purchased the importing/distributing entities." (Id.) Plaintiffs identified several specific legitimate importers/distributors that Defendants purchased: Rueda; Puyana & Cia.; and Fonandes. (Id.)

Similarly, the Second Amended Complaint alleges that the Diageo and Pernod Ricard Defendants agreed to purchase certain assets and liabilities of the Seagram spirits and wine business. (Id. ¶¶ 58, 59.) "The Diageo and Pernod Ricard Defendants agreed to purchase the Seagram Spirits and Wine Division to further their illegal and anti-competitive activities" and, in doing so, "knowingly acquired a money laundering enterprise." (Id. ¶ 60.)

As a result, Plaintiffs have specifically alleged that Defendants purchased new businesses to further their money-laundering enterprise. In doing so, they "acquire[d] an interest in, or the establishment" of a RICO enterprise. 18 U.S.C. § 1962(a). The Second Amended Complaint does not appear to state explicitly that Defendants used proceeds from the RICO enterprise to

make these investments. However, given the lengthy allegations concerning the extent to which Defendants profited from the enterprise, the fact that at least some of the enterprise profits were used to make these investments can be reasonably inferred. Plaintiffs have successfully pleaded a Section 1962(a) violation.

These allegations concerning the purchase of the Colombian entities and the Seagram Spirits and Wine Division also satisfy Section 1962(b). Such allegations constitute a claim that Plaintiffs suffered "an acquisition or maintenance injury separate and apart from the injury suffered as a result of the predicate acts of racketeering[:]" Plaintiffs allege that the purchase of these businesses injured Plaintiffs by allowing Defendants to broaden and deepen the enterprise and its effects. United States Fire. Ins., 303 F. Supp. 2d at 450 (internal quotation marks omitted). Defendants argue that it is unreasonable to infer that the Diageo and Pernod Ricard Defendants' purchase of the Seagram business lines was for the purpose of furthering the RICO enterprise. (Def. RICO Rep. at 38.) Assuming *arguendo* that Plaintiffs are required to plead that the purchases were for the *purpose* of furthering the enterprise, such an inference is warranted in this case.

The Second Amended Complaint also satisfies the operation and management test and, in doing so, successfully pleads a violation of Section 1962(c). As described in detail above, Plaintiffs have alleged that Defendants, with the knowledge and support of high-level executives, have controlled the enterprise. They have accomplished this through a variety of means, including setting prices, visiting Colombia and the Caribbean, being present when the money laundering was actually occurring, and having frequent communications with other participants in the RICO enterprise. This is not a case, as Defendants argue, in which

101

Defendants are merely alleged to have provided essential goods to the enterprise, engaged in a business relationship with the enterprise, aided and abetted the enterprise, or concealed the enterprise's illegal conduct. (Def. RICO Mem. at 45.)

With respect to Section 1962(d), the Second Amended Complaint provides significant information about the conspiracy alleged. First, the purpose of the conspiracy is to use the liquor manufacturing and distribution business to launder money. The geographic scope of the conspiracy includes Colombia but extends to other countries, including Aruba and Panama. Second, Defendants are alleged to have conspired with each other as well as with every person and entity beneath Defendants on their vertical distribution chain(s). Third, the conspiracy is alleged to have begun in the early 1990s and to continue to this day. Finally, the Second Amended Complaint identifies numerous instances of communications and other activities taken in furtherance of the conspiracy.

As discussed above, there are certain aspects of the conspiracy that receive less attention in the Second Amended Complaint. Above all else, in contrast to the numerous allegations concerning Defendants' communications and control over the vertical chain through which their products are distributed, there are fewer factual assertions concerning the horizontal conspiracy amongst Defendants. Further, the allegations concerning specific transactions through which money was laundered are old and may fall outside of the statute of limitations. Even when these shortcomings are considered, however, the Second Amended Complaint adequately pleads a violation of Section 1962(d).

## C.    Proximate Cause

### 1.    Background

Defendants assert that Plaintiffs have failed to adequately plead proximate cause.[20] Under the civil RICO statute, which requires a plaintiff to establish that he was injured "by reason" of a RICO violation, 18 U.S.C. § 1964(c), Plaintiffs must establish that their injuries were proximately caused by the alleged violation. Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 265-68, 112 S. Ct. 1311, 1316-18 (1992). Proximate cause "reflects ideas of what justice demands, or of what is administratively possible or convenient" and requires "some direct relation between the injury asserted and the injurious conduct alleged." Id. at 268 (internal quotation marks omitted); see also Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 1998 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 381 (2d Cir. 2001) (Holmes "expressly warned against applying a mechanical test detached from the policy considerations associated with the proximate cause analysis at play in this case. We have accordingly turned to those policy considerations explained in Holmes to guide any application of the Court's direct relation test.") (internal citation omitted). In order to recover for a civil RICO claim, the "compensable injury flowing from a violation of [RICO] necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the

---

[20] In their initial moving brief, Defendants argued that Plaintiffs failed to allege that they had standing to bring a RICO claim. (Def. RICO Mem. at 21-22.) In their Reply brief, Defendants characterize very similar (if not identical) arguments as an assertion that Plaintiffs have failed to allege proximate cause. (Def. RICO Rep. at 14-15.) As a result, the court will treat this argument as a proximate cause argument.

commission of those acts in connection with the conduct of an enterprise." <u>Anza</u>, 126 S. Ct. at 1996 (internal quotation marks omitted).

There is significant uncertainty in the case law as to the RICO proximate cause requirement. <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 284 (2d Cir. 2006). It is clear, however, that the proximate cause element has a different meaning in the RICO context than it does in the common law context:

> At common law, so long as the plaintiff category is foreseeable, there is no requirement that the risk of injury to the plaintiff, and the risk of the harm that actually occurred, were what made the defendant's actions wrongful in the first place. With statutory claims, the issue is, instead, one of statutory intent: was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the "mischief" the statute sought to avoid.

<u>Id.</u> (internal quotation marks and citation omitted).

Further, "when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 769 (2d Cir. 1994); <u>see also</u> <u>Amsterdam Tobacco Inc. v. Philip Morris Inc.</u>, 107 F. Supp. 2d 210, 218-20 (S.D.N.Y. 2000) (dismissing civil RICO claim on the ground that intervening factors were the proximate cause of plaintiffs' injuries). As the Supreme Court has explained, in certain cases, civil RICO claims are barred when it is difficult to "ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other independent factors" such as "poor business practices or [plaintiff's] failure[] to anticipate developments in the financial markets." <u>Holmes</u>, 503 U.S. at 269-73, 112 S. Ct. at 1318-20.

## 2.   Analysis

Defendants argue that Plaintiffs have failed to plead proximate cause as a matter of law because (1) Plaintiffs have not alleged a sufficient causal connection between Defendants' money laundering and the injury they suffer, (2) the alleged connection between money laundering and Plaintiffs' lost sales is too speculative, and (3) intervening acts break the causal chain between money laundering and Plaintiffs' lost sales. (Def. RICO Rep. at 14-26.) For the reasons discussed below, these arguments fail.

### (a)   *Direct and Non-Speculative Causal Connection*

First, Plaintiffs have sufficiently alleged that their injuries were caused by the stated predicate acts. Defendants argue that "the products with which the Departmental monopolies' products allegedly compete are the *smuggled* liquor products, not the laundered money, and thus it is only the smuggling that could even conceivably cause competitive harm." (Def. RICO Rep. at 18.) Defendants cite this court's <u>Amazonas</u> decision in support. In considering a money laundering claim that was similar to the instant claim, this court explained that:

> On the pleadings, the only apparent connection between the injury alleged and the allegations of money laundering is the harm visited by money laundering as a link in the smuggling chain. . . .
>
> . . . .
>
> Stripped of the harms suffered from smuggling, the complaint offers no additional, distinct causal connection between the allegations of money laundering and the injuries asserted. Simply put, Plaintiffs' complaint attacks a smuggling scheme. The money laundering claims are merely asserted as part of the overarching claims of injury from smuggling. Deprived of that context, Plaintiffs' particular money laundering claims lose all connection to the injuries alleged. While there may yet exist a discreet connection between money laundering and harm suffered by Plaintiffs, this court cannot divine that connection.

105

Amazonas, 186 F. Supp. 2d at 243. As both parties have stated in their motion papers, and the published European Community cases make clear, the European Community cases, including Amazonas, primarily addressed smuggling claims as opposed to money laundering claims. Further, the Amazonas opinion makes clear that a causal connection between money laundering and the European Community plaintiffs might exist. Certainly, this court's initial decision in European Community to dismiss the money laundering claims without prejudice makes clear that the plaintiffs should have been given an opportunity to re-plead the causation element of their civil RICO claim. See Amazonas, 186 F. Supp. 2d at 245 ("Plaintiffs' RICO and common law claims predicated on Defendants' money laundering transactions are DISMISSED without prejudice to replead.").

In this case, the allegations concerning money laundering are far better developed than they were in Amazonas. The Second Amended Complaint states that Defendants' laundering of narcotics proceeds and the associated mail and wire fraud enabled Defendants to sell their liquor at lower prices (the money-laundering discount) which, in turn, caused Plaintiffs to lose profits and revenues. Although this is a close case that falls somewhere in between the Supreme Court's decision in Anza v. Ideal Steel Supply Corp. and the Second Circuit's decision in Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc., this case falls closer to Commercial Cleaning and, as a result, Plaintiffs have adequately pled a direct and non-speculative relationship between Defendants' money-laundering enterprise and Plaintiffs' injury.

In Anza, the Supreme Court held that a manufacturer of steel mill products failed to plead the proximate cause element of a civil RICO claim when it alleged that a competitor had harmed it by repeatedly failing to pay taxes. Anza, 126 S. Ct. at 1996-99. The plaintiff had

asserted that, by evading sales taxes through an enterprise engaged in mail and wire fraud, the defendants reduced their prices without altering their profit margin. Id. at 1994. The Court concluded that the "[t]he cause of [plaintiff's] asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." Id. at 1997. The court cited several factors in reaching the conclusion that no proximate cause existed: (1) New York State, which was defrauded of its sales taxes, was a direct victim of the enterprise, whereas the plaintiffs were not "direct" victims; (2) it would be very difficult to determine the extent to which the defendants' decrease in prices resulted from the defendants' tax evasion rather than other, independent reasons; (3) the fact that the defendants committed tax evasion did not necessarily mean that they would reduce their prices—they could have kept some of the money resulting from the tax evasion as profit or re-invested it into their corporation; (4) plaintiff's lost sales could have resulted from some fact other than tax evasion; (5) requiring a direct causal connection is "especially warranted" where the directly injured victim—the State of New York—"can be expected to vindicate the laws by pursuing its own claims;" and (6) it would be far easier to adjudicate a claim brought by the State of New York because it would require a simple calculation of the amount of the tax evasion. Id. at 1996-98; see also Gelt Funding, 27 F.3d at 770-72 (lender's civil RICO claim alleging it was fraudulently induced to make nonrecourse loans by intentionally inflated real estate valuations dismissed for failure to plead proximate cause where (1) the magnitude of the overstatement was unclear because the methodologies used by the plaintiff were faulty and (2) five-year interval between the plaintiff's losses and the defendants' misrepresentations coupled with the collapse of the real

estate market at that time meant the nexus between the misrepresentation and the injury was too tenuous).

In Commercial Cleaning, the Second Circuit held that the plaintiffs had adequately plead the proximate cause element of a civil RICO claim where they alleged that the defendant obtained an unfair business advantage over its competitors in the cleaning services industry by knowingly hiring "[h]undreds of illegal immigrants at low wages." Commercial Cleaning, 271 F.3d at 378-79, 380-85. Specifically, the plaintiffs alleged that the defendant's hiring of illegal immigrants permitted them to out-bid the plaintiffs on a lucrative cleaning contract to clean a specific facility. Id. at 379. As Commercial Cleaning was decided before Anza, the Commercial Cleaning court based its analysis on three factors cited in Holmes:

> First, the less direct an injury is, the more difficult it becomes to determine what portion of the damages are attributable to the RICO violation as distinct from other, independent, factors. Second, if recovery by indirectly injured plaintiffs were not barred, courts would be forced, in order to prevent multiple recovery, to develop complicated rules apportioning damages among groups of plaintiffs depending on how far each group was removed from the defendant's underlying RICO violation. Third, there was no need to permit indirectly injured plaintiffs to sue, as directly injured victims could be counted on to vindicate the aims of the RICO statute, and their recovery would fix the injury to those harmed as the result of the injury they suffered.

Id. at 381-82 (citations to Holmes omitted). The Commercial Cleaning court applied the three Holmes factors as follows: (1) although defendants may be able to argue that they won the head-to-head bid for the Pratt & Whitney contract for a variety of reasons other than the defendants' hiring of illegal immigrants (e.g., by providing higher quality services or having a better reputation), "the plaintiffs may well show that they lost contracts directly because of the cost savings defendant realized through its scheme to employ illegal workers;" (2) there was no risk

that defendants would have to compensate multiple plaintiffs for the same injuries because each plaintiff would have to prove that defendant's hiring of illegal immigrants was the "but-for" cause of its losing a given contract; and (3) there was no other individual who was injured more directly than plaintiffs and could be counted on to bring a civil RICO claim to deter such conduct. Id. at 382-85.

The instant case is similar to <u>Commercial Cleaning</u> in that there is no person who has been injured more directly than Plaintiffs. As a result, if Plaintiffs are not permitted to bring the instant claim, it would appear that Defendants' money-laundering enterprise would not give rise to an actionable civil RICO claim. See <u>Commercial Cleaning</u>, 271 F.3d at 385 ("There is no class of potential plaintiffs who have been more directly injured by the alleged RICO conspiracy than the defendant's business competitors, who have a greater incentive to ensure that a RICO violation does not go undetected or unremedied, and whose recovery would indirectly cure the loss suffered by these plaintiffs."). Defendants assert that Colombian tax authorities are directly injured by the alleged enterprise in the same way that New York State was directly injured in <u>Anza</u>. (Def. RICO Rep. at 28.) Defendants are certainly correct with respect to Plaintiffs' claims for lost taxes. As discussed above, such claims are being dismissed because they are barred by the revenue rule. With respect to Plaintiffs' money-laundering claims, however, Colombian tax authorities do not appear to be a victim. Defendants do not point to any financial harm that Colombian tax authorities suffer as a result of the money-laundering enterprise. Defendants argue only that "[j]ust as with tax laws, the Republic would be expected to enforce its own currency laws and would be the direct victim." (<u>Id.</u>) Defendants' argument fails because Plaintiffs are alleging that they have been injured by Defendants' violation of United

States money laundering laws as opposed to Colombia currency laws.[21]  In this way, the case is distinguishable from Anza, where there was a third-party—the state—that directly lost tax revenues as a result of the defendants' tax evasion and, as a result, was better suited to bring a civil RICO claim.

Congress has classified intranational and international money laundering as a predicate act that can give rise to RICO liability.  See European Community I, 355 F.3d at 133-35 (describing how the Patriot Act amended RICO to add additional money-laundering predicate acts).  In doing so, Congress clearly created a private RICO cause of action predicated on money laundering.  It is conceivable that, in contrast to the context of tax evasion addressed in Anza, in many money-laundering cases, a competitor of the defendant is the person that is most likely to be directly injured as a result of the money laundering.  After all, other participants in the defendant's distribution chain are likely to benefit from the defendant's money laundering:  the drug dealers obtain the benefit of having their money laundered; at best, consumers may benefit from cheaper prices resulting from the narco-laundering discount and, at worst, consumers should not be harmed.  In considering whether Plaintiffs have pled proximate cause, the Second Circuit requires this court to make the following determination:  "was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the 'mischief' the statute sought to avoid[?]"  Abrahams v. Young & Rubicam Inc., 79 F.3d 234, 237 (2d Cir. 1996).  Certainly, the instant claims appear to be well

---

[21] In a footnote, Defendants argue that "the United States is another entity that could be expected to pursue these Defendants." (Def. RICO Rep. at 28.)  Although the United States could bring a criminal case against Defendants, the United States has not suffered a direct financial injury in the way that the State of New York had in Anza.

within Congress's core purpose in creating a RICO cause of action predicated on money laundering.

This case does, however, appear to fall closer to <u>Anza</u> than <u>Commercial Cleaning</u> in one respect: the instant claims will require the factfinder to sort out the extent to which Plaintiffs' losses result from money laundering as opposed to other factors. Plaintiffs' revenues and profits are directly related to the quantity of goods sold and the price at which they are sold. The price and quantity figures are, in turn, potentially based on a wide variety of factors, including consumer preferences, the extent of tax evasion, the extent of money laundering, manufacturing and shipping costs, effectiveness of Plaintiffs' management of their liquor businesses, and the values of United States Dollars and Colombian Pesos. As the Supreme Court explained in <u>Anza</u>, sorting out what portion of a plaintiff's losses resulted from a defendant's illegal acts can be difficult, particularly when the plaintiff and defendant are competitors:

> The injury [plaintiff] alleges is its own loss of sales resulting from [defendant's] decreased prices for cash paying customers. [Defendant], however, could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud. It may have received a cash inflow from some other source or concluded that the additional sales would justify a smaller profit margin. Its lowering of prices in no sense required it to defraud the state tax authority. Likewise, the fact that a company commits tax fraud does not mean the company will lower its prices; the additional cash could go anywhere from asset acquisition to research and development to dividend payouts.

> There is, in addition, a second discontinuity between the RICO violation and the asserted injury. [Plaintiff's] lost sales could have resulted from factors other than petitioner's alleged acts of fraud. Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost sales were the product of [defendant's] decreased prices. . . .

. . . .

> Further illustrating this point is the speculative nature of the
> proceedings that would follow if [plaintiff] were permitted to
> maintain its claim. A court considering the claim would need to
> begin by calculating the portion of [defendant's] price drop
> attributable to the alleged pattern of racketeering activity. It next
> would have to calculate the portion of [plaintiff's] lost sales
> attributable to the relevant part of the price drop. The element of
> proximate causation recognized in Holmes is meant to prevent
> these types of intricate, uncertain inquiries from overrunning
> RICO litigation. It has particular resonance when applied to
> claims brought by economic competitors, which, if left unchecked,
> could blur the line between RICO and the antitrust laws.

Anza, 126 S. Ct. at 1997-98.

In this same sense, the instant case is distinguishable from Commercial Cleaning where

the plaintiff was claiming that defendants' hiring of illegal immigrants at very low wages

permitted them to reduce their prices and, in doing so, secure a specific cleaning services

contract with Pratt & Whitney. The Second Circuit explained that determining causation and

damages is simpler in the context of head-to-head bidders:

> Where, as here, the parties have bid against each other, the
> difference between the lowest and second lowest bid is readily
> discoverable. If [plaintiff] can prove that but for [defendant's]
> lower wage costs attributable to its illegal hiring scheme,
> [plaintiff] would have won the contract and would have earned a
> profit on it, it will have shown a proximately caused injury,
> compensable under RICO.

Commercial Lending, 271 F.3d at 382-83. Proving causation and damages will most likely be

far more difficult in the instant case than in the head-to-head bidding context of Commercial

Lending.

Even though this case may fall closer to Anza than to Commercial Lending with respect

to how difficult it will be to prove causation and damages, dismissal at this time is not

112

appropriate. As discussed above, (1) Plaintiffs state a reasonably direct claim that Defendants'

illegal money-laundering enterprise caused Plaintiffs to lose revenues and sales and (2) there is

no more direct plaintiff to bring a civil RICO claim against Defendants. At this early stage of

the litigation, it is not possible to determine that, as a matter of law, Plaintiffs will not be able to

prove to a reasonable degree of certainty that Defendants' money laundering caused Plaintiffs to

lose revenues and profits. At this time, the court has no way of knowing what facts will emerge

in discovery or what methodologies the parties' experts will use to prove and disprove damages.

For instance, it is entirely possible that Defendants possess market analyses that reach

conclusions as to the effects of key market variables, such as consumer preferences, Colombian

taxes, and elasticity of demand. To the extent Plaintiffs simply seek to use Defendants' real-time

market analyses, it may be very simple for Plaintiffs to prove at least some level of damages.

Similarly, it very well may be that Plaintiffs' and Defendants' experts share key assumptions or

methodologies that greatly simplify many of the problematic issues raised in Anza.[22]

---

[22] Defendants' reliance on First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 2004), is misplaced. In that case, the Second Circuit held that a civil RICO case alleging that a lender was fraudulently induced to make loans on the basis of intentionally inflated valuations should be dismissed under Rule 12(b)(6) because the plaintiff failed to plead proximate cause. Id. at 769-72. Gelt Funding is distinguishable on a number of grounds. First, the Second Circuit appeared to require the plaintiff to plead a methodology for calculating damages that was far more specific than is typically required on a Rule 12(b)(6) motion because the plaintiffs had lost money on real estate loans in the midst of a crash in the real estate market: "Given the complexity of the New York real estate market, and the fact that [plaintiff's] losses came in the wake of a downturn in the real estate market, [plaintiff] must allege loss causation with sufficient particularity such that we can determine whether the factual basis for its claim, if proven, could support an inference of proximate cause." Id. at 770. The court ultimately concluded that "[t]he methodology employed by [plaintiff] in determining the magnitude of the defendants' alleged[ly fraudulent] overstatements of income is so defective, and the conclusions reached so defy logic, that no 'reasonable inferences' can be drawn therefrom." Id. at 772. Here, there is no reason to require Plaintiffs to plead a specific methodology for proving causation and damages and, thus, the Plaintiffs are entitled to the benefit of all reasonable inferences. Second, in Gelt Funding, there was a five-year difference between the time of the alleged misstatements and the time of

### (b)    Intervening Acts

Defendants argue that the following intervening acts break the chain of causation

between Defendants' alleged conduct and Plaintiffs' injuries:

> (1) [T]he Republic creating Duty-Free Ports and Special Customs
> Regime Areas ("SCRAs") out of which liquor products can
> easily—and often legally—be brought into the interior of
> Colombia without payment of taxes; (2) the importers' selling
> liquor products to customers in Colombia's Duty-Free Ports and
> SCRAs; (3) the customers in the Duty-Free Ports and SCRAs
> smuggling the products or selling to others who smuggle the
> products into the interior of Colombia; (4) the custom agents
> overlooking or facilitating the smuggling of liquor products; (5)
> the Colombian distributors transporting smuggled liquor products
> throughout Colombia; (6) the retailers selling smuggled liquor
> products to retail customers in Colombia; (7) the retail customers
> choosing not to purchase Plaintiffs' products; (8) the business
> practices of the Departmental monopolies that may adversely
> impact their ability to compete; and (9) the Republic's
> protectionist policies, such as monopolies and high taxes, which
> create incentives to smuggle liquor products.

(Def. RICO Mem. at 26-27.)

Several of these so-called "intervening" acts (1, 4, and 9) are nothing more than tax and

money laundering laws and law-enforcement policies and practices.  Defendants have not cited

and this court is not aware of any precedent that stands for the proposition that an actor—such as

a RICO enterprise—that engages in tax evasion or money laundering is not the proximate cause

of injuries resulting from the evasion or laundering because the government whose laws are

---

the losses whereas, in the instant case, the losses are alleged to occur more or less
contemporaneously.  Id.  Finally, in Gelt Funding, the Second Circuit pointed to the real estate
crash that had occurred in the relevant market during the relevant five-year period as an
intervening factor that tended to disrupt any inference of proximate causation.  Id.  In the instant
case, Defendants have not pointed the court to any intervening variable of even remotely similar
magnitude.

being violated "intervened" by not enacting optimal laws or not enforcing the laws that are being broken in an optimal way (or in the way that the actor believes is optimal). In effect, Defendants are arguing that they should not be liable because Defendants have enacted and enforced laws in such a way as to create economic incentives to violate the laws. This line of argument is without precedent and, without question, fails.

Several of the "intervening" acts to which Defendants point involve distributors and middle-men smuggling and selling the liquor after Defendants sell it to them. Defendants cite Amsterdam Tobacco Incorporated v. Philip Morris Incorporated for the proposition that such smuggling and sales constitute intervening acts. (Def. RICO Mem. at 27-29.) In Amsterdam, the plaintiffs alleged that the defendant, Philip Morris, was a member of a RICO enterprise engaged in the following scheme: Philip Morris sold cigarettes to Virginia distributors; the distributors then smuggled the cigarettes to other states with cigarette taxes that are higher than those in Virginia; the distributors then sold the cigarettes to consumers in high-tax states without paying the higher cigarette taxes. Amsterdam, 107 F. Supp. 2d at 212-13. The district court granted summary judgment for the defendant, finding, *inter alia*, that the plaintiffs had failed to create a material question of fact as to whether the defendant had participated in the alleged enterprise and that the plaintiffs' injuries were proximately caused by the defendant's conduct. Id. at 216-20. The defendant did not participate in the RICO enterprise because the defendant did not "play[ ] a part by operating or managing [the enterprise's] affairs, either by being part of upper management or by exerting control over the enterprise." Id. at 216. As a result, all of the sales that occurred downstream of the defendant constituted independent acts that intervened in the chain of causation between the defendant's initial sale of the goods and the ultimate purchase

of the goods by the consumer. Id. at 218-20 ("The (direct) cause of Plaintiffs' lost profits was not any activity of Philip Morris'. Rather, the 'but for' cause of Plaintiff's alleged loss was, among other things, the smuggling activity and the decision by New York consumers not to purchase cigarettes from Plaintiffs."). The court also found that, as the Supreme Court did in Anza, when "the primary purpose of an alleged racketeering enterprise is to avoid paying taxes or otherwise defraud the government, indirectly injured parties do not have standing to bring RICO claims." Id. at 219.

In contrast to Amsterdam, the instant Plaintiffs allege that Defendants are actively managing an enterprise that is engaged in smuggling and downstream sales. The Second Amended Complaint alleges that "Defendants controlled every aspect of the financial transactions involving the purchase of their liquor products. The Defendants also controlled the exact methods and means by which they were paid for the liquor products." (SAC ¶ 28.) "Defendants also dictated that their criminal customers route payments to them through intermediary distributors, shippers, and other cut outs. This procedure, known in money-laundering jargon as 'layering,' is conducted for the sole purpose of concealing the payments' true source from Colombian and United States law enforcement." (Id. ¶ 29.) Defendants' distributors "maintained [distribution] channels according to specific instructions from the Defendants, which included special handling instructions for shipments designated for Colombian customers that the Defendants knew were involved in criminal activities." (Id. ¶ 30.) Defendants' representatives would visit Colombian customers along with distributors "so as to keep a close eye on the market." (Id.)

Because Defendants' actively managed the enterprise, unlike <u>Amsterdam</u>, Defendants may very well have managed, directed, and/or controlled downstream sales, particularly downstream sales to and by cut outs that Defendants were involved in creating for the exclusive or primary purpose of laundering money. Because Plaintiffs are entitled to every reasonable inference, the Second Amended Complaint's allegation that "Defendants controlled every aspect of the financial transactions involving the purchase of their liquor products" constrains this court to find that, for purposes of this motion, Defendants controlled the entire distribution system up to and including the actual sale to the ultimate consumer.[23] As a result, in contrast to <u>Amsterdam</u>, Plaintiffs have successfully alleged that there were no intervening acts between their Defendants' conduct and Plaintiffs' injury.

### D.     Predicate Acts

The Second Amended Complaint alleges four types of predicate acts: money laundering; wire fraud; mail fraud; and violation of the Travel Act. Defendants argue that the Second Amended Complaint fails to plead adequately each of these predicate acts. Each predicate act will be considered in turn.

### 1.     Money Laundering

Plaintiffs allege the predicate act of money laundering under both 18 U.S.C. §§ 1956 and 1957. Section 1956 requires that:

---

[23] It is not entirely clear that Plaintiffs need to establish that Defendants controlled every sale in the distribution chain in order to recover: if Plaintiffs establish that Defendants controlled a sale to a distributor located in whole or in part in Colombia, Plaintiffs may be able to show that the enterprise caused Defendant to lose revenues and/or profits. At this time, the parties have not briefed this issue and there is no reason for the court to reach it.

> (1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing or disguising the nature, the location, the source, the ownership or the control of the illegally acquired proceeds.

Bernstein v. Misk, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997) (internal quotation marks omitted); see also United States v. Maher, 108 F.3d 1513, 1527-28 (2d Cir. 1997). Section 1957 requires that the defendant "(1) knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specific criminal activity." Bernstein, 948 F. Supp. at 236 n.2.

Defendants argue that the Second Amended Complaint fails to allege money laundering as a predicate act because (1) Plaintiffs have failed to state that Defendants were furthering a specified unlawful activity, and (2) Plaintiffs have failed to state intent or knowledge. (Def. RICO Mem. at 51-56.) Defendants also argue that the allegations concerning these points were conclusory. (Def. RICO Rep. at 42-45.)

The Second Amended Complaint contains numerous allegations that Defendants had actual knowledge and intent and that Defendants were furthering illegal narcotics trafficking. Defendants "have directed, managed, and controlled a criminal scheme . . . by knowingly selling their products into illegal channels and receiving payment in the form of laundered proceeds from narcotics sales and other criminal activities[.]" (SAC ¶ 2.) "Defendants knowingly sell their products to organized crime, arrange for secret payments from organized crime, and launder such proceeds in the United States or offshore venues known for bank secrecy." (Id. ¶

4.) "Defendants created a circuitous and clandestine distribution chain so as to sell their liquor to criminal organizations and to receive payment for their products with criminal proceeds while at the same time concealing their activities from Colombian and U.S. law enforcement." (Id. ¶ 27(a).)

Defendants' employees traveled to Aruba to meet with narcotics traffickers and, at such meetings, Defendants' "distributors and criminal customers explained the criminal nature of the business in great detail including that narcotics proceeds were utilized to pay for the liquor. . . . In spite of these detailed explanations of the criminal nature of the liquor sales, all these Defendants continued not only to conduct this business but to take all possible steps to expand this business." (Id. ¶ 27(h).) The Second Amended Complaint describes the types of communications that Defendants had with their distributors concerning the Defendants' entire distribution chain(s) and avers that, "[i]n this way, the Defendants knew who their ultimate customers were and knew that they were receiving criminal proceeds in payment for their products." (Id. ¶ 27(I).) "Since at least 1991, all the Defendants were selling liquor to individuals whom they knew were reputed narcotics traffickers."[24] (Id. ¶ 27(n).)

Defendants were aware that their Aruban distributors used numerous corporate entities to conceal the source of their funds: "Defendants, aware of the artifice and design of the Aruban distributors and the need to disguise the nature, source and origin of the narcotics and other criminal proceeds they were receiving, adapted themselves to and received payment continually

---

[24] Although ¶ 27(n) states at one point that Defendants 'knew or should have known' that one individual was a narcotics trafficker and that he used certain companies for money laundering, this paragraph also alleges that Defendants had actual knowledge that some of their customers were narcotics traffickers.

from these various [cut out] companies and the accounts they held." (<u>Id.</u> ¶ 27(q).)  In fact,

"Defendants structured their payment schemes to maximize their own security from detection by

United States and Colombian law enforcement." (<u>Id.</u> ¶ 29.)  "Defendants also dictated that their

criminal customers route payments to them through intermediary distributors, shippers, and other

cut outs." (<u>Id.</u>)  With respect to the Colombian money-laundering transactions, intermediaries

included Romar, Transimex, Licores Aruba, and brokers in Colombia, such as Victor Ojeda and

Samuel Santander Lopesierra. (<u>Id.</u>)  Defendants' employees would visit storage and distribution

companies that were organized along product lines and would accompany representatives of

such companies on trips to visit Colombian customers. (<u>Id.</u> ¶ 30.)  On such trips, Colombians

would gain knowledge about the source of the illegal narcotics proceeds that they were

receiving. (<u>Id.</u>)

Defendants correctly cite <u>Casio Computer Co., Ltd. v. Sayo</u>, No. 98-cv-3772 (WK), 2000

WL 1877516, at *17 (S.D.N.Y. Oct. 13, 2000) and <u>Bernstein</u>, 948 F. Supp. at 236 n.2, for the

proposition that a money-laundering claim cannot be plead with wholly conclusory allegations.

Here, however, the Second Amended Complaint provides substantial facts concerning the

alleged money laundering:  Defendants laundered the proceeds from illegal United States

narcotics sales; at least some of the drug traffickers whose funds were being laundered are

specifically identified; specifics as to the money-laundering process are provided, including how

smurfs deposit funds in bank accounts and how various corporate entities are utilized for the

purpose of concealing the nature of the transactions; Defendants learned of the source of the

funds that they were receiving through their employees' trips to Aruba and Colombia and

through close supervision of their distribution chain.  Defendants are correct that the Second

Amended Complaint fails to provide significant specifics as to each Defendant's money-laundering acts. Because, however, Plaintiffs allege that each of the Defendants is engaged in the same enterprise and each of the Defendants utilizes identical tactics, this defect is not fatal. The Second Amended Complaint adequately pleads money-laundering predicate acts.

### 2.     Travel Act Violation

In order to prove violation of The Travel Act, 18 U.S.C. § 1952, the plaintiff must show (1) travel in or use of the mail or any facility of interstate or foreign commerce, (2) "intent to 'facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,'" and (3) performance of "an additional act in furtherance of the specified unlawful activity." United States v. Jenkins, 943 F.2d 167, 172 (2d Cir. 1991) (quoting 18 U.S.C. § 1952(a)).

Other than this enumeration of the elements of a violation of The Travel Act, Defendants primarily cite cases outside the Second Circuit for a description of the scope of The Travel Act and the elements of a Travel Act violation. Plaintiffs have not argued that the cases from outside of the Second Circuit are inconsistent with Second Circuit case law. The court assumes, for purposes of this motion, that the cases cited by Defendants are consistent with Second Circuit case law. The Seventh Circuit has held that "in a Travel Act prosecution, the interstate travel or use must relate significantly, rather than incidentally or minimally, to the illegal activity." United States v. McNeal, 77 F.3d 938, 944 (7th Cir. 1996) (internal quotation marks omitted); see also United States v. Archer, 486 F.2d 670, 685 (2d Cir. 1973) ("[T]he overriding Congressional purpose [of The Travel Act] was to permit federal government to act against members of organized crime whose activity crossed state lines when local law enforcement officers were unable or unwilling to do so—not to extend federal power to deal with corruption

in local prosecutors' offices by affording the corrupters an opportunity to use interstate or foreign telephone facilities in dealing with an undercover agent on any such 'casual and incidental basis' as here.") (quoting United States v. Corallo, 413 F.2d 1306, 1325 (2d Cir. 1969)).

The Ninth Circuit has held that the mens rea element of The Travel Act requires the plaintiff to show that the defendant "in some significant manner associated himself with the . . . criminal venture for the purpose of its advancement." United States v. Gibson Specialty Co., 507 F.2d 446, 449 (9th Cir. 1974). The Fifth Circuit has held that in order to state a Travel Act claim on the basis of an illegal narcotics business, the plaintiff must allege a narcotics "business enterprise" within the meaning of 18 U.S.C. § 1952(b), which requires a "continuous course of conduct" as opposed to "sporadic casual involvement in a proscribed activity." United States v. Davis, 666 F.2d 195, 202 n.10 (5th Cir. 1982).

Defendants argue that the Second Amended Complaint fails to state a violation of The Travel Act because (1) the allegations are conclusory, (2) the conduct that is alleged to violate The Travel Act is "merely incidental" to the overall scheme, (3) intent is not adequately alleged, and (4) the stated connection between the conduct that violates The Travel Act and the narcotics trafficking is "only sporadic." (Def. RICO Mem. at 56-58.) Each argument will be considered in turn.

First, the Second Amended Complaint adequately alleges specific foreign travel. Two categories of trips are most notable: (1) Defendants' employees' trips to Aruba to meet with Defendants' distributors and criminal customers for the purpose of negotiating liquor prices and at which Defendants were advised that proceeds of narcotics sales were used to pay for the liquor

(SAC ¶ 27(h)); and (2) Defendants' employees trips to Colombia for the purpose of monitoring Defendants' distribution chain, during which Defendants' employees on multiple occasions observed large amounts of cash changing hands (Id. ¶ 27(g)). The allegations include specific facts about these trips, including the names of some of the individuals who participated in them and the substance of the discussions held. Such allegations are not conclusory. (Id. ¶¶ 27(g), (h).)

Second, these same two categories of trips are essential to the overall scheme. The alleged enterprise includes the entire chain through which Defendants' liquor is distributed to Colombia, and managing such an enterprise would ordinarily require significant foreign travel. The travel alleged in this case included a negotiation of prices (and, hence, the money-laundering discount) and an exchange of substantive information about the scope of the scheme. Such travel is in no way incidental to the enterprise.

Third, as described in Section IX(F)(1) above, the Second Amended Complaint adequately alleges that Defendants had the requisite intent because Defendants are alleged to have (1) actively managed the enterprise and (2) knowingly received the proceeds of illegal narcotics sales.

Finally, the alleged money-laundering enterprise is claimed to have begun operating in the early 1990s and to have operated continuously through the filing of the complaint. As a result, it is a "continuous course of conduct" as opposed to "sporadic casual involvement." See Davis, 666 F.2d at 202 (Travel Act conviction upheld even where, although only one narcotics transaction was proved, the evidence showed that two individuals "had for some time engaged in a continuous business relationship in illegal drug trafficking").

### 3.  Mail and Wire Fraud

"'[A] complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme.'" Leung v. Law, 387 F. Supp. 2d 105, 115-16 (E.D.N.Y. 2005) (Garaufis, J.) (quoting S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996)). In order to state a RICO claim on the basis of wire or mail fraud, "[t]he use of the mails need not be essential to the fraudulent scheme as long as the mailing is incident to an essential part of the scheme." Id. at 116 (quotation marks omitted). Fraud "require[s] a misrepresentation or concealment of *material* fact." Neder v. United States, 527 U.S. 1, 22, 119 S. Ct. 1827, 1840 (1999) (emphasis in original). In the Second Circuit, a civil RICO plaintiff asserting a predicate act of mail or wire fraud must also show that the plaintiff or a third party relied upon the fraud. Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 257-64 (2d Cir. 2004), rev'd in part, vacated in part by, 126 S. Ct. 1991 (2006) (the Second Circuit has "accepted the principle that a RICO claim based on mail fraud may be proven where the misrepresentations were relied on by a third person, rather than by the plaintiff").[25] Irrespective of who relied on the fraud, the plaintiff must have been injured as a proximate result of the fraud in order to recover. Id. ("[A] plaintiff who is injured as a proximate

---

[25] In Anza, the Supreme Court specifically declined to reach the question of whether a RICO plaintiff had to show reliance. Anza, 126 S. Ct. at 1998 ("Because Ideal has not satisfied the proximate-cause requirement articulated in Holmes, we have no occasion to address the substantial question whether a showing of reliance is required."). As a result, this court remains bound by the Second Circuit's holding in Anza that a RICO plaintiff must show reliance by the plaintiff or a third party.

result of fraud should be able to recover regardless of whether he or a third party is the one deceived") (quotation marks omitted).

In most cases, mail and wire fraud predicate RICO acts are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. E.g., Moore v. PaineWebber, Inc., 189 F.3d 165, 172-73 (2d Cir. 1999); McLaughlin v. Anderson, 972 F.2d 187, 190-91 (2d Cir. 1992). Generally, "[i]n the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Moore, 189 F.3d at 173 (internal quotation marks omitted). The complaint "must also identify the purpose of the mailing within the defendant's fraudulent scheme." Id. (quotation marks omitted). "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation marks omitted).

The parties dispute how Rule 9(b) should be applied in this case. Plaintiffs point to several district court decisions in this Circuit in which courts confronted with allegations of mail or wire fraud in the context of an underlying scheme have required only a particularized description of the underlying scheme and its connection to the mail or wire fraud. See In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998) ("In cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud . . . . a detailed description of the underlying scheme and the connection therewith of the mail and/or

wire communications, is sufficient to satisfy Rule 9(b)"); <u>Spira v. Nick</u>, 876 F. Supp. 553, 559 (S.D.N.Y. 1995) ("we do not regard mailings in furtherance of the scheme, but which are not themselves false or misleading, as 'averments of fraud' within the language of Rule 9(b)"); <u>Giuliano v. Everything Yogurt, Inc.</u>, 819 F. Supp. 240, 244 (E.D.N.Y. 1993) ("the complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used[.]") (quotation marks omitted).

Defendants point to the fact that, in <u>Leung v. Law</u>, this court held as follows: "In order to satisfy the particularity standard set forth in Rule 9(b), a plaintiff's complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" <u>Leung</u>, 387 F. Supp. 2d at 112 (<u>quoting</u> <u>Anatian v. Coutts Bank (Switz.) Ltd.</u>, 193 F.3d 85, 88 (2d Cir. 1999)). In <u>Leung</u>, however, this court was not confronted with the argument that, in cases where a mail or wire fraud scheme was alleged in detail, communications that traveled via mail and/or wire need only to be alleged with less particularity.

As Judge Kaplan explained in <u>Spira</u>:

> [I]t is difficult to see any useful purpose in requiring that a RICO complaint specifically allege each mailing in furtherance of a complex commercial scheme, at least where, as here, the complaint alleges that numerous mailings of particular kinds were made in furtherance of the scheme. Once the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls.

Spira, 876 F. Supp. at 559 (internal footnote omitted). The same is largely true in this case: irrespective of whether the fraud predicate acts are dismissed at this time, the court has found that Plaintiffs have adequately stated a claim against Defendants predicated on laundering proceeds of illegal narcotics traffickers; it is not clear to this court how Defendants suffer greater reputational harm if they have to face an allegation that, somewhere in the midst of this elaborate money-laundering scheme, Defendants made a fraudulent wire or mail communication. Further, irrespective of whether the money laundering predicate acts are dismissed, Plaintiffs will be entitled to seek discovery about the money-laundering scheme, including communications that occurred through mail and wires and Defendants' understanding of such communications. As a result, it does not appear that declining to dismiss the fraud predicate acts will in any way reduce the very substantial discovery costs that this case forces Defendants to bear. In any event, as discussed below, even under the Rule 9(b) pleading standard, the court finds that the Second Amended Complaint adequately pleads the fraud predicate acts.

Defendants argue that the Second Amended Complaint fails to plead predicate acts of wire and mail fraud because: (1) the fraud identified in the Second Amended Complaint is not alleged to be essential to the overall scheme; (2) there is no allegation that Plaintiffs or some third party reasonably relied upon the fraudulent statements; (3) the Second Amended Complaint fails to particularize which Defendants committed which tortious conduct; (4) Plaintiffs fail to identify which Plaintiffs were the victim of which fraud; and (5) fraudulent intent has not been adequately plead.[26] Each argument will be considered in turn.

---

[26] Defendants raise these arguments in two separate sections of their brief. (Def. RICO Mem. at 58-71.) In one of those sections in Defendants' moving brief, Defendants assert that the state law claims for fraud, negligent misrepresentations, conversion, money had and received, public nuisance, and unjust enrichment have not been plead with the particularity required under Fed.

First, Plaintiffs do allege fraud that is in furtherance of the scheme. Specifically, Plaintiffs allege that Defendants made false statements to Colombian authorities, including Plaintiffs, "to systematically misinform the Plaintiffs about their true role in the criminal money-laundering scheme, and to prevent the Plaintiffs from discovering the role of the Defendants in the money laundering enterprise." (SAC ¶ 27(l).[27]) In fact, Plaintiffs allege Defendants purported to fight against Colombian black markets for the purpose of deceiving Plaintiffs as to the nature of such black markets. (Id.) The Second Amended Complaint alleges that all Defendants participated in an industry association called the Colombian Association of Importers of Liquor and Wines ("ACODIL"). (SAC ¶ 44.) On June 30, 1998, ACODIL sent a letter to the Colombian Ministry of Foreign Trade entitled, "Proposal for the Fight against the Informal Market of Wine and Liquor." (Id. ¶ 45.) The alleged purpose of this proposal was to conceal Defendants' money-laundering scheme and prevent Defendants from making efforts to interfere with the scheme. (See id.) Defendants argue that the June 1998 letter cannot serve as

---

R. Civ. P. 9(b). (Def. RICO Mem. at 63.) In their Reply Brief, Defendants appear to change their position, stating that the state law fraud claim is subject to Rule 9(b)'s pleading requirements, but that the claims for negligent representation, conversion, money had and received, public nuisance, and unjust enrichment "potentially" fall under Rule 9(b). (Def. RICO Rep. at 50.) In any event, other than these blanket statements, Defendants do not address the Plaintiffs' state law claims. Defendants do not identify the elements of these state law claims or explain how the Second Amended Complaint fails to plead them. On this basis, the court denies Defendants' motion to dismiss the state law claims on Rule 9(b) grounds.

[27] Paragraph 27(l) does not explicitly state that the communications alleged therein were made through United States mail or wires. Arguably, it is possible to read this allegation in connection with the numerous allegations concerning use of United States wires and mails and, in doing so, draw a reasonable inference that at least some of the false statements made to the Colombian government were made with the use of United States wires and mails. This court, however, need not reach this question because, as discussed below, the Second Amended Complaint contains numerous other allegations that specifically cite to use of the United States wires and mail.

128

the basis for a mail or wire fraud claim because the Second Amended Complaint does not explicitly state that this letter was sent through U.S. mails or wires. (Def. RICO Rep. at 52 n.56.) However, this court must read the allegations concerning this letter along with (1) the allegation that Defendants participated in hundreds of telephone conversations and faxes through U.S. wires and mails in furtherance of the scheme "on virtually a daily basis" (SAC ¶ 122) and (2) the allegation that all of the Defendants had "External Affairs" divisions of their corporations for the purpose of lobbying the Colombian government and concealing their illegal activities (id. ¶¶ 79-80). When these allegations are considered collectively, it is clear that Plaintiffs have adequately alleged that Defendants used the U.S. wires and mails to communicate with each other and Colombian government officials in order to fraudulently conceal their enterprise.

The Second Circuit has held that lulling the victim of a fraud into believing that no fraud had been committed is a "necessary step in executing" the fraud and, thus, can serve as the basis for a mail or wire fraud claim." United States v. Angelilli, 660 F.2d 23, 36 (2d Cir. 1981). In fact, "[s]uch 'lulling' mailings are essential to the fraudulent schemes in cases . . . where the frauds are not isolated and unrelated swindles[.]" Id. at 37 (internal quotation marks omitted); see also Leung, 387 F. Supp. 2d at 116 ("It is therefore clear that if it appears from the face of [the] complaint that the alleged falsifications of the tax statements were made by the defendants, and subsequently mailed, with an eye toward keeping [the plaintiff] from discovering the defendants' fraudulent scheme, then the 'in furtherance' element of the mail fraud statute is present.").

Similarly, the Second Amended Complaint identifies numerous other mailings. Throughout the alleged scheme, checks reflecting proceeds of illegal narcotics sales, were

129

deposited in Transimex's Interbank account and were wired or mailed from this account to Defendants. (SAC ¶ 27(e).) Details of the shipments of liquor were routinely sent through United States wires and mails. (Id. ¶ 27(e).) Defendants' Aruban and Panamanian distributors "would constantly use the wires and mails to communicate every detail about their activities. They would send details of product movement of their own products, as well as information on the movement of competitor's products, including prices." (Id. ¶ 30.) Plaintiffs also allege that "[i]n addition to using the mail and wire communications themselves to advance the money-laundering schemes, the Defendants[] caused the use of the U.S. mails and wires in furtherance of the money-laundering schemes by acting with knowledge that the use of the U.S. mails and/or wires would follow in the ordinary course of business and/or could be reasonably foreseen as a result of their activities." (Id. ¶ 87.) Although not all of these allegations refer to mailings or wire transmissions that, in and of themselves, constitute fraud or contain a misrepresentation, they are alleged to be essential to the overall fraud scheme. "[I]nnocent mailings—ones that contain no false information—may supply the mailing element. . . . The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." Schmuck v. United States, 489 U.S. 705, 109 S. Ct. 1443, 1448 (1989) (holding that mailing of truthful vehicle information to state agency to transfer titles could serve as the basis for mail fraud because defendant knew that transferring title was an essential element of selling used vehicles whose odometers had been fraudulently rolled back). Similarly, in the instant case, Plaintiffs have alleged that Defendants' use of U.S. mail and wires—often to convey truthful

communications—was essential to the overall fraud. As discussed below, to the extent such communications were reasonably relied upon by third parties that were not a part of the racketeering enterprise, such communications may constitute wire or mail fraud.

Second, Plaintiffs have adequately alleged reasonable reliance. The Second Amended Complaint clearly alleges that Plaintiffs relied upon misrepresentations about Colombian black markets and/or Defendants' involvement in them. (SAC ¶ 27(l).) Defendants argue that "Plaintiffs are government entities with a responsibility to halt smuggling and with the full arsenal of sovereign powers to enforce their own laws. They cannot have reasonably relied on alleged assurances from entities they suspected of being involved in smuggling as the basis for any inaction." (Def. RICO Mem. at 62.) Regulators and other government agencies routinely rely upon statements made by the entities that they regulate. Defendants have not cited any case in which a court held that reliance by a government agency upon a statement made by an entity subject to its jurisdiction is unreasonable as a matter of law.[28] Without a clear precedent, the

---

[28] Defendants cite <u>Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.</u>, 113 F. Supp. 2d 345, 369-70 (E.D.N.Y. 2000) (health insurer's reliance unreasonable as a matter of law), and <u>Grumman Allied Indus., Inc. v. Rohr Indus., Inc.</u>, 748 F.2d 729, 737-38 (2d Cir. 1984) (dealing with "sophisticated businessmen"). (Def. RICO Mem. at 62-63.) In <u>Blue Cross</u>, Judge Weinstein granted defendants' motion for summary judgment on the issue of whether a sophisticated insurance company's reliance upon a tobacco company's allegedly fraudulent campaign denying negative health effects of smoking was reasonable. Judge Weinstein's decision was fact-specific: the insurer had a "large corps of doctors, bio-technicians, and other health care experts" capable of learning the health effects of smoking; the insurer had a "strong financial interest in discovering" the health effects; as a provider of medical care, the insurer most likely had "first-hand information on the negative health effects of smoking [and] the opportunity to catalogue and study the rates and patterns of injuries being suffered by smokers". <u>Id.</u> at 369-70. Because this court confronts the reasonableness of Plaintiffs' reliance on a motion to dismiss, the court simply does not, at this time, have a factual basis for determining how sophisticated Plaintiffs are with respect to detecting, investigating or understanding the type of multinational RICO enterprise at issue in this case.

court is not prepared, at this time, to find Plaintiffs' alleged reliance upon Defendants' statements unreasonable as a matter of law. Also, even though Plaintiffs are government agencies, they are also liquor manufacturers and distributors that compete with Defendants. Even if Plaintiffs, in their capacity as a sovereign, cannot rely upon a fraudulent communication as a matter of law, Plaintiffs, in their commercial capacities, may still be entitled to rely on fraudulent communications.

Further, Plaintiffs argue that third parties such as bankers, shippers, importers, and exporters may have reasonably relied upon shipping and other logistical information about the distribution of Defendants' products. (Pl. RICO Opp. at 53.) To the extent such individuals and entities were outside of the alleged enterprise, Plaintiffs may be able to prove their claim by demonstrating that they reasonably relied.

Third, the Second Amended Complaint's allegations concerning the conduct of individual Defendants is adequate to satisfy Rule 9(b). Defendants are correct that, in the typical case in which multiple defendants are accused of fraud, Rule 9(b) requires at least some connection between the individual defendants and the fraud. See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) (In most contexts, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); Colony at Holbrook, Inc. v. Strata G.C., Inc., 928 F. Supp. 1224, 1232 (E.D.N.Y. 1996) (dismissing mail and wire fraud predicate acts in part because "the amended complaint contains sweeping and general allegations of mail and wire fraud directed at all the defendants rather than connecting the alleged fraud to the individual defendants").

132

Defendants argue that the Second Amended Complaint improperly groups (a) competitors with each other and (b) parent and subsidiary corporations. Defendants are correct that the Second Amended Complaint could include far more specific allegations as to each Defendant. However, the Second Amended Complaint provides sufficient allegations as to each Defendant to survive a motion to dismiss. Plaintiffs allege that each of the Defendants participated in ACODIL and, in doing so, participated in fraudulent communications intended to deceive Plaintiffs and conceal Defendants' role in the alleged money-laundering enterprise. (SAC ¶¶ 44-45.) Similarly, Plaintiffs allege that each of the Defendants maintained lobbying divisions for the purpose of deceiving Plaintiffs about the alleged enterprise and generally concealing the existence of the enterprise. (Id. ¶¶ 79-80.) In doing so, Plaintiffs have adequately alleged that each Defendant was connected to the fraud.

Fourth, the Second Amended Complaint's allegations concerning which statements were made to which Plaintiffs are adequate. Where individual investors bring fraud claims against the same defendants, courts have required the investors to specify which statements were made to which investors. See Kolbeck v. Lit America, Inc., 923 F. Supp. 557, 568-69 (S.D.N.Y. 1996); Butala v. Agashiwala, 916 F. Supp. 314, 322 (S.D.N.Y. 1996). In contrast, in this case, Plaintiffs are agencies of the same government. Also, Plaintiffs' allegation that each of the Plaintiffs was defrauded by the same disingenuous communications satisfies Rule 9(b).

Fifth, Plaintiffs adequately plead fraudulent intent. In order to state a claim for wire or mail fraud, the plaintiff must allege intent to defraud. Powers v. British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir. 1995). "Because it would be unrealistic to expect a plaintiff to plead a defendant's actual state of mind, Federal Rule of Civil Procedure 9(b) permits plaintiffs to allege

133

fraudulent intent generally while the circumstances amounting to fraud must be averred with particularity." Id. (internal quotation marks and citations omitted). However, "the plaintiff must provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent." Id. (internal quotation marks omitted). When the plaintiff alleges "a motive for committing fraud and a clear opportunity for doing so," the complaint gives rise to a sufficient inference of fraudulent intent. Id.

Plaintiffs have sufficiently alleged motive and a clear opportunity. The Second Amended Complaint alleges that Defendants are engaged in a complex transnational money-laundering enterprise that launders the proceeds of illegal narcotics sales through the Colombian liquor market. Entities that engage in illegal conduct of such seriousness and scope have a clear and unequivocal incentive to go to great lengths to conceal the enterprise, including misleading government officials. As a result, Plaintiffs have pled a clear motive. Defendants' participation in ACODIL—an industry association that represents Defendants' interests in the Colombian liquor business—creates an excellent opportunity to mislead and conceal their conduct. In fact, Plaintiffs allege that the very purpose of ACODIL was to "deceive and defraud the Colombian government." (SAC ¶ 45.) As a result, the Second Amended Complaint adequately pleads fraudulent intent.

Defendants' assertion that Defendants have failed to plead the wire and mail fraud predicate acts is rejected.

### E.    Equitable Relief

Defendants argue that RICO does not permit equitable remedies for civil RICO plaintiffs. (Def. RICO Mem. at 71-73.) Plaintiffs argue that the court should not address the issue at this

134

time because (1) the Supreme Court and Second Circuit have yet to determine whether RICO permits equitable remedies and either court may have determined the issue by the time this court grants relief (if ever) in this case, (2) Plaintiffs are entitled to equitable relief under their state law claims, and (3) declining to dismiss the claim for equitable relief will in no way affect discovery. (Pl. RICO Opp. at 61-62.) The court agrees with the Plaintiffs' first and third points. Further, Defendants fail to cite any authority for the proposition that Plaintiffs are not entitled to equitable relief on their state law claims. As a result, even if the court were inclined to determine at this early stage whether RICO permitted equitable relief, the issue of whether Plaintiffs are entitled to equitable relief under the state law claims has not been adequately briefed and, thus, the court cannot reach a decision on the issue at this time. As a result, the court declines to address Defendants' motion to dismiss the claim for equitable relief at this time. Defendants are free to re-raise this argument in an appropriate motion at the conclusion of discovery.

## X.    STATUTE OF LIMITATIONS

### A.    Background

Defendants argue that Plaintiffs' RICO claims are barred by the statute of limitations and must be dismissed. The parties agree that Plaintiffs' RICO claims are subject to a four-year statute of limitations. See Rotella v. Wood, 528 U.S. 549, 553, 120 S. Ct. 1075, 1079-80 (2000). Although the Supreme Court has yet to specify precisely when the RICO period of limitations begins to run, see id. at 554, 120 S. Ct. at 1080, the Second Circuit has held that it "begins to run when the plaintiff discovers or should have discovered the RICO injury." In re Merrill Lynch Partnerships Litig., 154 F.3d 56, 58 (2d Cir. 1998) (hereinafter, "Merrill Lynch Partnerships").

135

The Second Circuit "recognizes a 'separate accrual' rule under which a new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a *new and independent* injury." Id. at 59 (emphasis added). At this time, the case law in this circuit leaves some ambiguity as to precisely what constitutes a "new and independent injury." In Bingham v. Zolt, 66 F.3d 553, 561 (2d Cir. 1995), the Second Circuit held that a series of diversions of money and assets that were part of separate schemes each constituted a new and independent injury. In contrast, in Merrill Lynch Partnerships, the Second Circuit held that plaintiffs suffered a single injury when defendant, through a single scheme, fraudulently sold investments to them and then continued to make a number of false statements to plaintiffs as "continuing efforts to conceal the initial fraud." Merrill Lynch Partnerships, 154 F.3d at 59-60. Defendants argue that "to be a 'new and independent injury,' there must be a variety of different schemes." (Def. SOL Rep. at 13.) The Merrill Lynch Partnerships court, however, clearly did not hold that all injuries suffered as a result of a single scheme are not "new and independent injuries" *per se*: "We recognize that *in some instances* a continuing series of fraudulent transactions undertaken within a common scheme can produce multiple injuries which each have separate limitations periods." Merrill Lynch Partnerships, 154 F.3d at 59 (emphasis added). As a result, the Second Circuit case law appears to have made the following clear: injuries suffered as a result of separate schemes are "new and independent;" injuries suffered as a result of the same scheme are sometimes but not always "new and independent."

**B.    Analysis**

Defendants argue that the RICO claims are barred by the statute of limitations because (1) Plaintiffs had actual or constructive knowledge of the instant RICO claims more than four

years before they filed this case and (2) Plaintiffs allege a single injury. In order to prevail on their motion to dismiss the Second Amended Complaint on statute of limitations grounds, Defendants must show that they are entitled to judgment as a matter of law on both grounds. The court will consider the latter argument first.

Defendants are correct that Plaintiffs have alleged a single RICO enterprise that engaged in a money-laundering scheme. (SAC ¶ 108 ("The Defendants, along with their co-conspirators in the money-laundering schemes, including associated distributors, shippers, currency dealers, wholesalers, moneybrokers, and other participants in the scheme identified above, were, at relevant times, an association-in-fact of individuals and corporations engaged in, and the activities of which affected, interstate and foreign commerce, and thus constituted an 'enterprise' within the meaning of 18 U.S.C. § 1961(4).").) Plaintiffs have clearly alleged that this money-laundering scheme continuously caused them competitive injury beginning in the 1990s and through the 2004 filing of the instant case. The Second Amended Complaint, however, alleges that the enterprise was dynamic and significantly changed in the few years before Plaintiffs filed this case. In 2003, the Diageo Defendants and Pernod Ricard Defendants agreed to jointly purchase and manage Seagram's assets, which included money-laundering operations. (SAC ¶¶ 58-66.) This potentially involved a significant substantive change in the activities and effects of the alleged enterprise. Further, the Second Amended Complaint claims that Defendants continued to launder proceeds of illegal narcotics sales by making additional sales of liquor from 2000 to 2004. (Id. ¶¶ 56, 70-76.)

In light of these allegations, it is impossible to conclude as a matter of law that Plaintiffs did not suffer any "new and independent" injuries between 2000 and 2004. This case is

distinguishable from Merrill Lynch Partnerships, in which the plaintiffs' injury was complete the moment that they purchased the fraudulent investment. See Merrill Lynch Partnerships, 154 F.3d at 59-60. At the time of purchase, "the amount of damages was clear and definite, and the injury was ripe". Id. at 59 (internal quotation marks omitted). In this case, however, Plaintiffs continued to suffer additional losses each time Defendants' laundered money by making an additional sale to narcotics traffickers and their co-conspirators. At any given point in time, there is no way for Plaintiffs to know how much liquor Defendants will sell or how much money Defendants will launder in the future. For this reason, the instant case is distinguishable from the other cases relied upon by Defendants. See Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 266 (S.D.N.Y. 2006) (no new and independent injury occurred where plaintiff was aware of damages it would suffer as a result of kickback scheme and defendants specified how much they would demand in kickbacks at the initiation of the scheme); Pharr v. Evergreen Gardens, Inc., No. 03 Civ. 5520 (HB), 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) (no new and independent injury occurred where plaintiffs suffered an illegal increase in their rent at one point in time even though inflated rent bills were sent monthly).

Instead, at this very initial stage, this case appears to be more similar to AMA v. United HealthCare Corp., No. 00 Civ. 2800 (LMM), 2006 WL 3833440 (S.D.N.Y. Dec. 29, 2006). In that case, plaintiffs alleged that defendants constituted a RICO enterprise that engaged in fraudulent schemes to send and wire false and misleading communications in order to obtain unlawful fees for health care services. Id. at *3. The court concluded that "the alleged injuries occurred each time the Defendants made a 'false [health care fee] reimbursement

determination[],' and these multiple injuries cannot be said to have resulted from one initial event. Rather, they are 'new and independent' injuries within the meaning of the Second Circuit's rule of separate accrual." Id. at *10 (internal citation omitted).

To be clear, the court is not, at this time, determining that each and every sale of liquor that Defendants made into the Colombian market(s) constitutes a new and independent injury for purposes of the statute of limitations. At this time, the court is merely concluding that it cannot determine as a matter of law that Plaintiffs suffered no new and independent injuries because (1) the enterprise is alleged to have changed significantly in the 2000-2004 time period and the exact nature and scope of such changes are not clear at this time, and (2) the Defendants are alleged to have continued to engage in additional money laundering acts through the 2004 filing of this case. Because the court cannot determine as a matter of law that Plaintiffs suffered no new and independent injuries after October 8, 2000, the court cannot grant Defendants' motions to dismiss the RICO claims on the ground that they are barred by the statute of limitations.

In the alternative, Defendants request that this court limit Defendants damages to only those sustained after October 8, 2000, i.e., to those damages sustained during the four-year period prior to which this case was filed. (Def. SOL Rep. at 15-16.) In support of this alternative motion, Defendants argue that the following evidence demonstrates as a matter of law that Plaintiffs knew or should have known of the instant claims before October 8, 2000: (1) statements in the Second Amended Complaint that, in the 1990s, Colombian law enforcement officials were aware of liquor smuggling and related money laundering; (2) exhibits to Plaintiffs' opposition papers, including evidence of communications among Plaintiffs and (a) Defendants and (b) law enforcement authorities in other countries (such as the United States), placed

139

Plaintiffs on notice of the scheme; (3) in correspondence between Plaintiffs' counsel and counsel for Diageo in the four months preceding the filing of this case, Plaintiffs requested an agreement to toll the statute of limitations, suggesting Plaintiffs were aware of the scheme at least four months before this case was filed; (4) 1999 Congressional testimony by Colombia's Director of Revenue and Customs Service that "the problem of liquor contraband [in Colombia] focuses particularly on the major Scotch whisky brands sold by producers in the United Kingdom to distributors in Panama and Aruba" and that such liquor is "believed to be purchased with drug traffic dollars" (Laurie Uustal Matthews Aff. Exh. 9 at 82); and (5) in the years prior to October 8, 2000, the media published numerous reports about the smuggling of liquor products. (Def. SOL Rep. at 3-10.)

Plaintiffs respond by arguing that Defendants rely upon evidence that is extrinsic to the Second Amended Complaint and, therefore, may not be considered by the court on a motion to dismiss under Rule 12(b)(6). Rule 12(b) unequivocally states that if, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." This language has been read to mean that, on a Rule 12(b)(6) motion, courts, without converting the motion to one under Rule 56, may consider "'documents attached to the complaint as an exhibit or incorporated in it by reference . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" Republic of Ecuador v. ChevronTexaco Corp., 376 F. Supp. 2d 334, 375 (S.D.N.Y. 2005) (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)); see also Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993) (On Rule 12(b)(6) motions, courts will consider "documents the

authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint[]" without converting the motion into one under Rule 56).

Defendants cite primarily to Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991), for the proposition that a court may rely on documents that are extrinsic to the complaint when the plaintiff has notice of the documents relied upon. (See Def. SOL Rep. at 16-17.) Defendants are correct that relying upon evidence that is extrinsic to the complaint in ruling on a Rule 12(b)(6) motion is far less problematic when the plaintiff has notice of the evidence and an opportunity to respond:

> A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant, since, as noted earlier, the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason—requiring notice so that the party against whom the motion to dismiss is made may respond—that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

Cortec, 949 F.2d at 47-48. Defendants' argument that Plaintiffs had notice of all of the evidence upon which Defendants rely and that this notice resolves many of the policy concerns associated with considering evidence extrinsic to the complaint on a Rule 12(b)(6) motion is well-taken and clearly supported by Cortec. In Cortec, the Second Circuit held that, in ruling on a Rule 12(b)(6) motion, the district court could rely upon a stock-purchase agreement, an offering memorandum, and a warrant. Id. The court found that (1) each of these documents was "integral" to plaintiff's claim and (2) the plaintiff had notice of each of these documents. Id. Recently, the Second

141

Circuit read <u>Cortec</u> in precisely this manner. <u>See Roth v. Jennings</u>, __ F.3d __, 2007 WL 1629889, at *10 (2d Cir. June 6, 2007) ("[E]ven if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion.") (<u>quoting</u>, <u>Cortec</u>, 949 F.2d at 47) (emphasis added by <u>Roth</u> court).

The instant case is different from <u>Cortec</u> in that Defendants ask the court to consider evidence that goes far beyond contracts and other similar documents that are at the heart of the dispute. That being said, it may still be possible to read <u>Cortec</u> and the other precedents cited by Defendants to permit this court to consider the virtual mountain of extrinsic evidence that Defendants have submitted in support of their Rule 12(b)(6) motion. To do so, however, would be to carry a good joke too far.

Defendants do not argue that this court is required to consider evidence outside the pleadings on a motion under Rule 12(b)(6); Defendants merely argue that the court "may" consider evidence outside of the pleadings. (Def. SOL Mem. at 8 n.8; Def. SOL Rep. at 16-21.) Similarly, <u>Cortec</u> merely states that the district court "could" have considered documents in ruling on a Rule 12(b)(6) motion. <u>Cortec</u>, 949 F.2d at 48.

There is simply no reason to consider at this time the evidence outside of the pleadings that Defendants have submitted. The parties do not seem that far apart in their positions on the statute of limitations issue. Plaintiffs appear to acknowledge that their claims will be partially barred by the statute of limitations. Defendants' alternative request for relief is to limit Plaintiffs' damages to those suffered after October 8, 2000. At oral argument, Plaintiffs' counsel went so far as to acknowledge that "there are certain parts of the claim for the 90's that are going

to be barred because time has passed[.]" (Mar. 7, 2007 Oral Arg. Transcript at 97.) In another case, it might make sense to consider such a massive compilation of evidence at the motion to dismiss stage, such as if doing so might limit the scope of discovery, increase the likelihood of settlement, or achieve some other useful purpose. This, however, is not one of those cases and there are at least two reasons not to consider it at this time.

First, Defendants make this alternative argument almost exclusively in their Reply Brief. Defendants only reference to this argument in their moving brief was a single sentence towards the end of the brief. (See Def. SOL Mem. at 14-15.) It is not clear whether this single sentence saves Defendants from the rule that "[a]rguments raised for the first time in a reply brief are properly ignored." In re Comverse Tech., Inc. Derivative Litig., No. 06-cv-1849 (NGG), 2006 WL 3193709, at *5 n.3 (E.D.N.Y. Nov. 2, 2006) (Reyes, M.J.); see also Mason v. Jews for Jesus, No. 06 Civ 6433 (RMB), 2006 WL 3230279, *5 n.3 (S.D.N.Y. Nov. 8, 2006) ("Arguments made for the first time in a reply brief need not be considered by a court.").

Second, Defendants would have the court rely upon the following types of evidence in ruling on this Rule 12(b)(6) motion: (1) documents ranging from government reports to experts' declarations that were submitted by Plaintiffs; (2) correspondence between the parties' counsel; (3) Congressional testimony; and (4) news stories published in United States and foreign newspapers. Nothing about Defendants' request that this court find that Plaintiffs knew or should have known about their alleged injuries before October 8, 2000 resembles a Rule 12(b)(6) motion. The sheer breadth and volume of evidence submitted precludes any resemblance. As the Second Circuit recently explained, "a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact." Roth, 2007 WL 1629889, at

*10. As a result, it simply does not make sense for the court to consider all of this evidence at this time.

Defendants' motion to dismiss Plaintiffs' RICO claims on the ground that they are barred by the statute of limitations is denied in its entirety without prejudice.

## XI.  SUPPLEMENTAL JURISDICTION

Defendants request that this court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims in the event that the court dismisses Plaintiffs' RICO claims. (Def. RICO Mem. at 73-75.)  As this court has not dismissed Plaintiffs' RICO claims, Defendants' request is premature and need not be considered.

## XII. CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are GRANTED in part and DENIED in part. Specifically, Defendants' motions are denied with the following exceptions: Plaintiffs' RICO claims for lost taxes and other injuries suffered by Plaintiffs in their sovereign capacity are dismissed.

This case was filed on October 8, 2004 and discovery has yet to begin.[29] The parties are to contact Magistrate Judge Viktor V. Pohorelsky immediately to schedule a discovery conference.[30]

SO ORDERED.

Dated: June 19, 2007
      Brooklyn, N.Y.

/signed/
_____
NICHOLAS G. GARAUFIS
United States District Judge

---

[29] Shortly after this case was filed, the parties entered into a series of stipulations effectively staying this action while the United States Supreme Court and the United States Court of Appeals for the Second Circuit considered the European Community cases and other cases involving the revenue rule. Oral argument on the instant motions was held in February and March of this year.

[30] The briefs filed in support of and opposition to this motion were unduly long. Any subsequent requests for an extension of the page limits contained in this court's Individual Rules should include (1) a brief but detailed description of why the legal and/or factual issues are sufficiently complex so as to justify the extension and (2) an estimate of how many pages will be dedicated to each legal issue.